**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **i4i LIMITED PARTNERSHIP,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION** |
| | § | |
| | § | |
| **vs.** | § | **6:07-CV-113-LED** |
| | § | |
| **MICROSOFT CORPORATION,** | § | **JURY TRIAL** |
| | § | |
| | § | |
| **Defendant.** | § | |

**<u>PLAINTIFF'S OPENING BRIEF ON CLAIM CONSTRUCTION</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     PRINCIPLES OF CLAIM CONSTRUCTION ....................................................1

III.    LEVEL OF ORDINARY SKILL IN THE ART ..................................................2

IV.     OVERVIEW OF THE TECHNOLOGY RELATING TO THE
        '449 PATENT.......................................................................................................2

V.      PROPOSED CONSTRUCTIONS FOR THE '449 PATENT ............................4

        A.      "metacode(s)" [Claim 1] .........................................................................4

        B.      "map of metacodes" or "metacode map" [Claim 1] ................................5

        C.      "address[ ] of use" [Claim 1] .................................................................7

        D.      "mapped content" [Claim 1] ...................................................................8

        E.      "metacode map distinct storage means" [Claim 1];
                "metacode storage means" [Claim 1]; or "distinct map
                storage means" [Claim 14].....................................................................11

        F.      "means for providing a menu of metacodes to said
                metacode storage means" [Claim 1] ......................................................15

        G.      "means for compiling said metacodes of the menu by
                locating, detecting, and addressing the metacodes in the
                document to constitute the map and storing the map in the
                metacode storage means" [Claim 1] ......................................................18

        H.      "means for resolving the content and the metacode map
                into the document" [Claim 1] ................................................................22

        I.      "mapped content distinct storage means" [Claim 2] or
                "mapped content storage means" [Claim 14] ........................................24

        J.      "raw content distinct storage means" [Claim 3] ....................................27

        K.      "means for comparing the multiplicity of metacodes in the
                map with a predetermined set of criteria [Claim 5];..............................29

        L.      "means for amending the first map to produce a second
                map" [Claim 6]; ....................................................................................29

        M.      "means for providing a multiplicity of maps in association
                with a mapped single content" [Claim 9]; .............................................29

N.      "means for amending a plurality of maps in consequence of an amendment of mapped content" [Claim 10]; and .............................................29

O.      "means for amending a first plurality of maps to produce a second plurality of amended maps in a plurality of distinct storage means."  [Claim 12].................................................................29

P.      "description code" [Claim 13] .............................................................33

Q.      "compiling a map of the metacodes in the distinct storage means, by locating, detecting and addressing the metacodes" [Claim 14] ................................................................34

        1.      "compiling a map of the metacodes in the distinct storage means".............................................................34

        2.      "detecting . . . the metacodes"..................................................35

        3.      "locating . . . the metacodes" ...................................................35

        4.      "addressing the metacodes" ....................................................35

R.      "providing the document as the content of the document and the metacode map of the document" [Claim 14] ...........................................37

S.      "providing the document as the content of the document separately from the metacode map of the document" [Claim 20] .................................................................................37

VI.     CONCLUSION...............................................................................................40

Austin 41174v4

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)........................................................................24

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997)........................................................................24

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998)........................................................................10

*Creo Prods. v. Presstek, Inc.*,
    305 F.3d 1337 (Fed. Cir. 2002)...........................................................20, 21, 22, 24

*Daiichi Sankyo Co. v. Apotex, Inc.*,
    501 F.3d 1254 (Fed. Cir. 2007)..........................................................................2

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988)...................................................................6, 7, 36

*Envtl. Designs, Ltd. v. Union Oil Co.*,
    713 F.2d 693 (Fed. Cir. 1983)............................................................................2

*Ferguson Beauregard/Logic Controls v. Mega Sys., L.L.C.*,
    No. 6:99CV437, 2001 U.S. Dist. LEXIS 25682 (E.D. Tex. Aug. 31, 2001)...12, 13, 25, 28

*Forest Labs., Inc. v. Abbott Labs.*,
    239 F.3d 1305 (Fed. Cir. 2001)........................................................................39

*Free Motion Fitness, Inc. v. Cybex Int'l*,
    423 F.3d 1343 (Fed. Cir. 2005)........................................................................10

*Generation II Orthotics, Inc. v. Med. Tech. Inc.*,
    263 F.3d 1356 (Fed. Cir. 2001)..............................................................20, 22, 24

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
    91 F.3d 1580 (Fed. Cir. 1996).................................................................12, 25, 28

*Ishida Co. v. Taylor*,
    221 F.3d 1310 (Fed. Cir. 2000)........................................................................20

*JVW Enters. v. Interact Accessories*,
    424 F.3d 1324 (Fed. Cir. 1999)..............................................................13, 14, 26, 27

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
    194 F.3d 1250 (Fed. Cir. 1999)......................................................................13, 14, 24

*Neomagic Corp. v. Trident Microsystems*,
    287 F.3d 1062 (Fed. Cir. 2002) ...........................................10, 14, 26, 36, 40

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003)......................................................................21

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)......................................................................21

*Personalized Media v. U.S. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)...................................................................12, 26

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................1, 2

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987).........................................................................5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997).........................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).............................................10, 14, 26, 36, 40

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999).................................................................30, 32

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001)......................................................................12

## <u>TABLE OF EXHIBITS</u>

Exhibit A        United States Patent No. 5,787,449

Exhibit B        Comparison Chart of i4i's and Microsoft's Proposed Constructions for the Disputed Terms

Exhibit C        Dictionary Extrinsic Evidence

Exhibit D        Bates-Labeled Excerpts of File History for United States Patent No. 5,787,449

## I.     INTRODUCTION

Pursuant to P.R. 4-5(a) and the Court's July 25, 2007 Docket Control Order, i4i Limited Partnership ("i4i") respectfully submits this Opening Brief on the proper construction of disputed claim terms of United States Patent No. 5,787,449 ("the '449 patent").  [Exh. A][1]  i4i also submits herewith, for the Court's convenience, a chart logically grouping the disputed claim terms and providing side-by-side the parties' respective proposed constructions of those terms. [Exh. B]

## II.    PRINCIPLES OF CLAIM CONSTRUCTION

i4i proposes constructions of the '449 patent in accordance with long-established principles of claim construction—giving a claim term the full breadth of its ordinary meaning that one of skill in the art, at the time of the invention and in light of the patent's specification and prosecution history, would have given it, except in two unusual circumstances: (1) where the intrinsic record provides a special definition for the term; or (2) where the patentee disclaims a portion of the term's ordinary meaning.[2]   The '449 patent's specification is especially well-written and provides clear, distinct, and concise definitions of terms used in the asserted claims. Where such terms may have previously been used in the prior art, this specification makes clear the meaning that those terms have in defining the scope of this invention.

Because the Court is familiar with the law of claim construction, i4i will discuss specific claim construction principles only where applicable to the facts of this case.

---

[1] References herein to "Exh. __" are to the Exhibits accompanying this Brief.

[2] *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316–17 (Fed. Cir. 2005).

## III.   LEVEL OF ORDINARY SKILL IN THE ART

Claims are to be construed from the viewpoint of a person of ordinary skill in the art.[3] The level of ordinary skill in the art is a function of many factors, including "'(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.'"[4]

Considering all of those factors in the context of the technology of the '449 patent, one of ordinary skill in the art of computer programming would have a Bachelor of Science degree in computer science or a Bachelor of Science degree in electrical engineering with an emphasis on computer systems and to two to three years of working experience in the art of writing computer programs.

## IV.   OVERVIEW OF THE TECHNOLOGY RELATING TO THE '449 PATENT

The inventors filed the application for '449 patent, entitled "Method and System for Manipulating the Architecture and the Content of a Document Separately from Each Other," on June 2, 1994 and the PTO issued the patent on July 28, 1998.  The technology of the '449 patent is related to document processing of encoded documents.  Throughout the history of document processing—from the early days of manual typewriters to the present day computer controlled data processing systems—two important characteristics of documents have remained constant: documents are still characterized by their structure, *i.e.*, the way they look like when published, and by their content, *i.e.*, the information they convey.  The '449 patent addresses the ideas of

---

[3] *Phillip*, 415 F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim construction.").

[4] *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quoting *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983)).

structure and content of a document in a new way of processing encoded documents to provide more flexible and efficient document manipulation.

As the title to the '449 patent implies, the patent discloses and claims a computer system and method for the manipulation of the architecture, *i.e.*, structure, of a document separately from its content, and vice versa. The invention of the '449 patent accomplishes this result through a novel way of processing certain types of encoded documents. These documents are those that consist of content and embedded metacodes, where the metacodes are instructions to a publishing or other type of computer system, such as a database, that controls the interpretation of the encoded content. In other words, metacodes impart structural information about the content. Mark-up languages, such as the Standard Generalized Markup Language (SGML) (discussed in the specification of the '449 patent) or the later standardized mark-up language, Extensible Markup Language (XML) (which is the subject of the present litigation), contain such metacodes.

In accordance with the invention of the '449 patent, a copy of the specific metacodes found in a document, along with an address of the location in the content where each metacode is located (termed the "address of use"), are stored as a "map of metacodes." As a result of the creation of the metacode map, the content of the document now becomes what the patent refers to as "mapped content." The document is provided to a computer system for further processing as two separate and distinct elements:  mapped content and a metacode map. In this form, the structure of the document is manipulated by editing the metacode map directly, without the need to reference the content. In this fashion, changes to the view of the document are made without requiring access to the content. Creating multiple metacode maps for the same mapped content provides different views of the document using a single copy of the content.

3

## V.   PROPOSED CONSTRUCTIONS FOR THE '449 PATENT

### A.   "metacode(s)" [Claim 1]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| an individual instruction which controls the interpretation of the content of the data | An individual instruction, including but not limited to a descriptive code, that controls the interpretation of the content of the data, i.e., it differentiates the content. |

In the '449 patent, the inventors expressly defined the term "metacode:"

> A metacode, which includes but is not limited to a descriptive code, is an individual instruction which controls the interpretation of the content of the data, i.e., it differentiates the content.

[4:14–17]  i4i's proposed definition is extracted from the language.  The phrase "including but not limited to a descriptive code" is not included because it is not a phrase of the definition, but is, instead, merely an expression of something that is within the scope of the term.  The definitional portion of the sentence naturally begins after the word "is."  Moreover, the term "description code" is a disputed term in the context of this *Markman* process.[5]  The phrase ending the cited passage, "*i.e.*, it differentiates the content," is also not included because it merely offers an alternative meaning to the otherwise clear definition just given.  Thus, neither phrase is necessary for the concise meaning intended by the inventors for the term "metacode."

The inventors repeatedly reaffirmed this definition throughout the prosecution history of the '449 patent:

> "A metacode . . . is an individual instruction which controls the interpretation of the content of the data." Specification, pg. 6, lines 23–24.

*See e.g.*, 01/05/96 Amendment under 37 C.F.R. 1.115, at p. 5 (ellipses in original) [Exh. D at i4i000000077]; *See also* 08/19/96 Amendment under 37 C.F.R. 1.115, at pp. 4–5 (ellipses in

---

[5] *See* subsection P below.

original) [Exh. D at i4i000000092–93]; and 07/01/97 Amendment under 37 C.F.R. 1.115, at p. 7 (ellipses in original) [Exh. D at i4i0000000119].   Accordingly, i4i's proposed definition for metacode, "an individual instruction which controls the interpretation of the content of the data," is consistent with the intrinsic evidence and should be adopted by this Court.

Although Microsoft's proposed construction includes the language proposed by i4i, Microsoft seeks to include the phrases excluded by the inventors.   Moreover, the term "description code" itself is a disputed term.   For example, as evidenced by the specification and claim 13, a "description code" or "descriptive code" is merely an example of one type of metacode, not the definition of a metacode.   [Claim 13 ("A system as claimed in claim 1 wherein metacode is a description code.")]   Including exemplary references of a "metacode" as part of the definition of the term serves to confuse, not clarify what is a "metacode."[6]   Thus, Microsoft's proposed definition should be rejected.

### B.      "map of metacodes" or "metacode map" [Claim 1]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| a plurality of metacodes and their addresses of use corresponding to a mapped content | a data structure containing each of the multiplicity of metacodes of the document and an address of use in mapped content where each metacode was or will be embedded. |

The '449 patent provides a concise definition for the term "metacode map:"

> [a] metacode map is a multiplicity of metacodes and their addresses associated with mapped content.

[4:17–19]   i4i's proposed definition is consistent with that disclosure.   Indeed, i4i's proposed definition, "a plurality of metacodes and their addresses of use corresponding to a mapped

---

[6] *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that "claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims").

content" is nearly verbatim that of the specification's.

Furthermore, in the art of computer software, the term "map" has a plain and ordinary meaning.  It is well-understood by one of ordinary skill in the art, and the specification does not attempt to give it a contrary meaning.  Three authoritative dictionaries recognized in the computer industry define a map as a correspondence that exists between the elements of one set and elements of another set.[7]  In the context of the patent, the first set is the metacodes of the map and the other set is the content.  The correspondence between the two sets is established by the addresses of use, which provide a location of where in the content stream the metacodes are to exert their effect.  Thus, i4i's proposed construction of "map of metacodes" or "metacode map" is consistent with both the ordinary and plain meaning and the definition within the intrinsic record.

Although Microsoft's definition includes the construction i4i proposes for the terms, Microsoft seeks to add to the construction the extraneous limitations that (i) a "map of metacodes" or "metacode map" must be "a data structure"; and (ii) addresses of use are "where each metacode was or will be embedded."  The Federal Circuit, while recognizing the propriety of using "the specification to interpret what the patentee meant by a word or phrase in the claim[,]"[8] has repeatedly cautioned against importing extraneous limitations from the specification.[9]  The court defined extraneous as "a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular

---

[7] *See* Exh. C (dictionary extrinsic evidence from IBM DICTIONARY OF COMPUTING, MICROSOFT PRESS COMPUTER DICTIONARY, and THE NEW IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS).

[8] *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)

[9] *See id.* (contrasting using "the specification to interpret what a patentee meant by a word or phrase" with "adding an extraneous limitation appearing in the specification, which is improper").

words or phrases in the claim."[10]  Microsoft's proposed construction, which adds the extraneous limitations should, therefore, be rejected.

Moreover, Microsoft's proposed construction of the disputed terms as "a data structure containing each of the multiplicity of metacodes of the document and an address of use in mapped content **where each metacode was or will be embedded**" directly contradicts its own construction for the term "addresses of use," which is discussed in the immediately following section.  Microsoft defines "address of use" as the position in the content at which the metacode is to exert its effect, not **where each metacode was or will be embedded**.  Microsoft's own inconsistency further illustrates its attempt to import extraneous limitations.

**C.**     **"address[ ] of use" [Claim 1]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| an address which defines the position in the content at which the metacode is to exert its effect | a unique identifier which defines the position of a metacode relative to a mapped content stream and the place in the content at which the metacode is to exert its effect. |

In computer systems, the term "address" has a well-recognized, ordinary, and accustomed meaning as evidenced by the technical dictionaries available at the time the inventors files the patent application.[11]  For example, The New IEEE Standard Dictionary states that an address "refer[s] to a device or storage location by an identifying number, character, or group of characters[.]"[12]  In connection with the invention disclosed in the '449 patent, the meaning of the term "addresses of use" is used in the ordinary and accustomed meaning of the term "address."

---

[10] *Id.*

[11] *See* Exh. C.

[12] *See id.*

The term "address" is clearly used in the specification in a manner consistent with the ordinary and accustomed meaning:

> An address is the place in the content at which the metacode is to exert its effect.

[4:17–21]   i4i's proposed definition of "addresses of use" is quoted almost verbatim from the specification:  "an address which defines the position in the content at which the metacode is to exert its effect."  Accordingly, the Court should adopt i4i's proposed construction.

Microsoft's proposed construction improperly combines the patentees' definition of address with a statement regarding the term "addressing."   [4:40-42 ("by 'addressing' is meant forming a unique identifier which defines the position of a metacode relative to a mapped content stream")].   Yet, the term "addressing," which appears separate and apart from "address[]of use" in independent method claims 1 and 14, is not in dispute.  Furthermore, as described in the specification, "addressing" is the act of forming an address, not a definition of what an "address" is.  The appropriate definition for "addresses of use" comes solely from the term "address," not in combination with a term describing how an address is formed, as Microsoft's construction requires.  Accordingly, Microsoft's proposed construction should be rejected.

### D.      "mapped content" [Claim 1]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| the content of a document corresponding to a metacode map | Content with all metacodes separated out and stored in a corresponding metacode map. |

In each of the independent claims of the patent, the invention is defined in terms of producing a map of metacodes and their addresses of use in association with mapped content of a document.  The written specification likewise speaks of the invention in those terms:

> The system of the invention may be implemented using maps and mapped content broken into three sections.  The first section involves decomposing existing documents into a representative map and its associated mapped content.  The second involves creating or editing a document consisting of content plus a metacode map.  The third is building a combined view from the constituent parts, which is necessary because interaction with the document may be done as a visual whole rather than its constituent parts.

[7:66–8:7]

> The invention does not used embedded metacoding to differentiate the content of the document, but rather, the metacodes of the document are separated from the content and held in distinct storage in a structure called a metacode map, whereas document content is held in a mapped content area.

[4:3–10]

A document starts out as a content stream with embedded metacodes.  The invention creates a map of the metacodes that are contained in the document as part of separating the structural information from the content of the document.  When that map is created, one of the elements of the map is the addresses of use, which indicates the position in the content stream at which that metacode is to exert its effect.  When that map of metacodes is created with the addresses of use associated with each metacode, the content of the document becomes mapped content because the content is mapped to the metacodes.  In accordance with the specific language of the claims and the specification, the map of metacodes creates a correspondence— through the addresses of use—between the metacodes and mapped content.  The correspondence makes the content "mapped content."

i4i's proposed definition for mapped content, "the content of a document corresponding to a metacode map," is supported by the specification as described above.  The extrinsic evidence likewise supports i4i's proposed definition.  The IEEE Standard Dictionary defines "map" as "[t]o establish a correspondence between the elements of one set and the elements of

another set."[13]

Microsoft's proposed definition is inconsistent with the intrinsic record and would exclude a preferred embodiment of the invention. Microsoft contends that "mapped content" is "[c]ontent with all metacodes separated out and stored in a corresponding metacode map[.]" Claim 3, which depends from claim 1, "further compris[es] raw content distinct storage means[.]" As defined in the patent, "[r]aw content is an extreme example of mapped content wherein the latter is totally unstructured and has **no embedded metacodes in the data stream**[.]" [4:10–14 (emphasis added)] Thus, the specification makes clear that mapped content is broader than raw mapped content. Microsoft's definition, however, would equate "mapped content" with "raw content," rendering Claim 3 superfluous and, thus, violating the doctrine of claim differentiation.[14] "The difference in meaning and scope between claims is presumed to be significant 'to the extent that the absence of such difference in meaning and scope would make a claim superfluous.'"[15] Microsoft's attempt to render Claim 3 superfluous should be rejected.

Moreover, Microsoft's proposed definition that "all" metacodes are separated from the content stream would exclude the preferred embodiments wherein "mapped content" is not "raw content." The Federal Circuit has held that "[i]t is elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support.'"[16] Accordingly, Microsoft's proposed definition should be rejected.

---

[13] Exh. C.

[14] *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1351 (Fed. Cir. 2005) ("The doctrine of claim differentiation 'creates a presumption that each claim in a patent has a different scope.'" (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998))).

[15] *Id.* (quoting *Tandon Corp. v. U.S. Int'l Trade Com.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

[16] *See Neomagic Corp. v. Trident Microsystems*, 287 F.3d 1062, 1073 (Fed. Cir. 2002) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1578 (Fed. Cir. 1996)).

E.      "metacode map distinct storage means" [Claim 1]; "metacode storage means" [Claim 1]; or "distinct map storage means" [Claim 14]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| a portion of memory for storing a metacode map<br><br>This limitation is not governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is recited in the element.  Storage means is a structural element well known to one of ordinary skill in the computer arts. Furthermore, there is no function recited for this claim element. | *Function*:<br><br>Persistently[17] storing the metacode map separately and distinctly from the mapped content so that the metacode map can be edited directly without having access to the mapped content.<br><br>*Corresponding structure*:<br><br>A separate file on a hard disk that stores the metacode map as described at col. 4, lines 5-10; col. 5, lines 6-7; col. 6, lines 11-17; col. 7, lines 6-16, 29-33, 41-49, 59-62; col. 8, line 60; col. 9, lines 1-4; col. 10 lines 1-11; col. 11, lines 30-40; col. 13, lines 43-45; col. 14, lines 1-3, 35-36; col. 15, lines 3-5, 8-12; Fig. 1 at blocks 20, 22; Fig. 2 at blocks 20, 44 and other; Fig. 3 at blocks 64, 66; Fig. 4 at blocks 72, 74; Fig. 5 at blocks 92 and 94, 102, 104; Fig. 6 at blocks 114, 116; Fig. 7 at blocks 140 and 146; Fig. 8 at blocks 154 and 156, 172 and 174; Fig. 9 at blocks 184, 186, and 188. |

The parties dispute whether the "metacode map distinct storage means," "metacode storage means," or "distinct map storage means" element should be construed as a means-plus-function element under 35 U.S.C § 112, ¶ 6.  i4i contends that the term is not governed by 35 U.S.C. § 112, ¶ 6 because (i) there is no function recited for the claim element; (ii) even if the Court finds that there is a function implicit in the terms of the element, there is sufficient structure recited in the element; and (iii) storage means is a structural element well known to one of ordinary skill in the computer arts.  Consistent with the plain and ordinary meaning of the

---

[17] Throughout Microsoft's proposed definitions where the term "storage" is involved, Microsoft seeks to read the limitation "persistently" into the construction of the terms on the basis of an argument of the inventors to distinguish the claims over the prior art.  Microsoft does this despite any requirement from the examiner for an amendment of the claims to add the word "persistently."

words "storage means" in the context of computer systems and the specification, i4i proposes as the definition for this term "a portion of memory for storing a metacode map."

While the terms at issue contain the word "means," which "creates a presumption that § 112, P 6 applies[,]"[18] "a limitation that uses the word 'means' but does not recite a function that corresponds to the means does not invoke § 112, P 6."[19]  None of the terms in dispute—"metacode map distinct storage means," "metacode storage means," or "distinct map storage means"—recite a function that corresponds to the means.  Accordingly, those terms do not fall within the constraints of 35 U.S.C. § 112, ¶ 6.

Moreover, sufficient structure is recited in the element "storage means" to take this element outside the constraints of 35 U.S.C § 112, ¶ 6.  In determining whether sufficient structure is recited, the Federal Circuit has inquired into whether the "term, as the name for structure, has a reasonably well understood meaning in the art."[20]  The term "storage" is a familiar term in electrical engineering and computer science, if not to the public at large, and certainly evokes in one's mind a particular "structure."  Indeed, that is exactly what Special Master Peterson concluded in *Ferguson Beauregard/Logic Controls v. Mega Sys., L.L.C.*, No. 6:99CV437, 2001 U.S. Dist. LEXIS 25682 (E.D. Tex., Aug. 31, 2001) with respect to the term "memory means" in an opinion adopted by Judge Steger.[21]  Reviewing several dictionaries for an ordinary meaning of "memory," the Special Master in *Ferguson Beauregard* observed that the term "memory" seems to enjoy a generally common definition or understanding.[22]  The Special

---

[18] *See Personalized Media v. U.S. Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998).

[19] *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1232 (Fed. Cir. 2001).

[20] *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).

[21]  2001 U.S. Dist. LEXIS 25681, Dec. 13, 2001.

[22] *Ferguson Beauregard*, 2001 U.S. Dist. LEXIS 25682, at **127–39.

Master concluded that "[a]s commonly understood, therefore, a 'memory' may be said to evoke sufficient 'structure' for accomplishing the stated function[.]"[23]   "Indeed, the limitation at issue is just as easily understood without the word 'means[.]'"[24]

Factually, the '449 patent presents the same issues as in *Ferguson Beauregard*.   The specification of the '449 patent discloses that an acceptable computer system for practicing the system and method of the invention would include "storage" in the form of "memory:"

> A specific example of such an acceptable computer system comprises a Quadra 800 personal computer, a standard Apple 14" monitor, a standard Apple keyboard, working <u>storage (RAM)</u>, primary storage hard disk, programming language supporting I/O, integer calculations, and logical operations and flow control."

[5:3–8 (emphasis added)]

RAM stands for Random Access Memory.   The reasoning of *Ferguson Beauregard* compels the conclusion that the term "storage means" provides sufficient structure to carry the limitation outside the ambit of 35 U.S.C. § 112, ¶ 6.   Thus, the "storage means" is simply a storage mechanism—*i.e.*, a memory.

Microsoft simply ignores the lack of a recited function in the disputed term and simply creates a function out of whole cloth.   Such a practice, however, is clearly at odds with the controlling case law.   As the Federal Circuit held in *JVW Enters. v. Interact Accessories, Inc.*, "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'"[25]   In *JVW Enters.*, the Federal Circuit rejected the district

---

[23] *Id.* at *128.

[24] *Id.*

[25] 424 F.3d 1324, 1331 (Fed. Cir. 2005) (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)).

court's identification of the function for a term construed according to 35 U.S.C. § 112, ¶ 6.[26]
The district court erroneously added "unclaimed functions" that "relate[d] to a working
embodiment disclosed in the '754 patent's written description."[27]  This practice, rejected by the
Federal Circuit in *JVW Enters.*, is precisely what Microsoft proposes with its identification of the
function for the terms "metacode map distinct storage means," "metacode storage means," or
"distinct map storage means."  Out of the twenty-eight words of which Microsoft's proposed
function consists, only two words, "metacode map," find their source in the disputed terms.
Accordingly, even if there was a function disclosed in the disputed terms, which there is not,
Microsoft's proposed function is impermissibly "different from that explicitly recited in the
claim."[28]

  Microsoft compounds its error by seeking to limit the corresponding structure to "[a]
separate file on a hard disk that stores the metacode map[.]"  In doing so, Microsoft omits the
preferred embodiment's storage that includes "working storage (RAM)[.]"  As the Federal
Circuit has repeatedly held, "[i]t is elementary that a claim construction that excludes the
preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary
support.'"[29]

  For support of its corresponding structure for the "file on a hard disk" limitation it seeks
to add, Microsoft cites to numerous areas in the patent.  However, nowhere in those citations—or
anywhere else in the written specification—do the words "file," "computer file," or "hard disk
file" appear.  In other words, Microsoft adds to its made-up function made-up requirements for

---

[26] *Id.*

[27] *Id.*

[28] *See JVW Enters.* 424 F.3d at 1331 (quoting *Micro Chem.*, 194 F.3d at 1258).

[29] *Neomagic*, 287 F.3d at 1073 (quoting *Vitronics Corp.*, 90 F.3d at 1582 (Fed. Cir. 1996)).

the corresponding structure that do not appear in the specification.  For all of these reasons,

Microsoft's proposed construction should be rejected.

**F.     "means for providing a menu of metacodes to said metacode storage means" [Claim 1]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is not contained in the limitation for performing the recited function.<br><br>The <u>recited function</u> is providing a menu of metacodes to said metacode storage means.<br><br>The <u>corresponding structure</u> is the software of box 14 and the software of Processing System 12 (Figures 1 and 2) that associates the menu of metacodes in box 14 with the metacode map in box 20, and equivalents thereof; or alternatively,<br><br>the software of box 58 and the software of Processing System 56 (Figure 3) that associates the menu of metacodes in box 58 with the metacode map in box 66, and equivalents thereof. | *Function*:<br><br>Providing a menu of metacodes to said metacode storage means.<br><br>*Corresponding structure*:<br><br>No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |

The parties agree that "means for providing a menu of metacodes to said metacode

storage means" should be construed under 35 U.S.C. § 112, ¶ 6.  The parties further agree that

the recited function is providing a menu of metacodes to said metacode storage means.  The

parties dispute, however, the corresponding structure for performing that function.  i4i proposes a

construction for the corresponding structure from two alternative embodiments of the invention,

an embodiment shown in FIGS. 1 and 2, and another embodiment shown in FIG. 3.  Microsoft,

on the other hand, contends that no corresponding structure is disclosed for this means plus

function claim element, thus hoping to invalidate the claim.  Microsoft is wrong.

The parties agree that the function of this means-plus-function element provides a "menu

of metacodes" to the "metacode storage means."   The use of menus in computer software systems was, even in 1994 when the inventors filed '449 patent application, ubiquitous to software.  As even Microsoft recognized, "menu" was a term with an ordinary and accustomed meaning in the computer software industry in 1994:

> **Menu:** "a list of options from which a program user can select in order to perform a desired action, such as choosing a command or applying a particular format to part of a document."[30] MICROSOFT PRESS COMPUTER DICTIONARY, at 226 (Microsoft Press 1991).

The specification of the '449 patent uses the term "menu" consistently with that meaning and, in fact, provides an example of the use of a menu in connection with the discussion of an item of prior art in the Background of the Invention section of the patent:

> One early innovation of the PC revolution was the replacement of manually entered dot commands by a menu driven interface.  The WordStar word processing program allowed the user to select BOLD off a menu of formatting options.  Behind the scenes it would then insert a BOLD command code into the text.

[2:13–18]  Menus and the methods for providing them in software systems were well known when the inventors filed the '449 patent application.

The independent claims of the '449 patent, claims 1, 14, and 20, are directed at the decomposition of a document containing embedded metacodes and content.  FIGS. 1, 2, and 3 illustrate broad flow diagrams disclosing the inventive concepts of those claims.  The written specification of the '449 patent describes FIG. 1 in the Brief Description of the Drawings section, beginning at Column 8, line 8, as "a broad flow diagram representing main components of a system and method for the manipulation of architecture and content of a document."  FIG. 2 is described as "the diagram of FIG. 1 further comprising associated mapped content storage." Both FIGS. 1 and 2 show a Means for Providing a Menu of Metacodes, labeled as Box 14,

---

[30] Exh. C.

associated with a Processing System, labeled as Box 12, and a metacode storage means, labeled

Box 20.   The arrangement for providing a menu of metacodes to the metacode storage means

illustrated in the flow diagrams of FIGS. 1 and 2 represents corresponding structure to this means

plus function element.   FIGS. 1 and 2 are reproduced below with the corresponding structure

identified in i4i's proposed construction highlighted in yellow.



Similarly, the embodiment of FIG. 3 also discloses corresponding structure for this means

plus function element, and thus, is designated, in the alternative, as corresponding structure.

FIG. 3 is reproduced below with the corresponding structure for this embodiment highlighted in

yellow.



The Detailed Description of the Invention section of the written specification describing

the content of these figures discloses that the boxes 14 and 58 labeled "means for providing a

menu of metacodes" contain software instructions for performing the specified function for this element:

> "A processing system, shown as Box 12, generates a menu of metacodes through the instructions for providing a menu of metacodes shown as Box 14."

[13:19–21]    i4i's proposed corresponding structure comes from these figures and their accompanying disclosure in the written specification.

Microsoft's position that there is no corresponding structure disclosed for this means plus function element is wrong.   Microsoft completely ignores the fact that the figures and the detailed description of the invention expressly disclose structure for providing a menu of metacode to the metacode storage means.   Microsoft's position that no corresponding structure is disclosed should be rejected.

> **G.    "means for compiling said metacodes of the menu by locating, detecting, and addressing the metacodes in the document to constitute the map and storing the map in the metacode storage means" [Claim 1]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is not contained in the limitation for performing the recited function. The <u>recited function</u> is compiling said metacodes of the menu by locating, detecting, and addressing the metacodes in the document to constitute the map and storing the map in the metacode storage means. The <u>corresponding structure</u> is the software of Boxes 16 and 18 and the software of Processing System 12 (Figure 1), that compiles the metacodes in the document into a metacode map and stores the map in memory (box 20) in accordance with the algorithm described at Col. 5, line 57 to Col. 6, line 7 and at Col. 8, line 56 to Col. 10, line 10, and equivalents | *Function*: Detecting all metacodes embedded in a content stream, separating the metacodes out from the content stream, and persistently storing the metacodes along with data identifying the place where each metacode was embedded in the content stream separately and distinctly from the mapped content. *Corresponding structure*: 1. Document with content and embedded metacodes as described at col. 5, lines 57-63; col. 8, line 49 to col. 10, line 11. 2. Processing system programmed with an algorithm described at col. 4, lines 32-44 and col. 8, line 49 to col. 10, line 11, that recognizes, identifies or differentiates each metacode from content; finds the position |

| | |
|---|---|
| thereof; or alternatively,<br><br>the corresponding structure is the software of Boxes 36 and 18 and the software of Processing System 12 (Figure 2), that compiles the metacodes in the document into a metacode map and stores the map in memory (box 20) in accordance with the algorithm described at Col. 5, line 57 to Col. 6, line 7 and at Col. 8, line 56 to Col. 10, line 10, and equivalents thereof; or alternatively,<br><br>the software of Boxes 60 and 62 and the software of Processing system 56 (Figure 3), that compiles the metacodes in the document into a metacode map and stores the map in memory (box 66) in accordance with the algorithm described at Col. 5, line 57 to Col. 6, line 7 and at Col. 8, line 56 to Col. 10, line 10, and equivalents thereof. | of each metacode in and relative to an input content stream; and forms a unique identifier which defines the position of each metacode relative to the mapped content stream, and stores each metacode and a unique identifier defining its position relative to the mapped content stream in persistent memory separate from the mapped content.<br><br>3.  A metacode map distinct storage means as construed herein. |

The parties agree that this element should be construed according to 35 U.S.C. § 112, ¶ 6. The parties, however, dispute both the recited function and the corresponding structure.

i4i's proposed recited function faithfully tracks the claim language, in accordance with the controlling case law.  With respect to the corresponding structure, the specification discloses three embodiments for practicing the invention while decomposing an encoded document into a map of metacodes and mapped content, the embodiments illustrated in the flow diagrams of FIGS. 1, 2, and 3.  FIGS. 1, 2, and 3 are reproduced below with the structure identified as i4i's proposed construction for this means-plus-function term highlighted in yellow.



The text in the specification accompanying these figures, FIG. 1 [13:18–26], FIG. 2 [13:27–32], and FIG. 3 [13:33–46], describes the manner in which the various blocks of these flow diagrams work together to practice the system and method of the invention.  In addition to that disclosure, the '449 patent provides a detailed description of the invention in the context of a series of steps for decomposing an encoded document.  The specification also provides a discrete example of the practice of those method steps in the context of an SGML-encoded document. [8:56–10:10]  The structures shown in FIGS. 1, 2, and 3, the language from the specification describing those figures, and the examples cited in the specification are clearly linked to the recited function.  "'Proper application of § 112 P 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function.  Specifically, disclosed structure includes that which is described in a patent specification, including any alternative structures identified.'"[31]  For these reasons, i4i's proposed construction for this term is correct and should be adopted by the Court.

Microsoft improperly proposes a function that differs considerably from the language provided in the claim element.  When construing the functional statement in a means-plus-function limitation, the Court "must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim."[32]  Despite that admonition, Microsoft seeks to add into the recited function the requirement that "all" metacodes embedded in a content stream be detected.  This additional limitation finds no anchor in the explicit claim language.  As such, Microsoft's defined function is improper, given that "[t]he function of a means-plus-function limitation . . . must come from the claim language itself[,]"

---

[31] *See, e.g.*, *Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002) (quoting *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000)).

[32] *Generation II Orthotics, Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1364–65 (Fed. Cir. 2001).

and "it is improper to restrict a means-plus-function limitation by adopting a function different from that explicitly recited in the claim[.]"[33]

Moreover, as explained above in subsection E in connection with the terms "metacode map distinct storage means," "metacode storage means," and "distinct map storage means," the distinction between "raw content" and "mapped content" compels a rejection of Microsoft's proposed construction of this term for the same reasons. Accordingly, this Court should reject the additional functional limitation proposed by Microsoft, and should adopt i4i's construction of the claimed function, which faithfully follows the language of the claim.

Microsoft further errs by proposing corresponding structures that are not necessary for performing the recited structure. While the totality of the structure cited by Microsoft includes the same structure as cited in i4i's construction, Microsoft chooses to add structural components that are not needed to perform the specified function in the claim term. The Federal Circuit has found, however, that "the structure must be necessary to perform the claimed function."[34] What Microsoft has done can be illustrated by a simple analogy. Consider the means-plus-function claim term "means for slicing an apple," in which the disclosed structure for slicing an apple is a knife. According to Microsoft's logic for designating corresponding structure, in the construction of this term, corresponding structure would be the knife <u>and</u> the apple; and, while it is true the apple is getting sliced, it is not performing the "slicing."

Examples of Microsoft's superfluous citations to components unnecessary to perform the function are (i) "[d]ocument with content and embedded metacodes as described at col. 5, lines 57-63;" and (ii) "[a] metacode map distinct storage means as construed herein. For the foregoing

---

[33] *Creo Prods.*, 305 F.3d at 1344, 1346.

[34] *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003)).

reasons, this Court should reject Microsoft's proposed construction for the recited function and corresponding structure for this disputed term.

### H. "means for resolving the content and the metacode map into the document" [Claim 1]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| This limitation is governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is not contained in the limitation for performing the recited function.<br><br>The <u>recited function</u> is resolving the content and the metacode map into the document.<br><br>The <u>corresponding structure</u> is the software of Boxes 120 and 122 and the software of Processing System 118 (Figure 6) for performing the algorithm of building a document view described at Col. 11, lines 41 to Col. 13, line 16, and equivalents thereof. | *Function*:<br><br>Assembling the separately and distinctly stored metacode map and mapped content to build the document having content with embedded metacodes.<br><br>*Corresponding structure*:<br><br>1.  Mapped content separated out from all metacodes as described at col. 4, lines 7-13, 45-47; col. 5, lines 6-7; col. 6, lines 5-7, 16-17, 19-21, 37-38; col. 7, lines 17-25, 54-57, col. 8, lines 17-18, 52-53, 62-67; col. 9, lines 7-8; col. 13, lines 27-31; col. 14, lines 1-3, 6-9, 20-23, 32-36, 49-56; Fig. 2 at blocks 42, 44; Fig. 6 at blocks 112, 116; Fig. 7 at blocks 138, 140; Fig. 8 at blocks 152, 156; and Fig. 9 at blocks 182, 184. . . .[35] |

The parties agree that "means for resolving the content and the metacode map into the document" should be construed under 35 U.S.C. § 112, ¶ 6.  The parties dispute both the recited function and the corresponding structure for performing that function.

With regard to the recited function, i4i's proposed construction faithfully tracks the language of the claim, consistent with Federal Circuit authority.[36]  i4i's proposed corresponding structure likewise comports with the controlling case law and is consistent with the intrinsic

---

[35] For the remainder of Microsoft's proposed corresponding structure, i4i refers the Court to Exhibit B of the Joint Claim Construction and Pre-Hearing Statement.

[36] *See Generation II Orthotics*, 263 F.3d at 1364–65; *Creo Prods.*, 305 F.3d at 1346.

record.   The specification of the patent dedicates an entire figure for the embodiment that performs the recited function, FIG. 6.  FIG. 6 is reproduced below with the structure designated as corresponding to the recited function highlighted in yellow.



In addition to the flow diagram of FIG. 6, the specification generally describes the components of the flow diagram of FIG. 6 at column 13, line 66 to column 14, line 11, and provides a detailed description of the steps necessary to rebuild from the metacode map and mapped content a composite document with metacodes embedded in the content stream in column 11, lines 41 to 44 of the specification:

> Building a Document View
>
> Documents will frequently have to be rebuilt as a composite of their structure and content rather than as two discrete elements.

Accordingly, i4i's proposed construction should be adopted by the Court.

Microsoft, however, continues to ignore the directives of the Federal Circuit by proposing a construction for the claimed function that improperly adds to or changes the functional language of the claim.  Microsoft identifies as the recited function "[a]ssembling the separately and distinctly stored metacode map and mapped content to build the document having content with embedded metacodes."  Such a proposal is utterly divorced from the claim term and, thus, is

impermissibly "different from that explicitly recited in the claim."[37]

With regard to the corresponding structure, Microsoft's proposed construction ignores both the specification and the teachings of the Federal Circuit.   The Federal Circuit has repeatedly held that "[s]ection 112 paragraph 6 does not 'permit incorporation of structure from the written description beyond that necessary to perform the claimed function.'"[38]   Where Microsoft's proposed corresponding structure of this element goes astray is in its indiscriminate reference to portions of the disclosure of the invention, as set forth in the '449 patent, beginning at column 4, which are not part of rebuilding a composite document.   Specific examples of Microsoft's citation to superfluous structure, unnecessary for performing the recited function are (i) "[m]apped content separated out from all metacodes as described at col. 4, lines 7–13;" and (ii) "[m]etacode map as described at col. 4, lines 5–10."   Microsoft's attempt to burden the corresponding structure with extraneous "structure" should be rejected.

I. **"mapped content distinct storage means" [Claim 2] or "mapped content storage means" [Claim 14]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| a portion of memory for storing mapped content<br><br>These limitations are not governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is recited in each element.  Storage means is a structural element well known to one of ordinary skill in the art.  Furthermore, there is no function recited for these claim elements. | *Function*:<br><br>Persistently storing the mapped content separately from the metacode map so that the mapped content can be edited directly without having access to a corresponding metacode map.<br><br>*Corresponding structure*:<br><br>A separate file on a hard disk that stores the |

---

[37] *See Generation II Orthotics*, 263 F.3d at 1364–65; *Creo Prods.*, 305 F.3d at 1344 (Fed. Cir. 2002).

[38] *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369–70 (Fed. Cir. 2001) (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257–58 (Fed. Cir. 1999)).  *See also id.* at 1370 ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." (citing *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."))).

|  | mapped content as described at col. 4, lines 7-13, 45-47; col. 5, lines 6-7; col. 6, lines 5-7, 16-17, 19-21, 37-38; col. 7, lines 17-25, 54-57, col. 8, lines 17-18, 52-53, 62-67; col. 9, lines 7-8, 63-65; col. 11, lines 26-29; col. 13, lines 27-31; col. 14, lines 1-3, 6-9, 20-23, 32-36, 49-56; Fig. 2 at blocks 42, 44; Fig. 6 at blocks 112, 116; Fig. 7 at blocks 138, 140; Fig. 8 at blocks 152, 156; and Fig. 9 at blocks 182, 184. |
|---|---|

The terms "mapped content distinct storage means" and "mapped content storage means" present the same issues as those discussed in detail above in subsection E with respect to the terms "metacode map distinct storage means," "metacode storage means," and "distinct map storage means," albeit with reference to "mapped content," rather than "metacode map." For all of the reasons stated there, these disputed terms do not fall within the ambit of 35 U.S.C. § 112, ¶ 6, given that there is no function recited in either of the claim elements. Even if the Court finds that there is a function implicit in the terms of the element, sufficient structure is recited in the element "storage means," given that the "term, as the name for structure, has a reasonably well understood meaning in the art."[39]   That is precisely the finding of the court in *Ferguson Beauregard/Logic Controls*.   As explained above, in construing the term "memory"—a term nearly identical to "storage"—the court found that "a 'memory' may be said to evoke sufficient 'structure' for accomplishing the stated function[.]"[40]   Accordingly, following the reasoning of *Ferguson Beauregard* and the teachings of the Federal Circuit, this Court should conclude that the term "storage means" provides sufficient "structure" and, thus, is not governed by 35 U.S.C. § 112, ¶ 6. i4i's definition for the terms, which is consistent with the plain and ordinary meaning of the words "storage means," should be adopted.

---

[39] *See Greenberg*, 91 F.3d at 1583.

[40] *Ferguson Beauregard/Logic Controls*, 2001 U.S. Dist. LEXIS 25682, at *128.

Again, Microsoft takes the untenable position that these terms are governed by 35 U.S.C. § 112, ¶ 6.  In doing so, Microsoft ignores the Federal Circuit's holding in *Personalized Media*, in which the court found that "a limitation that uses the word 'means' but does not recite a function that corresponds to the means does not invoke § 112, P 6."  Despite the absence of a recited function in the terms, Microsoft inexplicably derives the function of "[p]ersistently storing the mapped content separately from the metacode map so that the mapped content can be edited directly without having access to a corresponding metacode map" from the terms "mapped content distinct storage means" and "mapped content storage means."  Microsoft, thus, disregards the Federal Circuit's directive that "a court may not construe a means-plus-function limitation 'by adopting a function different from that explicitly recited in the claim.'"[41] Accordingly, the Court should reject Microsoft's proposed function.

Despite the presence of sufficient structure in the claim terms, Microsoft identifies corresponding structure and, once again, seeks to limit it to "[a] separate file on a hard disk that stores the metacode map[.]"  In doing so, Microsoft omits storage that would include RAM, which would have the effect of impermissibly excluding the preferred embodiment.[42] Accordingly, Microsoft's construction should be rejected.  Moreover, as previously explained, Microsoft's proposed structure, "[a] separate file on a hard disk that stores the metacode map," finds no foundation in the patent.

---

[41] *See JVW Enters.*, 424 F.3d at 1331 (quoting *Micro Chem.*, 194 F.3d at 1258 (Fed. Cir. 1999)).

[42] *See Neomagic*, 287 F.3d at 1073 ("[i]t is elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support'" (quoting V*itronics*, 90 F.3d at 1582)).

**J.**      **"raw content distinct storage means" [Claim 3]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| a portion of memory for storing raw content<br><br>This limitation is not governed by 35 U.S.C. § 112, ¶ 6, because sufficient structure is recited in the element.  Storage means is a structural element well known to one of ordinary skill in the art.  Furthermore, there is no function recited for this claim element. | *Function*:<br><br>Persistently storing the raw content separately from the metacode map so that the raw content can be edited directly without having access to the metacode map.<br><br>*Corresponding structure*:<br><br>No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |

The element "raw content distinct storage means" presents the same issues addressed in the previous subsection and subsection E.  i4i's arguments presented there apply equally to this term as well.  The element does not fall within the ambit of 35 U.S.C. § 112, ¶ 6 because (i) there is no function recited for this claim element; (ii) even if the Court finds that there is a function implicit in the terms of the element, there is sufficient structure recited in the element; and (iii) storage means is a structural element well known to one of ordinary skill in the art; and Accordingly, i4i proposes a construction for the term that is consistent with the plain and ordinary meaning of the term "storage means."

Microsoft, as it did for the "metacode map storage means" terms and the "mapped content storage means" terms, creates a function for the term "raw content distinct storage means" out of whole cloth: "[p]ersistently storing the raw content separately from the metacode map so that the raw content can be edited directly without having access to the metacode map." Such a proposal, which bears no relationship to the claim language, is clearly at odds with controlling precedent, as discussed in detail above.[43]      Accordingly, Microsoft's proposed

---

[43] *See JVW Enters.*, 424 F.3d at 1331 (quoting *Micro Chem.*, 194 F.3d at 1258 (Fed. Cir. 1999)).

Austin 41174v4

construction for the recited function should be rejected.   Given that Microsoft's proposed function is utterly divorced from that which is explicitly recited in the claim element, it is no surprise that Microsoft asserts that there is "[n]o corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6."   As explained in detail in the previous subsection and subsection E, however, sufficient structure is recited in the claim element, such that 35 U.S.C. § 112, ¶ 6 does not apply.

The Federal Circuit has found that sufficient structure is recited in the element when the "term, as the name for structure, has a reasonably well understood meaning in the art."[44]   In construing the term "memory means," that is precisely what the court found in *Ferguson Beauregard/Logic Controls*.   The court found that "a 'memory' may be said to evoke sufficient 'structure' for accomplishing the stated function[.]"[45]   Here, the term is "storage means," but in this specification, "storage" is equated to "memory" when the inventors described an acceptable computer system for practicing the invention at column 5, line 6 as including "working storage (RAM)."   Thus, in accordance with the holding in *Ferguson Beauregard*, this Court should conclude that the term "storage means" provides sufficient "structure" and adopt i4i's construction.

---

[44] *See Greenberg*, 91 F.3d at 1583.

[45] *Ferguson Beauregard/Logic Controls*, 2001 U.S. Dist. LEXIS 25682, at *128.

**K.**     **"means for comparing the multiplicity of metacodes in the map with a predetermined set of criteria [Claim 5];**

**L.**     **"means for amending the first map to produce a second map" [Claim 6];**

**M.**     **"means for providing a multiplicity of maps in association with a mapped single content" [Claim 9];**

**N.**     **"means for amending a plurality of maps in consequence of an amendment of mapped content" [Claim 10]; and**

**O.**     **"means for amending a first plurality of maps to produce a second plurality of amended maps in a plurality of distinct storage means." [Claim 12]**

Each of the above five "means plus function" elements present similar claim construction issues for the Court.  Accordingly, i4i will address all five here as a group.

i4i and Microsoft agree that these five terms require construction according to 35 U.S.C. § 112, ¶ 6.  Furthermore, the parties agree that the specified function for each term is the function recited in the claim element following the words "means for."  The parties differ, however, on what constitutes corresponding structure.  The parties' proposed construction for corresponding structure for each of the five means plus function claim terms is presented in the following chart:

| Claim Term | i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|---|
| "means for comparing the multiplicity of metacodes in the map with a predetermined set of criteria [Claim 5] | The <u>corresponding structure</u> is the software of Boxes 78 and 80 and the software of Processing System 76 (Figure 4) for comparing the metacodes in the map with a predetermined set of criteria, and equivalents thereof. | *Corresponding structure*:<br><br>No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |
| "means for amending the first map to produce a second map" [Claim 6] | The <u>corresponding structure</u> is the software of Boxes 98 and 100 and the software of Processing system 96 (Figure 5) for amending the first metacode map to produce a second map, and equivalents thereof. | *Corresponding structure*:<br><br>No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |
| "means for providing a multiplicity of maps in | The <u>corresponding structure</u> is the software in Boxes 158, 160, 164, | *Corresponding structure*: |

| | | |
|---|---|---|
| association with a mapped single content" [Claim 9] | 166, and 168 (Figure 8), and the software of Processing System 162 for producing additional maps for the same mapped content, and equivalents thereof. | No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |
| "means for amending a plurality of maps in consequence of an amendment of mapped content" [Claim 10] | The <u>corresponding structure</u> is the software in Boxes 190, 192, 196, and 198 and the software in Processing System 194 (Figure 9) for updating all maps associated with the same mapped content when that mapped content is changed, and equivalents thereof. | *Corresponding structure*: <br><br> No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |
| "means for amending a first plurality of maps to produce a second plurality of amended maps in a plurality of distinct storage means" [Claim 12] | The <u>corresponding structure</u> is the software of Boxes 218, 220, 224, and 226 and the software in Processing System 222 (Figure 10) for amending a first plurality of metacode maps to produce a second plurality of amended metacode maps, and equivalents thereof. | *Corresponding structure*: <br><br> No corresponding structure disclosed; claim is invalid for failure to comply with 35 U.S.C. § 112 ¶6. |

i4i identifies specific structure disclosed in the specification for performing each of the recited functions. The corresponding structure identified by i4i for these means-plus-function software claim limitations is a processor or computer programmed according to the disclosed algorithm.[46] Microsoft contends that there is no corresponding structure disclosed for performing the specified function. Microsoft is wrong.

These software claim elements each correspond directly to a particular figure in the written specification. These figures represent computer software flow diagrams that describe the necessary structural elements—including the processor and the algorithm—for performing the recited function of the claim element. The written specification explains in detail the structures shown in the figure including how the structures work together to perform the recited function.

---

[46] *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999).

The following chart juxtaposes the language of the five claim elements with the language used in the specification to identify the corresponding figure. The chart also provides the citation for the corresponding detail description of the figures.

| Claim Term | Corresponding Figure |
|---|---|
| "means for comparing the multiplicity of metacodes in the map with a predetermined set of criteria" [Claim 5] | "FIG. 4 is a broad flow diagram representing a map being compared to specified criteria according to the system and method of the invention;" [8:23–25; *See also* corresponding text for FIG. 4 at 13:46–56] |
| "means for amending the first map to produce a second map" [Claim 6] | "FIG. 5 is a broad flow diagram representing a map being transformed to create a second map according to the system and method of the invention; " [8:26–28; *See also* corresponding text for FIG. 5 at 13:57–65] |
| "means for providing a multiplicity of maps in association with a mapped single content" [Claim 9] | "FIG. 8 is a broad flow diagram representing the creation of a second map associated with existing content according to the system and method of the invention; " [8:36-38; *See also* corresponding text for FIG. 8 at 14:32–48] |
| "means for amending a plurality of maps in consequence of an amendment of mapped content" [Claim 10] | "FIG. 9 is a broad flow diagram representing the modification of content with multiple associated maps according to the system and method of the invention; " [8:39–41; *See also* corresponding text for FIG. 9 at 14:49–15:5] |
| "means for amending a first plurality of maps to produce a second plurality of amended maps in a plurality of distinct storage means" [Claim 12] | "FIG. 10 is a broad flow diagram representing the a modification of a metacode map with multiple associated metacode maps according to the system and method of the invention; " [8:42–44; *See also* corresponding text for FIG. 10 at 15:6–26] |

In every instance, the specification's description of the figure mirrors the functional language of the corresponding means-plus-function element. For example, consider the first element in the chart above, from dependent claim 5: "means for **comparing** the multiplicity of metacodes in the **map** with a predetermined set of **criteria**." (emphasis added). The description

of the corresponding figure, FIG. 4, uses substantially similar language: "FIG. 4 is a broad flow diagram representing a **map** being **compared** to specified **criteria** according to the system and method of the invention."  (emphasis added).

i4i's proposed construction for the structure for each of these software claim limitations comes directly from the corresponding figure, and its accompanying text.  The written disclosure accompanying these figures (FIG. 4 [13:46–56], FIG. 5 [13:57–65], FIG. 8 [14:32–48], FIG. 9 [14:49–15:5], and FIG. 10 [15:6–26]) describes in detail the algorithm for performing the specified function.   Consider for example the claim element "means for comparing the multiplicity of metacodes in the map with a predetermined set of criteria."   The accompanying text for FIG. 4 states:

> **FIG. 4** shows generally as 70 a system and process for comparing a metacode map against a known set of criteria.   The map, represented by Box 72, is stored in primary storage, represented by Box 74.   The **processing system 76** performs the comparison shown as **Box 78**.   The metacode map is compared against criteria, shown as **Box 80**, which is provided to the processing system.   The processing system 76 outputs the results of this comparison, as shown by Box 82.   This output may take a variety of forms such as a print out or a set of inputs to another process.

[13:46–56 (emphasis added)]

i4i's proposed corresponding structure for this claim element comes directly from FIG. 4 and accompanying text: "the software of **Boxes 78 and 80** and the software of **Processing System 76 (Figure 4)** for comparing the metacodes in the map with a predetermined set of criteria, and equivalents thereof."   The bolded text shows the correspondence between i4i's proposed corresponding structure and the intrinsic record.

These flow diagrams and the text accompanying each provide the algorithm for performing the recited function for these means-plus-function elements.   As expressed by the Federal Circuit in *WMS Gaming*, a means-plus-function limitation having a processor or

32

computer as its corresponding structure should be construed to be that structure programmed according to the disclosed algorithm. Each of i4i's proposals is in accordance with the teachings of *WMS Gaming, Inc.* Accordingly, the Court should adopt i4i's proposed corresponding structure for these terms.

Microsoft's position on corresponding structure for each of these means-plus-function elements is the same—there is no corresponding structure disclosed. Microsoft is wrong. Microsoft completely ignores the fact that each of these elements has both a corresponding figure that discloses a computer flow diagram for performing the specified function, along with a detailed explanation of how the processing of each figure is carried out. For these reasons, Microsoft's position that no corresponding structure is disclosed should be rejected.

### P.   "description code" [Claim 13]

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| a metacode whose content describes the meaning of a metacode instruction | Metacode that contains a word describing the instruction provided by the metacode |

The parties' respective proposed constructions are not that far apart. i4i believes its proposed construction is more accurate, in that a description code is a metacode whose content describes the meaning of a metacode instruction. Microsoft provides that it contains one word describing the instruction when it could, instead, contain many words. For example, in SGML and XML, a metacode can be multi-part, *i.e.*, <box height="12" width="18" units="cm">. The reader would know what the meaning of the instruction is from the code's content. i4i's construction should, therefore, be adopted.

**Q.**      **"compiling a map of the metacodes in the distinct storage means, by locating, detecting and addressing the metacodes" [Claim 14]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| creating a map of the metacodes and storing it in a portion of memory by identifying each metacode in the document, finding the position of the metacode relative to the content stream, and forming an address that defines the position in the content at which the metacode is to exert its effect | detecting all metacodes embedded in a content stream, separating the metacodes out from the content stream, and persistently storing the metacodes along with data identifying the place where each metacode was embedded in the content stream separately and distinctly from the mapped content so that the metacode map can be edited directly without having access to the mapped content. |

This claim step requires four steps: (1) "compiling a map of the metacodes in the distinct storage means;" (2) "detecting . . . the metacodes;" (3) "locating . . . the metacodes;" and (4) "addressing the metacodes."  i4i's proposed construction for this claim element is the composite of the definitions provided in the intrinsic record for each of these steps.

### 1.      "compiling a map of the metacodes in the distinct storage means"

Beginning at column 4, line 25 of the patent, the specification defines "compiling a map of the metacodes in the distinct storage means:"

> [a]ccordingly, in its broadest aspect the invention provides a computer system . . . the system comprising . . . means for **compiling the metacodes of said menu** by locating, detecting and addressing the metacodes **to constitute the map and storing the map in the metacode storage means**.

[4:25–35 (emphasis added)]

Similarly, in the August 19, 1996 Amendment the applicants noted

> that the Examiner has misunderstood the term "compiling" as used herein.  As noted above, the notion of <u>compiling</u> as defined in the specification refers to "locating, detecting and addressing the metacodes to **constitute the map and storing the map in the metacode storage means**." *Specification*, pg. 7, lines 6–8. . . . Claim 14 has been amended to clarify the meaning of the term "compiling" as used herein.

8/19/96 Amendment at p. 8 (emphasis added) [Exh. D at i4i000000096].  This intrinsic evidence

supports i4i's construction for the first element of the claim step: "creating a map of the

metacodes and storing it in a portion of memory."

### 2. "detecting . . . the metacodes"

The second element of the claim step, "detecting . . . the metacodes," is defined in the

specification beginning at column 4, line 36: "recognizing, identifying or differentiating a

metacode from content[.]"  [4:36–37]  Accordingly, i4i's proposed construction for the second

element of the claim step, "identifying each metacode in the document," is in accordance with

the definition provided in the specification.

### 3. "locating . . . the metacodes"

Beginning at column 4, line 37 of the specification is the definition of the third element

of the claim step: "finding the position of a metacode in and relative to an input content

stream[.]"  [4:37–39]  i4i's proposed construction for this element of the claim step is, therefore,

supported by this intrinsic evidence.

### 4. "addressing the metacodes"

The specification provides a definition for the fourth element of the claim step: "forming

a unique identifier which defines the position of a metacode relative to the mapped content

stream."  [4:39–41]  The "unique identifier" is the address of use defined above in subsection C.

Accordingly, i4i's proposed definition for the element "addressing the metacodes" of the claim

step is "forming an address that defines the position in the content at which the metacode is to

exert its effect."

While i4i's construction is a compilation of definitions for the four elements provided in

the step, which adhere closely to the definitions provided in the intrinsic evidence, Microsoft's

proposed construction impermissibly seeks to impose extraneous limitations into the claim.  The

35

Court is well aware of the Federal Circuit's admonition to not read in extraneous limitations that are absent from the claim language.[47]

Microsoft continues to ignore the Federal Circuit's teachings.  Specifically, its language of "separating the metacodes out from the content stream[.]" when coupled with the phrase "storing . . . data identifying the place where each metacode was embedded in the content stream" would have the effect of requiring the metacodes to be extracted from the document. However, nothing in this disputed term in particular, or claim 14 in general, requires that the metacodes be extracted from the content stream in performing the step of compiling a map of metacodes.  Microsoft's proposed definition would exclude "mapped content" which was not "raw mapped content" and, thus, exclude the preferred embodiment.  The Federal Circuit has held that "[i]t is elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support.'"[48]  Accordingly, Microsoft's proposed definition should be rejected.

Moreover, Microsoft's definition requires that the metacodes be stored "separately and distinctly from the mapped content so that the metacode map can be edited directly without having access to the mapped content[.]"  Such functionality is nowhere suggested by this disputed claim term or by claim 14.  Claim 14 is directed to "[a] method for producing a first map of metacodes and their addresses of use in association with mapped content and stored in distinct map storage means."  As such, claim 14 says nothing about manipulating or editing of the metacode map.  Accordingly, that phraseology is extraneous and is merely an effort to read limitations into the claim step.  Finally, Microsoft's use of the phrase "edited directly without

---

[47] *See E.I. Du Pont de Nemours*, 849 F.2d at 1433 (contrasting using "the specification to interpret what a patentee meant by a word or phrase" with "adding an extraneous limitation appearing in the specification, which is improper").

[48] *See Neomagic*, 287 F.3d at 1073 (quoting *Vitronics Corp.*, 90 F.3d at 1582).

having access to the mapped content" in its definition is another attempt to rewrite the claim, as such language is neither suggested nor required by the claim or intrinsic evidence and, instead, describes the benefit that flows from creating a map and storing it into memory.

Given Microsoft's improper importation of extraneous limitations into its proposed construction of the claim step, the Court should reject Microsoft's proposed construction.

**R.     "providing the document as the content of the document and the metacode map of the document" [Claim 14]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| resolving the content and the metacode map into a single composite document, or providing the document as two separate discrete elements, *i.e.*, mapped content and a metacode map | Providing the document as the separately and distinctly stored metacode map and mapped content, so that each of the metacode map or the mapped content can be edited directly without accessing the other. |

**S.     "providing the document as the content of the document separately from the metacode map of the document" [Claim 20]**

| i4i's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| providing the document as two discrete elements, *i.e.*, mapped content and a metacode map | Providing the document as the separately and distinctly stored metacode map and mapped content, so that each of the metacode map or the mapped content can be edited directly without accessing the other. |

i4i addresses the above limitations together because the fourth and final step of claim 14 and step (e) of claim 20 are identical with one notable difference:  step (e) of claim 20 requires providing the content "**separately from**" the metacode map.  Claim 14, in contrast, is silent as to whether the content and the metacode map are provided separately or as a composite document. i4i's proposed construction is consistent with the difference in claim language as well as the embodiments described in the specification.  Microsoft, however, incorrectly proposes the same claim construction for these two limitations of differing language and scope.

The Summary of the Invention explains that the invention uses two structures—raw content and a metacode map—and "[d]elivering a complete document would entail delivering both the content and a metacode map which describes it."  [4:21–24]  Providing the document may be accomplished by providing the content and the metacode map as separate structures, or combining these structures into a single composite documents.  The parties do not dispute that the patent describes providing the content and the metacode map separately.

The specification, however, also discloses an embodiment wherein the content and the metacode map are <u>not</u> separate and distinct, but combined into a single document.

> The system of the invention may be implemented using maps and mapped content broken into three sections. The first section involves decomposing existing documents into a representative map and its associated mapped content. The second involves creating or editing a document consisting of content plus a metacode map. **The third is building a combined view from the constituent parts, which is necessary because interaction with the document may be done as a visual whole rather than in its constituent parts.**

[7:66–8:7 (emphasis added)]   In this embodiment, the invention creates the content and the metacode map from an existing document.  Interaction with the document is possible using a "combined view," wherein the content and the metacode map are combined into a single document.  The document exists "as a visual whole rather than in its constituent parts."  The patentees teach that providing the combined document will occur frequently, as dictated by the user's needs:

> Documents will frequently have to be rebuilt as a composite of their structure and content rather than as two discrete elements. This is true when taking a hard copy of the document, or for sending it to a system which only deals with documents containing embedded codes.

[11:41–46]  The patentees further teach "[a]n algorithm for building a composite document from its metacode map and raw content[.]"  [11:46–48]

As such, the patent describes two embodiments for providing a document—an embodiment in which the document exists as two discrete elements "separate from" one another, and an embodiment in which the document is a composite of these two elements. The language of claim 20 explicitly claims the "separate from" embodiment in contrast to the language of claim 14 that covers both the separate and composite embodiments.

Undoubtedly, the difference between the claim language and the description in the specification illustrates a fundamental difference between these limitations of claim 14 and claim 20. Despite this difference, Microsoft erroneously proposes the **exact same meaning** for the final step of claim 14 and step (e) of claim 20. Microsoft ignores the difference in claim language between these two steps and the corresponding difference in claim scope required by the language. The limitation in claim 20 requires that the content is provided "separately from" the metacode map—the limitation in claim 14 imposes no such requirement.

The addition of the language "separately from" in claim 20 creates a presumption that the scope of this limitation is narrower than the similar limitation in claim 14. As the Federal Circuit explained in *Forest Labs*, "[w]here claims use different terms, those differences are presumed to reflect a difference in the scope of the claims."[49] The sole difference between this limitation in claim 20 and claim 14 is the "separately from" language. i4i's proposed constructions appropriately account for and reflect the difference in claim scope between these limitations. As evidenced by their proposed construction, Microsoft imports the "separately from" requirement into claim 14 to rewrite the limitation in claim 14 to be commensurate in scope with claim 20. In other words, despite the difference in terms, Microsoft's proposed construction for these limitations is exactly the same. Such a construction is improper and should be rejected.

---

[49] *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001).

Furthermore, Microsoft's proposed construction for claim 14 excludes a preferred embodiment. The specification describes providing the document as two structures—the content and the metacode map. These structures may be provided "separately from" each other as required by claim 20, or—as described in the preferred embodiment—provided as "a visual whole rather than in its constituent parts." [7:66–8:7] Microsoft's attempt to import language from claim 20 into claim 14[50] impermissibly excludes this preferred embodiment.[51]

## VI.   CONCLUSION

i4i's proposed construction for the disputed terms follows established principles of claim construction, giving effect to the intrinsic record, and adopting constructions consistent with the understanding of those of ordinary skill in the art. Accordingly, i4i respectfully requests that the Court adopt its proposed construction of the asserted claims as set forth herein and in the claim chart contained in the accompanying Exhibit B.

---

[50] As with several other disputed terms discussed above, Microsoft attempts to import the phrase "can be edited directly without accessing the other." Microsoft's use of this phrase in its definition is one final attempt to rewrite the claim, as such language is neither suggested nor required by the claim or intrinsic evidence and, instead, describes the benefit that flows from creating a map and storing it into memory.

[51] *See Neomagic*, 287 F.3d at 1073 (holding that "it is elementary that a claim construction that excludes the preferred embodiment 'is rarely, if ever correct and would require highly persuasive evidentiary support'" (quoting *Vitronics*, 90 F.3d at 1582)).

DATED:  January 24, 2008                              Respectfully submitted,

                                                      **McKOOL SMITH, P.C.**

                                                      /s/  Samuel F. Baxter
                                                      Sam F. Baxter
                                                      Lead Attorney
                                                      Texas State Bar No. 01938000
                                                      sbaxter@mckoolsmith.com
                                                      McKool Smith P.C.
                                                      104 East Houston, Suite 300
                                                      Marshall, Texas 75670
                                                      Telephone: (903) 923-9000
                                                      Telecopier: (903) 923-9099

                                                      Mike McKool, Jr.
                                                      Texas State Bar No. 13732100
                                                      mmckool@mckoolsmith.com
                                                      Jeffrey A. Carter
                                                      Texas State Bar No. 03919400
                                                      jcarter@mckoolsmith.com
                                                      Anthony J. Magee
                                                      Texas State Bar No. 00786081
                                                      amagee@mckoolsmith.com
                                                      McKool Smith P.C.
                                                      300 Crescent Court, Suite 1500
                                                      Dallas, Texas 75201
                                                      Telephone: (214) 978-4000
                                                      Telecopier: (214) 978-4044

                                                      T. Gordon White
                                                      Texas State Bar No. 21333000
                                                      gwhite@mckoolsmith.com
                                                      Gretchen K. Harting
                                                      Texas State Bar No. 24055979
                                                      gharting@mckoolsmith.com
                                                      McKool Smith P.C.
                                                      300 West Sixth Street, Suite 1700
                                                      Austin, Texas 78701
                                                      Telephone: (512) 692-8700
                                                      Telecopier: (512) 692-8744

                                                      Robert M. Parker
                                                      Texas State Bar No. 15498000
                                                      rmparker@cox-internet.com
                                                      Parker, Bunt & Ainsworth, P.C.

100 E. Ferguson Street, Suite 1114
Tyler, Texas 75702
Telephone: (903) 531-3535
Telecopier: (903) 533-9687

Thomas John Ward, Jr.
Texas State Bar No. 00794818
jw@jwfirm.com
WARD & SMITH LAW FIRM
PO Box 1231
Longview, Texas 75606-1231
Telephone: (903) 757-6400
Telecopier: (903) 757-2323

**ATTORNEYS FOR PLAINTIFF**
**i4i LIMITED PARTNERSHIP**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service on this the 24th day of January, 2008.  Local Rule CV-5(a)(3)(A).

/s/      Gretchen K. Harting
Gretchen K. Harting