<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3  i4i LIMITED PARTNERSHIP      *    Civil Docket No.
                                 *    6:07-CV-113 (LED)
 4  VS.                          *    Tyler, Texas
                                 *
 5                               *    May 11, 2009
    MICROSOFT CORPORATION        *    1:30 P.M.
 6
                        TRANSCRIPT OF TRIAL
 7          BEFORE THE HONORABLE LEONARD E. DAVIS
               UNITED STATES DISTRICT JUDGE
 8                       AND A JURY

 9  APPEARANCES:

10  FOR THE PLAINTIFF:      MR. GORDON WHITE
                            MR. KEVIN BURGESS
11                          MR. JOHN CAMPBELL
                            MS. GRETCHEN HARTING
12                          McKool Smith
                            300 West Sixth Street
13                          Suite 1700
                            Austin, TX    78701
14
                            MR. DOUGLAS CAWLEY
15                          MR. JEFFREY CARTER
                            MR. TOM FASONE
16                          MR. JONATHAN YIM
                            MR. JOHN CURRY
17                          McKool Smith
                            300 Crescent Court, Suite 1500
18                          Dallas, TX    75201

19  APPEARANCES CONTINUED ON NEXT PAGE:

20

21  COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                            MS. JUDITH WERLINGER, CSR
22                          Official Court Reporters
                            100 East Houston, Suite 125
23                          Marshall, TX    75670
                            903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:        MR. ROBERT M. PARKER
                         Parker Bunt & Ainsworth
                         100 East Ferguson, Suite 1114
                         Tyler, TX   75702


FOR THE DEFENDANT:       MR. MATTHEW POWERS
                         Weil Gotshal & Manges
                         201 Redwood Shores Parkway
                         Redwood City, CA   94065

                         MR. DAVID LENDER
                         MR. PAUL TORCHIA
                         MR. STEVEN KALOGERAS
                         MS. ARIAN NEWELL
                         Weil Gotshal & Manges
                         767 Fifth Avenue
                         New York, New York   10153

                         MR. KEVIN KUDLAC
                         MS. AMBER ROVNER
                         MR. TODD PATTERSON
                         Weil Gotshal & Manges
                         8911 Capital of Texas Highway
                         Building One, Suite 1350
                         Austin, TX   78759

                         MR. ANDREW CULBERT
                         Microsoft Corporation
                         One Microsoft Way, Building 8
                         Redmond, WA   98052

                   *     *     *     *     *     *     *

P R O C E E D I N G S

1

2          (Jury in.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Please be seated.

5          All right.  Ladies and Gentlemen of the

6  Jury, I hope you had a good lunch and back ready to get

7  the case started.

8          What we're going to do first is have the

9  opening statements by both sides.  That will take about

10  45 minutes each, which is the time that's been allotted.

11  And then we'll take a short break probably around 3:00

12  o'clock, and then we will come back and start the

13  evidence.

14          So the Court will recognize Plaintiff for

15  purposes of opening statement.

16          MR. CAWLEY:  Thank you, Your Honor.

17          THE COURT:  Mr. Cawley.

18          MR. CAWLEY:  Every lawsuit is a story.

19  It may be a little hard to believe that now when you've

20  spent this morning probably hearing a lot more

21  complications about patent law than you ever dreamed

22  that you would when you came to Court.  But I think

23  you'll find that this lawsuit, like all others, is

24  basically a story about people.

25          This lawsuit is a story about two men who

1  invented a way to help people use the information in

2  computer documents.  Probably none of us in this

3  courtroom had ever heard of this invention, except the

4  inventors themselves and the people they work with.

5            We don't know about it, and yet even

6  though this invention is invisible to most of us, it's

7  affected us in ways that we don't even know.

8            Businesses that we may work for or

9  somehow do business with are more efficient because of

10 the invention.

11           Because of this invention, drug

12 companies, pharmaceutical companies are better able to

13 fulfill their obligations of filing with the government

14 and reporting things, like side effects and the

15 effectiveness of drugs.

16           We're even all a little bit safer because

17 of this invention, because it's helped law enforcement

18 agencies more efficiently share information.

19           This afternoon I'd like to tell you a bit

20 more about that invention, what it is and how it works.

21 But, first, I'd like to introduce you to the people who

22 made it possible.

23           This is Stephen Owens (indicates), and

24 back here a long way away is Mr. Michel Vulpe.  These

25 are the two inventors of this invention.

1          Mr. Vulpe was working on the problem when

2 he talked to his next door neighbor many years ago, and

3 his next door neighbor said, you know, my kid brother is

4 a computer whiz.  You really ought to talk to him.

5 That's how these two men met, and eventually, working

6 together, came up with the invention that has brought us

7 all to the courtroom today.

8          Now, to explain a little background of

9 how the invention works, I want to now take about 10

10 minutes to talk to you about the history of documents.

11          Now, documents have been around for

12 thousands of years, of course.  And this is what we

13 usually think of (indicates) when we think about a

14 document.

15          When all of us were in the first grade,

16 we first learned to make documents like this.  But what

17 we'll learn -- we learned, I'll suggest to you, really

18 comprised two different parts.  We learned the content

19 of documents; how to put things down in words.  But we

20 also learned how to make the document look, how to leave

21 a margin down one side, how to skip a line after the

22 title.

23          The name for how a document looks as

24 opposed to its content is called formatting.  For

25 thousands of years, of course, all documents were

1  handwritten like that one.  But when the printing press

2  came along, there were some changes, because in printing

3  presses, it's a person called a typesetter that actually

4  takes the wooden type, in the early days, or the lead

5  type in later days, and lays it into a tray to print the

6  sheet or the pamphlet or the book that becomes the

7  document.

8           There were also people, though, whose job

9  it was to tell the typesetter how the document should

10  look, and those people were called markup men.  Now, I

11  don't know if any of them were women, but the fact of

12  the matter is what they were called was markup men.

13  And the markup men and the typesetters developed between

14  themselves a specialized language that the markup men

15  would use to mark up the document to tell the

16  typesetter, any typesetter, here's how the document

17  should be formatted; here's how it should look.  And

18  this special set of symbols and numbers and drawings

19  came to be called markup language.

20           Now we come to the era of the next big

21  event, the computer.  The computer created a revolution

22  in documents.  First of all, before the computer, almost

23  all documents were on paper.  After computers, though,

24  some computer documents could be printed on the paper,

25  but the vast majority of computer documents are never

1  printed.  They're created on a computer.  They're read

2  on a computer.  They're stored on a computer and may be

3  sent to computers all around the world, but they're

4  still known as documents.

5           Here, for example, is a simple example of

6  a computer document created on a computer and read on a

7  computer screen (indicates).

8           The availability of computers to people,

9  to everyday people in businesses beginning in the 1980s

10  created an explosion in the number of documents

11  available, and that, in turn, created two problems.

12           First, there were too many documents for

13  people to read; and, second, computers back in that

14  time, the 1980s, couldn't read documents like people do.

15           Now, let me take just a minute to explain

16  those two problems.  Let's suppose that this very simple

17  document that you see is something that was created in

18  the course of some business and that that business

19  creates those documents all the time.  And over the

20  years, they've accumulated enough of those documents to

21  fill this courtroom, hundreds of thousands or millions

22  of documents like this.

23           Well, if my boss comes into the office

24  one day and says, you know, I need to find all the

25  documents relating to a certain date, how am I going to

1  find those documents?  If I'm lucky, maybe we've

2  organized the documents in chronological order, so all

3  I'd have to go is look for the right date.  Well, that

4  solves that problem.

5              But what if instead my boss comes in and

6  says, you know, forget the date.  What we're really

7  interested in is everything that happened in Tyler.

8              Well, now the dates don't help me.  How

9  am I going to find everything that happened in Tyler?

10  The short answer is I'm going to have to read the whole

11  room full of documents.  And for a business with

12  literally millions of documents, this was not a

13  possibility.

14              But you may well be asking yourself,

15  well, what about a computer?  I mean, those documents

16  are on computer.  Aren't computers really good at

17  searching for things quickly?  Why couldn't you just do

18  that?

19              Well, yes, computers are very good at

20  searching for things quickly.  But in the 1980s, they

21  weren't good at understanding what they had found like a

22  human could.

23              So, for example, if this was one of a

24  million documents and we asked the computer to search

25  for all the documents in which 903 occurs, within a few

1  seconds at least, a modern computer could go through

2  those million documents and give you, let's say, 10,000

3  documents in which 903 appeared.

4              But wait a minute.  Does that mean area

5  code 903, or does it mean 9:03 in the morning, or does

6  it mean $903?

7              The computer, although it has the ability

8  to search for all the 903s, it doesn't know what it's

9  reading.  And if you want to tell it to go out and just

10 look for area codes, couldn't do that.

11             Well, people in the early days of

12 computing saw that this was going to be a big problem,

13 and some people came up with a solution what to do about

14 it.  And what it was, was a markup language, just like

15 in the old days, except instead of using the markup

16 language just to give formatting about how a document

17 should look, this kind of markup language would be used

18 to tell the computer where there was a certain kind of

19 information.

20             Now, how did it do that?  First of all,

21 what was it called?

22             There were a couple of names for these

23 languages, and you will hear these throughout the trial.

24 I don't think it's important that you remember the

25 titles and what the initials stand for, but you're going

1  to hear about something called SGML, which stands for

2  standard generalized markup language.

3           There was a certain kind of SGML, a

4  subset of SGML, if you will, called XML, which stands

5  for extensible markup language.

6           Now, the important thing to remember from

7  this -- as I said, it's not necessarily to try and

8  memorize those names -- but to remember when you see

9  these initials that end in the M-L, that stands for

10 markup language.  And these are markup languages that

11 instead of telling people how documents should look

12 would tell computers what the information of the

13 document is and where it is.

14          Now, how would it do that?

15          Well, here is an example of that simple

16 document that you saw before, but this time, it's in the

17 XML markup language.  And you see, it looks quite a bit

18 different than what we're used to.  But if you look at

19 it carefully, you'll see on the top line here, there's

20 the My Document, the title that we had before, but now

21 it's surrounded by these two things that you will learn

22 during the trial are called tags.  That's the name that

23 they're given in XML.

24          And those tags signal to the computer

25 that what is in between those two tags is the title of

1  the document.  Take the area code example we discussed

2  earlier.  Here's the 903 that we saw before.

3                    But now that 903 is surrounded by these

4  two tags that tell the computer that this isn't a price

5  tag; it's not a time of day; it's area code 903.

6  The availability to do this had the potential to

7  revolutionize the way that people use computer documents

8  because now, in addition to being able to use computers

9  to churn out stored documents, people could actually use

10  SGML and XML to search for the information contained in

11  those documents, to let a computer read a document for

12  information in much the same way as a human being would

13  read the document, if they had time.

14                    Mr. Owens and Mr. Vulpe, who were working

15  in this field, the inventors, recognized that this was

16  going to be a huge leap forward in data management of

17  computer technology.  Governments would be able to share

18  information among agencies.  And it wasn't only

19  information like that that could be used.

20                    Any computer application that could

21  understand this SGML language, such as something that

22  would make computer drawings or even an application that

23  would operate a robot, any of those things could be

24  paired with a document using the SGML language.  But at

25  the same time, they saw the promise of these markup

1  languages.  Mr. Owens and Mr. Vulpe saw the problem.

2            Now, from the benefit of hindsight, it

3  may not seem like a huge problem, but at the time,

4  before SGML and XML had been widely adopted, it was a

5  huge problem, and there were actually two of them.

6            The first is in front of you.  This

7  document, frankly, looks pretty much like a mess.  It

8  looks very different than the kind of documents you're

9  used to seeing, if you create documents on a computer,

10  this is the kind of documents that you create.  And it

11  looks very different from the kind of documents that

12  businesses at that time and today typically create.

13  And although there might be big advantages to sticking

14  these tags in the document for some purposes, businesses

15  were very reluctant to have to switch over to a system

16  that made all their letters, all their memos, all their

17  internal documents look like this.

18            The second related problem was that you

19  had to have a special piece of computer software to

20  create the tags and the content in this document.  That

21  meant that you couldn't use readily available word

22  processors, like, for example, Microsoft Word, to create

23  these documents.

24            Now, some of you indicated that you use

25  Microsoft Word.  If that's true, then you've spent at

1   least hours, and in some cases, many hours learning how

2   to use that word processor to create documents in the

3   way you want to.

4            If you are a word-processing

5   professional, a secretary, or someone in data entry, you

6   might have spent hundreds of hours learning how to use

7   Microsoft Word.

8            If you are a business who employs a lot

9   of those word-processing professionals, you have an

10  enormous investment in their knowledge of how to use

11  Microsoft Word.  And businesses were simply flat-out not

12  willing to abandon the ability to create documents using

13  their already existing word processors in order to

14  explore the benefits of using XML.

15           Stephen and Michel realized if XML was

16  ever going to get off the ground, if businesses were

17  ever going to capture its power, somehow a way was going

18  to have to be found to let people create XML documents

19  using an ordinary word processor.

20           They thought about the problem, and one

21  day they came up with a solution.  And this is a drawing

22  of it (indicates).

23           Their idea was to take the content of the

24  document and instead of burying these tags in it, to

25  separate into a separate part of the computer memory the

1  map to the tags so that someone who wanted to create an

2  XML document could use their ordinary word processor,

3  for example, Microsoft Word, create the document.

4           It would look just like an ordinary

5  document, but software would track where these tags

6  actually appear in the document.  Every time the

7  document's changed, the software would keep track of

8  this.

9           This separation of the map tags and the

10 mapped content into two different portions of the

11 computer's memory solved the problem of the adoption of

12 XML.

13          Now, it's very important as the case

14 proceeds here that we be crystal clear about what Michel

15 and Stephen invented and what they didn't.  Of course,

16 they didn't invent computers; they didn't invent SGML;

17 they didn't invent XML.

18          What they invented was a way to bring XML

19 to reality by enabling businesses to use an ordinary

20 word processor, like Microsoft Word, in creating XML

21 documents.

22          Now, I'd like to show you some things

23 that happened at certain times.  In about five minutes,

24 you'll see why it's kind of important that we keep track

25 of these dates.

1          But let's begin with 1994.  It was in

2    1994 that Mr. Vulpe and Mr. Owens filed their United

3    States patent application.  And as you saw in the video

4    downstairs this morning, the Patent Office considered

5    that application.  There was some back and forth.

6          In fact, they looked at it for almost

7    four years.  And in 1998, the U.S. Patent Office issued

8    Mr. Owens and Mr. Vulpe a United States patent, which we

9    have in the courtroom with us right now.

10          Mr. Owens, if you would show that for the

11   jury.

12          MR. OWENS:  (Complies.)

13          MR. CAWLEY:  This is the original copy of

14   the United States patent issued to them that usually

15   hangs framed on the walls of i4i's offices.

16          Did I push a button up here by accident?

17          Should be left consultant computer.

18          Right?  There we go.

19          At the time that Mr. Owens and Mr. Vulpe

20   followed this invention, they were working for a company

21   called Infrastructures for Information that you heard

22   referred to in this lawsuit as i4i.  i4i is a Canadian

23   company.  At it's largest, it's been about 115

24   employees.  Today, it has about 20.

25          You will hear throughout the course of

1 this lawsuit that because it's small and had a brand new

2 idea, i4i has always struggled financially to compete in

3 the marketplace.  To help them do that, in 1998, they

4 hired this man, Bill Cox.

5             Mr. Cox at that time had 35 years of

6 experience in the software industry, and he had already

7 retired.  Though when Mr. Vulpe showed him this

8 invention and showed him what it could do, you'll hear

9 Mr. Cox testify that he was blown away by the

10 possibilities and insisted on coming out of retirement

11 so he could help bring this product to the marketplace.

12             i4i produced a product using the

13 invention that's called S4/Text.  That's the name of the

14 product that i4i sold to the marketplace.  And it

15 allowed people to use Microsoft Word as an editor to

16 prepare XML documents.  That was released into the

17 marketplace in 1999.

18             And then a pretty incredible thing

19 happened.  You remember the discussion about the Patent

20 Office's consideration of the invention from 1994 to

21 1998.  You remember again you saw that on the video

22 downstairs and the young woman whose desk was piled up

23 with documents and so forth.

24             After S4/Text was released to the

25 marketplace, the United States Patent Office came to i4i

1  and said we want your product; we want to become a

2  customer for S4/Text; we need the power of your

3  invention.

4            This is an article from a Canadian

5  newspaper announcing that the United States Patent

6  Office itself had become a customer for i4i's product.

7  And that happened late in the year 2000.

8            Since that time, i4i has largely

9  continued to specialize in delivering its products to

10  pharmaceutical companies.  These are an example of some

11  of the companies that have been its customers; companies

12  like Amgen, Bayer, Baxter, Bausch & Lomb, and other

13  major pharmaceutical companies that you may have heard

14  about.

15            Now, at this point, I need to pause a

16  moment, and I need to talk to you about the Defendant in

17  this lawsuit, Microsoft.  Probably all of you know

18  Microsoft.  It's one of the biggest companies in the

19  world.  It's by far the biggest software company in the

20  world.  The last time I saw a count they have about

21  80,000 employees all around the world.

22            One of Microsoft's most popular products

23  is called Microsoft Word, a word processor that helps

24  people in businesses create documents on a computer.

25  And Microsoft has had a lot of versions of Microsoft

1    Word all the way back into the 1980s.

2                    And these little icons down below the

3    line of the dates represent different versions of

4    Microsoft Word that Microsoft has released to the

5    marketplace.  Basically, what they do is they'll come

6    out with an improvement every year and sometimes every

7    two years, tell people why their product is better than

8    the old version, and encourage people to upgrade to the

9    new version.

10                    But throughout this time that you see

11   here, from 1992 to 2001, every one of these versions of

12   the Microsoft Word word processor had something in

13   common:  None of them worked with XML.

14                    And as you are about to see, by late in

15   this timeframe, long after the application for i4i's

16   invention, long after the patent issued, Microsoft began

17   to realize there's an XML revolution coming and we're

18   not on the bus.  We don't have a product that people can

19   use as an XML editor.

20                    Let me show you some actual internal

21   Microsoft documents about this.  Here's one (indicates).

22   This was written by a man named Jean Paoli, an employee

23   of Microsoft.

24                    Now, let me caution you that in about the

25   next 10 minutes, I'm going to be throwing a lot of names

1    at you, because there are a lot of people who work at

2    Microsoft, and it's not really important that you

3    remember those names.  I'll try and identify clearly

4    whenever I throw one at you that it's a Microsoft

5    employee that we're talking about.

6              But this one's name is Jean Paoli.  He

7    was very familiar with XML and what it could do.  And

8    early in the year 2000, he wrote this memo to other

9    people within Microsoft.  And this section starts off:

10   The bad news for us.  We are in deep trouble, to

11   paraphrase.  We are not building a single client.

12   And there the word, client, refers to a software

13   product.

14             We're not building a single client who

15   can consume XML in its generality.  Please do not be

16   fooled by what we at Microsoft are building today.

17   There is absolutely no client or product in Microsoft

18   which can consume, manipulate, modify, author, present

19   the data in a user-friendly way to the user -- sorry;

20   I'll get it in a minute -- and let her take advantage of

21   generic XML schemas.

22             So Mr. Paoli here is sounding the alarm

23   within Microsoft.  We don't have a product, and we don't

24   even have a product on the drawing board that can do

25   XML.

1          And the timing here is important, because

2   Mr. Paoli wrote this memorandum to Microsoft, that

3   they're in deep trouble, early in 2000, many years after

4   i4i conceived of the invention that solves this problem

5   and a year and a half after the patent had issued.

6          But it didn't stop with Mr. Paoli.

7   During the course of the trial, you'll see quite a bit

8   of communication back and forth within Microsoft about

9   their desperate need for an XML editor.

10          But, significantly, it went all the way

11  to the top.  This is an e-mail from Mr. Bill Gates, who

12  I'm sure most of you have heard of, the Chairman and

13  founder of Microsoft.  And in March of 2001, he wrote in

14  his e-mail:  Now the market wants a great XML editor.

15  It's hard to say we are the leader of the XML revolution

16  if we don't have an editor.

17          And when did he write this?

18          Once again, long after i4i had already

19  patented an invention that would solve this problem.

20  But then, sure enough, Mr. Gates, in a way, proved that

21  he didn't get to where he is by not having pretty good

22  sense and pretty good foresight, because almost on the

23  same day that he wrote that e-mail about needing an XML

24  editor, another employee of Microsoft named Chris

25  Pratley, who works with government agencies, sent out an

1   alarm within Microsoft.

2               He said, Here's a great example of a huge

3   customer interest in XML.  The Department of Defense has

4   been searching for ways to create knowledge and then

5   find it once it has been created.  It's a significant

6   portion of the revenue within North America in the

7   federal government, and I worry that they can replace

8   our cash cow.

9               We want to sell Office XP, and we want to

10  remain the best production application in the

11  government.  The government is pretty hard over on the

12  XML document requirements, so how can we remain number

13  one?

14              They, the government, are also willing to

15  live with all sorts of pain to get content out of Word.

16  Well, now Microsoft had a problem.  It's not just

17  theoretical anymore.  One of their biggest customers,

18  the federal government, is demanding of them, how are

19  you going to let us create XML documents using Microsoft

20  Word?

21              So what did Microsoft do?

22              Well, I will suggest to you, Ladies and

23  Gentlemen, the second incredible thing in this case

24  happened.  The giant, Microsoft, turned to i4i for help.

25  There's going to be a meeting in Washington, D.C.  The

1   government insisted on meeting with Microsoft to be told

2   how Microsoft was going to solve this problem.

3                 Microsoft invited i4i in the form of

4   these two employees, John Tulley and Keith Thomas, who

5   are both in the courtroom today, and who you'll hear

6   from later on in the trial.

7                 Mr. Tulley and Thomas sat in on the

8   meeting with Microsoft and told them how the invention

9   in their product worked.  They gave them handouts in a

10  presentation.  In this presentation, they told Microsoft

11  that S4/Text delivers the benefits of valid XML to Word

12  users and that it provides the familiar Word

13  environment.  You can make XML documents and not have to

14  use a new Word processor.

15                Significantly, they also gave a copy of

16  something called i4i At-A-Glance to Microsoft.  And in

17  that document, Microsoft was informed that the

18  technology in S4/Text was patented by this U.S. patent,

19  the number which you probably recognize.  It's the

20  patent in this lawsuit.

21                The next day, there was a big meeting

22  between Microsoft and the government.  They asked i4i to

23  attend that meeting with them.  In that meeting, when

24  the government representative insisted, how are you

25  going to provide XML capability in your Microsoft Word

1   product, Microsoft responded:  Well, when we have a

2   special need for a customer like you, we often turn to

3   people like this, pointing to the representatives for

4   i4i.

5              After that meeting, the man who was in

6   charge of it, another Microsoft employee this time named

7   Mark Belk, sent a message to some of the i4i people who

8   had been involved in the meeting and said:  You should

9   see this as an opportunity, since you have a capability

10  that we, Microsoft, only have on the drawing board.

11  Significantly, Mr. Belk also communicated to other

12  people within Microsoft about how the meeting between

13  Microsoft and the government and i4i had gone.  And

14  here's what he said:  The only way that we could do this

15  was with a third-party plug-in, and i4i came through for

16  us.

17             Well, that was pretty high praise from

18  Mr. Belk.  And indeed, it indicated a relationship

19  between i4i and Microsoft that seemed to be good for

20  everybody.

21             You see here a document from April of

22  2001 in which Microsoft describes i4i as being a

23  Microsoft partner.

24             And then pretty well the icing on the

25  cake.  In June, Mr. Belk sent this e-mail to Mr. Thomas

1   and other people within i4i, that Microsoft was sending

2   an invitation to i4i to attend something called the

3   Office Advisory Council.  And you'll hear that this is a

4   big deal.

5          A meeting of Microsoft and some

6   third-parties that work with Microsoft to discuss the

7   future of products.  And you'll hear that when i4i got

8   this invitation to the Office Advisory Council, they

9   thought to themselves, looks like our years of struggle

10  have finally paid off.  We have arrived.

11         But then something strange happened.  The

12  next e-mail that i4i got from Microsoft was this one.

13  It's from a man named Andy Zukerberg, who, of course,

14  works at Microsoft.  And Mr. Zukerberg told i4i, well,

15  you know, that invitation to the big meeting, that was

16  due to a miscommunication on our end.  That's not really

17  available.

18         For some reason, i4i got uninvited to the

19  party.  Well, Microsoft knew why that was, and they put

20  it in a secret document that Microsoft has kept secret

21  until it's going to be seen publicly for the first time

22  today.

23         Mr. Zukerberg told others at Microsoft on

24  the same day he uninvited the i4i:  My main concern with

25  i4i is that if we, Microsoft, do the work properly,

1   there won't be a need for their product.

2              In 2003, this sequence of e-mails

3   occurred.  The first that you see here is actually an

4   e-mail from another employee of i4i, Mr. Baksh, who sent

5   this e-mail to Microsoft because he hadn't heard

6   anything in a long time about their so-called

7   cooperation.

8              He reminds them about i4i's Tagless

9   Editor and what it can do, and he also reminds them that

10  this technology is protected by the U.S. patent.  You

11  will see that this e-mail arrives at Microsoft and goes

12  up the chain of command until it finally arrives on the

13  desk of a man named Martin Sawicki.

14             So Martin Sawicki, who works at Microsoft

15  and works on XML, eventually receives this document, and

16  he responds back down to the Microsoft people who sent

17  it to him by saying:  Thanks, we saw this tool some time

18  ago and met its creators.  Word 11 will make it

19  obsolete.  It looks great for XP, though.

20             Consider what this e-mail means.

21             First of all, Mr. Sawicki at Microsoft

22  says that for XP, which was the old Microsoft Word

23  product that didn't do XML -- for XP, the i4i invention

24  works great, but don't worry about it because our new

25  product, Word 11, will make it obsolete.

```
 1              Meanwhile, what's going on at i4i?

 2              Not more than a month before this e-mail

 3    was written within Microsoft, Mr. Vulpe at i4i sends

 4    this e-mail to Jean Paoli.

 5              Remember him?  He works at Microsoft on

 6    XML.

 7              Basically, wanting to know, so what's

 8    going on.  And he says:  Jean, congratulations on your

 9    progress with Office 11 and XDocs.  Would it be possible

10    to discuss that and where i4i is.  Our S4/Text add-in to

11    Word is getting attention.  We have over 50,000 seats

12    out there.

13              THE COURT:  Let me just advise, you

14    probably have about 10 minutes.

15              MR. CAWLEY:  Thank you, Your Honor.

16    So i4i still hoped that the relationship was intact.

17    They didn't know Microsoft's internal plans.  And,

18    indeed, Microsoft carried out exactly the plans that you

19    heard.  They took the invention and moved it in to

20    Microsoft Word.

21              Now, there's a witness here today -- if

22    you'll stand up -- this is Mr. Tom Rhyne.  You heard

23    about him briefly earlier today.  I can't tell you that

24    the full explanation of how Microsoft infringes the

25    patent is going to be simple, but I can tell you that
```

1   when Dr. Rhyne explains it, you will understand it.

2   We brought him here, because, as you heard, he has

3   decades of experience as a professor at Texas A&M and as

4   a professor at the University in Texas -- of Texas.  His

5   stock and trade is teaching and explaining complicated

6   matters like this.

7                  And he will explain to you in maybe more

8   detail than we all want to hear, but in the amount of

9   detail we need to hear, how Microsoft 2003 and 2007

10  infringes the patent.

11                 But the high-level story is that it

12  infringes the patent because it does this (indicates).

13  Microsoft created within its Word product this portion,

14  the metacode map that maps the tags to the content of a

15  document that's located in a separate datastructure in a

16  different part of the computer memory.

17                 You'll also hear that since the time that

18  it started using i4i's invention, that Microsoft has

19  made more than $14 billion in profit from the sale of

20  products that can be used to infringe i4i's patent.

21                 Now, Microsoft lawyers can be expected to

22  argue to you, oh, but there's lots of features in

23  Microsoft Word.  This XML thing, that's just one of the

24  many kinds of things that we put into Word and it's

25  really only -- it's really only a small and

1  insignificant part of the value.

2             As you hear that argument, consider,

3  though, the evidence in the case.  This is a document

4  created by Microsoft in connection with their own launch

5  of Word 2003.  And at that time, before they got into

6  this lawsuit, they said:  Foremost among the

7  improvements in Word 2003 is the deep support for

8  customer-defined XML, not a small feature of Microsoft

9  Word but foremost among the improvements.

10             Well, sometime after Microsoft made its

11  decision and brought Word 2003 into the marketplace, i4i

12  began to suspect that something was amiss.  They even

13  began to suspect that Microsoft might be infringing

14  their patent and using their invention.

15             Unfortunately, it wasn't easy to figure

16  out.  When you go and buy a copy of Microsoft Word, you

17  don't actually get the code, what's called the source

18  code, to show you how it works.  So i4i hired some

19  experts to help them get to the bottom of that, and

20  eventually their worst fears were confirmed.  And they

21  learned that Microsoft was infringing their patent.

22             i4i then had to make a decision what to

23  do about it, and their decision eventually was to bring

24  this lawsuit to defend their patent rights.  To do that,

25  they had to reorganize the company.  They took i4i Inc.,

 1    i4i Incorporated, the existing corporation, and they

 2    formed a new company called i4i Limited Partnership.

 3    All the partners in the corporation became -- sorry --

 4    all of the shareholders in the corporation became

 5    partners in the new limited partnership.  Investors from

 6    whom they raised additional money also became partners

 7    in the limited partnership, and they moved the ownership

 8    of the patent from i4i corporation into i4i limited

 9    partnership.

10              That's the reason that Judge Davis

11    explained to you today that there are really two i4i

12    entities in this lawsuit:  The corporation and the

13    limited partnership.

14              i4i has brought this case so they can ask

15    you to award them fair value for the use of their

16    invention.

17              Now, what would fair value be for

18    something like this?

19              Well, they also hired a man by the name

20    of Mike Wagner.  He's right here (indicates).

21              Mr. Wagner has spent his entire career of

22    30 years plus in the business of trying to determine the

23    amount of a fair and reasonable royalty for the use of a

24    patent.  He's done extensive work and analysis in this

25    case, and you'll hear from him, his conclusion, that a

1  reasonable royalty to i4i for Microsoft's use of its

2  invention is about $200 million.

3               Now, $200 million is a lot of money in

4  any context and by anybody's perspective.  But to keep

5  that number truly in perspective, let me remind you that

6  $200 million represents this tiny fraction of

7  Microsoft's profits.

8               And, remember, that's not their revenues;

9  just the money they took in the door.  That's

10  Microsoft's profits from all of the units they have sold

11  that are capable of being used to infringe this patent.

12               So that, Ladies and Gentlemen, is the

13  story we believe that you'll hear during this trial.

14  You'll hear a story about the two men, Mr. Owens and

15  Mr. Vulpe, with a new idea.

16               You'll hear a story about the other

17  employees of i4i who worked hard to try and make it a

18  success, who worked hard to try and work in partnership

19  with Microsoft.

20               And you'll hear a story about the people

21  at Microsoft who decide it was better for them to take

22  that invention without paying fair value for it.

23               And at the end of the day, when we finish

24  the trial, I'll stand here; I will review the testimony

25  that you've heard; and I will ask you to award i4i fair

1  value for Microsoft's use of this invention.

2                    THE COURT:  Thank you, Mr. Cawley.

3                    All right.  Counsel for Defendant.

4                    MR. POWERS:  Thank you, Your Honor.

5                    Your Honor, can we bring the lights back

6  down, if we could?

7                    THE COURT:  Sure.

8                    MR. POWERS:  Well, good afternoon.

9  Mr. Cawley and I agree that this case would be story.

10 We just don't agree what the story is.  I actually do

11 agree with about 80 percent of what he said, but where

12 we disagree is some other facts that I would like to

13 bring to your attention.

14                    At the end of trial, though, after you've

15 heard all the evidence -- and as Judge Davis said, it

16 really is important that you wait till the end, because

17 we have to go second.  Please wait until you've heard

18 all of the evidence.  At the end of all of that

19 evidence, we believe that the evidence will tell a very

20 different story.

21                    Now, one of the things you're going to

22 have to decide in this case is something we talked about

23 a little bit during voir dire.  There are all sorts of

24 good reasons to enforce a patent.  There are some not so

25 good reasons to enforce a patent.

1                We think that what the evidence will show

2    here is that the enforcement of this patent is brought

3    wrongly.  But that will be for you to decide.

4                The issue here begins with the parties.

5    And I think of cases -- and there's a lot of different

6    ways to think about them -- as being either engineer

7    cases or banker cases.

8                Engineer cases are often ones that are

9    brought to protect a patent, to protect a successful

10   patent from being copied.  That's not what this case is

11   about in our view based on the evidence.

12               Other cases, the banker cases, are ones

13   where you didn't have a very successful product, and the

14   bankers decide to try to get their money out another

15   way.  We think the evidence will show that is what this

16   case is about.

17               i4i, Inc., was founded by Mr. Vulpe.  He

18   founded it as a software company trying to sell software

19   products, and it was not successful.

20               There's no shame in that.  A lot of

21   companies don't succeed despite having good people who

22   try hard and work very hard.  There's no shame in that

23   at all.

24               The shame, from our perspective, comes

25   from what happens next.  A lot of great companies have

1  been formed when people who failed the first time try it

2  again.

3              The shame could be instead of -- trying

4  again to make a product that people will buy and sell

5  instead of suing people for making products that people

6  really want.  And we think that's what happened in this

7  case.

8              i4i, Inc., was founded by Mr. Vulpe.  He

9  originally ran it as the President.  Starting around

10  2002, he was no longer the President, and the bankers, a

11  group called McLean Watson, who owned most of i4i at

12  that point, took over the company, and we'll show you

13  what impact that has on the facts of this case.

14              The second part is interesting.  The

15  second part is i4i, LP, which you heard a little bit

16  about from Mr. Cawley.  That was actually the party that

17  sued in this case originally back in 2007.

18              It wasn't i4i, Inc., the company that was

19  actually making the product; it's this other company

20  just owned by the bankers.  They sued and only a year

21  later did they add i4i, Inc., Mr. Vulpe's company.

22  Microsoft, of course, we all know.  The products that

23  are accused here are Word 2003 and 2007.  But Word has

24  been being produced many, many years before that, and

25  that's important in this case for reasons we'll talk

1  about in a minute.

2  Let's talk about i4i a bit as a company.

3  It's based in Toronto.  An interesting fact is that it

4  joined at the very beginning of this company to

5  Microsoft Developers Network.  And that's a network that

6  Microsoft sets up for companies that want to sell

7  products that work with our products.

8  And the interesting fact about that, a

9  member of the Microsoft Developers Network gets advance

10  copies of our software.  They don't have to go buy it

11  off the shelf.  They actually get advance copies that

12  they can work from so they can design something that

13  works with our products.

14  And that's exactly what i4i, Inc., did.

15  i4i, Inc., got an advance copy so that they could do so.

16  And Mr. Vulpe, when he comes to testify, will tell you

17  that, in fact, they followed Microsoft's products very,

18  very closely.

19  They would go to conferences that

20  Microsoft would offer to the sponsor and say, tell us

21  what you're doing so that we can help build products

22  that work with yours.  So they knew exactly what we were

23  doing because they are a member of the club.  They

24  signed up.

25  The last point, and this is important,

1  is, before the accused product was released -- you heard

2  Mr. Cawley say that we effectively did them some harm.

3  Before the product they're accusing was released, they

4  had already lost over $25 million, and you'll see that

5  their company was effectively out of money.

6          Couldn't have been caused by a product

7  they're now complaining about because it happened before

8  then.  But the question that you'll have to answer is,

9  why was that?  Was it because the product couldn't

10  satisfy a need?  Were there problems with the product?

11  That's where there will be some evidence on that issue.

12  i4i Limited Partnership -- that's the company that

13  originally brought suit that doesn't have any technology

14  in it, just has the patent -- its sole purpose, sole

15  purpose is to bring this lawsuit.

16          It was brought into existence by a bunch

17  of legal documents six months before the lawsuit was

18  filed.  Its only asset is the patent they're suing on.

19  So that's all it is.  It was just designed to do this

20  lawsuit right here.  And they sued us with no notice, no

21  discussion, no nothing.

22          Microsoft, you've all heard about,

23  thousands and thousands of engineers.  That's important

24  because Microsoft makes its own technology.  We either

25  buy it and pay good money for it, or we do it ourselves

1  using our own technology.

2            In this case, we did it ourselves using

3  our own technology, and we think that's what the

4  evidence will show you.

5            The interesting thing about Microsoft is,

6  although it has thousands of employees now, it started

7  with four guys, just like the two guys that were talked

8  about here today; four guys out of college, one of whom

9  didn't even graduate.

10           They built a successful company by

11 building products people wanted, products that worked,

12 and that makes them a target.  That puts a big target on

13 their back for people who want to file lawsuits that

14 shouldn't be filing them.  We think the evidence will

15 show this lawsuit is one of those.

16           Mr. Cawley showed you a timeline.  I'd

17 like to show you another.  Because we think these facts

18 are very important in your decision, in helping you to

19 decide what type of case this is and really whether

20 Microsoft infringes.

21           The first important fact, in late 2002 --

22 this is before Word 2003 comes out.  Now, because i4i is

23 a member of our developer network, they get an advance

24 copy of our software so they can work with it.

25           And you will hear admissions from i4i

1   people, particularly Mr. Vulpe, that they got it, they

2   downloaded it, and they studied it.

3                    So when Mr. Cawley says they had no

4   reason to believe that Microsoft was infringing, the

5   facts won't support that.  Because they knew, when they

6   studied the software in 2002, that it did exactly what

7   they're complaining about now.

8                    Here's a copy of the download, and you'll

9   see over here a little i4i and their own number.  That

10  means this is a document that came from i4i's files.

11  They downloaded it from our developer website and

12  studied the software and studied how it worked and

13  learned how it worked.

14                   So you would think that the next thing

15  they would do, after they had studied our software, if

16  they thought it infringed their patent, is they would

17  call us and say, you're infringing our patent.  Stop it.

18  What happens next?  Very quickly after they studied it,

19  Mr. Vulpe, instead of challenging us for infringement or

20  saying, you're doing something wrong, congratulates us.

21  Here's the e-mail.  December 5, 2002.  He sent it to the

22  man who's responsible for this part of the technology,

23  or at least part of it, and tells him -- encourages him,

24  said this is a good thing.

25                   Does he accuse us of infringement in this

1  e-mail?  No.

2              Mr. Vulpe will admit that at the time he

3  wrote this e-mail, he already studied the software and

4  knew how it worked and knew that it did the things they

5  are now saying are wrong.  He didn't say any of that.

6  We think it's because it wasn't wrong, and he knew it.

7  After this time, December of 2002, did anyone ever from

8  i4i say anything to Microsoft that they thought

9  Microsoft was doing anything wrong?  No.  Never, ever a

10  hint that there was anything that Microsoft was doing

11  was wrong, even though they had an advanced copy of our

12  code and studied it very, very closely.

13              But it's not just to us that Mr. Vulpe

14  was saying there's no problem.  Internally, internal

15  memos, does he say that this product, after they studied

16  it, infringes our patent?  Does he say it causes a

17  problem for us?  Does he say it's going to hurt us?  No.

18  He says it creates an opportunity.

19              This is June 5 of 2003, about six months

20  after he had analyzed the software carefully and a few

21  months before it was even released.

22              So even internally, he's saying

23  Microsoft's entry into the marketplace creates more

24  opportunities, opens doors and opportunities.  They were

25  positive about it, at least Mr. Vulpe was.

1              So Mr. Vulpe knew this patent for sure.

2   He knew our program for sure.  He was studying it

3   closely.  He saw no problem with it in 2002 and 2003

4   We released the product toward the end of 2003.  We hear

5   nothing.  The lawsuit's filed about three and a half

6   years later in March of 2007.

7              So one of the questions you're going to

8   have to ask and answer is what changed.  Between the

9   time that he's saying, this is great, congratulations,

10  to the time that he's saying it's horrible, infringing

11  our rights, what changed?

12             Well, we think the clue is going to be in

13  the management change inside i4i and i4i LP.  What

14  happened is the bankers took over.

15             The man in the middle, Mr. Angus, became

16  President.  He's from McLean Watson, the banker that

17  owned most of i4i, Inc., at that point.  The man on the

18  left, Mr. Owen, Chairman of the Board; the man on the

19  right, Mr. Stewart, became Chief Financial Officer.  All

20  the top positions in the company were taken over by the

21  bankers.

22             The two men at the bottom are from a

23  company called Northwater, specifically called the

24  Northwater Patent Fund.  What they do is they invest in

25  litigation, and you'll see that later as well.

1           So what changed?  When they took over,

2    the bankers declared a financial crisis inside i4i, Inc.

3    Here's an internal memo to the Board of Directors of i4i

4    from Mr. Angus.  Remember, he's from McLean Watson, the

5    new President.  He says, it's a financial crisis; we're

6    going to run out of cash.

7           Now, why was that?  Was that something

8    caused by Microsoft Word?  No.  It happened before Word

9    was even introduced.

10          As of April of 2003, six months before we

11   introduced the product they're complaining about, they

12   had lost already by that time a total of $25.5 million.

13   That's the financial crisis that Mr. Angus is referring

14   to.

15          So they had to do some options.  They had

16   to look at what they were going to do to solve that

17   financial crisis that the banker was talking about to

18   the board.

19          Well, they quickly seize upon one option.

20   We can sue Microsoft, in his words, to increase value,

21   whatever that means.  This is Mr. Owen, Chairman of the

22   Board, again from McLean Watson, the lead banker owning

23   i4i.

24          He says, well, what are we going to do?

25   Increase value or achieve liquidity.  That's banker-ese

for how do we get our money out of this company?

Well, they sue Microsoft.  They've got a lot of money.  They're successful.

Mr. Owen keeps it up.  February of 2005 sends a memo to Mr. Stewart.  Remember, he's the Chief Financial Officer now, both from McLean Watson.  He says, well, can we sell the litigation to someone who hates Microsoft?  Maybe that will get us some money. So what's really changed here is not the patent.  The patent didn't change in this time period.  Word 2003 didn't change.  What changed is the people inside the company who were thinking about what i4i should do. Mr. Vulpe didn't see a problem with infringement.  Saw it created opportunities.  The banker saw a different kind of opportunity.  They saw an opportunity to get some money out of the company and get their money back.

So what happened?  After saying that they'd sue Microsoft or sell it to somebody that hates Microsoft, they found somebody.  They found that Northwater Patent Fund, investor in patent litigation.

Here's the agreement by which they sold the patent to them.  So i4i, Inc., Mr. Vulpe's company, the one that's actually making software, doesn't have the patent anymore.  They sold it to this LP that's owned by bankers whose sole job is to sue us.

1            The very same day, September 22, i4i, LP,

2  was formed, same group of documents, and six months

3  later, the lawsuit happened.

4            That, we think, is the story of why we're

5  here.  Not because Mr. Vulpe felt aggrieved by patent

6  infringement; we're here because the bankers decided to

7  achieve liquidity, as they put it.  That's not what we

8  think is the right way to be doing a lawsuit.  There is

9  the limited partnership in September of 2006.

10            Now, what's this case about?  We're all

11  here.  Even bankers can bring meritorious lawsuits.  We

12  have to look at the merits of the lawsuit carefully.

13            These are the two issues that we believe

14  you're going to have to address:

15            1.  Does Microsoft Word work the same way

16  as the Vulpe patent?

17            We think the answer to that is no.  It

18  works in a different way, because it uses Microsoft

19  technology that we've been building on for years.

20            2.  Did the Patent Office have all the

21  right information?

22            The answer to that would be no, because

23  the information we're showing you, the Patent Office

24  didn't have.

25            Why is Word different?

1               The first reason Word is different is

2    because it's building on 12 prior generations of Word.

3    Microsoft has been making Word since the early '80s, and

4    that has created a body of technology, which we're going

5    to build on.

6               So when Microsoft makes Word 2003 or Word

7    2007, it doesn't just change how it's doing and adopt

8    some other company's way of doing things; it builds on

9    what we do.  And that difference will be important.

10              One of the things that I think is

11   important in any patent case is to make sure that we

12   look closely at the evidence.  It's easy enough to throw

13   up a document on a screen and see a word that says map

14   or something like that, or Bill Gates saying we need an

15   editor.  But we believe the evidence requires a closer

16   look, and I thought this would be an interesting way to

17   make that point.

18              This is a satellite photo taken of two

19   different things.  It looks pretty similar from many

20   miles up in the sky.  You zoom in, it still looks

21   awfully similar.  But you zoom in a little more, and it

22   turns out the one on the right has all along been the

23   Great Wall of China.  The one on the left side all along

24   has been the Sabine River.  Apparently, that fork is a

25   little southeast of this courthouse.

1          That is just making the point that you
2    can't just look at the surface of the evidence in this
3    case.  What we ask is that you look closer.  And when
4    you look closer, we believe you're going to see that
5    Microsoft Word is different.
6          So, for example, one of the documents
7    that I put up, I'll show you this exhibit that has the
8    word XML mapping.  And you'll say the patent has the
9    word map; this has XML mapping; that's all you need
10   know.
11         We're going to ask you to look closer,
12   because when you look at exactly how the Court construes
13   mapping, we think we don't infringe.  And I'll show you
14   that in detail in a few minutes.
15         Mr. Gates' e-mail, which Mr. Cawley
16   showed you in opening statement, talking about XML
17   editors, well, that's interesting, because I think the
18   evidence will show that that's not what this case is
19   about.
20         What this case is about, these are three
21   requirements for i4i to meet its burden of proof on
22   infringement.  And they have to meet all three, every
23   single one of them.  If only one of them isn't present,
24   i4i has not met its burden.  And we think it can't meet
25   any of these.

1              The first is that they have to store a

2 metacode map in what's called a datastructure.  And here

3 I've shown you -- and I think it's important -- again,

4 we're asking you to look closely at the evidence.

5              You saw Mr. Cawley put up a board that

6 showed some -- a couple of boxes here and there.  We're

7 showing you the actual claim, and we're showing you

8 Judge Davis' actual construction that's in your book of

9 that claim.

10             A metacode map is a datastructure.  So

11 what does that mean, and why is it required?

12             Well, in order to understand that, you

13 have to understand what's a metacode and what's the

14 content.

15             Here's an example from the patent itself.

16 The patent shows this formatted document, a very simple

17 document.  The title is The Secret Life of Data.  The

18 first paragraph is data that's hostile, the end.  This

19 is actually in the patent that's at issue here.

20             But what the patent says is -- and this

21 is similar to what Mr. Cawley showed you -- if you have

22 embedded codes in that, that would tell you which part

23 is the chapter, which part is the title, where the

24 paragraph is, et cetera, and at the bottom, mixes

25 together the content with those metacodes.

1                    And what the patent teaches is exactly

2    what Mr. Cawley said.  You separate that mapped content,

3    the actual words, from the metacodes.  And all these

4    figures are straight out of the patent.

5                    So you have the metacode map on the

6    right.  That's the datastructure the Court's

7    construction is referring to.

8                    So the question is, does Microsoft Word

9    2003 have a datastructure as the Court's claim

10   construction requires?

11                   You see the metacodes; you see the

12   positions and the addresses.  That's exactly how the

13   patent teaches it works.  So it has to be in the

14   datastructure.

15                   Dr. Rhyne, who was pointed out to you

16   earlier, he produced a report.  And his testimony will

17   be coming to you.  And he shows you the structure on the

18   left and says, well, that's a datastructure, and it

19   looks sort of like the one on the right, and therefore,

20   Microsoft infringes.

21                   That was after his report and study.

22   That's what he presented to us.

23                   And, again, on first look, before you

24   start looking closely, it looks like a pretty simple

25   single datastructure.  It looks like a datastructure.

1   You have to look a little closely, though, because there

2   are some words obscured by the red box that Mr. Rhyne

3   put there.  Those words say, Merge structures for

4   display purposes.

5               What does that mean?  Well, it turns out

6   there's no such structure like that in Word, so it does

7   not exist.  This is something he made up.  He made it up

8   off of something on the right that comes from another

9   expert report.

10              Now you won't find that in Dr. Rhyne's

11  report, Figure 13.  It turns out that there's three

12  structures on the right -- it's a little hard to see,

13  but we'll show it to you better later -- that he

14  scrunched together to create an imaginary structure on

15  the left.

16              And that was the testimony that he

17  prepared for this case.  But the one on the left doesn't

18  exist in real life.

19              That's like taking a bedroom from David's

20  house and a living room from Kevin's house and a kitchen

21  from Eric's house and putting them together and saying

22  here's a house.

23              It's not a house; it's three rooms in

24  three different houses.  But that is the testimony --

25  the basis of the testimony that Mr. Rhyne prepared.

1                So it turns out, even Figure 13 from

2    Dr. Martin's report, the one that he merged, even that's

3    incomplete.  You see those little orange boxes that

4    we've got up there.  It turns out, those aren't really

5    labeled.  There's a lot more to tell there.

6                So when you actually go and figure out

7    how it works and you look closely, this is exactly what

8    it looks like.  You've got structures and content all

9    over the place.

10               Now, it will be for you to decide whether

11   that, as you look at it after -- as you look closely, is

12   a datastructure in the meaning of the patent under the

13   Court's construction.  We think the answer to that is

14   no.

15               The second requirement from the Court,

16   again showing you the claim language and the Court's

17   construction, not just a void with some lawyer words on

18   it, is that the metacode map must contain the metacode.

19   Clear requirement in Judge Davis' construction.

20               You see exactly what that means.  Again,

21   straight out of the patent.  In the patent here is a

22   metacode map, as shown in the patent, and you see it has

23   a little caret to the left and caret to the right,

24   chapter, title, paragraph, et cetera.

25               But now as you look at Dr. Rhyne's

1  supposed metacode map, it doesn't have anything right

2  here in this green box.  That's where he says, in

3  theory, the metacode exists, but there's nothing there.

4  There certainly isn't a less-than sign, chapter, and

5  greater-than sign.

6            But when you see it, look really closely.

7  There's a little magnifying glass, there again partially

8  hidden behind that red box.  What that magnifying glass

9  means, it turns out, is there's a lot of detail in there

10 that isn't shown.

11           And when you figure out what that detail

12 is that wasn't shown, it turns out it's back to this.

13 So, again, as presented, you've got to look a lot

14 closer.

15           But even after you go through this whole

16 process, you don't get what the patent says is the

17 metacode.  Even after that, what you get is just the

18 word chapter -- you do get that -- the word title, the

19 word paragraph, but you don't get these little marks

20 that are called delimiters:  The less-than sign, the

21 greater-than sign, or the slash.

22           And it turns out those are important.

23 Those are important, because if you don't have them,

24 it's not a metacode.  And therefore, you won't meet the

25 Court's construction that it must contain the metacodes.

1   And there won't be a dispute about that among the

2   experts, but that is not what comes out of that process.

3   And the patent makes clear that those less-than signs

4   and greater-than signs are important parts of the

5   metacodes.  And the standard, this W3C standard of XML

6   makes very clear that those marks are required.  But

7   they're not there.

8                    So the very thing that Dr. Rhyne is

9   calling a meta map just isn't one.

10                   The third requirement is that you have to

11  map the metacodes to the input content stream.  That

12  sounds like a mouthful and it sort of is.

13                   But, again, Judge Davis has given us a

14  very clear construction that says, when you're making

15  this map, you have this input stream with the original

16  document, and you have to map the metacodes to the

17  places where those codes existed in that input context

18  stream.

19                   And that's exactly how the patent works.

20  You take that original document, and you identify where

21  in that stream -- here is Position 37 for that one code,

22  and here is Position 56, and that's how it works.

23                   The problem is, Word does not work that

24  way.  Why not?  Because Word is built on all the prior

25  Word technology, which means it's going to work the way

1 Word works, not the way somebody else's technology

2 works.

3              Rob Little, right here, is one of those

4 that looked at that code, he'll testify exactly how it

5 works.

6              And Stephen Gray is also here, an expert

7 witness with over 30 years of experience in exactly this

8 area, will testify about how Word takes that original

9 input stream, but it changes it.  And it changes it in a

10 way that Word can understand.  And it does so because of

11 Word's particular technology, because we're building on

12 Microsoft's technology, not i4i.

13              Now, as a result of that, is that input

14 positions on -- in the input content screen that were 37

15 and 56 in the patent, the way the patented invention

16 works, those don't work in ours.  If we treated those as

17 a position, it would break in our system, because the

18 numbers are different.

19              Why?  Because we've added a bunch of

20 other things to that stream when we did that

21 transformation.  And there won't be any dispute about

22 that among the experts either.

23              So the three key requirements where i4i

24 has to prove all three, as construed by Judge Davis,

25 they can't prove any of the three.  And we think that's

1    what the evidence will show on their burden of proof on

2    infringement.

3              Let's take a closer look at some of the

4    evidence they offer, some of the evidence that

5    Mr. Cawley offered today.

6              First, they'll put in a lot of evidence

7    that XML is very important to Microsoft in general.

8    True.  XML is important.  It has an advantage for many

9    people.  But i4i didn't invent XML.  It didn't invent,

10   and it will admit it didn't invent any of these types of

11   uses of XML.

12             So the issue is not whether XML is

13   valuable or even custom XML or Word ML -- Word ML, by

14   the way and Office Open ML -- XML are types of XML that

15   we invented particularly.  And i4i agrees they don't

16   infringe.

17             So when someone uses our Word product and

18   does it with Word ML, the type of XML that we created,

19   even i4i agrees there's nothing wrong with that at all.

20   But the case isn't about whether XML in general is

21   valuable.  We invented our own XML, and that does not

22   infringe even under i4i's position.

23             Interestingly, you can read that entire

24   patent end to end, and it doesn't mention XML at all.

25   The very thing they're now saying is the whole point of

1   it.  Doesn't mention XML.  Talks about SGML, which is a

2   predecessor standard, different standard.

3            Also interestingly, although i4i is here

4   now claiming that it really is the one that makes XML

5   possible.  Microsoft, not i4i, was one of the people

6   involved in actually inventing and creating the standard

7   for XML.  That's this Jean Paoli Microsoft.

8            W3C stands for Worldwide Web –– that's

9   what the 3 means –– Consortium.  This is the same that

10   creates XML.  And it's Microsoft that's involved in the

11   inventing, and now we're being accused saying that we

12   have to pay them $200 million for something that we

13   contributed to, not i4i.

14            Now, the second big thing you heard from

15   Mr. Cawley today, that Microsoft met with i4i in 2001.

16   That's true.

17            You also heard that that's something that

18   we desperately turned to i4i on.  That's not true.  The

19   evidence, we think, will show quite the opposite; that

20   i4i was desperately pursuing Microsoft to try to make

21   some money, which makes sense.  A lot of people do that.

22   And if they have technology that we think is worth

23   buying, we buy it.

24            In this case, the people that Mr. Cawley

25   was referring to in the meeting, they didn't write the

1   source code.  They didn't design what's accused.  They

2   received no confidential information.  And you heard

3   Mr. Cawley say at the very end that Microsoft decided

4   to, quote, take that invention, close quote.

5             But I don't want you to be confused by

6   that.  By that, he does not mean that i4i is arguing

7   that we copied, because i4i is not arguing that.  They

8   said that clearly.  There is no argument that Microsoft

9   copied.  So the issue isn't that.

10            Microsoft independently developed Word

11  and the accused functionality.  Mr. Little will testify

12  at length about what he did and how he did it.  And he

13  had no access to Mr. Vulpe's information.  He didn't

14  know about the patent, didn't have any i4i information

15  at all.  He did it using Microsoft technology, not

16  anything from i4i.

17            So first question:  Does Microsoft Word

18  work the same way as the Vulpe patent?

19            We think the answer to that is no.  No,

20  because we don't meet any one of all three requirements

21  that must be met and because we used our own technology.

22            The second issue is:  Did the Patent

23  Office have the right information?

24            Well, that goes to the question of

25  validity.  These are the four prior art references we're

1  going to elaborate on.  We will show you that each of

2  these four is before i4i's work and invalidates their

3  patent.  And none of these four was considered by the

4  Patent Office, not a single one.

5              Now, how do we know that?  We know that

6  from the very face of the patent in the book in front of

7  you.

8              The part we've highlighted is titled

9  References Cited, and you see four different things

10  cited there.  That's the place in the patent where the

11  Examiner is required to list what it is he considered in

12  deciding whether this was patentable.

13              So we know, there's no debate whether any

14  of the four things were -- we're offering to you was

15  considered.  None of those four is on that list.

16  And it's important to know that the whole process by

17  which i4i was in the Patent Office getting this

18  invention and talking to the Patent Office that is

19  referred to both by Judge Davis and by Mr. Cawley,

20  that's private.

21              That's a process which I think, as the

22  video told you this morning, no other party has a right

23  to participate.  Microsoft can't be there, and nobody

24  else can be there saying, hey, here's some prior art you

25  ought to consider.  It's a totally private proceeding,

1   totally confidential.

2               And the result of that is that only these

3   four things were considered by the Examiner.  And those

4   four things do not include any of the four that we're

5   relying on here.

6               So you, the jury -- as Judge Davis said

7   and the video said, you, the jury, will be the first to

8   assess whether this patent's valid in light of those

9   four references.

10              Let's look at the four.  The first is our

11  own technology, not surprisingly.  We have products of

12  Word going back many, many years.  The person that is

13  accused here is colloquially called Word 11.  That's the

14  one that became Word 2003.  Word 5 and 6 were much

15  earlier.

16              June of 1994 is when Mr. Vulpe filed his

17  patent application.  Word 6 was released almost a year

18  later, about six months earlier; Word 5, about a year

19  and a half earlier, well before the patent application

20  was filed and six years before the patent became public.

21  The patent didn't issue until 1998.  It was all

22  confidential starting in 1994.  But we had already

23  released Word 5 and 6 years and years before that.

24              Now, why does that matter?  It matters

25  because Word 5 and 6 did the same thing they're talking

1  about here using separate codes to influence what the

2  content looks like.

3            Here's an example.  Particular codes that

4  are called in those products are RTF codes, also known

5  as rich text format.  Rich text formats is codes that

6  affect content.  You see these two.  They converted that

7  particular bit of text to italics.  These codes here

8  called para create a paragraph.  Same type of technology

9  that they're talking about here.

10            Now, i4i will argue, well, those RTF

11  codes really don't count as metacodes because they're

12  formats.  That's what Dr. Rhyne will say.  The problem

13  is the patent doesn't square with that argument.

14            Here is Mr. Vulpe's own patent where he

15  says particularly where the metacodes are text formatted

16  codes.  So we know from his own patent that metacodes or

17  formatting codes are included.  So that argument doesn't

18  wash with Mr. Vulpe's patent.

19            So that's Microsoft Word 5 and 6, well

20  before, years before, and has codes that influence

21  content which works the same way.

22            The second prior art reference, second

23  validating art is something called SEMI-S4.  Sometimes

24  you'll hear it called S-to-the-4th or S superscript 4 or

25  just S4.

1                Now, what that is, is a product that i4i

2     sold itself.  And you might ask, well, how can I browse

3     on a product and invalidate i4i's patent?  Good

4     question.

5                The answer lies in the rule of the Patent

6     Office that is absolutely clear and unchangeable.  The

7     rule is that you've got a one-year grace period before

8     the time you file your patent application.  And that's

9     it.  As Judge Davis said to you earlier, patents, it

10    exists for a limited period of time.

11               So the way the Patent Office rules work

12    is, you get a one-year head start, but you can't start

13    selling products governed by that patent 366 days before

14    you file a patent application.

15               Why?  Because that would cheat the public

16    on how many years you get protection.  You can't lie

17    behind the log selling products and then come out with a

18    patent much later.  You've got to file.  It's a strict,

19    strict Patent Office rule.

20               So the issue is going to be, does the

21    evidence show an offer for sale by i4i before June 2 of

22    1993, which is exact -- exactly one year before June 2,

23    even though it says 12, of 1994.  That's the issue.

24               Well, there won't be a debate that i4i

25    sold the product to a company called SEMI, which is a

1  semiconductor company or its consortium out in

2  California back in the fall of '92.  It was way before

3  that magic date.

4                    And it was actually even installed.  It

5  wasn't just offered for sale, it was installed in

6  February of '93, well before that critical date.

7  So there's no debate that there was a sale.  The only

8  debate remaining is whether what was sold to SEMI

9  practiced Mr. Vulpe's patent?  If it did, that absolute

10 one-year bar, no way out of it.  The Patent Office rule

11 is strict.

12                    So that's the question is, does what was

13 sold to SEMI practice Mr. Vulpe's patent?  Well,

14 Mr. Vulpe answered that for us in his own words.  When

15 he's describing his company's technology, he says,

16 Infrastructures has applied for a U.S. patent, and he

17 gives the patent number to protect specific technology

18 that it has developed.

19                    The initial implementation is embedded

20 into Infrastructure's S-to-the-4th product integrated --

21 targeted to the semiconductor and publishing industries.

22 Well, the semiconductor industry was SEMI, the very

23 company it sold to in '92 and '93.  And S-to-the-4th was

24 the name of the product they sold to SEMI.  There won't

25 be any dispute about either of those.

1          Now, that number that he says he got a

2    patent for, that number matches exactly what the number

3    is on the face of the patent that's in your books.  That

4    is the application number.

5          So he's saying the very same patent

6    that's here covers what was sold to SEMI as the

7    S-to-the-4th product.  That's exactly what that Patent

8    Office rule does not allow.  That's jumping the gun.

9    That's breaking the one-year rule.

10          But he didn't just say it there.  In

11   another document, he refers to -- it says, Summary of

12   the progress to date, talking about the state of the

13   technology, and he says U.S. Patent Application filed

14   i4i flagship product S-to-the-4th vertical market

15   product.

16          So in his own words, his own handwriting,

17   he's telling you that S-to-the-4th product was what was

18   patented, and that violates the Patent Office rule.  The

19   Patent Office's invalid.  You can't jump the gun and

20   sell products more than a year before you file the

21   patent.

22          Now, there's a witness called Mr. Scott

23   Young, currently works for another company.  He used to

24   be an employee of both SEMI, the company that was sold

25   to, and i4i.  And he'll testify squarely that Mr. Vulpe

1 told him that, yes, the patent at issue here covered

2 that SEMI system, exactly what's not allowed.

3             The third piece of prior art is this

4 Waterloo patent, this Waterloo product called Rita.

5 Waterloo is also based in Canada incidentally, just down

6 the road from where i4i is.  They had a software product

7 that worked on this computer a long, long time ago, way,

8 way before Mr. Vulpe filed his patent application.  No

9 doubt that it's earlier.

10             And we'll show you videotaped testimony

11 from Dr. Cowan, who is one of the people involved in the

12 Rita project and the Rita program.

13             This is a picture of a screen shot from

14 that that shows here, for example, para, para, end doc,

15 beginning doc, body.  Same type of things.  Codes,

16 content separated, exactly what Mr. Vulpe claims in his

17 invention.

18             And the final piece of prior art is a

19 patent, another U.S. patent, to a gentleman named

20 DeRose.  Here's the piece of the patent that they show

21 you.  Again, it's well before, years before Mr. Vulpe

22 filed his patent application.

23             And this is a picture from the patent

24 that shows, again, title, chapter, body, et cetera, and

25 Mr. Gray will testify in detail why, in his opinion, his

1  expert opinion, this DeRose patent does everything that

2  Mr. Vulpe claimed in his.

3          And the U.S. is unique in the world in

4  saying a patent is invalid just because you're the first

5  one to get to the Patent Office.  You have to be the

6  first one to make the actual invention.

7          And even if Mr. Vulpe was first to the

8  Patent Office, he was not the first to make the

9  invention.  And in the case of DeRose, he wasn't the

10 first to the Patent Office anyway.

11         Mr. Gray will testify at great length.

12 He has extensive experience in exactly this area, and

13 he'll tell you that in his view, after great study, why

14 the patent is not infringed and is invalid.

15         Now the question of damages briefly.

16 Now, Defendants don't normally like to talk about

17 damages because they don't think there's any due.  If

18 they didn't meet the three requirements for

19 infringement, then the patent is invalid.

20         But in this case, I'd like to, because I

21 think the damage claim shows you something about what

22 type of lawsuit it is.

23         Here you remember they've lost $25

24 million before our product was even introduced.  The

25 company was in financial crisis, couldn't make the

1   payroll.  Yet they're asking for almost $200 million for

2   a company that your product, people didn't want, where

3   the marketplace had voted against the technology.

4   The stark difference between those two tells you

5   something about what type of claim this is.  The reason

6   Microsoft is successful is not because they took i4i's

7   technology that the marketplace didn't want; it's

8   because it was using Microsoft's technology that the

9   marketplace did want.

10                   And the stark difference between these

11  numbers tells you a lot about what's really going on.

12  But this also does.  Here's a copy of what's being

13  accused.  I actually bought it from Amazon last week.

14  And I did -- it has Word; it has Excel; it has

15  PowerPoint; it has all sorts of technology that's not

16  part of this case at all.  So it has a whole lot.  The

17  price I paid for that was $97.98 from amazon.com.

18                   What i4i is asking for as a royalty for

19  every person that they claim uses the little slice of

20  Word technology that they think is infringed -- they'll

21  admit that there's thousands of things Word does that

22  don't infringe, and there's lots of ways even through

23  XML that don't infringe.  They'll admit all of that.

24  And they'll admit that Excel and PowerPoint and OneNote,

25  those aren't a problem at all.  Despite all of that,

1  they're claiming that for everybody who actually they

2  think uses their technology on Word, they want a hundred

3  dollars, even though the price is less than that.

4                    Does that make sense?  That will be for

5  you to decide.

6                    And you'll also hear about how they came

7  to the idea of how many people use the technology, and

8  we think that will tell you something as well.  Because

9  they did a survey, and the survey is one that we believe

10 shows you what type of claim this is, and you'll hear

11 that from Mr. Wecker as well.

12                    So they want $200 million.  They want it

13 despite the fact that they can't meet any one of the

14 three requirements for infringement where they have to

15 meet all three.  And they want it despite the fact that,

16 really, they jumped the gun; they violated the Patent

17 Office rules.  And the patent is invalid based on prior

18 art.

19                    For those reasons, after you've heard all

20 the evidence, we'll ask you to return a verdict for

21 Microsoft.  I thank you very much for your attention.

22                    THE COURT:  Thank you, Mr. Powers.

23                    All right, Ladies and Gentlemen of the

24 Jury.  It's 3:00 o'clock now.  We're going to take our

25 afternoon break at this time.  We'll be in recess for 20

1  minutes, until 3:20.

2             So remember my instructions.  Don't

3  discuss the case among yourselves or with anyone else.

4             Stretch your legs, get a cup of coffee,

5  and I will see you back here at 3:20.  The jury is

6  excused.

7             COURT SECURITY OFFICER:  All rise for the

8  jury.

9             (Jury out.)

10             THE COURT:  Please be seated.

11             All right.  Let me just remind the

12  parties what our procedure is going to be when we come

13  back.  I'd like for both sides to have all of their

14  witnesses that are here today, whether in the hallway or

15  elsewhere in the courtroom.  We'll do a mass swearing

16  in.  Just we'll line them up wherever they are, have

17  them state their name.  They'll be sworn in.

18             Is either side invoking the Rule in this

19  case?

20             MR. POWERS:  We are, Your Honor.

21             THE COURT:  All right.  The Rule will be

22  invoked.  I'll give instructions to them regarding the

23  Rule.

24             Those -- have you reached an agreement as

25  to who's excluded from the Rule?

1           MR. POWERS:  Just the corporate

2 representatives.  We don't know who their's is.  I

3 believe it's Mr. Cox, but that's for them to decide.

4           MR. CAWLEY:  That's correct, Your Honor.

5           THE COURT:  All right.  What about

6 experts?  Are they not excluded?

7           MR. POWERS:  I would say not excluded.

8           MR. CAWLEY:  Meaning they're not excluded

9 from the courtroom?

10           MR. POWERS:  Exactly.  They are excluded

11 from the operation of the Rule, but --

12           THE COURT:  They are excluded from

13 operation of the Rule.

14           MR. CAWLEY:  We agree.

15           THE COURT:  All right.  Very well.

16           All right.  The parties' representatives

17 and experts will be excluded.

18           Now, as soon as we get the witnesses

19 sworn in, the next order of business will be an offer of

20 documents, and I believe I went over this with you in

21 pretrial.

22           What I will want the Plaintiff to do is

23 stand up and offer whatever exhibits the other side does

24 not object to.  You will stand up and say no objection.

25 I will admit them.  We'll get all those documents in en

```
 1   masse.  Then at the same time, I'll do the same thing
 2   for the Defendant.
 3                Do y'all have your lists ready?  Have you
 4   met and conferred, and are you ready to go on those?
 5                MR. POWERS:  We certainly have with
 6   regard to the Plaintiff's exhibits that they've given us
 7   for direct examination.
 8                There's no -- been no exchange for
 9   whatever was going to be used on cross, because I'm not
10   sure what's going to be used yet, of course.  But for
11   that, we would intend to offer it as we went along.
12                THE COURT:  Okay.  Well, what I want to
13   avoid is having identified this exhibit, and, Your
14   Honor, I offer this; any objection.  That just bogs us
15   down.
16                So you pretty well know what exhibits
17   you're going to use, and so not just for this witness,
18   but for the whole case, I'd like to just get that out of
19   the way, if you're prepared to do it today.
20                Are you?
21                MR. POWERS:  There are no objections to
22   the exhibits that we're going to use, so I'm certainly
23   happy to hand Mr. Cawley a list before each witness.
24                I don't -- we didn't have an agreement
25   nor an order from the Court saying we have to give them
```

1  cross exhibits the night before or anything.  I

2  Certainly wouldn't want to do that either way.  I

3  think that's -- I don't know which ones we're going to

4  use, and I don't -- wouldn't want them admitted until I

5  know which ones I use.

6            THE COURT:  All right.  When do you plan

7  to offer those then?

8            MR. POWERS:  Anytime the Court asks me

9  to.  I would suggest perhaps, since they're not objected

10  to, and I'll represent that every exhibit I'll be using

11  with both witnesses today are not objected to, I would

12  do -- not -- I would not go through the process Your

13  Honor described of identifying, et cetera, and just

14  offer it at the end, once we know which ones we actually

15  use, because --

16            THE COURT:  All right.  Is that

17  acceptable?

18            MR. POWERS:  -- I expect a large number.

19            THE COURT:  Is that acceptable to you,

20  Mr. Cawley?

21            MR. CAWLEY:  Well, offering it at the end

22  kind of begs the question, because when he confronts a

23  witness with documents, then we may have a dispute on

24  our hands about whether that's objectionable or not.

25            THE COURT:  I thought he said that you

1 had already agreed they were not objectionable.

2                    MR. CAWLEY:  Oh, for today?

3                    MR. POWERS:  Yes.

4                    MR. CAWLEY:  Oh, I'm sorry.  Yeah, for

5 today, I don't think there's an issue.

6                    MR. POWERS:  For every exhibit I'm

7 intending to use, they do not have an objection noted to

8 them.

9                    THE COURT:  Okay.  Well, whatever

10 exhibits you're prepared to offer en masse, before we

11 start with the first witness, I will hear that offer and

12 acceptance, and they'll be admitted into evidence.

13                    That doesn't preclude you from offering

14 other exhibits later during the course of trial, but I

15 would just like not to bog it down with a lot of

16 individual offerings.

17                    That will be the procedure each day.  If

18 you don't have them for the whole trial, at the

19 beginning of each day, I will give both sides an

20 opportunity to offer their exhibits for that day, and

21 you can offer them.

22                    If you intend to offer them, Mr. Powers,

23 at the end of your cross-examination, for example, be

24 sure you remember and that you have an agreement that

25 you can use them without an offer at the time.

1                    If you don't have an agreement, then you

2    need to offer it, and I'll hear the objections.

3                    At the end of each day, I would order

4    both sides to prepare a list of those exhibits that were

5    admitted that day and furnish it the next morning to

6    Ms. Ferguson so she can reconcile it with her records to

7    be sure we have a clean record on it.

8                    Also, I need from both sides -- I need

9    three hard copies of your exhibit list and three hard

10   copies of your witness list.

11                   Do y'all have an agreement as to

12   exchanging who your witnesses are going to be for the

13   next day and what exhibits --

14                   MR. CAWLEY:  Yes, Your Honor.

15                   THE COURT:  Okay.  Very good.

16                   Anything else before we take our break?

17                   MR. CAWLEY:  I guess just a point of

18   clarification on a slightly different subject.

19                   As it turns out, our first witness,

20   Mr. Owens, may have some testimony that will be relevant

21   to inequitable conduct.  So does the Court want to hear

22   that from Mr. Owens after the jury is excused today?

23                   THE COURT:  Yes.

24                   All right.  We'll be in recess until

25   3:20.

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    (Recess.)

 3                    COURT SECURITY OFFICER:  Be seated.

 4                    All rise.

 5                    (Jury in.)

 6                    THE COURT:  Please be seated.

 7                    All right.  Ladies and Gentlemen of the

 8       Jury, we are about to begin the evidence phase of the

 9       case in just a few moments, but, first, we're going to

10       take care of a couple of housekeeping matters.

11                    I would like to ask the parties to have

12       all their witnesses that are here that are going to be

13       testifying in the case to please stand so that we can

14       swear them in.

15                    All right.  Very well.  Let's start here,

16       and if you would state your name for the record, please,

17       sir.

18                    A WITNESS:  Stephen Owens.

19                    A WITNESS:  William Cox.

20                    THE COURT:  Okay.

21                    A WITNESS:  George Gerstman.

22                    A WITNESS:  Michael Wagner.

23                    A WITNESS:  Stephen Gray.

24                    THE COURT:  Back in the front here

25       (indicates)?
```

```
 1                  A WITNESS:  John Tulley.

 2                  A WITNESS:  Keith Thomas.

 3                  A WITNESS:  David Martin.

 4                  A WITNESS:  Tom Rhyne.

 5                  A WITNESS:  Michel Vulpe.

 6                  THE COURT:  Okay.  And?

 7                  A WITNESS:  Robert Little.

 8                  THE COURT:  Very well.  Did the court

 9  reporter get all those names alright?

10                  All right.  If you would, Ms. Ferguson,

11  please swear the witnesses in.

12                  (Witnesses sworn.)

13                  THE COURT:  All right.  If you would

14  remain standing just a moment and let me instruct you

15  and explain to the ladies and gentlemen of the jury, the

16  attorneys have invoked what's called the Rule in this

17  case, which means that those of you who are witnesses --

18  and if you're not a representative of a party or an

19  expert witness, then the Rule will apply to you.

20                  And the rule is this:  That during the

21  course of the trial, you will remain outside the

22  courtroom, except when you testify.  And you shall not

23  discuss the case or the testimony or anything with any

24  other person, except the attorneys in the case.

25                  So unless you are excused from the Rule
```

1   as being either a party representative or an expert, at

2   this time, I would like to ask you to leave the

3   courtroom and wait in the witness rooms.

4                    And the rest of you may be seated.

5                    (Witnesses exit the courtroom.)

6                    THE COURT:  All right.  And I will expect

7   counsel for both sides to inform your other witnesses

8   that the Rule's been invoked and also to inform the

9   Court whenever a witness appears the first time that has

10  not been sworn.

11                   All right.  Do Plaintiffs have any

12  exhibits they would like to offer at this time?

13                   MR. CAWLEY:  Yes, Your Honor.  Exhibits

14  1, 4, 7, and 8.

15                   THE COURT:  1, 4, 7, and 8.

16                   Any objection?

17                   MR. POWERS:  No objection, Your Honor.

18                   THE COURT:  Be admitted.

19                   Does the Defendant have any exhibits they

20  wish to offer?

21                   MR. POWERS:  Yes, Your Honor.  2058.

22                   THE COURT:  Is that one exhibit?

23                   MR. POWERS:  That's one exhibit.

24                   THE COURT:  All right.

25                   MR. POWERS:  DTX2058.  2058.

1             THE COURT:  All right.

2             MR. POWERS:  2202, 2366, 2380, 2395,

3   2396, and 2065.

4             THE COURT:  All right.  Any objection?

5             MR. CAWLEY:  No, Your Honor.

6             THE COURT:  All right.  Those will be

7   admitted.

8             All right.  Plaintiffs may call their

9   first witness.

10             MR. BURGESS:  Your Honor, Plaintiffs call

11  Stephen Owens.

12             THE COURT:  Stephen Owens.

13             MR. BURGESS:  May I proceed, Your Honor?

14             THE COURT:  Yes, you may.

15        STEPHEN OWENS, PLAINTIFFS' WITNESS, SWORN

16                   DIRECT EXAMINATION

17  BY MR. BURGESS:

18        Q.    Good afternoon, sir.

19        A.    Good afternoon.

20        Q.    Would you please introduce yourself to the

21  jury.

22        A.    Yes, sir.  My name is Stephen Owens.

23        Q.    And why are you here today, Mr. Owens?

24        A.    I'm here to discuss the patent that Mr. Vulpe

25  and myself were granted by the United States Patent

1  Office.

2      Q.    And you understand that's the patent that's

3  at issue in this case?

4      A.    Yes, sir, I do.

5      Q.    Referred to as the '449 patent?

6      A.    Yes, sir, that's correct.

7      Q.    Where do you live, Mr. Owens?

8      A.    I live in Caledon East in Ontario, Canada.

9      Q.    Is that near Toronto?

10     A.    Yes, sir.  It's about 45 minutes north.

11     Q.    Are you married?

12     A.    Yes, sir.

13     Q.    What's your wife's name?

14     A.    Leslie.

15     Q.    Do you and Leslie have any children?

16     A.    Yes, sir.  Twin boys.

17     Q.    And how old are your sons?

18     A.    Twelve years old.

19     Q.    That must be a handful.

20          You know, it occurs to me that yesterday was

21 Mother's Day, and I know you were here with me, but did

22 your sons do something special for their mom yesterday?

23     A.    Yes, sir.  I had to delegate the Mother's Day

24 tasks to them, and they got up early, cleaned the house,

25 and made breakfast for their mom.  So I was pretty happy

1 with my delegation.

2     Q.    Now, Mr. Owens, are you the first inventor in

3 your family?

4     A.    Well, no, sir, I guess not.  My grandfather

5 was perhaps famous.  It was certainly a family story

6 where he was the first one to use cross-country skis to

7 get from lumber camp to lumber camp in northern Quebec

8 instead of using snow shoes, which was the current

9 technology.

10     Q.    Is that what we call the Great White North?

11     A.    I think that's how it's referred to up here,

12 yes, sir.

13     Q.    Now, Mr. Owens, what do you do?

14     A.    I have a very small software consulting firm.

15     Q.    And can you tell us what's software?

16     A.    Well, software is really anything that runs

17 on a computer and makes it do what computers do.

18     Q.    What -- what might be a typical example of a

19 piece of software that people are probably familiar

20 with?

21     A.    Well, certainly we've heard about Microsoft

22 Word in the introduction of this case, and that's a good

23 example.  Also, the MAC operating system might be

24 another example that people would be familiar with.

25     Q.    How long have you been in development

1    software?

2        A.    It's been a while now.   About 27 years.

3        Q.    And do your boys like computers like their

4    dad?

5        A.    Yes, sir.   The older of the two twins says he

6    wants to take over the family firm when he gets a bit

7    older.

8        Q.    Now, if you could, you've got a notebook

9    there with a couple of exhibits in it, and if I could

10   ask you to look at the first one, and you can also see

11   it on your monitor.

12           Can you tell the jury what Plaintiffs'

13   Exhibit 1 is, please?

14       A.    Yes, sir.   That's the patent that's at issue

15   in this court -- in this case.   I believe it's being

16   referred to as the '449 patent.

17       Q.    And are you one of the inventors?

18       A.    Yes, sir.

19       Q.    And are you proud of this patent?

20       A.    Yes, sir, very proud.

21       Q.    Let's take a little bit closer look at the

22   cover of the patent.   I see there is a line for the

23   inventor.

24           Is that your name, sir?

25       A.    Yes, sir.

```
 1        Q.    And who are the other gentlemen that are
 2   listed?
 3        A.    That's Michel Vulpe.  He's the founder of
 4   Infrastructures for Information.
 5        Q.    And do you understand that we'll hear from
 6   Mr. Vulpe later in the case?
 7        A.    Yes, sir.
 8        Q.    And is there a -- is there a shorthand that
 9   people often use to refer to Infrastructures for
10   Information?
11        A.    Yes.  It's usually referred to as i4i.
12        Q.    Now, we saw in opening and we can see here on
13   the cover of the patent that the application was filed
14   in June 2nd of 1994.
15             Now, when the application was filed, were you
16   working for i4i?
17        A.    Yes, sir.  I was consulting for i4i at the
18   time.
19        Q.    Were you employed by i4i?
20        A.    No, sir.
21        Q.    Have you ever been employed by i4i?
22        A.    No, sir.
23        Q.    And did you eventually stop consulting for
24   i4i?
25        A.    Yes, sir, I did.
```

1      Q.     And about when was that?

2      A.     That was around 1995.

3      Q.     So after the application was filed?

4      A.     Yes, sir.

5      Q.     Now, did you ever come back after you left

6  i4i and do some additional consulting?

7      A.     Yes, sir.  I did a couple of projects for

8  them over the next few years.

9      Q.     Now, if I were to ask you about things that

10  happened at i4i after you left in 1995, would you be

11  able to answer my question?

12      A.     Well, I could certainly answer questions

13  about the particular projects I was working on, but I

14  wasn't working in the i4i offices anymore.  So I only

15  have the most general information about the company.

16      Q.     Now, we've heard quite a bit about SGML so

17  far.

18             And can you just -- we're going to talk about

19  it in some detail, but very briefly, could you remind us

20  what it is?

21      A.     Yes, sir.

22             So SGML is a way to add information to

23  documents to make them, hopefully, of higher value and

24  more usable in the future.

25      Q.     Now, are you -- are you familiar with SGML

1    now?

2         A.    Yes, sir.

3         Q.    What about XML; are you familiar with that?

4         A.    Yes, sir.

5         Q.    And did you see at opening Mr. Powers made a

6    point of emphasizing that your patent doesn't mention

7    XML?

8         A.    Yes, sir, I did.

9         Q.    Is there a reason for that?

10        A.    Yes, sir.  XML actually had not been invented

11   at the time we filed the patent application.

12        Q.    Now, in terms of your patent and your

13   invention, is there a significant difference between

14   SGML and XML?

15        A.    No, sir, none at all.

16        Q.    Now, when you first came to work with i4i and

17   Mr. Vulpe, had you heard of SGML?

18        A.    No, sir, not at all.

19        Q.    How did you come to learn of it?

20        A.    Well, I was lucky that I was working with

21   Mr. Vulpe.  He was a very early expert in SGML, so he

22   was kind of my first teacher in explaining the concepts

23   to me.

24              Also, I was working on projects that involved

25   the technology, so I was kind of learning on the job.

1  And, again, I was also reading material on the -- on

2  the standard.

3      Q.    Do you remember the first project that you

4  worked on at i4i that involved SGML?

5      A.    Yes, sir.  That would be the SEMI project.

6      Q.    Is that the same SEMI project that we heard

7  about in Mr. Power's opening?

8      A.    Yes, sir.

9      Q.    Now, what software did you create for SEMI?

10     A.    So SEMI, as you heard in the opening, is the

11 consortium for manufacturers of equipment for making

12 semiconductors.  And we worked on a system to help them

13 track their membership, create standards, and allow

14 their members to vote on those standards.

15     Q.    This is a little hard to read, but based on

16 your experience, can you -- can you tell me what this

17 is?

18     A.    Yes, sir.

19           That would be an example of a document

20 created by the SEMI system for use by SEMI.

21     Q.    Now, this -- this -- I'm having a hard time

22 reading it.  And can you explain why this is so

23 difficult to read?  I mean, other than the fact that

24 it's small.

25     A.    Yeah.  Yes, sir.

1          So this is an example of an SGML document.

2   And one of the reasons it's hard to read is that there's

3   a bunch of special characters that really only SGML

4   cares about.  And people trying to read the document,

5   not only don't care about, but it's actually just

6   confusing.

7          Q.    Is there -- is there really a document with

8   real information in amongst this mess?

9          A.    Yes, sir.  If you know how to read it, it's

10  buried in there.

11         Q.    So did somebody actually have to keep track

12  of all this and type this all in?

13         A.    Yes, sir, they did.

14         Q.    And, again, is this an example of what a

15  typical document created with your SEMI software would

16  look like?

17         A.    Yes, sir, it's a fair example.  It's perhaps

18  a little short but the same kind of document.

19         Q.    Now, let's take a look at a very different

20  kind of document.

21         Just looking at this, do you notice any

22  differences from the document we just saw in the last

23  slide?

24         A.    Yes, sir.

25         So the key difference is this is much more

1  familiar.  This document has not been marked up, as we

2  heard in opening, with SGML.  So this is much more the

3  kind of document that everyone is familiar with writing

4  themselves, either by hand or using a word processor.

5       Q.    Now, can you tell the jury why this document

6  looks so different from this document?

7       A.    Well, I referred just a minute ago to adding

8  value to documents using SGML, and it might be a little

9  hard to see when you see this mess.  But the difference

10  really is that this document that we're looking at now

11  has had SGML applied to it, whereas the second document

12  has not.

13       Q.    Now, did you eventually deliver your product

14  to the folks at SEMI?

15       A.    Yes, sir, we did.

16       Q.    And what did the managers at SEMI think about

17  your work?

18            MR. POWERS:  Objection, Your Honor.  He

19  can testify to what was said, perhaps, depending on its

20  relevancy, but he can't testify about their internal

21  feelings.

22            THE COURT:  Restate your question,

23  please.

24       Q.    (By Mr. Burgess) Were you ever made aware of

25  what the managers at SEMI thought about your work?

```
 1                 MR. POWERS:  As phrased, it calls for

 2  hearsay, Your Honor.

 3                 THE COURT:  Overruled.

 4      A.    Yes, sir.

 5           My understanding was that those managers did

 6  appreciate the value that they were getting out of the

 7  SGML.

 8      Q.    (By Mr. Burgess) And what about the poor

 9  folks that actually had to create documents like this?

10  What did they think about your work?

11      A.    Well --

12                 MR. POWERS:  Same objection to relevance.

13                 THE COURT:  Excuse me?

14                 MR. POWERS:  Same objection.  He asked

15  how those people thought about it, and this witness

16  can't answer it.

17                 THE COURT:  All right.  Restate your

18  question.

19      Q.    (By Mr. Burgess) Did you -- did you come to

20  understand what the folks that had to create these

21  documents thought about your product?

22      A.    Yes, sir.

23           I had a number of conversations with people

24  who had to create documents for SEMI, and they weren't

25  real happy at being forced to type what they thought had
```

1    a pretty meaningless code.

2        Q.    And so did you do something to help those

3    folks out?

4        A.    Yes, sir, we did.

5        Q.    And is that what you patent -- that's part of

6    what your patent is about?

7        A.    Yes, sir.  It certainly is part of the

8    invention.

9        Q.    Now, at the time that you did your work for

10   SEMI, if someone had wanted to create an SGML

11   document -- for instance, a document like this -- what

12   software was available for them to do that with?

13       A.    Well, really, it was what I'll call the text

14   editor, and a text editor really just lets you type

15   letters.  And by that, I just mean individual

16   characters, so it wasn't really very easy to use.

17       Q.    How does -- how does a text editor compare to

18   the tools that you delivered as part of your SEMI

19   product?

20       A.    A text editor is really very simple.  It just

21   lets you add the characters.

22             In the SEMI product, we gave a little bit

23   more help in terms of letting you put the tags in a

24   little more easily, but it was still essentially a text

25   editor.

1   Q.   Now, back in the same time period when you

2   did your work at SEMI, if you had wanted to create a

3   document like this, a simple letter home to Mom, for

4   example, what sort of tools were available for you to do

5   that with?

6   A.   So most users would have been using word

7   processors, like WordPerfect or Microsoft Word, to write

8   documents like this.

9   Q.   Now, at that time, could a word processor

10  like that have created a formatted document that also

11  had SGML?

12  A.   No, sir.

13  Q.   So with that background, can you explain to

14  the jury what one of the problems that you sought to

15  solve with your invention was?

16  A.   Yes, sir.

17       So we had a mismatch, really, where people

18  wanted to use tools they were familiar with to create

19  their content.  And at the same time, management wanted

20  to take advantage of SGML, and we didn't have a solution

21  to offer to them.

22  Q.   Do you think it would be helpful to explain

23  this concept to the jury if you could draw a little

24  diagram on the whiteboard?

25  A.   Yes, sir.  I hope that would help.

1            MR. BURGESS:  Your Honor, may Mr. Owens

2    have permission to approach?

3            THE COURT:  Yes, he may.

4            MR. BURGESS:  Thank you.

5       Q.    (By Mr. Burgess) So what is it that you could

6    draw for the jury that would be helpful to explain this?

7       A.    So I'd like to just illustrate the different

8    concepts that we were trying to reconcile, trying to

9    make into one.

10      Q.    Okay.  So what's the first part of that?

11      A.    So the first part represents with this big

12   circle, and this is really the applications that the

13   authors of the content wanted to use.  And I used as an

14   example before, you know, WordPerfect, Microsoft Word,

15   and --

16      Q.    Did those applications have to be word

17   processors?

18      A.    No, sir.

19            So it could have easily been a drawing

20   program, if they needed to create a drawing instead of

21   text.

22      Q.    Okay.  Now, what about the SGML piece that

23   you described?

24      A.    So the other half of the equation is what I'm

25   going to call an SGML application, and that's really the

1  thing that delivers the value that we talk about in

2  SGML.

3      Q.    And so what was it that you hoped to

4  accomplish?

5      A.    So what we wanted to do was come up with an

6  application that gave them the ease of use and the

7  familiarity that users had from using these types of

8  tools in the application.

9      Q.    Is there another piece to that?

10     A.    Yes, because what we also wanted to do was

11 not lose the value from the SGML application.

12     Q.    And so did your invention provide this

13 solution?

14     A.    So among other things, it, in fact, solved

15 this combined best-of-both-worlds picture that I'm

16 trying to illustrate over here.

17     Q.    So you said among other things.  Were there

18 other problems that your invention addressed?

19     A.    There were.

20          So applications that weren't necessarily

21 content editors also had problems with combining that

22 SGML content that you saw with the -- with the

23 application.  And we were trying to solve a bunch of

24 them, including being able to apply many different SGML

25 structures on to one document.

1          I'll show a bit more about that in the near

2     future.

3          Q.     Thank you, Mr. Owens.  You can take a seat,

4     please.

5          A.     (Complies.)

6          Q.     Now that you've talked about one of the

7     problems that your invention solved, let's start to talk

8     about how you actually did it.

9          Have you -- have you created a few boards

10    that illustrate the way in which your invention solved

11    this particular problem?

12         A.     Yes, sir, I have.

13              MR. BURGESS:  Your Honor, could we have

14    your permission for Mr. Owens to approach the other

15    easel and answer a few questions about his boards?

16              THE COURT:  Yes, sir.

17              MR. BURGESS:  Thank you, sir.

18         Q.     (By Mr. Burgess) So what is it you want to

19    explain to the jury using your boards, Mr. Owens?

20         A.     So what I'd like to try to do is put the

21    invention in context, because I think that it can be a

22    bit hard to appreciate sort of how it fits in and how it

23    delivers value.

24              So I created a number of boards that try to

25    provide some context to the history of this.

1    Q.    Okay.  Now, right away, I notice at the

2  bottom of that first board there is a timeline, and it

3  looks like the part that you've highlighted runs from

4  the printing press in 1455 through 1986.

5          What's the significance of that timeline?

6    A.    So as we heard in the opening statement,

7  documents have a really long history.  People have been

8  writing them for a long time.  They've been scratching

9  them on rocks.

10         And one of the time periods that was most,

11  you know, exciting in terms of standardizing the way

12  documents look and the type of convention we have in the

13  way they look is the invention of the printing press in

14  1455, which, of course, was used to print the Gutenberg

15  Bible.

16   Q.    Now, the top part of your board, what's

17  illustrated there?

18   A.    So up here we have, you know, a document.

19  You know, the subject matter isn't really terribly

20  important.  In fact, we've made it bland by design.

21  But it's just a document that anybody would be familiar

22  with.  The layout looks fairly standard, doesn't have

23  all those nasty codes in it.  Just a simple document.

24   Q.    Now, does this document, this simple

25  document, convey any information?

1    A.    It does.  And what I think is interesting is

2 that the outcome of what's in the document, they would

3 usually say, well, there's a bunch of words, and I can

4 read my document.  This is a description of my document.

5 And many people might also say, well, it has a title,

6 and the title is My Document.

7    Q.    Is there any other sort of information that's

8 conveyed by this document?

9    A.    There is.

10        So, you know, if we look at the way -- I

11 think it's interesting that everybody is immediately

12 going to say, well, it's just a title.  But few people

13 would say, well, I wonder how I know it's a title?

14 And, of course, you know it's a title because it's bold;

15 it's large at the top; it's centered; it's got some

16 spacing.  That's all formatting.

17        Another thing that people might suspect is

18 that often in documents the very first paragraph gives

19 you an overview, just explains generally what the

20 document is about.

21        So if you started reading a paragraph and it

22 said this is a description of my document, you might

23 say, yeah, this one is, in fact, an overview of the

24 document.

25    Q.    Is there a term that we can use to talk about

1    that sort of information?

2         A.    Yes.  So when I've read my document, those

3    words are in black and white on the page.  So they're

4    kind of right there in the document.  And that I call

5    explicit information, because it's explicitly in the

6    document.

7               That other type where we say this is the

8    title, this is an overview, that information is what I

9    call input.  And that really means you have to guess a

10   little bit.  It's not written anywhere in the document

11   that it is those things.

12        Q.    Now, in addition to what you just described,

13   is there any other implied information in this document?

14        A.    There is.  And, again, it comes back to

15   inventions and formatting.

16             Almost everybody is going to recognize this

17   is a date just because of the way it's laid out, the

18   characters there.  Anybody who lives in Tyler is going

19   to recognize this as a city name.  And as soon as you

20   see it near a state, Texas, almost anyone, even those of

21   us who doesn't know the city of Tyler, would recognize

22   that as a location.

23        Q.    Is there anything else?

24        A.    So slightly more subtle, this arrangement

25   with numbers on a page almost always means the phone

1  number to, certainly, people in North America.  So I

2  think you would pick that out as a phone number.

3      Q.    Now, once this document is created and saved

4  away in a file system, what happens to that implied

5  information?

6      A.    Yeah, that's a great question.

7            And the way I like to think about it is when

8  someone writes this document, they have all kinds of

9  information in their head.  They're really thinking

10 about what they're writing, and, of course, they know

11 their purpose.  But they don't put all of that

12 information into the document.  They only put part of

13 it.

14           So when they save this document, some of the

15 information that that person was thinking about at the

16 time is, in fact, lost.  And unless you can find that

17 person and ask them questions about it, you may not know

18 exactly what was going on when they wrote that.

19     Q.    Okay.  Now, following along your timeline on

20 the bottom of your board, did something happen that

21 helps us to deal with this problem about losing vital

22 information?

23     A.    So that takes us to the next board.

24           THE WITNESS:  Thank you, sir.

25     A.    This one picks up where the last one left

1  off.

2     Q.    (By Mr. Burgess) All right.  Now, I notice

3  we've got a continuation of your timeline, a much

4  shorter slice highlighted here from 1986 to 1993.

5          What's the significance of SGML standardized

6  that you've highlighted right above the timeline?

7     A.    So the SGML standard was fully ratified on

8  this date, and that means we have this very long period,

9  hundreds of years, where documents were really

10  controlled by their formatting, by the way you lay them

11  on the page, the way they look, the types of things the

12  way you write them.

13         In this time period, we add something new to

14  that picture.

15    Q.    I think it's clear, but just so there's no

16  confusion, did you or Mr. Vulpe invent SGML?

17    A.    No, sir.

18    Q.    Who did?

19    A.    Dr. Charles Goldfarb.

20    Q.    Did you or Mr. Vulpe ever claim to invent

21  SGML?

22    A.    No, sir.

23    Q.    Now, at the time that you've highlighted

24  here, from 1986 to 1993, was there a large group of

25  people that were interested in working with SGML?

1      A.     No, sir.  That's a very small number, sir.

2      Q.     So we see a document here on the top part of

3  your slide.

4             What kind of document is this?

5      A.     So this is an example, and it's a very

6  simplified example.  In fact, I intentionally omitted

7  some things that would even be required in SGML, but

8  this is just meant to be an example of how an SGML

9  document looks.

10     Q.     Is this the same type of document as the

11  really complicated one that we saw on the overhead

12  earlier?

13     A.     It is.  It's a simplified example, but it's

14  exactly the same structure.

15     Q.     Now, if we can, if we can pull up your first

16  board on the overhead, so we can kind of compare and

17  contrast.

18             This looks -- this looks different.  What are

19  the differences?

20     A.     So I think the first thing that everyone will

21  notice is this one is just plain harder to read, so

22  we've lost the formatting.  We don't have that big bold

23  title anymore.  The paragraphs aren't laid out as

24  nicely.  And I think that's kind of immediate.

25     Q.     Is there any other difference?

1      A.      So we've lost all that formatting.   We have

2 gained the wonderful advantages of some special

3 characters, less-than/greater-than sign.

4      Q.      And do you discuss these tags in the patent?

5      A.      Yes, sir.

6              In the patent, actually, we refer to these as

7 metacodes, and there's a reason for that terminology,

8 because they're slightly different when we get into

9 that.

10      Q.      Okay.   Now, do these metacodes have anything

11 to do with the implied information that we discussed

12 with respect to your first board?

13      A.      Yes, they do.

14              So wherein the first board we talked about,

15 we knew that was a title, because of its formatting and

16 it's location.

17              Now we've made that guess of the title, which

18 is a pretty strong guess, but we made it very explicit.

19 Now it is in black and white.   It really says this is

20 the title.

21      Q.      Are there any other examples like that in

22 this document?

23      A.      Yes, there are.

24              So we, again, had a good guess that the first

25 paragraph was probably an overview, and that guess

1    turned out to be right.  So we've got an overview there.

2    I want to draw your attention to the date.  We had a

3    guess that that was a date, and certainly more than a

4    guess, because we were right about that, but notice we

5    didn't get it immediately.

6           We knew it was a date, but what we didn't

7    know is that it was a trial date.  And we didn't know

8    that because the person who wrote the document hadn't

9    put that information in.

10       Q.    Are there any other examples of that sort of

11   information in this document?

12       A.    So, again, call your attention to the city.

13   We got that right again.  It was a city, but more than

14   that, it was a trial location.  So, again, we got more

15   important information from that document.

16          And the final example, we've now picked out

17   not just the phone number, we've actually identified

18   that this is an area code.  And it just goes back to the

19   opening comments that one of the values that we're

20   offering is to find this information again.

21       Q.    Now, you discussed with respect to your first

22   board the possibility that some of the implied

23   information would get lost.

24          Now, in this case when we create this

25   document and save it away, what happens to that

1   information?

2       A.    So now that we've made the information

3   explicit, now the information is really in the document

4   in black and white, we can actually just read it.

5   When you save the document, all that information goes

6   with it, so it's now permanently associated with the

7   document.  You'll always know what it is.

8       Q.    Let me just ask you one more thing to make

9   sure there is no confusion.  We'll just use the title as

10  a simple example.

11          I notice that there are -- there are --

12  there's a title here and there's a title here

13  (indicates).  Why are there -- why is that there twice?

14      A.    So what happens is you need to know that this

15  tag or metacode is here, because that tells you what's

16  coming up is the title.  But the other thing that you

17  need to know is where does the title stop?  How many

18  characters are inside it?

19          So what happens is, this is called start tag.

20  And it says -- the title will be starting, and then

21  here's the end tag.  It just says the title ends here,

22  and this slash here tells you that you're at the end.

23      Q.    Okay.  So continuing to follow along your

24  timeline, did something happen next that affects the way

25  that we can use documents like this?

1        A.     Yes, sir.  We get another change.

2               So later in 1993, we get a new phase of this

3    work.

4        Q.     And why do you label this one the invention?

5        A.     So this is the period where we came up with

6    the idea.  That's a discussion to file the invention.

7        Q.     Okay.  And I notice right away sort of an

8    obvious difference between this one and the last one,

9    which is that we've got two boxes on this that we didn't

10   have before.

11              Can you explain what these two boxes are?

12       A.     Yes.  So in the invention and one of the

13   things that we've done is recognize that the content

14   that the document -- what was in that very first slide

15   is not the same as the information about the document

16   and no longer has to be mixed.

17              As part of that recognition, you actually

18   create two separate places, two distinct places to store

19   that information so that we can tell -- we can

20   distinguish between those two types of information.

21       Q.     Now, the right side of the board you've

22   labeled mapped content.  What does that mean?

23       A.     So I think everyone is fairly familiar with

24   the word content.  It just means the words that are in

25   the document, My Document and its content.

1            So mapped content means that this is the

2    content, what you would expect to find in a document,

3    but it's got more value than it used to have and,

4    therefore, the word mapped.

5        Q.    So the left side of the board is labeled

6    metacode map.

7            Can you tell us what that means?

8        A.    So if we go back to Slide 2, we talked about

9    those tags, which are called metacodes in the patent.

10   And here in the metacode map, you see a list of all the

11   same tags that were in the second document.

12       Q.    Is that all there is to the metacode map,

13   just a list of names?

14       A.    No, sir.  That wouldn't be enough.

15            You also have to know how the map relates to

16   the mapped contents, because you have to know that

17   they're together; they're part of the same thing.

18       Q.    And how does the metacode map represent that

19   relationship?

20       A.    Well, what it does is it needs to -- it needs

21   to know where each metacode has an effect in the

22   document.  And that's actually called the address use in

23   the patent, and that address is the way you identify

24   where this metacode is in this document.

25       Q.    So how does that work?

1    A.    So let's assume this is part of a larger

2  document we've been in discussion about.  All the

3  characters are in it, but if this is Character 100 right

4  here (indicates), that means I am 100 characters into

5  the document, which we counted from the beginning.

6  All we do is we say this title metacode starts at

7  Character 100, and then we just count and we say, okay,

8  I start here; I go 101, 102, 103, 4, 5, 6, 7, 8, 9, 10,

9  11.  So we put 111 in at the end of it, and that tells

10  us that this title metacode takes in all the content

11  starting with this M all the way up to the T at the end.

12    Q.    And could you do the same thing for, say, the

13  trial date entry on the map?

14    A.    Sure.  So, again, we see the word content in

15  here.  I'll say that this is Character 200 counting in

16  round numbers.  So we would put in here in the trial

17  date that it starts at Character 200, and that goes 201,

18  2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, so up to 212.

19          And now we can say that that trial date spans

20  that whole region.

21    Q.    Could you do that same thing for the

22  remainder of the entries in the map?

23    A.    Yes, you could.  But you would fill in all of

24  those -- all that information, then you would know where

25  all the metacodes are in the document.

1    Q.   Okay.  Now, I'm going to put your first board

2 back up on the screen, the overhead.

3       How does the combination of the mapped

4 content and the metacode map and the board that you're

5 just discussing compare to the document that we saw on

6 your first board?

7    A.   So I think it's important to recognize that

8 this here, the mapped content, is identical.  It looks

9 the same; it's got the same content, so it's really the

10 same document.

11      What this adds to the first board is that on

12 the first board we didn't have the extra information.

13 We didn't know that was the trial date.  We didn't know

14 it was the trial inclusion, so what is added is that

15 extra information.

16    Q.   Okay.  And so how does the combination of the

17 mapped content and the metacode map on your third board

18 compare to the SGML document that we saw on your second

19 board?

20    A.   So this combination preserves all the

21 information that was in that second board.  We've still

22 got all that explicit information that we talked about,

23 but it adds back the nice formatting that people want to

24 read and can read easily.

25    Q.   Thank you, Mr. Owens.  You can take your

1  seat.

2       A.    (Complies.)

3       Q.    Now, just a few minutes ago you used this

4  whiteboard to illustrate for the jury one of the

5  problems that you wanted to solve with your invention.

6       A.    Yes, sir.

7       Q.    Can you explain to us how you mentioned

8  that you just described to actually solve that

9  problem?

10      A.    Yes, sir.

11            So what happens is that -- you know, if we go

12 back to that very long history lesson at the beginning

13 where we talked about how -- way back at the Gutenberg

14 Bible, we came up with these printing conventions, for a

15 very long time, it was all about putting the formatting

16 and the content together.

17            And when we started developing computer

18 systems to do this, of course, we followed the same

19 thing.  We kept putting everything together because

20 that's what we had always done for hundreds of years.

21 There's a lot of human history there.

22            And once you realized that those two things

23 don't have to be together inside a computer anymore,

24 because the computer is more flexible than paper is,

25 then it opens up a whole bunch of possibilities.

1         And in particular, what it lets you do is you

2    can refer to things that are not just plain text.  So

3    you can have a word processing document in a word

4    processor like Microsoft Word but add all of that value

5    that's in the -- in the mapped content and make all of

6    that information explicit, but continue to keep the

7    same, you know, familiar word processing.

8         Q.    Now, does it matter to the metacode map

9    what's in the mapped content?

10        A.    No.  I think that's -- you know, that's kind

11   of the key thing now is that because we're not trying to

12   mingle everything together, we no longer care what kind

13   of content is in the mapped content.

14        Q.    Could the mapped content be just plain text?

15        A.    Sure.  Yes, it could.

16        Q.    Could it be formatted text?

17        A.    Yes, sir, it could.

18        Q.    Could it be pictures?

19        A.    Yes.  You actually could mark up a drawing or

20   a picture in the same way that you mark up text.

21        Q.    Could the mapped content contain technical

22   drawings?

23        A.    Yes, sir.

24        Q.    Could it contain blueprints for a house?

25        A.    Yes, sir.

1      Q.    And could it even contain metacodes?

2      A.    Yes.  It's -- an interesting outcome is that

3  because we really don't care what's in there, even if it

4  were an SGML document itself, it could still be referred

5  to.

6      Q.    So just again so we're clear on this, is your

7  invention limited to working with word processors?

8      A.    No, sir.  That actually was just one of the

9  outcomes of the invention.

10     Q.    And, again, can you give us some examples of

11 other sorts of programs that your invention could work

12 with?

13     A.    Yes.

14           So it could work with, for example, you know,

15 a program that keeps inventory for a manufacturing

16 facility.  You could describe inventory parts.  And you

17 could even, then, use those descriptions to feed into a

18 robot on an assembly line to pick those parts up.

19     Q.    Why is that able to happen?

20     A.    Well, again, because the invention makes the

21 markup, that explicit information, independent of the

22 content, then you can really apply it to anything.

23     Q.    Now, we just looked at an, admittedly, very

24 simple example on your boards.  But can you explain to

25 us why this technology matters to real companies, real

1   organizations, real organizations that create lots and

2   lots of real documents?

3        A.    Yes, sir.

4              So I think when you -- when you see a very

5   simplified example like this, it's easy to say, well,

6   okay, I see what you're doing, but why would you want to

7   do it?

8              And I think the why comes back to a very

9   different scale of document production than any of us

10  who are used to who have written letters or memos or,

11  you know, sort of individual documents.

12       Q.    Can you give us a real-world example of where

13  this technology would make a real difference for a real

14  company?

15       A.    Yes, sir.

16             So if you look at a company like Boeing, for

17  example, they produce their planes obviously, and those

18  airplanes last for decades.  They are well-built, so

19  they stick around for a long time.

20             With each plane comes millions of pages of

21  documentation of that airplane.  It's actually a

22  requirement that they keep that.  So the value to Boeing

23  of all of those millions of pages, the effort they have

24  to go into producing them, the effort they have to go

25  into to preserve them over time, and then to use them to

1  find things in the future, there's just huge, huge value

2  there.

3           I mean, there are lots of other examples,

4  like the FDA where they have to process drug

5  applications, like the Patent & Trademark Office that

6  has to process, you know, lots of patent claims every

7  year.

8       Q.    And is your invention an important part of

9  that equation?

10      A.    Yes, sir, I think it is.

11      Q.    Can you explain why?

12      A.    Well, so all the value that I discussed

13 happens if you make that what we call the implicit

14 information, so the information we were guessing about,

15 if you make that explicit, if you really put it in the

16 document.

17           But the problem is that just like I got

18 pushed back from people at SEMI when I tried to say,

19 well, do it my way, companies don't want to give up on

20 old familiar tools and the familiar processes that they

21 have.  So that means that it may not be possible to

22 realize that value to get the value out of SGML or even

23 XML just because of that disconnect, that mismatch.

24      Q.    Okay.  Thank you.

25           Do you feel like your invention was an

1  important step in sort of the way we progressed over

2  time and how we think about and how we use documents?

3       A.   Yes, sir, I do, because I think it was -- I

4  think it was a split, a separation for things that used

5  to be joined.  It was one of the first things to really

6  recognize a receptor.

7       Q.   Now that we've talked about what you and

8  Mr. Vulpe actually invented, or at least one of the

9  applications of your invention, let's talk about how you

10 and Mr. Vulpe came to that invention.

11          Can you describe for us how you met

12 Mr. Vulpe?

13      A.   Mr. Vulpe was my brother's next door

14 neighbor.

15      Q.   And who is your brother?

16      A.   Richard Owens.

17      Q.   And how did that lead you to meet Mr. Vulpe?

18      A.   Well, my brother called me and said that his

19 next door neighbor was looking for someone to help out

20 on a software project and suggested that I get in touch

21 with him.

22      Q.   And did you?

23      A.   Yes, sir.  I called right away.

24      Q.   And what came of that?

25      A.   Mr. Vulpe described the project he was

1  working on and that he needed someone to help out, and

2  since I was available and looking for work, I suggested

3  that I would be very happy to.

4      Q.    And is this when you began to consult with

5  i4i?

6      A.    Yes, sir.

7      Q.    And can you remind us what your first SGML

8  project with i4i was?

9      A.    Yes, sir.  That was the SEMI system.

10      Q.    And just so we'll recall, is that the system

11  that would create documents that looked like this

12  (indicates)?

13      A.    Yes, sir, that's right.

14      Q.    And could you remind us what you came to

15  understand the folks that had you create these documents

16  thought about your system?

17      A.    Well, the folks who helped to create it

18  weren't as happy as we would have liked.  I think they

19  felt that we were messing up their workday.

20      Q.    Did you ever try to convince them that, you

21  know, this formatting stuff is just not that important.

22  SGML is really powerful, and that's really what this is

23  all about?

24      A.    Well, yeah, I guess I was kind of young and

25  naive, and I tried to make the argument that, hey,

1  there's a lot of value here, guys, and you should get on

2  the train and go with it.

3      Q.    Were you successful?

4      A.    No.  I think I would have to say I was

5  definitely not.

6      Q.    And did you have similar experience dealing

7  with other clients?

8      A.    Yes, sir.  We had a number of client

9  engagements where we would talk to the content authors,

10  the people who had to really do the work of creating the

11  documents.  And they weren't as keen on our vision of

12  the SGML documents as we were.

13      Q.    Did you ever come around and change your

14  viewpoint to become more sympathetic with the feedback

15  you were getting from your clients?

16      A.    Yes, sir, I did.  And I think that, you know,

17  what happened is that when I started out, I was looking

18  purely from the SGML side, and I was kind of neglecting

19  those hundreds of years of human experience and learning

20  with these nicely formatted documents and sort of

21  saying, oh, that stuff doesn't matter; let's just do it

22  the new way.

23           And I think they quite rightly pointed out

24  that maybe I was being a bit short-sighted in that

25  regard.

1     Q.    Did this change in your own point of view

2  help to lead you to your invention?

3     A.    Yes, sir, it did, because once I realized

4  that both points of view were important, that you had to

5  take into account all the things people were familiar

6  with, but, hopefully, still try to deliver the value

7  that we were offering, then I think it made it a lot

8  clearer that we needed to find a way to get those things

9  to work together.

10     Q.    Do you remember the day that you and

11  Mr. Vulpe had your eureka insight?

12     A.    Yes, sir.  I don't remember the exact date,

13  but I sure do remember the day.

14     Q.    Well, what happened?

15     A.    Well, we were sitting and talking over a

16  trestle table at the i4i offices and discussing customer

17  problems and how to resolve them.  And we were trying to

18  come up with, you know, something that resolved these

19  issues.  And we finally did, you know, kind of in that

20  discussion come to the realization, wait, the problem

21  we've got is we keep thinking these two are the same

22  thing.  And if they weren't, a lot of those problems

23  would go away.

24     Q.    When you say these two, what are you

25  referring to?

1    A.    So it's really the structure of the document,

2  the metacodes, that information that used to be implied,

3  and the content of the document.

4    Q.    And how did you feel when you had that

5  realization?

6    A.    Well, it was actually pretty exciting,

7  because I think we thought that that was a pretty new

8  idea.

9    Q.    Did you tell anybody about it?

10    A.    Yes, sir.  I have a perhaps bad habit of

11  going home and telling my wife all about the boring and

12  geeky things I do at work, so I definitely went home and

13  excitedly told her about that conversation.

14    Q.    Now, when you and Mr. Vulpe first had this

15  idea, were you sure that it would work, that it would do

16  what you wanted it to?

17    A.    Oh, no, sir.

18    Q.    So what did you do?

19    A.    Well, you know, what you need to do is try to

20  build something.  And when you're in software, building

21  something consists of sitting down at a keyboard and

22  starting to type.  So I sort of ran over to my keyboard

23  and started typing.

24    Q.    Where did you do that work?

25    A.    That was at the i4i offices in Toronto.

1     Q.    And what was that like?  What was your office

2  like?

3     A.    So I think a generous assessment would be

4  basic.

5     Q.    And what do you mean by that?

6     A.    Well, so you're looking at a few used roll

7  chairs, some trestle tables with computers setting on

8  them, and the cafeteria was the 2-for-1 pizza place on

9  the street outside.

10     Q.    Were you eventually able to create a working

11  prototype?

12     A.    Yes, sir, we were.

13     Q.    And about how long did that take?

14     A.    Well, I don't know the exact timeline, but it

15  was certainly in the months kind of range.  We spent,

16  you know, several weeks just playing with ideas and

17  trying to get something that worked.

18     Q.    How did you feel when you finally got it to

19  work?

20     A.    Well, it was exciting.  I think it's

21  something that most people looking at it would go:

22  That's all it does?

23          But to us, it really proved that we had done

24  what we set out to do, that it was now feasible to take

25  these things apart, put them back together, and deal

1   with them separately.

2       Q.     Now, what sort of computer system did you

3   develop your prototypes to run on?

4       A.     The computers were what's called IBM PCs, not

5   because they're made by IBM but because they have a

6   particular type of processor in them.  And they were

7   mostly running DOS and Microsoft Windows.

8       Q.     And why did you decide to develop your

9   prototype on that particular sort of system?

10      A.     Well, there was another piece of software

11  that was available at that time called the SP Parser

12  from someone named James Clark, and it let us read all

13  those SGML characters very easily.

14             So it was very convenient to use that

15  platform.  Also, I was just a lot more familiar with the

16  development tools on that platform than I was anywhere

17  else.

18      Q.     Did you ever change or modify your prototype

19  to run on the Macintosh platform?

20      A.     No, sir.  That SP product that I just

21  mentioned wasn't available on the Macintosh at the time,

22  and I wasn't very familiar with the particular

23  development tools I was using on the PC.

24      Q.     And what computer system did the SEMI product

25  run on?

1      A.     It was running on the Macintosh.

2      Q.     And did you ever go back and modify or

3  retrofit the SEMI system to include your invention?

4      A.     No, sir.  I never did that work.

5      Q.     Now, we saw your patent.

6             MR. BURGESS:  PX1, pull it back up here.

7      Q.     (By Mr. Burgess) When did you and Mr. Vulpe

8  decide to file the application that ultimately issued as

9  the '449 patent?

10     A.     I don't remember the exact date.  It would be

11 late '93 or very early in '94.  It was very -- very soon

12 after we had the initial discussions around the idea.

13     Q.     Had you or Mr. Vulpe ever filed for a patent

14 before?

15     A.     No, sir.

16     Q.     Have you filed for one since?

17     A.     No, sir.

18     Q.     Why did you pick this idea as one to file a

19 patent application?

20     A.     Well, I think that I always felt the bar for

21 a patent was pretty high, and it had to be something

22 innovative, something new.  And I think this was the

23 idea that we came up with that I felt sort of meet (sic)

24 and exceeded that bar.

25     Q.     Did you think the problem that you had solved

 1  was an important one?

 2       A.    Yes, sir, I did.

 3       Q.    And did you have a role in actually preparing

 4  the application?

 5       A.    Yes, sir.

 6             I was asked to write a draft that would

 7  provide information to the -- to the patent agent in

 8  helping them actually write the patent application.

 9       Q.    And did you eventually sign off on the

10  application?

11       A.    Yes, sir, I did.

12       Q.    Look here at Plaintiffs' Exhibit 4, Page 38,

13  which is also in your handbook.

14             Can you tell me what's highlighted here?

15       A.    Well, first of all, the somewhat illegible

16  bit on the left is my signature.

17       Q.    And I see there's a date there.  What's that

18  date?

19       A.    That's the 24th of May, 1994, a pretty

20  memorable day for me.

21       Q.    Why do you say it was a memorable day?

22       A.    Well, my wife's birthday is the 25th, and we

23  were supposed to be leaving on a camping trip to

24  celebrate.  And I was in a patent office discussing

25  last-minute details with the lawyer instead of packing

1 the car and putting everything ready to go, so I was

2 getting a bunch of increasingly annoyed phone calls all

3 day.

4     Q.    Now, looking back at PX1, the cover of the

5 patent, we see that it issued in July of 1998.

6           By this time, were you still consulting for

7 i4i?

8     A.    No, sir, I was not.

9     Q.    Nonetheless, did you learn when the patent

10 issued?

11     A.    Yes, sir, very quickly.

12     Q.    And how did you find out?

13     A.    Mr. Vulpe called me pretty much as soon as he

14 found out.

15     Q.    And what happened there?

16     A.    Well, it was kind of whoa moment.

17     Q.    And how did you feel when the U.S. Patent

18 Office issued you that patent?

19     A.    I felt great, and it's something that, you

20 know, I didn't think I would probably ever achieve that.

21 I think the kind of recognition that, well, maybe every

22 geeky software developer would like to get.

23     Q.    Are you pleased with what you and Mr. Vulpe

24 accomplished and what the Patent Office recognized with

25 the issuance of your '449 patent?

```
 1        A.    Yes, sir, very pleased.

 2        Q.    Thank you.

 3              Before you step down, there is one more

 4   thing.  Do you recall having your deposition taken in

 5   this case?

 6        A.    Yes, sir, I do.

 7        Q.    Where you sat down with some lawyers and a

 8   lawyer from Microsoft asked you some questions?

 9        A.    Yes, sir.

10        Q.    Do you recall the Microsoft attorney asking

11   you about the money that i4i owed you?

12        A.    Yes.

13        Q.    Now, when you came back to do some consulting

14   for i4i, after you had initially left, was i4i always

15   able to pay you on time?

16        A.    No, sir.

17        Q.    Why not?

18        A.    My understanding was they didn't have the

19   money.

20        Q.    And did Mr. Vulpe ever tell you whether or

21   not he intended to pay you?

22        A.    Yes, sir.  We discussed it and he promised me

23   that he would make every effort to repay that debt.

24        Q.    And has that happened?

25        A.    Yes, sir.
```

```
 1        Q.    And when did that happen?

 2        A.    That would be late 2007.

 3        Q.    Do you have any hard feelings toward

 4   Mr. Vulpe for the late payment?

 5        A.    No, sir.  I've been in small business,

 6   really, for quite a long time, and I do understand that

 7   these things happen.

 8        Q.    The fact that i4i paid you six months ago

 9   have any impact whatsoever on what you testified to

10   today?

11        A.    No, sir.

12        Q.    And if you hadn't been paid, would you have

13   said the same thing you have testified to here today?

14        A.    Yes, sir, it is, in fact.

15        Q.    Thank you, Mr. Owens.

16             MR. BURGESS:  I'll pass the witness, Your

17   Honor.

18             THE COURT:  Thank you.

19             Cross-examination.

20             MR. POWERS:  Your Honor, I have a binder

21   full of exhibits I may want to use with Mr. Owens.  May

22   I approach and give a copy to counsel?

23             THE COURT:  Yes, you may.

24             MR. POWERS:  Would Your Honor like a set?

25             THE COURT:  Yes, uh-huh.
```

1          MR. POWERS:  Would your attorney like one

2    as well?

3          LAW CLERK:  Yes, sir.

4          THE COURT:  Yes.

5          MR. POWERS:  May I proceed, Your Honor?

6          THE COURT:  Yes, you may.

7                    CROSS-EXAMINATION

8    BY MR. POWERS:

9        Q.    Good afternoon, Mr. Owens.

10       A.    Good afternoon.

11       Q.    I'd like to begin where you left off.  i4i's

12   counsel asked you about some money that Mr. Vulpe paid

13   you in late 2007.

14             Do you recall that?

15       A.    Yes, sir.

16       Q.    That was money that had been owed for several

17   years, correct?

18       A.    Yes, sir.

19       Q.    At least five or six?

20       A.    I would have to check the records, but that

21   doesn't sound wrong.

22       Q.    And it was about $73,000, a little more?

23       A.    That sounds about right, yes, sir.

24       Q.    And he paid you that $73,000 just around

25   Christmastime of 2007?

1          A.     Again, I'd have to check the date to be

2    certain, but it sounds about right, yes, sir.

3          Q.     And your deposition was just a few weeks

4    later in January of 2008, right?

5          A.     Again, I'd want to check the date, but that

6    sounds about right, yes, sir.

7          Q.     And you raised that debt with Mr. Vulpe when

8    he called you last year to help in this lawsuit, didn't

9    you?

10          A.     I'm sorry, sir.  Could you repeat that?

11          Q.     In 2007, Mr. Vulpe called you and asked for

12    your help in the lawsuit, didn't he?

13          A.     Yes, sir.

14          Q.     And when he did so, you raised this debt and

15    asked him to repay it, didn't you?

16          A.     I guess I'd like to say that I don't recall I

17    explicitly asked him to repay it.  He had raised the

18    debt issue.

19          Q.     He raised the debt.

20                 And Mr. Vulpe, who hadn't paid you for

21    several years, came up with the money three weeks before

22    your deposition; is that fair?

23          A.     Again, I'd want to see the dates.

24          Q.     But it was around Christmastime and your

25    deposition was around mid-January?

1      A.     Yes.

2      Q.     All right.  Based on your use of Word, your

3  study and your knowledge of your patent, when you were

4  involved in all of these projects, you couldn't say that

5  Word infringed your patent, could you?

6      A.     No, sir.

7      Q.     Let's talk about the SEMI project that you

8  testified about.

9           Now, one of the things that you said was

10  important about your invention was that you could

11  separate that SGML document into different parts and

12  store them separately, right?

13     A.     I don't believe I used the word store, sir.

14     Q.     So it's not important that you store the

15  separate parts?  Well, let's take it one piece at a

16  time.

17           You testified that one of your -- parts of

18  your invention was that you could take that SGML

19  document that was all combined and separate it into

20  different pieces, right?

21     A.     There is a separate metacode map and map

22  content, yes, sir.

23     Q.     Okay.  And you heard counsel for i4i in

24  opening statement say that those two things, the

25  metacode map and the content, are stored in different

1  places.

2          Is that -- would you agree that's part of

3  your invention?

4      A.   I don't think I heard that.  I'm sorry, sir.

5      Q.   You didn't hear that?

6      A.   No, sir.

7      Q.   Do you agree that storing the metacodes and

8  the content in different places is an important part of

9  your invention?

10     A.   No, sir.  I'm not sure that's in the patent.

11     Q.   Have you ever been shown His Honor's claim

12  construction ruling in this case, Judge Davis'?

13     A.   I don't believe so, sir.

14     Q.   Now, one aspect -- let's put aside the

15  storage aspect, since you weren't shown that.  The SEMI

16  system did allow separation of an SGML document into

17  separate parts, didn't it?

18     A.   So I feel like we're still talking about

19  separating SMGL into the content, and no, it did not

20  allow that, sir.

21     Q.   Okay.  I need to show you your deposition.

22          Do you have it in front of you, or do you

23  need it?

24     A.   Is it in this binder, sir?

25     Q.   It's not in that one; it's in a separate one.

1    I just didn't know if you had it separately.

2         A.    I don't have it, no.

3              MR. POWERS:  Your Honor, there are two

4    volumes.  One is January 15th, 2008, and one volume is

5    October 17, 2008.  I might as well hand both of them

6    now.  If I may approach?

7              THE COURT:  All right.

8              MR. POWERS:  Here's the January 15th.

9    I'll have you the October 17th one in a moment, Your

10   Honor.

11             So we can proceed, may I hand the witness

12   one, and then we can get going?

13             THE COURT:  Yes, you may.

14             MR. POWERS:  Thank you.

15             I'll give you our copy.

16        Q.   (By Mr. Powers) Mr. Owens, could you look in

17   the October 17 one that I just handed you at Page 95?

18        A.    Yes, sir.

19             MR. POWERS:  And, Your Honor, I'll read,

20   for the record, from Page 95, Line 24 through Page 96,

21   Line 6, and then Page 99, Line 17 to 21.

22             And, Your Honor, may I explain to the

23   jury what a deposition is, or do you wish to do that, or

24   do they understand the process?

25             THE COURT:  All right.  Yes.  I'll just

1  explain to the jury that a deposition is questions and

2  answers taken under oath at a time prior to trial, and

3  they're typed up into a formal written document that

4  shows the questions and the answers.

5            MR. POWERS:  Thank you, Your Honor.

6  On Page 95, Line 24:

7            QUESTION:  And they both allowed you to

8  decompose an SGML document into entities and store those

9  entities in -- as separate pieces or separate entries in

10  the database, right?

11            ANSWER:  SEMI --

12     A.    I'm sorry, sir.  There's a slight misreading.

13  The word is entities, not entries.

14     Q.    (By Mr. Powers) I thought I said entities,

15  but I'll say it again.

16            QUESTION:  And they both allowed you to

17  decompose an SGML document into entities and store those

18  entities as separate pieces or separate entities in the

19  database, right?

20            ANSWER:  SEMI did, and for Nelson, I just

21  don't remember.  It never kind of went as far, and I

22  wasn't as involved in it, so I'm not sure about Nelson.

23     Q.    (By Mr. Powers) That was your testimony in

24  that part of the deposition, Mr. Owens?

25     A.    Yes, sir.

1          MR. POWERS:  And then, Your Honor, I'll

2   read from Page 99 of the same transcript, Line 17.

3          QUESTION:  So in the SEMI database, you

4   would import an SGML document, and you would take that

5   document, and you would decompose it into different

6   pieces or entities, correct?

7          ANSWER:  Yes, I believe so.

8      Q.   (By Mr. Powers) That was your testimony there

9   as well, Mr. Owens?

10     A.   Yes, sir.

11     Q.   Okay.  The SEMI system was sold by i4i to

12  SEMI in 1992, wasn't it?

13     A.   I'm afraid I'm not aware of the sale date,

14  sir.

15     Q.   You just don't remember?

16     A.   I wasn't on the sales side; I was on the

17  technical side.

18     Q.   You were part of the group that installed it

19  in February of '93, though, weren't you?

20     A.   Yes, sir.

21     Q.   All right.  Now, February of '93, when you

22  installed it, that's more than one year before the date

23  you filed your patent application in 1994, right?

24     A.   That date would be more so, yes, sir.

25     Q.   And you understood that the system that you

1  installed at SEMI, the S-to-the-4th system, practiced

2  your patent, didn't you?

3      A.    No, sir, definitely not.

4            MR. POWERS:  Your Honor, I'd like to

5  play -- I think we have it available to show as a video

6  clip from Mr. Owens' deposition on January 15th at

7  Page 206, Line 23 through 207, Line 17.

8            THE COURT:  All right.  Let him have an

9  opportunity to locate it.

10           (Video playing.)

11           QUESTION:  Regardless of whether --

12           MR. POWERS:  No.  Wait.  Wait.  Wait.

13           (Video stopped.)

14     A.    I'm sorry.  What were the page numbers?

15     Q.    (By Mr. Powers) 206, Line 23 --

16     A.    Oh, yes, sir.

17     Q.    -- through 207, Line 17.

18     A.    Okay.

19           THE COURT:  All right.

20           (Video playing.)

21           QUESTION:  Regardless of whether -- if

22  they're occurring or not, which of i4i's products do you

23  understand embody your invention that you know about?

24           ANSWER:  That I know about?  So the only

25  system that I had direct interaction with was S4.

```
 1                 QUESTION:  Now, is that S4 the core
 2   engine, or was that S4/Text that we're talking about?
 3   I've seen several different descriptors.
 4                 ANSWER:  Right.  Yeah.
 5                 So, again, the -- yeah, the -- at the
 6   time that I was doing the original work, it was just S4.
 7   There wasn't any other nomenclature around.
 8                 QUESTION:  And what versions of S4 did
 9   you work on?
10                 ANSWER:  Oh, I don't remember.
11                 QUESTION:  Okay.
12                 ANSWER:  .01 certainly.
13                 QUESTION:  From -- from the first, from
14   the earliest?
15                 ANSWER:  Yeah.
16                 (End of video clip.)
17        Q.    (By Mr. Powers) Now, that exact testimony,
18   you were shown that testimony at your later deposition
19   in October, and you said it was true, didn't you?
20        A.    I was shown it, shown the videotape, sir?
21        Q.    No.  No.  Read the exact portion.
22        A.    Yes, sir, I believe so, although I would want
23   to see it in the deposition.
24        Q.    But you don't disagree with the testimony
25   that you just gave; it's accurate?
```

1        A.     It's -- what I said is correct, but it did

2  not refer to the SEMI system.

3        Q.     Okay.  Even though you said it was the very

4  first system you worked on and the only system you

5  worked on?

6        A.     I don't believe that's an accurate

7  characterization, sir.

8        Q.     You worked on the SEMI system, didn't you?

9        A.     Yes, I did, sir.

10       Q.     And that was the first system you worked on

11 for i4i?

12       A.     The SEMI system was the first system I worked

13 on for i4i, yes, sir.

14       Q.     All right.  Now, could you turn in your

15 binder to Exhibit 2395?

16              MR. POWERS:  Your Honor, this is in

17 evidence now.

18              So let's put it up on the screen, if you

19 could, Chris.

20       A.     I'm sorry.  That was 2395, sir?

21       Q.     (By Mr. Powers) Yes, it is.

22              Let me know when you have it.

23       A.     I believe I do, sir, yes.

24       Q.     This was -- this is a document dated in

25 August of '94.  Do you see that?

1      A.     Yes, sir, I see that date on the document.

2      Q.     And you -- and you were still at i4i in

3  August of '94?

4      A.     Yes, sir, I was.

5      Q.     Now, this document is a submission by i4i to

6  the Canadian government seeking funding for work,

7  correct?

8      A.     I don't know, sir.

9      Q.     Do you know that IRAP is the Industrial

10  Research Assistance Program in Canada?

11      A.     I believe I've heard that term, yes, sir.

12      Q.     Now, if you look -- and you are aware that

13  i4i was seeking money for further development costs,

14  weren't you?

15      A.     I'm not sure I was, sir.

16      Q.     Well, let me see if I can help remind you.

17  The document -- if you go to Page 10 of the document --

18            MR. POWERS:  Chris, if you could pull up

19  the section that says Project Team, please.

20      Q.     (By Mr. Powers) It's actually 9 on the

21  bottom.  Let me -- there's two types of numbers, so let

22  me help you.  The original document, it says Page 10,

23  but there's a .009 in the bottom right-hand corner, it's

24  .009.

25      A.     I see it.

1              MR. POWERS:  And if you could bring up

2    the Project Team, please, Chris, so we can all see it?

3        Q.    (By Mr. Powers) Do you see that you are shown

4    as project leader for this project?

5        A.    Yes, sir.

6        Q.    Do you recall being proposed as project

7    leader for a project for the Canadian government?

8        A.    No, sir.

9        Q.    You still remember it?

10       A.    No, sir.

11       Q.    You're not denying it happened, I take it.

12       A.    No, sir.

13       Q.    Now, you -- you've heard Mr. Vulpe

14   characterize the S4 technology that was sold to SEMI as

15   being patented, haven't you?

16       A.    No, sir, I have not.

17       Q.    Let's see if this reminds you.

18             MR. POWERS:  Chris, could you pull, from

19   the bottom of Page 2 of the document, which is on Page

20   1.001, starting at project technical background and pull

21   that up so we can all read it a little better.

22       Q.    (By Mr. Powers) And just to make sure that

23   we're all on the same page, I'll read it.  It says,

24   quote, Infrastructures has applied for a U.S. patent.

25   Then it shows a patent serial number.  That's the --

1              MR. POWERS:  Stop there.

2      Q.    (By Mr. Powers) That's the same serial number

3 that's on your '449 patent, isn't it?

4      A.    I'd have to compare them.  I believe --

5      Q.    Could you do that, please.  You've got --

6 it's Exhibit 1 in the book in front of you that your

7 counsel gave you, the one you used on direct

8 examination.

9      A.    Yes, sir.  The numbers are the same.

10     Q.    Same patent.  In fact, i4i only has one U.S.

11 patent, right?

12     A.    I don't know anymore, sir.

13     Q.    All right.  You only know of one?

14     A.    I only know of one, yes, sir.

15     Q.    All right.  So the quote is,

16 Infrastructures -- and that -- when it says

17 Infrastructures, that's referring to i4i, isn't it?

18     A.    I don't know, sir.  I assume so.

19     Q.    That was the name of the company?

20     A.    Yes, sir.

21     Q.    All right.  Infrastructures has applied for a

22 U.S. patent -- then it's the same serial number -- to

23 protect specific technology that it has developed.

24 The initial implementation is embedded into

25 Infrastructures S-to-the-4th product, which is a

1 vertical market document development and management

2 application targeted to the semiconductor and publishing

3 industries, close quote.

4          Do you see that?

5     A.    Yes, I do.

6     Q.    Now, the product that was sold to SEMI was

7 called S-to-the-4th, wasn't it?

8     A.    Yes, sir.

9     Q.    And SEMI was a semiconductor organization,

10 wasn't it?

11    A.    It was a consortium in the semiconductor

12 industry, yes, sir.

13    Q.    All right.  Could you turn then in the same

14 book to Exhibit 2396.

15    A.    Yes, sir.

16    Q.    Do you recognize on the back page --

17          MR. POWERS:  Chris, if you could pull up

18 the signature of Mr. Vulpe.

19    Q.    (By Mr. Powers) Do you recognize that as his

20 signature?

21    A.    It's a little squooshier than I've seen it.

22    Q.    But it looks similar to his normal signature;

23 that's fair, isn't it?

24    A.    I'm not sure I would want to comment.

25    Q.    All right.

1     MR. POWERS:  And if you would go up a

2 little bit to Item 4, please, Chris, on the same page

3 where it says subcontractor, No. 1, identification.

4  Q. (By Mr. Powers) It lists you as a

5 subcontractor in this and other documents submitted to

6 the Canadian government, this IRAP document.  Do you see

7 that?

8  A. Yes, sir, I do.

9  Q. Do you still not recall whether you were

10 being proposed as a subcontractor for this proposal to

11 the Canadian government?

12  A. No, sir.  This would be at my usual technical

13 level.

14  Q. But you didn't even know that you were being

15 proposed for that?

16  A. I certainly don't remember it, sir.

17  Q. Okay.  You're not denying it one way or the

18 other; you're just saying you just don't remember; is

19 that fair?

20  A. Correct.  Yes.

21  Q. All right.

22     MR. POWERS:  So let's go to the first

23 page, please, of the document, and bring up just the

24 first client information box, the big box at the top, so

25 that we can all read it.

1    Q.    (By Mr. Powers) The name of the client is

2 Infrastructures for Information.  That was the name for

3 i4i, wasn't it, Mr. Owens?

4    A.    Yes, sir.

5    Q.    And then it says, Business Products, and it

6 says S-to-the-4th, right?

7    A.    It certainly could be read that way, yes,

8 sir.

9    Q.    The 4 is shown as a superscript, isn't it?

10    A.    About halfway in between.

11    Q.    Don't you think it looks like a superscript?

12    A.    Yes, sir.

13    Q.    All right.  And that S-to-the-4th product is

14 exactly what was called -- what the SEMI product that

15 was sold to SEMI was called, S-to-the-4th, right?

16    A.    Yes, sir.

17    Q.    Okay.

18         MR. POWERS:  Now, if you'd turn to the

19 next page of the document, please.  And, Chris, could

20 you bring up the project title?

21    Q.    (By Mr. Powers) The project title is

22 called Metacodes Project.  Do you recall discussion

23 inside i4i about your invention being called the

24 metacode patent or Metacode Project?  Do you recall

25 that?

1    A.    Sir, I don't remember specific instances, no,

2 sir.

3    Q.    But that sounds like nomenclature that was

4 being used at the time, doesn't it?

5    A.    The nomenclature appears in the patent, so I

6 would expect so.

7    Q.    All right.

8         MR. POWERS:   And, Chris, if you could

9 bring up the third box on that page, the one that says

10 Summary of Progress to Date.

11    Q.    (By Mr. Powers) You see the first bullet

12 says, U.S. Patent Application filed, and there's only

13 one that was filed, right?

14    A.    Again, I'm not sure now.

15    Q.    As of this time, which is 1994 -- let's see

16 what the date is -- 1994, there was only one that was

17 filed as of that time, correct?

18    A.    Yes, sir, that's my understanding.

19    Q.    And the next bullet says, Single metacode

20 model implemented in i4i flagship product, S-to-the-4th,

21 vertical product market.

22         Do you see that?

23    A.    I do see that, yes, sir.

24    Q.    And that S-to-the-4th product is, again, what

25 the SEMI product was called.

1      A.     The SEMI product was called S-to-the-4th,

2  yes, sir.

3      Q.     All right.  Now, the SEMI product had a

4  metacode map, didn't it?

5      A.     No, sir.

6      Q.     Could you turn to Exhibit 2065 in your book.

7             MR. POWERS:  This is also in evidence,

8  Your Honor.

9             And, Chris, would you bring up, please,

10  the bottom portion?  It says Infrastructures'

11  S-to-the-4th.

12      A.     2065; is that correct?

13      Q.     (By Mr. Powers) 2065.

14             And the bottom part of that page refers again

15  to the S-to-the-4th SEMI product, doesn't it, right

16  there where it says Infrastructures' S-to-the-4th?

17      A.     Sorry.  Do you mind if I look through the

18  document?

19      Q.     I don't mind if you do that, but I'd like you

20  to answer the question first.  The page we're looking at

21  right now says, Infrastructures' S-to-the-4th, right?

22      A.     It does say that, but I'm not comfortable --

23  you asked if it referred to the SEMI system.  I'm not

24  comfortable with answering that unless looking through

25  the document.

1    Q.    Fair enough.  Let's -- we will look through

2  it, but the S-to-the-4th is what the SEMI system was

3  called, right?

4    A.    Yes.  S-to-the-4th is what the SEMI system

5  was called.

6    Q.    Okay.  And if you'll turn to Page 48 of the

7  document -- and by 48, I mean the .048 at the bottom

8  right-hand page.

9           MR. POWERS:  And, Chris, can you bring up

10  the top half of the page, please.

11           Can everybody read that?  It's a little

12  hard to read still.  If you can't read it, we'll try to

13  get it a little larger.

14           Anybody not read it from the jury?  Okay.

15    Q.    (By Mr. Powers) Do you see at the very top of

16  that page, Mr. Owens, it says, Metacode Services?

17    A.    Yes, sir, I see that.

18    Q.    And then it says, S4 duplicate map?

19    A.    Yes, sir, I see it.

20    Q.    And there's a discussion of how the S4

21  duplicate map works under the metacode services title?

22    A.    Yes, sir.

23    Q.    Does that help you remember that there was a

24  metacode map in the S-to-the-4th product?

25    A.    It does help me remember that this is

1   definitely not the SEMI system it was talking about,

2   yes.

3       Q.    Even though it says S-to-the-4th?

4       A.    And I'm sorry, sir.  Even though what?

5       Q.    Even though the document on the front page

6   says S-to-the-4th?

7       A.    Yes, sir.  The document is, obviously,

8   erroneous in that.

9       Q.    Okay.  Now, could you turn to Exhibit 2202 in

10  your book?

11      A.    Yes, sir.

12      Q.    This is a document that you used in

13  connection with the SEMI product, right?  There's no

14  debate that this is the SEMI product?

15      A.    Do you mind if I just take a quick look?

16      Q.    Of course not.

17      A.    Thank you.

18            Yes, sir.

19      Q.    So 2202 is the SEMI product that was sold

20  more than a year before your patent application was

21  filed?

22      A.    22 was a document about that, yes, sir.

23      Q.    All right.  It's a manual that you gave to

24  SEMI about that product, right?

25      A.    It's certainly a manual we authored, yes,

1  sir.

2  Q.    All right.  And it shows how it works, right?

3  A.    Not really, no, sir.

4  Q.    Well, this was a manual you gave to SEMI to

5  help them understand the system, right?

6  A.    Yes, sir.  It just helped to clarify how a

7  user would use it as opposed to how it would work.

8  Q.    Okay.  Now, in this -- in the SEMI system,

9  there was a screen called an editor screen, right?

10  A.    I don't believe that's the full name.

11  Q.    Could you look at Page 104 of Exhibit 2202,

12  and that's -- it's 104 either way, the real number or

13  the .104 number.

14  A.    That's convenient.

15  MR. POWERS:  Chris, could we get that a

16  little bigger?  Is that possible?  Well, that's a little

17  bigger.

18  Q.    (By Mr. Powers) The title of this page,

19  Mr. Owens, is the editor screen.

20  Do you see that?

21  A.    Yes, sir.

22  Q.    This is a screen that would actually be on

23  the SEMI system that a user could see, right?

24  A.    Yes, sir.

25  Q.    And the Section B, that screen would show the

1  SGML tags that were available to that user to work from,

2  correct?  That's what Item B says on the right?

3       A.    Yes, sir.

4       Q.    And there's also a portion of the SEMI system

5  called the document outline view, right?

6       A.    Yes, sir.

7       Q.    And those tags, those SGML tags you

8  described, those are metacodes, aren't they?

9       A.    Well, not in the terminology of the patent,

10  no, sir.

11       Q.    I thought you said on direct examination the

12  tags were metacodes.

13       A.    No, sir.  I think I said that in the patent,

14  we used the terminology metacode to refer to what are

15  called tags in SGML.

16       Q.    Okay.  So an SGML tag is a metacode within

17  the meaning of your patent, fair?

18       A.    Yes, sir.

19       Q.    All right.  Could you turn to Page 110 of

20  Exhibit 2202.  This is discussing the document outline

21  view?

22       A.    Yes, sir.

23       Q.    The document outline view was another type of

24  screen that a user of the SEMI system could use and see,

25  right?

1    A.    Yes, sir.

2    Q.    And through that screen and the editing

3 screen, you could manipulate the SGML tags or metacodes,

4 couldn't you?

5    A.    I'm afraid I don't remember, sir.

6    Q.    Don't remember one way or the other?

7    A.    Well, you said both, and I'm not sure that it

8 could do it in both.

9    Q.    It could do it in the editing screen for

10 sure.

11    A.    Yes, sir.

12    Q.    So you could move -- you could manipulate or

13 edit the metacodes in the editing screen in the SEMI

14 system.

15    A.    Well, SGML tags, to be clear.

16    Q.    Okay.  And those are metacodes within the

17 meaning of your patent.

18    A.    Well, if -- if we were talking about the

19 patent application, it would be, but in SEMI, of course,

20 they were just tags.

21    Q.    Okay.  And you could manipulate those tags

22 and edit them in a way that the user wanted to.

23    A.    You could certainly insert tags, I believe.

24    Q.    And you could move them, too, couldn't you?

25    A.    I don't know if that's true or not, sir.

1        Q.     Would you turn to Page 115 of Exhibit 2202.

2        A.     Yes, sir.

3        Q.     That gives you an example of moving tags to

4   the right or left, correct, as one manipulation of a tag

5   you could do in the SEMI system?

6        A.     No, sir.

7        Q.     There's a heading that says moving tag right

8   and tag left.

9        A.     Yes, sir.

10       Q.     So that doesn't mean moving tag left or tag

11  right?

12       A.     That's correct.  It does not mean that, sir,

13  no.

14       Q.     The text reads, quote, moving tag right or

15  tag left moves your cursor one tag position either

16  forwards or backwards.  This means that your cursor will

17  move from within a tag to outside a tag or from outside

18  a tag to the next tag.

19              Is that how it worked?

20       A.     Yes, sir.  So it did move the cursor

21  position, not the tag.  They're quite different.

22       Q.     And then you would use the editing screen to

23  manipulate the tag, right?

24       A.     Again, that's where I'm not sure.  I did say

25  we could insert, and that's -- that's my memory.

1    Q.    All right.  But the purpose of the editing

2 screen is to edit, isn't it?

3    A.    That's a reasonable assumption, sir, yes.

4    Q.    Okay.  Now, there are meta -- there are tags,

5 SGML tags, in that document outline view, physical ones,

6 in the SEMI system.

7    A.    In the SEMI system?  Yes, sir.

8    Q.    And those tags were stored in the data

9 structure, weren't they?

10    A.    I'm going to say no.

11    Q.    They weren't stored at all?

12    A.    Well --

13    Q.    How could you look at them if they weren't

14 stored?

15    A.    They were in a list, so there was a GUI list

16 that held them.

17    Q.    And the locations of those tags were stored

18 somewhere; otherwise, they'd be gone, right?

19    A.    I'm sorry, sir.  I'm not clear on the

20 question.

21    Q.    I thought you said -- just said that the tags

22 aren't stored anywhere; is that right?

23    A.    No, sir.  I think we were talking about

24 whether there was a data structure or not.

25    Q.    Okay.  They were stored.  The tags, the SGML

1  tags, that are visible in the document outline view are

2  stored, correct?

3       A.    Well -- so to be clear, it's really the --

4  just the name of the tag.

5       Q.    And that's stored?

6       A.    Is it stored?  It's in -- it would have to be

7  in the list.

8       Q.    And the address of it had to be stored,

9  right?  Otherwise, it's useless.

10      A.    Well, I'm going to say no.

11      Q.    So your testimony is that in the document

12  outline view or in the SEMI system, the addresses of the

13  SGML tags were never stored?

14      A.    Yes, sir.

15      Q.    So they're gone; can never be used.

16      A.    Well, no, sir, because they were still in the

17  document.

18      Q.    And they weren't stored anywhere?

19      A.    Well, they were in the document.  They were

20  mixed in with the content, as they are in any SGML

21  system.

22      Q.    And the SEMI -- and your testimony that we

23  showed you from your deposition said that the SEMI

24  system allowed separating the SGML document into

25  separate entities and storing them separately.

1  That was what your testimony that we just read said,

2  wasn't it?

3      A.    An entity is an SGML document with mixed tags

4  and content.  I think that's the confusion, sir.

5      Q.    Okay.  So let's talk about RTF for just a

6  minute.  You're familiar with rich text format?

7      A.    I'm familiar with the name, sir.

8      Q.    You refer to it in your patent as another

9  language that's been used, right?

10      A.    As I said, a formatting code, yes, sir.

11      Q.    So that has codes that affect what a document

12  looks like as well.

13      A.    I believe so, yes, sir.

14      Q.    And you're familiar that the rich text format

15  or RTF was created by Microsoft.

16      A.    Actually, I didn't know that, no, sir.

17      Q.    Could you look at your own patent, Exhibit 1.

18           MR. POWERS:  And, Chris, can you bring up

19  Column 2, Line 32?

20      Q.    (By Mr. Powers) Mr. Owens, let me know when

21  you have that.  It's also on your screen.

22           In your own patent, you say, quote, some of

23  these formats are being used as standards in the

24  industry.  Microsoft has developed a de facto standard

25  for document interchange called the rich text format or

1    RTF.

2              Do you see that?

3         A.    Yes, sir.  Apparently, I did know that at

4    some time.

5         Q.    Okay.  Now, in RTF or Microsoft's rich text

6    format, a paragraph code can be a metacode as you use it

7    in your patent, right?

8         A.    That's an interesting question.  I'm going to

9    say the answer is no.

10        Q.    Well, let's take it backwards.  There's a

11   paragraph tag in SGML, which you consider to be a

12   metacode within the meaning of your patent, right?

13        A.    Yes, sir.

14        Q.    And rich text format or RTF has the ability

15   to declare something a paragraph, but you say that's not

16   a metacode?

17        A.    Yes, sir, I believe so.

18        Q.    So one paragraph is a metacode, but one is

19   not?

20        A.    In entirely different standards, used for

21   different purposes, yes, sir.

22        Q.    All right.  Can we -- I'd like you to look --

23              MR. POWERS:  And, Your Honor, I'll read

24   from his deposition.  It's the January 15 deposition.

25   And it's at Page 142, Line 5 through 12.

1    Q.    (By Mr. Powers) Mr. Owens, you said in your

2    deposition, also under oath, quote:

3              QUESTION:  So would an RTF code that

4    designated a body of text as a paragraph, would that be

5    a metacode?

6              ANSWER:  So it would depend on what you

7    had to do to interpret that information.  So if -- you

8    know, if it required a skilled human who knew RTF to

9    work that out, maybe not.  If it -- yeah, it could be.

10   Q.    (By Mr. Powers) That was your testimony,

11   right?

12   A.    Sorry.  I've lost the line number.  Could you

13   give that to me again?

14   Q.    142, Lines 5 to 12.

15   A.    Yes, sir.

16   Q.    And the title code in RTF is also a metacode

17   within the meaning of your patent, too, isn't it?

18   A.    I'm sorry, sir.  Are you still reading from

19   the deposition?

20   Q.    It's a question for now.

21   A.    Again, so I would say no.

22   Q.    So title in SGML is a metacode, but title in

23   RTF is not, as your -- according to your testimony.

24   A.    Yes, sir.

25   Q.    Let's go to your deposition then, please, at

1  Page 142, Lines 13 to 20.

2            MR. POWERS:  And, Your Honor, I'll read

3  that into the record.

4            QUESTION:  It could be.

5            Now, wouldn't an RTF code that designated

6  a body of text as being a title, would that be a

7  metacode?

8            ANSWER:  So, typically, they're -- well,

9  I guess I don't know that.  Yeah, if it clearly defined

10  the semantics of the content it was embedded within,

11  then, yes, it would be a metacode.

12      Q.    (By Mr. Powers) That was your testimony,

13  correct?

14      A.    With the proviso that that's semantics, yes,

15  sir.

16      Q.    One final question, Mr. Owens.  You testified

17  on direct that you created the invention on a PC, and

18  the SEMI system was a MAC or Apple-based, correct?

19      A.    Yes, sir.

20      Q.    And I take it what you're trying to convey in

21  that is that the invention is related to a PC and

22  wouldn't have been done on an Apple system.  Is that --

23  was that the point of your testimony?

24      A.    I'm sorry.  Could you clarify the term

25  related to?

1      Q.     Well, I was trying to figure out what point

2  you were trying to make.

3             Were you trying to make the point that the

4  invention was done on a PC, and therefore, because the

5  SEMI system was done on an Apple, they're different?

6      A.     Yes, sir.

7      Q.     In fact, in your patent, you specifically say

8  that the best system that you know of is an Apple

9  system, isn't it?

10     A.     I don't believe I used the word best, sir.

11     Q.     Well, could you look in your patent at Column

12  5.

13             MR. POWERS:  And, Chris, could you please

14  bring up, oh, Lines 3 through the rest of that

15  paragraph.

16     Q.     (By Mr. Powers) And you say there, Mr. Owens,

17  in your own patent specification, a specific example of

18  such an acceptable computer system comprises a Quadra

19  800 personal computer, a standard Apple 14-inch monitor,

20  a standard Apple keyboard, working RAM, et cetera.

21             That's what you say in your patent, right?

22     A.     Yes, sir.

23     Q.     Now, the Quadra, that's an Apple computer,

24  isn't it?  Why is that?

25     A.     Yes, sir, one that's easier to identify.

1    Q.    All right.  So when you try to set out in

2 your patent the type of computer that would work

3 acceptably with the invention, you cited the Apple

4 system, not the PC system, right?

5    A.    Yes, sir, because Apples are much easier to

6 identify than PCs.

7    Q.    And in fact, you cited the exact Apple system

8 in your patent for use in the invention that you

9 specified to SEMI on the SEMI system, didn't you?

10    A.    I don't know that, sir.  It could be.

11    Q.    Would you look at Exhibit 2202 again.

12    A.    Yes, sir.

13         MR. POWERS:  Chris, could you bring up

14 Page 12.

15    Q.    (By Mr. Powers) This is part of your SEMI

16 document that you described earlier that describes the

17 SEMI system, right?

18    A.    Yes, sir.

19    Q.    And on Page 12, at the third bullet, you say,

20 Machine, at least a Macintosh 2c1.  We recommend that

21 you use a Quadra.

22    A.    Yes, sir, that's what it says.

23    Q.    So the SEMI system that you recommended is

24 exactly the same system that you recommended in the

25 patent.

 1      A.      I believe there are some differences, and I

 2 don't think we recommended it in the patent.

 3      Q.      It's the only one you listed in both places;

 4 is that fair?

 5      A.      I'd have to look through the patent.  It's

 6 the only one I did see in what we were just reading,

 7 yes, sir.

 8              MR. POWERS:  No further questions, Your

 9 Honor.

10              THE COURT:  All right.  Redirect?

11              MR. BURGESS:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13 BY MR. BURGESS:

14      Q.      Mr. Owens, you just had a discussion

15 regarding entities and SGML.

16      A.      Yes, sir.

17      Q.      Can you explain to the jury what an entity

18 is.

19      A.      Yes, sir.

20              As we saw in that document, originally, we

21 had several SGML tags.  We had the title; we had

22 overview; we had chapter.  And entity is just a way to

23 take an entire section of that document, all the

24 characters that you see on the screen.

25              So right from that very first angle bracket

1   in front of the word overview right to the last angle

2   bracket after the end overview tag, take that whole

3   piece out and just put it somewhere else, so it still is

4   mixed.

5          SGML tags and content has been practiced

6   forever in SGML.

7      Q.    Is an entity an example of mapped content?

8      A.    No, sir, in no way.

9      Q.    Is it a metacode map?

10     A.    No, sir.

11     Q.    Does it have anything to do with your

12   invention?

13     A.    No, sir.  It is, in fact, explicitly stated

14   in the SGML standard as a way to do a decomposition of

15   documents.

16     Q.    Now, you just had a discussion about the

17   reference to Apple computer in your patent.  Why did you

18   list Apple computers as an example of the system that

19   could implement your invention?

20     A.    Yeah.  So I referred earlier to the office

21   being quite basic, and one of the things that was basic

22   in the office were the computers that we used.  So all

23   the computers were white label.  There were no names on

24   them.  It wasn't like we bought from, you know, some --

25   IBM or Compaq or somebody.

1          So if you wanted to identify a computer by

2     name, it was quite hard to find anything on the

3     computers.  The only computer in the office that we had

4     that had a real name on it was the Apple Quadra.  So

5     that was the name I chose.

6          Q.    Is there any limit -- limitation in your

7     patent to the sort of system that your invention could

8     be used on?

9          A.    No, sir.  It's not limited in any way.

10         Q.    I'll just ask you what I asked you in your

11    direct examination again.  Did you ever implement your

12    invention in the SEMI system?

13         A.    No, sir, we did not.

14              MR. BURGESS:  Thank you, Your Honor.  No

15    further questions.

16              THE COURT:  Any recross?

17              MR. POWERS:  No, Your Honor.

18              THE COURT:  All right.

19              All right, Ladies and Gentlemen of the

20    Jury, I think we're going to call it a day.  You've been

21    very attentive, put in a hard day today.  We'll start

22    back at 9:00 o'clock in the morning continuing with the

23    testimony.

24              Please remember my instructions.  Don't

25    discuss this case among yourselves or with anyone else.

```
 1  Get a good night's sleep, and we'll see you back here at
 2  9:00 o'clock in the morning.  You are excused to the
 3  jury room.
 4                 COURT SECURITY OFFICER:  All rise.
 5                 (Jury out.)
 6                 THE COURT:  Please be seated.
 7                 All right.  Mr. Cawley, was there some
 8  testimony?
 9                 MR. CAWLEY:  Yes, Your Honor.  This
10  witness had some testimony relevant to inequitable
11  conduct.
12                 THE COURT:  All right.  Who will be
13  asking the questions?
14                 MR. CAWLEY:  Mr. White is going to handle
15  the inequitable conduct.
16                 THE COURT:  All right.
17                 MR. POWERS:  Your Honor, may I ask a
18  question before we proceed?
19                 We had testimony from this witness on his
20  30(b)(6) deposition on this exact topic, which is why
21  didn't he disclose the sale of SEMI.
22                 And we want to play that, Your Honor.  We
23  don't have to do that now.  We can do it whenever Your
24  Honor wishes to see it.  It would make some sense for
25  Your Honor to see it now for two reasons.
```

```
 1                    One is it's our burden of proof, and so
 2   it make sense for you to see his testimony from our
 3   perspective already taken on the 30(b)(6).
 4                    And second, it would be relevant to
 5   consider in the context of hearing what other testimony
 6   he's now going to give under oath on the other side.
 7   So if the high road is Your Honor wishes to hear that at
 8   another time --
 9                    THE COURT:  Well, let me ask about how
10   long you anticipate for your direct examination.
11                    MR. WHITE:  It shouldn't be longer, Your
12   Honor, than 30 minutes.  I'm hoping to certainly keep it
13   shorter than that.
14                    One of the reasons that we requested the
15   Court to allow us the opportunity to take Mr. Owens at
16   this time is that he is from out of the country, and
17   he's actually not even a party -- working for the
18   parties here.
19                    And so we're trying to get him off on the
20   issues that he has to address, and so we were hoping to
21   do this today while he's here so he can go home to his
22   family.
23                    The playing of the deposition, the
24   30(b)(6), since this is a bench matter, would seem that
25   it could come in at any time the Court deemed
```

1  appropriate.

2              So we would encourage -- or effectively

3  request that we have the opportunity to finish his

4  testimony on all the issues that he's going to testify

5  about today.

6              THE COURT:  You may proceed and try to

7  make it as brief as possible, and Mr. Powers can

8  cross-examine the witness.

9         STEPHEN OWENS, PLAINTIFFS' WITNESS, SWORN

10                   DIRECT EXAMINATION

11  BY MR. WHITE:

12     Q.    Mr. Owens, I have just a few questions

13  concerning the issue of the charge of inequitable

14  conduct.

15              Would you direct -- turn your attention,

16  Mr. Owens, to Plaintiffs' Exhibit 79 in the binder that

17  we've provided to you and ask you if this is a copy of

18  that S4 user's guide that you've been testifying

19  regarding.

20     A.    Yes, sir.  This looks like the SEMI user's

21  code.

22     Q.    Did you write the source code for that

23  product?

24     A.    Some parts of it, yes, sir.

25     Q.    What parts of that product did you write?

```
 1        A.    I was responsible for the editor in

 2   particular, as well as some of the pieces of the

 3   membership system and the document management.

 4        Q.    Does that source code exist today?

 5        A.    No, sir, it does not.

 6        Q.    Do you know why it doesn't exist?

 7        A.    It's just gotten too old.  I believe it was

 8   discarded.

 9        Q.    If you had that source code here today, what

10   would you be able to tell this Court about the design of

11   the editor portion of that product?

12        A.    Oh, I could then tell you exactly --

13                MR. POWERS:  Objection, best evidence.

14                THE COURT:  Excuse me?

15                MR. POWERS:  Object, best evidence.  I

16   mean, he either has a recollection, which he can testify

17   about, or -- but he shouldn't be speculating about what

18   he could testify about if he had source code that he

19   doesn't have.

20                THE COURT:  All right.  Restate the

21   question.

22        Q.    (By Mr. White) Would the source code reveal

23   to you how it was internally designed and operated?

24        A.    Yes, sir.  Then I could tell exactly how it

25   was done.
```

```
 1        Q.     Thank you.

 2               Despite the fact that that source code does

 3   not exist today, can you testify with any degree of

 4   certainty today whether the SEMI-S4 source code

 5   practiced the invention of the '449 patent?

 6        A.     Yes, sir, I can.

 7        Q.     And what is your opinion on that?

 8        A.     It could not have, because we had not yet

 9   come up with the idea.

10        Q.     When did you and Mr. Vulpe conceive of the

11   invention of the '449 patent?

12        A.     It was late in 1993, sir.

13               THE COURT:  Late 19 what?

14               THE WITNESS:  '93, Your Honor.

15               THE COURT:  '93.

16        Q.     (By Mr. White) And when was the source code

17   that you wrote for the SEMI S-to-the-4th product

18   completed and installed and running?

19        A.     Sir, I'm not sure of the exact date, but it

20   would have been early in '93 or late in '92.

21        Q.     So it was at least a year earlier than the

22   date you conceived of the idea which became the subject

23   matter of the '449 patent?

24        A.     Several months --

25               MR. POWERS:  Object to leading, Your
```

1    Honor.

2              THE WITNESS:  I'm sorry.

3              MR. POWERS:  Object to leading.

4              THE COURT:  Overruled.

5    A.    Yes, several months, sir.

6    Q.    (By Mr. White) What did you and Mr. Vulpe do,

7    after you had conceived of this invention, about trying

8    to obtain a patent on that invention?

9    A.    We talked to my brother, Richard Owens, to

10   see if he had any idea how to go about getting a patent.

11   Q.    And why would you speak to your brother?

12   A.    He was, at the time, I believe anyway,

13   corporate counsel for Infrastructures for Information.

14   Q.    Does your brother practice intellectual

15   property law?

16   A.    Yes, sir.

17   Q.    Did your conversations with your brother lead

18   to a meeting with a patent agent in connection with the

19   preparation of the patent application?

20   A.    Yes, sir.  He introduced us to Dr. Brian

21   Barlow, who was a patent agent working for the same firm

22   as my brother at the time.

23   Q.    Would you turn in your binder to Plaintiffs'

24   Exhibit 600.

25              MR. WHITE:  And, Your Honor, at this

 1  time, Microsoft has objected to the use of this

 2  Plaintiff -- of this Exhibit 600 in connection with

 3  Mr. Owens' testimony on the basis that Mr. Owens really

 4  has no personal knowledge regarding that document.

 5                  This is -- Plaintiffs' Exhibit 600 is, in

 6  fact, the handwritten notes of a notebook by Mr. Vulpe.

 7  He will identify and authenticate the document when he

 8  takes the stand.

 9                  We're using it today just for the purpose

10  of trying to refresh the recollection of the witness and

11  not being offered into evidence at this time, so --

12                  THE COURT:  All right.  You may proceed.

13                  MR. POWERS:  Your Honor, if I may, if

14  it's being used to refresh recollection, there is not

15  yet a precise question showing a absence of recollection

16  where it can be refreshed.

17                  Because if we don't do that, he's just

18  going to read it to him and say, is that right, and

19  that's not refreshing recollection.  I think it's an

20  inappropriate use of the document.

21                  THE COURT:  All right.  You may proceed.

22                  MR. WHITE:  Thank you.

23      Q.    (By Mr. White) Would you turn to Plaintiffs'

24  Exhibit 600, Mr. Owens.

25      A.    Yes, sir.

1    Q.    Can -- do you -- do you recognize the

2 handwriting that is on this document?

3    A.    May I just examine it for a second?

4    Q.    Yes, please.

5    A.    Yes.  I believe that to be Mr. Vulpe's

6 scrawl.

7    Q.    Are you familiar with the practice that

8 Mr. Vulpe had of taking notes at meetings in a

9 spiral-bound notebook?

10    A.    Yes, sir.  Actually, everyone at the company

11 followed the same practice.

12    Q.    Did you also have such a practice?

13    A.    Yes, sir, I did.

14         MR. WHITE:  Could I have shown on the

15 screen a portion of this exhibit that has the production

16 numbers 6911?

17    Q.    (By Mr. White) Mr. Owens, it's -- it's the --

18 the production number ends, and the last four digits is

19 6911.

20    A.    Yes, sir, I have it.

21    Q.    Do you see that?

22    A.    Yes, sir.

23    Q.    Now, this entry here, would you take a

24 look -- and it says -- I believe it says Brian Barlow,

25 and the date was February 18th, 1994.

1       A.    Yes, sir.

2       Q.    Does that refresh your recollection of a

3  meeting that occurred with Brian Barlow on that date?

4       A.    Yes, sir.  I know I did attend a meeting with

5  Dr. Barlow at Smith Lyons, which was my brother's -- my

6  brother's law firm.

7       Q.    Is this the date of the meeting you had with

8  Mr. Barlow?

9       A.    It certainly is in the right -- right

10  timeframe, yes, sir.

11       Q.    Now, if you'll notice Mr. Vulpe's notations,

12  does that refresh your recollection as to the subject

13  matter of the discussions you had with Dr. Barlow at

14  that meeting?

15       A.    Yes, sir.  Dr. Barlow was laying out the

16  information that we had to provide to him to use as

17  input in his drafting of the patent.  So we were laying

18  out what we needed to include in that -- in that set of

19  information.

20       Q.    Was he requesting that you and Mr. Vulpe

21  prepare the draft specification for this patent?

22       A.    Yes, sir.  He did ask that we do that.

23       Q.    Why -- why -- how did -- why did he make that

24  request of you; do you recall?

25       A.    Well, my understanding was software patents

1  were fairly new at that time, and Dr. Barlow, I believe,

2  was more in the chemical area, and so he didn't have the

3  familiarity with the subject matter, he felt, to do that

4  preparation.

5      Q.    Now, if I could have -- if you would turn

6  your attention to two pages further into the document,

7  to the page that has the production number 6193 on it,

8  there is -- there are some notations there by Mr. Vulpe

9  regarding the prior art and setting up a straw man.

10         Do you see that?

11     A.    Yes, sir.

12     Q.    Do you recall that discussion with Dr. -- Dr.

13 Barlow?

14     A.    Yes, sir.  The term straw man is particularly

15 evocative.  He suggested that we set up the prior art as

16 a straw man to demonstrate how we were different.

17     Q.    What did he tell you you were supposed to do

18 with respect to the disclosure of what you knew about

19 prior art?

20     A.    So we had the instruction that it was our

21 obligation to disclose everything we knew really that

22 was helpful in understanding the field of the invention

23 and might be helpful to an Examiner.

24     Q.    And did you prepare such a draft

25 specification?

1      A.      Yes, sir, I did.

2      Q.      If you would turn to Plaintiffs' Exhibit 594

3   in the binder.

4      A.      Yes, sir.

5      Q.      Do you recognize this document?  Take a look

6   at the entire document, if you need to, Mr. Owens.

7      A.      Yes, sir.  I believe that's the draft that I

8   wrote of the information for the patent application.

9      Q.      Now, you testified earlier today that after

10  you and Mr. Vulpe conceived of this invention, that

11  there was a period of time where you were in the process

12  of testing or validating the idea in the computer

13  program.

14          Do you recall that?

15     A.      Yes, sir.

16     Q.      Now, you indicated that you believed you

17  conceived of the invention in -- near the end of '93,

18  and the date of this document, the date in which you

19  delivered the first draft specification, I believe, is

20  in April of '94?

21     A.      Yes, sir.  April 13th, 1994 is the date on

22  this document.

23     Q.      What were you doing in that interim between

24  the conception and the date that this specification was

25  delivered as far as the validation of the invention was

1  concerned?

2      A.    Sir, there were two things.  One of the

3  instructions that we had is that we had to disclose how

4  to practice the invention in the patent.  And when we

5  came up with the original idea, we didn't know how to

6  practice the invention.

7           So we had to ensure that we had enough of

8  a -- at least a prototype implementation to prove that

9  we had, in fact, practiced it and could document that

10 for the Patent Office.  So that was certainly one of the

11 activities we were undertaking.

12     Q.    Now, your draft specification includes a

13 discussion of the prior art, correct?

14     A.    Yes, sir.

15     Q.    What was the source of the information that

16 you provided in the write-up, the first draft

17 specification, regarding the prior art?

18     A.    That was based on my experience in the SGML

19 industry, sir.

20     Q.    Did you have any discussions from Mr. Vulpe

21 as to what should go into this section?

22     A.    I'm afraid I don't remember it, specific

23 discussions.  It seems very likely.

24     Q.    Okay.  Have you ever heard of the duty of

25 candor in connection with the filing and prosecution of

1  a United States patent application?

2      A.    Yes, sir, I have.

3      Q.    And when did you first hear that concept?

4      A.    Well, that concept was explained to us really

5  in that -- in that initial meeting with Dr. Barlow.

6      Q.    Well, what did you understand the duty of

7  candor to mean?

8      A.    My understanding was that it was related to

9  our obligation to disclose any prior art that we were

10  aware of that would be helpful in leading the Examiner

11  in evaluating and understanding the application.

12      Q.    Well, how were you and Mr. Vulpe planning on

13  complying with your duty of candor after that meeting

14  with Dr. Barlow?

15      A.    Well, we were drafting the information that

16  Dr. Barlow had asked for, and my plan was to include in

17  that document anything I was aware of that I thought

18  would be relevant.

19      Q.    Well, do you believe that you and Mr. Vulpe

20  complied with your duty of candor in that regard?

21      A.    Yes, sir, very much so.

22      Q.    And how is that?

23      A.    Well, the application that I made -- or the

24  draft that I did had an explicit reference to the SGML

25  standard; it had reference to the types of applications

1   that I was aware of that practiced the prior art.

2       Q.    Let me stop you right there, Mr. Owens, and

3   ask that --

4               MR. WHITE:  If you would pull up a slide

5   on Plaintiffs' Exhibit 1.

6       Q.    (By Mr. White) If you could direct your

7   attention to the patent, PX1.

8       A.    Yes, sir.

9       Q.    Placed up on the screen, an excerpt out of

10  the patent.  In Column 2, we'll start with -- it looks

11  like Line 41.  You made reference to the SGML standard?

12      A.    Yes, sir.

13      Q.    Is this where you provided, in the written

14  description, the reference to the standard?

15      A.    Yes, sir.  I give the name of the -- of the

16  SGML language, as well as the ISO standard we referred

17  to.

18      Q.    Keeping your finger on that location in the

19  patent, would you turn over quickly to Plaintiffs'

20  Exhibit 131.

21      A.    Yes, sir.

22      Q.    Do you recognize that document?

23      A.    Yes, sir.  That's a copy of the ISO standard

24  for SGML.

25      Q.    Were you familiar with that standard at the

1   time you wrote this draft specification?

2       A.    Yes, sir.  We had to use the standard

3   frequently as a reference document anytime we were

4   producing SGML material.

5       Q.    The understanding that you have regarding

6   SGML and the features of that standard come from your

7   having studied the standard itself?

8       A.    Yes, sir, among other things, including --

9       Q.    Do you have any other reference materials you

10  relied on to understand how SGML and the standard

11  worked?

12      A.    Yes, sir.  There was a book called the SGML

13  handbook written by the inventor of SMGL, Dr. Charles

14  Goldfarb.

15      Q.    Could you look at Exhibit 291 and tell us, is

16  that exhibit the handbook you just referred to?

17      A.    Yes, sir.  That's a very familiar looking

18  cover, too.

19      Q.    What was the purpose of this handbook?

20      A.    So the standard, of course, is a technical

21  document.  It's intended to define exactly how SGML is

22  laid out.  And as such, it can be a little hard to

23  understand how to practice the standard.

24          The handbook tried to make the standard a

25  little more approachable by providing more in the way of

1  a tutorial and example-based approach to understanding

2  and using SGML.

3      Q.   Why did you feel it necessary to actually

4  cite the standard by the ISO number in connection with

5  your description of your invention?

6      A.   Well, I thought that, first of all, the prior

7  art that we were relying on was definitely SGML and that

8  in disclosing the standard number, we were giving a

9  whole and very large field of reference to the Examiner

10 to help understand where the invention fit in.

11     Q.   Okay.  If you would turn back to the patent

12 in Plaintiffs' Exhibit 1.

13     A.   Yes, sir.

14     Q.   You were saying that in addition to

15 disclosing the ISO standard for the SGML standard, that

16 you had described in some -- in a general sense, SGML

17 editors; is that right?

18     A.   Yes, sir.

19     Q.   Would you -- would you take a look then over

20 at Column 3, Lines 13 to 34 of the patent.

21     A.   Yes, sir.

22     Q.   What did -- what did -- what were you trying

23 to disclose here in this part of the background section

24 of the invention?

25     A.   Well, I think it might be helpful if I just

1    read that section as an introduction.

2         Q.    Please.

3         A.    It says the current practice outlined here

4    above -- here and above suffers from the following

5    disadvantages:

6              While inventing structural information in the

7    content stream is accepted standard practice, it is

8    inefficient and inflexible.

9              In a digital age for manual production of

10   documents, the intermingling of the markup codes with

11   the content is still the best way of communicating

12   structure.  For electronic storage and manipulation, it

13   suffers from a number of shortcomings.

14             That section is really referring to my

15   experience with actually having to deal with this

16   problem in trying to create the editor for the SEMI

17   application where we did have, you know, markup and

18   content mixed in the same stream, and it causes a bunch

19   of the problems that I refer to there.

20        Q.    Did the SEMI editor that you wrote, the text

21   editor that you wrote, did it work with documents that

22   combine structure and content as a single unit?

23        A.    Yes, sir, it did.  It pertains to SGML

24   documents that had the structure and content in them.

25        Q.    What do you mean by a single unit?

1    A.    So the -- the tags actually appeared -- and

2  by tags, I mean the angle brackets -- the names of the

3  tags appeared within the text stream of the content,

4  just at it did in the SGML system.

5    Q.    So all of the editing that would occur that

6  would cause changes to be made to the content or changes

7  to be made to the SGML tags, that would be handled by

8  processing the document combining structure and content

9  as a single unit?

10                MR. POWERS:  Object to leading, Your

11  Honor.

12                THE COURT:  Overruled.

13    A.    Yes, sir, that's my memory.

14    Q.    (By Mr. White) And that's what you were

15  trying to describe here in Column 3?

16    A.    Yes, sir.

17    Q.    Well, how many prior art SGML text editors

18  that processed documents combining structure and content

19  where you understood what the internal data structures

20  and the internal functions were prior to the time you

21  wrote this Column 3 disclosure?

22    A.    I was only familiar with one, just the SEMI

23  editor, sir.

24    Q.    Turn to Exhibit 4, if you would, Plaintiffs'

25  Exhibit 4, Mr. Owens.

1               This is a copy out of the prosecution history

2  of your oath and declaration, and I believe you've

3  already identified for the record that you signed the

4  oath and declaration on the day before your wife's

5  birthday.

6        A.    Yes, sir, that's right.

7        Q.    That was just prior to the time that you and

8  Mr. Vulpe filed your application?

9        A.    Yes, sir, it was.

10       Q.    Now, you indicated that your brother, Richard

11 Owens, is an intellectual property lawyer in Canada; is

12 that right?

13       A.    Yes, sir.  He was at Smith Lyons at the time.

14       Q.    And he was actually working with you and

15 Mr. Vulpe in connection with getting this application on

16 file?

17       A.    Yes, sir, in his capacity as counsel for

18 Infrastructures for Information.

19       Q.    Did you have a meeting with your brother, Mr.

20 Owens, Richard Owens, and Mr. Vulpe prior to the time

21 that you actually signed this declaration?

22       A.    Yes, sir.  At the Smith Lyons' offices just

23 before we signed, my brother took us both apart to

24 discuss some of the aspects of that signature.

25       Q.    Did he discuss with you your duty of

1    disclosure and duty of candor regarding this

2    application?

3         A.    Yes, sir.  He gave me the little brother riot

4    act about what I was signing.

5         Q.    Well now, this was the second time that

6    someone had advised you that you had a duty of candor

7    with regard -- regarding the prosecution of your

8    application; is that right?

9         A.    Yes, sir.  And the first time would have been

10   in my initial meeting with Dr. Barlow.

11        Q.    What did you say to your brother when he gave

12   you the admonition regarding your duty of candor prior

13   to the time you actually signed this oath?

14        A.    I said that I did understand what I was

15   signing, sir.

16        Q.    Did you feel like you were complying with

17   your duty in connection with the filing of this

18   application?

19        A.    Yes, sir, very much so.

20        Q.    Now, on the next -- the next page of your

21   oath and declaration, at the top of that document, there

22   is a copy of 37 CFR 1.56 A, which deals with the duty of

23   disclosure.

24              Did -- did you read that before you signed

25   your oath and declaration?

1    A.    Yes, sir.  I have a bit of a personality

2    quirk in actually tending to read legal documents before

3    signing them, and I did read that.

4    Q.    Well, what did you think about that as you

5    read it as far as your understanding of the duty of

6    disclosure?

7    A.    Well, two things really.  First of all, it

8    agreed with what I felt I understood.  And it also, I

9    think, drove home the seriousness of what I was

10   undertaking and signing.

11   Q.    Did you have an understanding, when you

12   signed your oath and declaration, that the duty of

13   candor to the United States Patent & Trademark Office

14   was a continuing duty that required you to disclose to

15   the Patent Office any relevant information you might

16   become aware of during the pendency of the application?

17   A.    Yes, sir, I did.

18   Q.    Well, let me ask you, then, Mr. Owens, did

19   you, during the time that the patent application was

20   pending, learn of any details of any prior art that you

21   considered to be relevant to your invention?

22   A.    No, sir, I did not.

23   Q.    Mr. Owens, did you ever have any intent to

24   deceive the Patent & Trademark Office by withholding

25   information about any prior art known to you prior to

1     the time you filed this application?

2          A.     No, sir, definitely not.

3          Q.     Did you ever have any intent to deceive the

4     United States Patent & Trademark Office by withholding

5     information about the SEMI-to-the-4th product that you

6     were aware of prior to the time you filed this

7     application for the '449 patent?

8          A.     No, sir, definitely not.

9          Q.     When you signed this oath and declaration of

10    your patent application, Mr. Owens, did you believe that

11    you had complied with your duty of disclosure as you

12    understood it?

13         A.     Yes, sir, I did.

14                    MR. WHITE:  I pass the witness.

15                    THE COURT:  All right.

16                    Cross-examination.

17                    Oh, Mr. White, Ms. Ferguson asked me do

18    you intend to offer these exhibits that you've made

19    reference to during your direct?

20                    MR. WHITE:  Yes.  Yes, Your Honor.

21                    THE COURT:  That would be what exhibits?

22                    MR. WHITE:  Oh, where's my list?

23                    MR. PARKER:  May we provide you with that

24    list in a few minutes, Judge?

25                    THE COURT:  No, I would like to go on and

1   get it now.

2                  MR. WHITE:  It would be Plaintiffs'

3   Exhibits 1, 4, 79, 594, 291, and 131.

4                  THE COURT:  All right.  Any objection?

5                  MR. WHITE:  PX600 is not being offered at

6   this time.

7                  THE COURT:  All right.

8                  MR. POWERS:  None to those exhibits, Your

9   Honor.

10                  THE COURT:  All right.  Be admitted.

11  Now, the PX, that's going to refer -- your exhibit

12  numbers with an X, are those the ones -- is that

13  Plaintiffs' exhibit?

14                  MR. WHITE:  Plaintiffs' exhibit.

15                  THE COURT:  And are these numbers all

16  mixed in with your jury exhibits as well?

17                  MR. WHITE:  I believe so, Your Honor.

18                  THE COURT:  Same exhibits.  But are you

19  offering these exhibits just for the inequitable conduct

20  or for the jury as well?

21                  MR. WHITE:  Some of these will be

22  referred to in Mr. Vulpe's direct testimony, and I'm not

23  sure, but I thought you did --

24                  MR. CAWLEY:  1 and 4 have already been

25  admitted in connection with the jury testimony.

```
 1                    THE COURT:  Which one is that?

 2                    MR. CAWLEY:  1 and 4.

 3                    THE COURT:  Okay.  Why don't we do this

 4  so that we can keep these straight:  If you've already

 5  offered them with regard to the jury, you don't need to

 6  reoffer them here, although you can if you want to.

 7  And then when each side provides Ms. Ferguson with a

 8  list tomorrow morning, give us two lists; one for the

 9  jury and one for the Court, okay?

10                    MR. WHITE:  Yes, sir.

11                    THE COURT:  Thank you.

12                    All right.  Let's proceed.

13                    MR. POWERS:  Yes, Your Honor.

14                         CROSS-EXAMINATION

15  BY MR. POWERS:

16      Q.    Mr. Owens, you provided testimony about what

17  you are contending as your conception date with

18  Mr. Vulpe.

19             Do you recall that?

20      A.    Yes, sir.

21      Q.    Now, you don't have any contemporaneous

22  notebooks that document that conception date, do you?

23      A.    I did have them, but I'm afraid they were

24  lost, sir.

25      Q.    So they're gone in the sands of time?
```

1      A.      Apparently so, yes, sir.

2      Q.      And the same with Mr. Vulpe's apparently?

3      A.      I don't know, sir.

4      Q.      The one that was shown to you was really

5  1994.

6              Have you seen any notebooks from Mr. Vulpe

7  from the conception period?

8      A.      I have not seen anything, no, sir.

9      Q.      The source code from the SEMI project and

10  that product that's gone, too, and that could have told

11  us what that product had exactly, correct?

12     A.      Yes, sir.

13     Q.      You testified that you were instructed about

14  your duty of candor in detail at least twice, right?

15     A.      Yes, sir.

16     Q.      So you knew you had to disclose anything that

17  was relevant to your invention that had been done

18  before, right?

19     A.      Yes, sir.

20     Q.      And do you recall that you were deposed on

21  the question -- and speaking for i4i on the question of

22  why didn't you disclose the SEMI sale.

23              Do you recall that?

24     A.      Yes, sir.

25     Q.      And do you recall that your answer was that

1 you tried to disclose the SEMI sale, didn't you?  That

2 was your answer, right?

3        A.    No, sir.

4        Q.    Not your answer.

5              Let's look at Page 202 of the October 17

6 transcript from Line 12 to 203, Line 6.

7              MR. POWERS:  I will read it into the

8 record, Your Honor.

9              Actually, we'll start -- I think it will

10 be easier -- it will be clearer if we start all the way

11 back at 201, Line 25.

12       A.    I'm sorry.  Which deposition, please, sir?

13       Q.    The October 17th deposition, the one where

14 you were testifying for the company.

15       A.    Yes, sir.

16             THE COURT:  Now, what was -- what was the

17 page and line?  201/25.

18             MR. POWERS:  201/25 is where we're

19 starting, and this is his 30(b)(6) deposition.  And I'm

20 going to include the topic in the question so that the

21 record is clear.

22             QUESTION:  All right.  You understand

23 that you're designated to testify as to Topic No. 19,

24 which reads:  All reasons that Michel Vulpe, Stephen

25 Owens, or agents and those substantively involved in the

1   prosecution of the '449 patent did not disclose products

2   systems or technology that Michel Vulpe, Martin Hensel,

3   and/or Hensel Corp. offered for sale and/or sold to

4   designed, developed, tested, and/or installed for SEMI

5   in 1992 and 1993 to the Patent Office?

6               ANSWER:  Yes.

7               QUESTION:  So why don't you tell me all

8   the reasons that you didn't disclose the SEMI system to

9   the Patent Office.

10              ANSWER:  Well, I think -- you know, I

11  think the best answer is we did try to.  The -- you

12  know, the patent talks about the sort of preamble of the

13  patent.  I'd have to look at it.  Probably should,

14  actually.  Let's go back, because I have a copy here.

15              And there's an off-the record discussion.

16              Answer continues:  Yeah, so I'm going to

17  talk about -- you know, this whole background to the

18  invention section talks about dealing with standardized

19  generalized markup languages -- standard generalized

20  markup languages, the problems of dealing with embodied

21  markup and mixed markup.

22              And I think that -- you know, that did

23  inform the Patent Office of the problems.  The -- what's

24  the word?  The art is practiced in the SEMI system,

25  so...

1          That was your answer given in the deposition,

2  right?

3      A.    I'm actually sorry.  I want to agree with

4  you.  I just didn't catch the page number.  I thought it

5  was 201, but I didn't see it there.

6      Q.    201, Line 25.

7      A.    201, Line 25.

8      Q.    Down through 203, Line 6.

9      A.    I think I must have a different copy.

10     Q.    It's October.

11     A.    I'm looking at January's.

12     Q.    I will wait till you find it.

13     A.    Now I'm there.  Sorry about that.

14     Q.    All right.  So your answer there was you did

15  try to disclose the SEMI system, right?

16     A.    I think the answer is that we did try to

17  disclose the problems of the SEMI system or the way the

18  SEMI system practiced the prior art, which was SGML.

19     Q.    But you didn't disclose the sale of the SEMI

20  system at all, did you?

21     A.    No, sir.

22     Q.    And you didn't disclose the fact that there

23  were repeated references that we just went through in

24  front of the jury to the SEMI S-to-the-4th system being

25  patented by the only patent i4i had.  You didn't

1  disclose that patent either, did you?

2      A.   I haven't seen any of those references

3  previously, sir.

4      Q.   You also didn't disclose the fact that there

5  was a document outline view and editor in the SEMI

6  system that would allow you to view the SGML tags, did

7  you?

8      A.   No, sir.

9      Q.   You didn't disclose the fact any of the

10  substantive information from the manual about how the

11  SEMI system worked?

12      A.   The SEMI system was an SGML system, so I

13  believe we did, sir.

14      Q.   My question was, you didn't disclose any

15  information from the manual so that the Patent Examiner

16  could decide for himself whether the SEMI system worked

17  just in the way that you're characterizing SGML prior

18  art systems or whether it was an improvement on those.

19  You didn't disclose the manual, did you?

20      A.   No, sir.

21      Q.   And you didn't disclose the fact that there

22  was a specific on sale and installation more than a year

23  before the patent application was filed?

24      A.   A specific what?  I'm sorry, sir.

25      Q.   Sale and installation more than a year before

```
 1  the patent application was filed?

 2       A.    Do you mean on the SEMI?

 3       Q.    On SEMI precisely.

 4       A.    No, sir.

 5       Q.    You did not disclose that, correct?

 6       A.    Yes, sir.

 7                  MR. POWERS:  With that, Your Honor, no

 8  further questions.

 9                  THE COURT:  All right.  Any redirect?

10                  MR. WHITE:  No, Your Honor.

11                  THE COURT:  Thank you.  You may step

12  down.

13                  Do you wish to have this witness finally

14  excused, or do you think you may have --

15                  MR. WHITE:  I believe so, Your Honor.

16                  MR. CAWLEY:  Yes, Your Honor.

17                  THE COURT:  All right.  Any objections,

18  Mr. Powers?

19                  MR. POWERS:  No objections.

20                  THE COURT:  All right.  You are finally

21  excused.

22                  THE WITNESS:  Thank you, Your Honor.

23                  THE COURT:  Thank you for your

24  attendance.

25                  All right.  Anything else before we
```

1  adjourn for the day?

2                  All right.  Y'all have a good evening.

3  We'll see you back in the morning at 9:00.

4                  COURT SECURITY OFFICER:  All rise.

5                  (Court adjourned.)

6

7

8

9                      CERTIFICATION

10

11          I HEREBY CERTIFY that the foregoing is a

12  true and correct transcript from the stenographic notes

13  of the proceedings in the above-entitled matter to the

14  best of my ability.

15

16

17

18  /s/_____          _____

    SUSAN SIMMONS, CSR                    Date
19  Official Court Reporter
    State of Texas No.:  267
20  Expiration Date:  12/31/10

21

22

23  /s/_____               _____

    JUDITH WERLINGER, CSR                 Date
24  Deputy Official Court Reporter
    State of Texas No.:  731
25  Expiration Date  12/31/10

