```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                         TYLER DIVISION

 3   i4i LIMITED PARTNERSHIP      *    Civil Docket No.
                                  *    6:07-CV-113 (LED)
 4   VS.                          *    Tyler, Texas
                                  *
 5                                *    May 12, 2009
     MICROSOFT CORPORATION        *    9:00 A.M.
 6
                          TRANSCRIPT OF TRIAL
 7            BEFORE THE HONORABLE LEONARD E. DAVIS
                  UNITED STATES DISTRICT JUDGE
 8                       AND A JURY

 9   APPEARANCES:

10   FOR THE PLAINTIFF:     MR. GORDON WHITE
                            MR. KEVIN BURGESS
11                          MR. JOHN CAMPBELL
                            MS. GRETCHEN HARTING
12                          McKool Smith
                            300 West Sixth Street
13                          Suite 1700
                            Austin, TX   78701
14
                            MR. DOUGLAS CAWLEY
15                          MR. JEFFREY CARTER
                            MR. TOM FASONE
16                          MR. JONATHAN YIM
                            MR. JOHN CURRY
17                          McKool Smith
                            300 Crescent Court, Suite 1500
18                          Dallas, TX   75201

19   APPEARANCES CONTINUED ON NEXT PAGE:

20

21   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. JUDITH WERLINGER, CSR
22                          Official Court Reporters
                            100 East Houston, Suite 125
23                          Marshall, TX   75670
                            903/935-3868
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1

 2   APPEARANCES CONTINUED:

 3   FOR THE PLAINTIFF:     MR. ROBERT M. PARKER
                            Parker Bunt & Ainsworth
 4                          100 East Ferguson, Suite 1114
                            Tyler, TX   75702
 5

 6
     FOR THE DEFENDANT:     MR. MATTHEW POWERS
 7                          Weil Gotshal & Manges
                            201 Redwood Shores Parkway
 8                          Redwood City, CA   94065

 9                          MR. DAVID LENDER
                            MR. PAUL TORCHIA
10                          MR. STEVEN KALOGERAS
                            MS. ARIAN NEWELL
11                          Weil Gotshal & Manges
                            767 Fifth Avenue
12                          New York, New York   10153

13                          MR. KEVIN KUDLAC
                            MS. AMBER ROVNER
14                          MR. TODD PATTERSON
                            Weil Gotshal & Manges
15                          8911 Capital of Texas Highway
                            Building One, Suite 1350
16                          Austin, TX   78759

17                          MR. ANDREW CULBERT
                            Microsoft Corporation
18                          One Microsoft Way, Building 8
                            Redmond, WA   98052
19

20            *       *       *       *       *       *       *

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    COURT SECURITY OFFICER:  All rise.

3                    (Jury in.)

4                    THE COURT:  Please be seated.

5                    All right.  Are the parties ready to

6    proceed?

7                    MR. POWERS:  Yes, Your Honor.

8                    MR. CAWLEY:  Plaintiff's ready, Your

9    Honor.

10                    THE COURT:  Very good.

11                    Let's begin by -- do you have any new

12   witnesses today that need to be sworn?

13                    MR. CAWLEY:  No, Your Honor.

14                    THE COURT:  All right.  Do you have any

15   exhibits that the Plaintiff would like to offer?

16                    MR. CAWLEY:  Pursuant to the Court's

17   request, we do, Your Honor.

18                    THE COURT:  Okay.

19                    MR. CAWLEY:  These are the exhibits that

20   the Plaintiff intends to offer during the trial.  Let me

21   just warn everybody, there's a hundred of them.

22                    THE COURT:  All right.

23                    MR. CAWLEY:  And, Your Honor, someone

24   once told me that in acting school, they sometimes ask

25   the students to read off numbers and try and make people

```
 1   cry or laugh, so should I do this straight, or would you
 2   like me to --
 3                    [Laughter.]
 4                    THE COURT:  We'll take it however you
 5   would like to give it.
 6                    Let me just ask you, have Defendants
 7   reviewed this list that he has?
 8                    MR. POWERS:  Your Honor, we received the
 9   list a few minutes ago.  We got, of course, their list
10   of exhibits that they intend to use today last night,
11   and that we reviewed.  I think there's no objections
12   there, except as to one that's an illustrative exhibit,
13   not substantive.
14                    We got this list of a hundred a few
15   minutes ago.  We've done our best to look through it.
16   We think there's no objections, but we'd like the chance
17   to look at it with a little more time than just the few
18   minutes that we've had.  But for the moment, we can say
19   that we believe we have no objections.
20                    THE COURT:  All right.  Is the
21   Plaintiff --
22                    MR. CAWLEY:  It's our understanding, of
23   course, that all of these don't have any objection,
24   but --
25                    THE COURT:  Well, this is why I go
```

1  through this laborious process of having you offer,

2  because we need to ascertain whether there are -- are

3  you prepared to make objections to them this morning?

4                THE COURT:  Well, if you're

5  to the list we got last night.  As to the list of a

6  hundred that we just got a few minutes ago, we did it

7  very hurriedly, and I believe there are no objections.

8  And I'm happy to take Counsel's representation that

9  there were none.

10                THE COURT:  All right.  Well, if you're

11  in agreement on the list, why don't you just bring the

12  list up and -- are counsel willing to stipulate that

13  we'll mark this as Exhibit List No. 1, that all of

14  those -- there's no objection to the exhibits listed on

15  there, and Ms. Ferguson will record those in the

16  minutes?  Is that so stipulated?

17                MR. POWERS:  Yes, Your Honor, with the

18  proviso I just gave, of course.

19                THE COURT:  Well, we need to either have

20  them either admitted or not admitted, so...

21                MR. POWERS:  I understand that, but I --

22  we only had a few minutes to go over a hundred numbers.

23  If we had gotten them last night, we could have

24  probably --

25                THE COURT:  All right.  Well, we won't --

```
 1  let's just call our first witness then.
 2              MR. CAWLEY:  Your Honor, I would call
 3  Mr. Bill Cox.
 4              THE COURT:  All right.  Mr. Cox.
 5              MR. CAWLEY:  Your Honor, may I approach
 6  the witness?
 7              THE COURT:  Yes, you may.
 8              MR. CAWLEY:  May I proceed, Your Honor?
 9              THE COURT:  Yes, you may.
10        WILLIAM COX, PLAINTIFFS' WITNESS, SWORN
11                  DIRECT EXAMINATION
12  BY MR. CAWLEY:
13      Q.    Good morning.  Would you state your name for
14  the jury, please.
15      A.    William Cox.  Excuse me.  William Cox, known
16  as Bill.
17      Q.    And how old are you, Mr. Cox?
18      A.    I turned 70 on the weekend.
19      Q.    Can you tell the jury why you're here today?
20      A.    I am a member of the Board of Directors of
21  i4i, Inc.
22      Q.    I can't help but notice, Mr. Cox, you seem to
23  have a little bit of an accent, and it sounds like
24  you're not from Texas.  Where were you born and raised?
25      A.    I was born and raised in Scotland.
```

1        Q.    All right.  I think that your -- it's good

2   that you're speaking into the microphone, but I think

3   that you might be a little too close to it, and it's

4   making a popping sound, so that's probably better.

5             You were born and raised in Scotland.  Where

6   do you live now?

7        A.    I live in Burlington, Ontario, just west of

8   Toronto.

9        Q.    I see.  And are you employed by anyone at

10  this time?

11       A.    I am retired, except for my participation on

12  the board of i4i.

13       Q.    Let's find out a little bit about your career

14  before we get into some of the specific facts of this

15  case.  What did you do when you were still working?

16       A.    Well, I -- I began many years ago as a

17  computer programmer at Rolls Royce where we built jet

18  engines for aircraft.  And I was then hired by DuPont of

19  Canada and brought to Canada and worked with them for

20  seven years and then joined a consulting company, which

21  I worked with for some 15 years.

22            Then in the mid-'80s, I became Vice President

23  of Operations for a company known as GEAC.  After three

24  years there, going through a receivership, I joined a

25  company called PROMIS.  And then three years later, I

1   joined ESRI Canada.

2       Q.    Now, I don't want to go into a lot of details

3   about the companies that you worked with, but from the

4   time that you began way back when as a computer

5   programmer, did you spend your entire career working in

6   the field of computers and computer software?

7       A.    Computers, product -- systems products,

8   software products.

9       Q.    Now, did the last three companies that you

10  indicated that you worked for GEAC -- and is that

11  spelled G-E-A-C?

12      A.    Correct.

13      Q.    PROMIS spelled P-R-O-M-I-S?

14      A.    Correct.

15      Q.    And ESRI.  Do those companies have anything

16  in common?

17      A.    Yes.  They all had either financial

18  difficulties or product difficulties or both.

19      Q.    Okay.  And so why were you brought into those

20  companies?

21      A.    To remedy the situation.

22      Q.    And did you have some success in doing that?

23      A.    I'm pleased to say I did, and the patients

24  all survived.

25      Q.    Okay.  Now, is it unusual in your experience

1  that startup software companies may have financial

2  difficulties?

3       A.    It's very common.

4       Q.    And why is that?

5       A.    Because the cost of R&D, research and

6  development expenditures is very high before one manages

7  to make sales.

8       Q.    Can a software company sometimes go for years

9  before it finally turns the corner and makes a profit?

10      A.    Indeed.  We have several examples of that.

11      Q.    But how -- how can they do that?  I mean, if

12  I go for very long going into the red, that the grocery

13  store stops taking my checks, how can the software

14  startup company like that sometimes go for several years

15  losing money before it finally makes a profit?

16      A.    Because of the potential.  The investors

17  believe in the potential of the product, and they're

18  prepared to invest accordingly.

19      Q.    Is it common for people who have an idea in

20  the software field to have to go out and find investors

21  to be able to accumulate the money necessary to bring

22  their products to the marketplace?

23      A.    Yes.

24      Q.    So you told us about these three companies

25  that you worked for to turn them around financially.

 1          What did you do after your contract with the

 2   last one of those expired in 1996?

 3      A.    I retired.

 4      Q.    Okay.  Now, let's get now, with that

 5   background, a little bit more specific about some of the

 6   things that we want to know about in this case.

 7          When did you first hear about a company

 8   called Infrastructures for Information?

 9      A.    It would be in 1996, perhaps '97, in terms of

10   the first -- first knowledge.

11      Q.    And tell us about that.

12      A.    Well, prior to working at GEAC, Michel Vulpe

13   was also an employee there, although we didn't -- we

14   didn't make contact; we didn't work in the same

15   organization.  He was in the California lab, and I was

16   in Toronto.

17          And -- but I did hire another employee of

18   GEAC in a subsequent time at PROMIS.  And this person

19   called me and said, You remember Michel from GEAC?  And

20   I said yes.

21          He said, well, he has discovered something

22   which is really quite remarkable.  I think you should go

23   over and talk with him, because he may need your help.

24      Q.    Okay.  And did you do that?

25      A.    Yes, I did.

1       Q.     And now, just -- I know that -- that we've

2   had a lot of names flying around the courtroom, but

3   this -- this -- just so we get reoriented, this is

4   Michel Vulpe, who you later learned is one of the two

5   inventors of the patent in this lawsuit; is that right?

6       A.     That is correct.

7       Q.     Okay.  So after you were advised that you

8   really ought to go and talk to Mr. Vulpe, what did you

9   do?

10      A.     Well, he -- essentially, he talked at me, and

11  he was talking about an area that I didn't have a lot of

12  experience with, which was SGML processing.  And I

13  explained to him that I didn't understand a lot of what

14  he was saying, and if I didn't understand it, chances

15  were a lot of other people wouldn't understand it.

16  So in order to make it understood, he should develop a

17  demo, and when he had some kind of working demo, I would

18  come back and look at it.

19      Q.     And then what happened?

20      A.     About a year later, he called me, and he

21  said, I think I have what you wanted.  Will you come and

22  look?

23      Q.     Did you?

24      A.     I did.

25      Q.     Tell us about that.

1    A.    He gave me a demonstration, and it just blew

2 my mind, because he had, at one end of the table, a

3 laptop on which there was a Microsoft Word document.  At

4 the other end of the table was a little robot with a

5 moveable arm.

6         And by changing a value in the Microsoft

7 Word's document, he changed the angle of the arm in the

8 robot.  It completely blew me away because -- sorry.

9    Q.    Well, my next question, because why?

10    A.    Well, because he was making something happen

11 that we had never been able to make happen before.  He

12 was changing the value of complex data without anything

13 having to be done by the user except present a value.

14    Q.    Okay.  Let -- let -- help us understand a

15 little bit better what you just said and why you said

16 you were blew away.  Because this is 1998; is that

17 right?

18    A.    (Nods head affirmatively.)

19    Q.    Surely, it was possible before 1998 to use a

20 computer to move a robot.

21    A.    Yes.

22    Q.    So why is it that this particular arrangement

23 blew your mind?

24    A.    Well, because traditionally in database

25 management systems at that time, one had to have an

1  application-specific piece of software, and then the

2  user of that application had to understand the

3  application and what it could do.

4      Q.    So if I had a computer and a robot and wanted

5  to move a robot with a computer in 1998, would I have to

6  either write or maybe go out and buy a particular piece

7  of software?

8      A.    Yes.  Yes, you would.

9      Q.    A robot control software?

10     A.    Right.

11     Q.    But on the demonstration that you saw, was

12 Mr. Vulpe using any robot control software?

13     A.    Not to my knowledge.

14     Q.    What was he using?

15     A.    He was using a piece of SMGL technology,

16 which made the data -- the piece of data, the angle in

17 the Microsoft document available to the program that

18 controlled the robot.

19     Q.    And is this a piece of Microsoft Word just

20 like anybody could go buy off the shelf?

21     A.    That's what it looked like.

22     Q.    And remind us, in your experience, up until

23 that day when you were blown away in 1998, had you ever

24 heard of Microsoft Word or Word Processor being used to

25 do anything like move a robot arm?

1          A.     Never.

2          Q.     So what did you say after you had this

3   meeting with Mr. Vulpe?

4          A.     I said, Michel, I have to be part of this.

5   What can I do?

6          Q.     And what did he say?

7          A.     He said, sure.  You know, let's figure out

8   what you can do.

9          Q.     Okay.  So what did the two of you figure out?

10         A.     Well, we agreed that because the -- the

11  company was in the fledgling state, that I would author

12  a marketing and sales plan and attempt to organize them

13  to sell more effectively.

14         Q.     Okay.  And did you do that?

15         A.     Yes, I did.

16         Q.     How long did it take?

17         A.     It took half of September, all of October,

18  all of November.  Towards the end of November, I handed

19  it in and went on vacation.

20         Q.     Still in 1998?

21         A.     Yes.

22         Q.     And then what happened?

23         A.     I came back from vacation, and I was asked to

24  talk with two members of the Board of Directors at that

25  time.

1      Q.     And who were they?

2      A.     One was Richard Owens, and the other was

3  Kenneth Sweet.

4      Q.     And tell us about that conversation.

5      A.     Well, we talked a great deal about data

6  processing in general and i4i's capabilities

7  specifically, and I explained to them, as I've explained

8  here, that what I thought was -- had been demonstrated

9  to me was really revolutionary.  I had never seen

10  anything like it before.

11      Q.     And after you had -- they had this discussion

12  with you, did they ask anything of you?

13      A.     They asked if I would consider taking an

14  executive position in the company.

15      Q.     And what did you respond?

16      A.     I couldn't say no.

17      Q.     So even though you were retired at that

18  point, did you come out of retirement to be a part of

19  bringing this invention to the marketplace?

20      A.     I came out of retirement with the -- with the

21  agreement of my wife, God bless her.

22      Q.     And why -- why did you do that?

23      A.     It was just such a fascinating challenge.  We

24  had to bring this capability to the world.  I sound

25  somewhat rambunctious perhaps, but it really was that

1  significant in my mind.

2      Q.    Now, what -- what position or title did you

3  take with i4i?

4      A.    Well, in the same way as I dealt with the

5  previous companies, I came in as Chief Operating

6  Officer.

7      Q.    Chief Operating Officer?

8      A.    Yeah.

9      Q.    So what was one of your first steps that you

10 took as a Chief Operating Officer?

11     A.    Well, having -- having looked over a little

12 closer the technology, my recommendation was that we

13 should build a product.  The software was not

14 productized at that time.

15     Q.    You used the word product.  I think most of

16 us know what that means, but you said productized.  Tell

17 us a little bit more what you're talking about.

18     A.    Well, there are at least two ways of building

19 software capability.  One is what you might call custom;

20 that is, that I take the specifications from a customer,

21 and I build a system specifically for that customer.

22 You usually do this on a project basis where there are

23 project definitions and time scales and charges.

24          The other way to do it is to build a product

25 which is most useful to most people most of the time,

1  and you sell that in great numbers.  You could say that,

2  for example, Microsoft Word is a product in that sense.

3       Q.    Okay.  So for those of us that don't buy a

4  lot of software products, can you just give us some

5  real-world example of what you're talking about?

6       A.    Sure.  Well, I don't know about real world,

7  but you may, for example, ask me to build you a toaster

8  to your specifications.  And that toaster may have

9  requirements and capabilities that other toasters don't

10  have because it's made for your specific requirements.

11          Then again, I could build a product which you

12  would sell in Wal-Mart for 29.99 and satisfy most of the

13  people most of the time.

14       Q.    Okay.  What was the board's response to your

15  recommendation that i4i begin to make a product instead

16  of doing projects?

17       A.    They were enthusiastic.

18       Q.    And did they also ask you, at least for a

19  while, to change your position within the company?

20       A.    Yes.  With Michel's agreement, in fact, with

21  his recommendation, I became CEO.

22       Q.    The Chief Executive Officer?

23       A.    Yes.

24       Q.    So you were, at least at that time -- and

25  when are we talking about again?

1      A.    I'm sorry?

2      Q.    When -- how long were you the CEO?

3      A.    From -- it would probably be February or

4  March of '99 till August of 2000.

5      Q.    So for that short period of time at least,

6  you were the head man at i4i?

7      A.    Yes.

8      Q.    Now, you told us about this transition that

9  you thought the company should make from being a project

10  company to being a company that made a product.  Did i4i

11  face any challenges in making that transition?

12      A.    The main challenges were financial.  It takes

13  money to do that.  There was no challenge in terms of

14  capability.  They had a very capable team of

15  technologists.

16      Q.    Now, pursuant to your recommendation, did i4i

17  make a product?

18      A.    Yes, indeed.

19      Q.    What did they call it?

20      A.    S4/TEXT.

21      Q.    And is that the product that we've already

22  heard some about in the testimony yesterday?

23      A.    S4/TEXT was developed in 1999.  Some of the

24  S4 mentioned yesterday was a period before that, which I

25  knew nothing about.

1      Q.      Let me ask you about -- you don't know

2   anything about the SEMI issue that we heard testimony

3   about yesterday?

4      A.      Nothing.

5      Q.      Was that before your time?

6      A.      Nothing.  Before my time.

7      Q.      But this product, S4/TEXT, that was made

8   pursuant to your recommendation that the company come up

9   with a product --

10     A.      Yes.

11     Q.      -- was it your understanding that that --

12   what did that product do?

13     A.      That product allowed Microsoft Word to become

14   an XML editor.

15     Q.      Okay.  And was this product, S4/TEXT,

16   supposed to work out of the box?

17     A.      No, not quite, because of the requirements

18   and understanding the application.  There was always

19   some relatively small amount of work to be done to

20   identify, to define the application to the product.

21     Q.      And then can you tell us how does this

22   S4/TEXT product fit within the concept of a product that

23   you had recommended to the Board of Directors of i4i?

24     A.      How did it fit?  Beautifully.

25     Q.      Who were some of the early customers for

1  S4/TEXT?

2      A.    Well, during my tenure, the big one was the

3  U.S. Patent Office.

4      Q.    How did that come about?

5      A.    Well, interestingly enough, the Patent Office

6  found us.  We were still in the formative stage of

7  marketing and selling, and we were approached by the

8  U.S. Patent Office, who expressed to us that they wanted

9  to have a system which would allow patent attorneys

10  across the country to submit proposals for patents in a

11  common fashion and had to use XML.

12          Their preference was that because Microsoft

13  Word was the choice of most of those organizations, that

14  we should -- the system should use XML Word -- I'm

15  sorry -- Microsoft Word and XML.

16      Q.    And what were the terms of the contract

17  between i4i and the U.S. Patent Office?

18      A.    Well, we initially agreed on several lots to

19  be released to them, I think 10,000 at a time, and there

20  was a three-year maintenance contract.

21          Interesting thing is that they pushed forward

22  with the delivery of the first two lots.  They actually

23  wanted them two or three months sooner than we had

24  originally agreed to deliver.

25      Q.    Okay.  And when the three-year term was up,

1  did they chose to renew it?

2       A.    I'm sorry?

3       Q.    When the three-year term was up, did they

4  choose to renew it?

5       A.    I don't know.  That was after my time, but I

6  don't think they did.

7       Q.    Okay.  And what's your understanding of why

8  not?

9       A.    Well, you have to understand that in the

10 world of new software, it takes a brave organization to

11 accept new technology without a great deal of testing

12 and trial.

13             And even when they do that -- because if the

14 new technology changes the way in which they do

15 business, they're very conservative about approaching

16 it.  So they tend to run pilot projects or tests or

17 whatever before they finally make a decision.

18             In the case -- and usually, you need to have

19 a champion inside the customer organization, someone who

20 believes in the technology and the way it's being

21 handled, and the champion pushes that in the customer

22 organization.

23             Our champion originally with the U.S. PTO was

24 promoted, ironically enough, and his successor preferred

25 an IBM solution to an i4i solution.

1      Q.     All right, sir.  Based on your experience in

2   the software industry and your experience with i4i and

3   S4/TEXT, why do customers purchase i4i's S4/TEXT?

4      A.     I think there are two major reasons, as has

5   been relayed to us by our customers.  One is that it

6   uses MS -- MS Word, and it uses it in a way that the

7   person who has to update the system does it without any

8   real knowledge of the system.

9           And secondly, when they use the screen, it is

10  what we call tagless.  There is no evidence that, in

11  fact, there is a software system hiding behind the

12  Microsoft Word.

13     Q.     And why is that good?

14     A.     What does it do?

15     Q.     Why is it good?

16     A.     Why is it good?  Because if you can't do it

17  that way, you have to retrain all of your staff on a new

18  system.  They have to understand the different formats,

19  the different screens, the different operating

20  capabilities.

21          If you do it using Microsoft Word, which

22  they're already familiar with, it's just another

23  template; it's just another blank to fill in as they

24  deal with many other things.

25     Q.     All right.  I don't say this to embarrass

1  you, Mr. Cox, but I couldn't help but notice you've got

2  a couple of hearing aids.

3      A.    Yes.

4      Q.    So if anybody, me or anybody else, asks you

5  any questions here and you have a hard time hearing,

6  please let us know, because we'll do whatever we need to

7  do to make sure that that's audible to you.

8      A.    Thank you.

9      Q.    Over the years, has i4i focused on a

10 particular segment of the market for its S4/TEXT

11 product?

12     A.    Yes.  And one has to, except as a fledgling

13 company, you can't tackle all parts of the market at the

14 same time, and so we set out early to try and identify

15 those industries that would -- this would be of most

16 value to.

17          And the U.S. Patent Office, of course, gives

18 a good confirmation of that direction.  It tended to be

19 a document-rich organization, such as government

20 institutions, such as large businesses, like the

21 pharmaceutical business.  Clearly, there was a lot of

22 paper to be processed.

23     Q.    And tell us more about the pharmaceutical

24 industry.

25     A.    Well, I had had some contacts earlier in life

1  with the pharmaceutical industry, and it struck me as

2  one that was controlled by FDA, for example, in the

3  United States where one had to do things in a specific

4  way in order to be approved.

5          It was also a me-too kind of industry; that

6  if you get a leader to accept our technology, then there

7  was a tendency for the other companies in that industry

8  to follow suit.

9     Q.    All right.  And who were some of i4i's

10 customers in the pharmaceutical industry?

11    A.    At the present time, we have, I think, out of

12 our -- more than 80 percent of our customers are

13 currently in pharmaceuticals.  There's Barr, Bausch &

14 Lomb, Bayer, Biogen, Bristol-Myers, Genpharm,

15 GlaxoSmithKline, Merck, Nexgen, Novartis.

16    Q.    That gives us an idea.

17          How does S4/TEXT specifically help these

18 pharmaceutical companies?

19    A.    At the present time, the Federal Drug

20 Administration has mandated, they have demanded that

21 these companies present labeling organization --

22 information for their new products in XML.

23          Again, with the benefit of Microsoft Word,

24 which is XML-capable, that makes the transition to that

25 requirement much easier.

1      Q.    Now, Mr. Cox, in the early days of i4i's

2  S4/TEXT product, who were the competitors for that

3  product?

4      A.    Oh, people from the traditional SGML field,

5  people like Autotext, Documentum, Interleave, those kind

6  of people.

7      Q.    Okay.  In those early days, did you consider

8  Microsoft to be a competitor?

9      A.    Never.

10     Q.    Why is that?

11     A.    There was no XML capability in MS Word.

12     Q.    Did that situation change?

13     A.    Yes.

14     Q.    Tell us about that.

15     A.    It was, again, after my tenure as CEO, but I

16  believe that, from what I -- the information I was

17  given, that there appeared to be XML capability in

18  MS Word 2003.

19     Q.    And from that point forward, did Microsoft

20  become a competitor for i4i's product?

21     A.    Yes, indeed.

22     Q.    When did you leave your position as CEO of

23  i4i?

24     A.    I'm sorry.  When?

25     Q.    When?

1      A.      August 2000.

2      Q.      And why did you step down?

3      A.      Well, in some ways, I had done my job.  We

4  had got the company off the ground.  We had it

5  organized.  We had our product.  We had our first major

6  customer.  And I had come out of retirement.

7          So it was a feeling, at the board level, that

8  we needed someone younger and someone with specific

9  sales experience and perhaps someone with an industry

10 knowledge that was -- that would help the rollout of the

11 product.

12     Q.      All right.  So after you stepped down as the

13 CEO, did you continue to hold any position in connection

14 with i4i?

15     A.      I became a director.

16     Q.      Okay.  And are you still a director, a member

17 of the Board of Directors today?

18     A.      Yes, indeed.

19     Q.      How -- since the time you stepped down as CEO

20 and you haven't been in contact with the day-to-day

21 activities of the company, how have you kept up with

22 what's going on at the company?

23     A.      We -- I was kept informed by the Board of

24 Director's meetings.  We had board meetings at

25 intervals.

1          I also maintain some personal contact with

2    some of the senior employees.  We meet for lunch perhaps

3    twice a year or something like that.

4          Q.    Okay.  But -- but did you make any effort,

5    from the time you stepped down as CEO, to involve

6    yourself in the day-to-day activities of i4i?

7          A.    No.  That was totally against my way of doing

8    business.

9          Q.    Okay.  Do you get paid for being a board

10   member of i4i?

11         A.    No.

12         Q.    Now, you've testified that in your work

13   history, particularly the last four years before your

14   retirement, at least your first retirement, that you had

15   quite a bit of experience in working with companies that

16   had financial difficulties; is that correct?

17         A.    That is correct.

18         Q.    Tell us, what was i4i's financial situation

19   like when you arrived at the end of 1998?

20         A.    For the work that they were doing for a

21   project-oriented software development company, the

22   finances were not too bad.

23              In that kind of business, the cash flow tends

24   to be lumpy.  You know, you don't always -- you're not

25   always able to match your revenue with expenses because

1  of the way the customer pays.

2          And for the work of productization, to build

3  a product, it was undercapitalized.

4      Q.    What do you mean undercapitalized?

5      A.    It did not have enough money in its pockets

6  to do a significant job that we wanted to have done.

7      Q.    And has i4i, since that time, ever got to the

8  point where it was not struggling financially?

9      A.    It has always struggled financially.

10     Q.    And I want to make sure we understand some of

11 the specifics of that.

12          During the time that you've been associated

13 with i4i, have there been concerns of the company from

14 time to time about whether it could make payroll?

15     A.    Yes.

16     Q.    Has it been in the position where sometimes

17 it had very little cash in the bank?

18     A.    Yes, indeed.

19     Q.    Has it sometimes maxed out its credit limit?

20     A.    Correct.

21     Q.    Has i4i, at times, had to go through layoffs

22 due to its financial condition?

23     A.    Indeed.

24     Q.    Has i4i sometimes talked to its creditors,

25 the people to who it owed money, to try and negotiate a

1  different payment schedule?

2      A.    Yes, sir.

3      Q.    And has i4i had to go out and seek additional

4  financing, additional sources of investment of money?

5      A.    Yes.

6      Q.    And have there even been discussions from

7  time to time that i4i might have to close its door

8  completely due to its financial issues?

9      A.    Yes.

10     Q.    Well, with all these financial issues,

11 Mr. Cox, how has i4i survived to still be a company

12 operating today?

13     A.    Well, I think there are several factors.

14 One is that we have always had consistent support from

15 our major investor, McLean Watson.  We believe that that

16 organization truly believes in what we're trying to do.

17           Secondly, the senior employees also believe

18 in what we're trying to do.  And at times, their payroll

19 has been a little late, and -- but they have -- they're

20 convinced that one day we'll receive vindication in the

21 marketplace.

22     Q.    Now, Mr. Cox, you were -- you were in the

23 courtroom yesterday, weren't you, for the opening

24 statements?

25     A.    Yes.

1    Q.    And you heard Microsoft's lawyer talk

2  about the bankers that own i4i.  Is that true?

3    A.    I think that was a distortion of the facts.

4    Q.    Tell us the truth.

5    A.    Not true.

6    Q.    Tell us what is true.

7    A.    Well, in the first place McLean Watson,

8  they're not bankers; they are investment funds.  And

9  they, in turn, are controlled by the shareholders who

10 invest in those funds, just as we might invest in a

11 mutual fund, for example.

12   Q.    Okay.  What kind of people put their money

13 into McLean Watson?

14   A.    Other organizations, some very rich people,

15 some not so rich people, people who are trying to make a

16 buck, I suppose.

17   Q.    For instance, Canadian Teachers Unions?

18   A.    Yes, which is probably one of the largest.

19 The Ontario pension plan, I believe, is one of the

20 largest anywhere.

21   Q.    All right.  And those people have put their

22 money in the hands of McLean Watson in the hopes that

23 McLean Watson can manage it and invest it wisely,

24 correct?

25   A.    Correct.

1          Q.     Has this relationship with an investor as a

2   source of money been important to i4i?

3          A.     Has been?  I'm sorry.

4          Q.     Has it been important?

5          A.     Oh, yes, very important.

6          Q.     In your experience, Mr. Cox, not just with

7   i4i, but way back into the other software, small startup

8   companies that you mentioned to us, is it unusual that

9   they have to seek investors?

10         A.     Not at all unusual.  I think it would be a

11  rarity for one not to have to seek investment capital.

12         Q.     All right.  And is it -- is it unusual that

13  one of the important assets of a small company with a

14  big idea is its intellectual property, like a patent,

15  for example?

16         A.     Absolutely.

17         Q.     Well, I said, is it unusual?  Is that usual

18  or unusual?

19         A.     It's most usual.

20         Q.     Most usual.

21                I think you heard Microsoft's lawyer also

22  suggest yesterday that this jury should somehow ignore

23  the patent rights of i4i because there were bankers,

24  which we now have learned the truth, are really

25  financial investors involved.  Have you ever heard of

1  anything like that before?

2      A.    No.

3      Q.    Does it make any sense to you, as a person

4  experienced in this field, that patent rights and their

5  value should depend on who's invested in the company

6  that owns them?

7      A.    Not at all.

8      Q.    When did you first learn of the possibility,

9  Mr. Cox, that Microsoft might be infringing i4i's

10  patent?

11      A.    I got an e-mail early in 2004 from Michel

12  Vulpe, and it was addressed to other people as well,

13  which suggested there might be some evidence of

14  infringement.

15      Q.    And what did you think i4i should do?

16      A.    I thought we better clarify it and make sure

17  one way or the other.

18      Q.    And did you make that recommendation?

19      A.    I did.

20      Q.    And what happened?

21      A.    The Board of Directors started an

22  investigation project.

23      Q.    Were you personally involved in the

24  investigation?

25      A.    No.

1      Q.    You just heard about it from the various

2  meetings?

3      A.    As a director, yes.

4      Q.    Okay.  And eventually, did i4i reach a

5  conclusion as to whether or not it believed that, in

6  fact, Microsoft was infringing its patent?

7      A.    Yes.  I think the conclusion was reached

8  later that year, 2004.

9      Q.    And once again, did you do the work involved

10  in reaching that conclusion?

11      A.    No.

12      Q.    Someone else did and reported it to you?

13      A.    Yes.

14      Q.    After hearing about this conclusion, what did

15  i4i do next?

16      A.    Well, we had a challenge.  We knew that if we

17  wanted to pursue litigation, it was going to take a lot

18  of money and a lot of time, and we didn't really have

19  either.  And so we had to figure out, how could we

20  possibly or should we possibly follow this course?

21      Q.    And what was decided?

22      A.    We decided that we should follow the course,

23  that the -- the value of our asset was so great that it

24  should not be allowed to disappear.

25      Q.    So what did you do to try and get resources

 1  to pursue your claim?

 2      A.    Well, we tried to find somebody with money to

 3  invest in the litigation.

 4      Q.    And were you successful in doing that?

 5      A.    Yes, we were.

 6      Q.    Did you have to restructure the company in

 7  order to be able to raise those resources?

 8      A.    Yes.

 9      Q.    When did this restructuring of i4i occur?

10      A.    Well, I'm -- I'm not sure.  Probably was

11  about 2006.  I'm a little vague on that.

12      Q.    All right.

13      A.    But I think 2006 might be.

14      Q.    Okay.  If I told you that the documents you

15  have in front of you show September of 2006, would that

16  sound right?

17      A.    That sounds right, yes.

18      Q.    What did the restructuring involve?  Tell us

19  how it worked.

20      A.    Well, my understanding is, it had to take --

21  it would take an understanding of the patent laws in the

22  U.S., because it was a U.S. patent, and we had to

23  understand what was possible and what was not possible.

24  But, eventually, we ended up creating an organization

25  called Limited Partnership in which the shareholders of

1  i4i, Inc., and the shareholders of the investing

2  organization would come together in a common vehicle.

3       Q.    Okay.  And let me make sure that I understand

4  some of the words you used there.

5            i4i and the investors caused a new company to

6  be set up called i4i Limited Partnership --

7       A.    Yes.

8       Q.    -- is that right?

9            And all of the shareholders, the people who

10  owned i4i, became part owners of the partnership; is

11  that true?

12       A.    That's correct.

13       Q.    And then the investors who were putting in

14  additional money also became part owner of the

15  partnership?

16       A.    That's correct.

17       Q.    How much money did the investors put in?

18       A.    I believe $10 million.

19       Q.    And was the patent -- the ownership of the

20  patent then transferred from i4i, the corporation, into

21  this limited partnership?

22       A.    Yes.

23       Q.    And are you -- do you have an ownership

24  interest in the Limited Partnership?

25       A.    I have options.  I have share options.

1    Q.    Did the restructuring involve any other

2  transactions?

3    A.    Ultimately, there was a transaction which

4  gave exclusive use of the -- of the patent back to i4i,

5  Inc., the operating company.

6    Q.    So that i4i Corporation could continue to use

7  the patent in its product?

8    A.    That is -- that is correct.

9    Q.    I don't want to spend any time going through

10  these exhibits at this time, but in front of you

11  there -- let's just identify those -- is Plaintiffs'

12  Exhibit 7.  If you would take a quick look at that.

13         Does that appear to be some of the documents

14  related to the formation of --

15    A.    Yes.

16    Q.    -- the Limited Partnership?

17    A.    Yes.

18    Q.    And does that -- some of those documents

19  include both an assignment of the patent and of all past

20  damages from the corporation to the partnership?

21    A.    Yes.

22    Q.    And Plaintiffs' Exhibit 8, does that appear

23  to be a copy of the exclusive license agreement from the

24  Limited Partnership back to the corporation?

25    A.    Uh-huh.

1      Q.     I'm sorry.  Did you say yes?

2      A.     Yes.

3      Q.     Okay.  Thank you.

4             Now, you mentioned that when the patent was

5      transferred or sold from the corporation to the Limited

6      Partnership, that the investors had put in $10 million.

7             Do you believe that that $10 million

8      represents the true value of the patent?

9      A.     No.

10            MR. POWERS:  Objection, Your Honor.  It's

11     calling for an opinion from this witness, which he's not

12     designated as an expert witness.

13            THE COURT:  Overruled.

14     Q.     (By Mr. Cawley) Can you explain your answer

15     to the jury?

16     A.     There's a difference between price and value.

17     And I think, for example, a bottle of water has a

18     trivial price, but to a thirsty gentleman, it's probably

19     got great value.

20            The -- I think the point is that the value of

21     the asset is in the eye of the beholder, what someone is

22     willing to pay for control of that asset.

23            If you're a large company with deep pockets

24     and interest in this particular market segment, then

25     that asset is worth a great deal.  If you're not and you

1    buy it, then it's not worth very much.

2        Q.    Okay.  While you were both an employee of i4i

3    and later a member of the Board of Directors, have you

4    seen various valuations of the value supposedly of the

5    entire company?

6        A.    Yes.

7        Q.    Do you think that those valuations have much

8    use to you?

9        A.    No.

10        Q.    Why is that?

11        A.    Well, one must remember that i4i is a private

12    company.  Unlike a public company, there's no real

13    yardstick to decide how much it's worth.

14            So, again, the value of the company is very

15    much what the possible purchaser intends to do with it.

16        Q.    And do you think that those efforts at

17    various times for somebody -- well, tell us some of the

18    ranges that you've heard of the value of i4i.

19        A.    Well, we did one at the beginning of my

20    tenure, and the purpose was quite specific, because we

21    want to understand, what is it worth to anybody, and

22    second, most importantly, to a strategic investor.  And

23    that valuation was as high as 700 million.  That was

24    early in '99.

25        Q.    Okay.  How about a low end?  What are some of

 1  the low values of the company you've seen?

 2      A.    2 million.

 3      Q.    2 million?

 4      A.    Uh-huh.

 5      Q.    Okay.  Do you think that any of those efforts

 6  by anybody to put a value on the company has anything to

 7  do with the value of the patent or a reasonable royalty

 8  for its use?

 9      A.    Well, that's difficult to say, because I'm

10  not really sure that the value of the patent was

11  included in that valuation -- those valuations.  I'm

12  sorry.  I couldn't say.

13      Q.    Do you think there's a difference between the

14  value of a company and the value of a patent that the

15  company owns?

16      A.    Oh, indeed, yes.

17      Q.    Why is that?

18      A.    Because the patent value can only be realized

19  when it's put to use.

20      Q.    All right.  Thank you, Mr. Cox.

21              MR. CAWLEY:  I'll pass the witness.

22              THE COURT:  All right.  Cross-exam.

23              MR. POWERS:  Your Honor, if it's helpful

24  during this cross-examination, we were able to review

25  the hundred exhibits, and confirm there's no

1   objection to them.

2            THE COURT:  All right.  They will be

3   marked as Exhibit List No. 1, and all the exhibits

4   listed on there are admitted.

5            MR. POWERS:  Your Honor, we have a much

6   shorter list that I'd like to read into the record, as

7   appropriate, as well.

8            THE COURT:  All right.

9            MR. POWERS:  2-0 -- and these are all

10  unobjected to as well.  2016, 2035, 2056, 2083, and -84,

11  2088, 2091 -- -90 and -91, 2093 and -95, 2225, 2235,

12  2238 and -9, 2242, 2345 and -6, 2404 and -05, 2007,

13  2018, and 2048.

14           THE COURT:  Very well.  Any objection?

15           MR. CAWLEY:  I'm going to accept

16  Counsel's representation that those are, in fact, are

17  exhibits to which no objection has been made, so we

18  don't make any objection, Your Honor.

19           THE COURT:  All right.  They're admitted.

20           MR. POWERS:  And, Your Honor, may I

21  approach with some exhibits as well?

22           THE COURT:  Yes, you may.

23           MR. POWERS:  May I proceed, Your Honor?

24           THE COURT:  Yes, you may.

25                    CROSS-EXAMINATION

1   BY MR. POWERS:

2        Q.    Good morning, Mr. Cox.

3        A.    Good morning.

4        Q.    You testified on direct examination about the

5   financial condition generally of i4i.  Do you recall

6   that?

7        A.    Yes.

8        Q.    I'd like to get just a little more specific

9   briefly.  And could you look at Exhibit 2345 in the book

10  that's in front of you?

11             Exhibit 2345 are the financial statements for

12  various years for i4i, correct?

13       A.    Yes.

14       Q.    These are prepared internally for i4i's use

15  as a business, right?

16       A.    As far as I'm aware of.

17       Q.    And if you could turn in that document to

18  Page 63, and by 63, I mean there is a number at the

19  bottom right-hand page -- of the page.  It says .063.

20  Let me know when you have it.

21             MR. POWERS:  Chris, let's bring that up,

22  if you would.

23       A.    Yes.

24       Q.    (By Mr. Powers) This shows that i4i had a

25  loss in the fiscal year that ends in April of 1999,

1  correct?

2       A.    Yes.

3       Q.    In that year, i4i lost just a little over

4  $4.8 million?

5       A.    Uh-huh.  Yes.

6       Q.    And the last line there says deficit, end of

7  year.  That's the cumulative total loss over the course

8  of the company by the April of 1999 time period, right?

9       A.    Yes.

10      Q.    Okay.  For the year 2000, could you turn to

11 Page 78 of the same document.

12      A.    (Complies.)

13      Q.    So is it accurate that in the year -- by

14 April of 2000, i4i had lost 3 -- a little over $3.3

15 million?

16      A.    Yes.

17      Q.    And the total loss, if you go to the next

18 page, was now a little over 13 million?

19      A.    Yes.

20      Q.    If we go to 2001 -- that's at Page 96 of the

21 same document, Exhibit 2345 -- in 2001, i4i lost a

22 little over $4.2 million, right?

23      A.    I'm sorry.  I have the wrong page.  I have

24 96.

25      Q.    96, the number at the bottom.

1      A.     I'll use the screen.  Yes.

2      Q.     Okay.  So it's a little over 4.2 million --

3      A.     Yes.

4      Q.     -- loss?

5             And the total loss by April of 2001 was

6  almost $18 million?

7      A.     I haven't got that figure on the screen,

8  so...

9      Q.     I'm sorry.  It's on the next page, Page 97.

10     A.     Okay.

11     Q.     Is that right?

12     A.     Yes.

13     Q.     Now, for 2002, we need to go to the next

14 exhibit, 2346.

15             MR. POWERS:  Can you bring that up,

16 please, Chris?

17     Q.     (By Mr. Powers) And, Mr. Cox, it will be at

18 Page 13 of that exhibit.  Let me know when you've got

19 it.

20     A.     Page 13?

21     Q.     Page 13 of Exhibit 2346.

22             MR. POWERS:  And, Chris, can you bring up

23 -- there we go.

24     Q.     (By Mr. Powers) On the very left column, it's

25 the numbers for fiscal year 2002, right?

1        A.     Uh-huh.

2        Q.     I'm sorry.  For the court reporter, you need

3  to say yes or no rather than uh-huh.

4        A.     I'm sorry.  Yes.

5        Q.     No problem.  Thank you.  It's a common

6  mistake.

7               So for 2002, i4i lost 5 -- a little over $5.3

8  million; is that right?

9        A.     Yes.

10        Q.     And that would bring the cumulative loss,

11  after 2002, to 17.8 plus about 5.3, so about $22

12  million.

13        A.     Okay.

14        Q.     And finally for fiscal year 2003, that's the

15  far right of the same page, the loss there was $2.4

16  million, a little over, right?

17        A.     Yes.

18        Q.     So that would bring the loss as of April of

19  2003 to a little over 25, $26 million.

20        A.     Yes.

21        Q.     Is that about right?

22        A.     Yes.

23        Q.     Okay.  Now, all of that loss happened before

24  Microsoft Word 2003 was introduced; isn't that true?

25        A.     It would appear so.

1      Q.    And, in fact, after Microsoft Word 2003 was

2   introduced, i4i's losses went down, didn't they?

3      A.    I'm sorry.  I don't -- after 2003?

4      Q.    Yes.

5      A.    I don't have those figures.

6      Q.    Do you remember that?

7      A.    I'm sorry?

8      Q.    Do you remember that in the year immediately

9   following the introduction of Microsoft Word 2003, the

10  product that i4i is accusing here, that i4i actually did

11  better as a company?

12     A.    No, I don't recall that at all.  It is

13  possible.

14     Q.    Could you turn to the last page of

15  Exhibit 2346, Page 18.

16          That shows on the left column the numbers for

17  i4i in 2004, correct?

18     A.    Uh-huh.  Yes.

19     Q.    And the loss went down to just barely over $1

20  million, right?

21     A.    Yes.

22     Q.    And the prior years, i4i was losing upwards

23  of 4 and $5 million?

24     A.    Uh-huh.

25     Q.    Right?

1      A.      Yes.

2      Q.      Okay.   Now, one significant cause of those

3    losses was product quality concerns among i4i's

4    customers; isn't that true?

5      A.      I'm sorry.   I don't follow you.   One of the

6    causes of concern...

7      Q.      I will repeat it, and, again, if there's any

8    question hearing, just let me know.   We all want to make

9    sure you have the exact question.

10      A.      I apologize for the inconvenience.

11      Q.      At 70 years old, you don't have to apologize

12   for anything.

13             One of the causes of i4i's financial problems

14   was product quality concerns; isn't that true?

15      A.      Not to my knowledge, no.

16      Q.      Isn't that something that was discussed

17   explicitly in i4i's Board of Directors, that one of the

18   causes of i4i's financial problems was quality problems

19   with i4i's products?

20      A.      Well, I find that strange, because one of the

21   things that I insisted on creating was a quality

22   assurance management activity, which was an attempt to

23   make the product bulletproof, and that was before I

24   left.

25             So if it deteriorated after that time, I'm

1   sorry, but I really can't answer your question.

2       Q.     Could you turn to Page -- Exhibit 2056?

3               MR. POWERS:  Chris, could you blow up the

4   first page of that, please?

5       Q.     (By Mr. Powers) Exhibit 2056 are minutes of

6   the Board of Directors' meetings of i4i in February of

7   2002, correct?

8       A.     Yes.

9       Q.     And if you look -- and you attended i4i's

10  Board meetings, right?

11      A.     Yes.

12      Q.     And you received copies of the minutes and

13  agenda, didn't you?

14      A.     Yes.

15              MR. POWERS:  Chris, can you turn to the

16  next page of the document and bring up the bottom

17  section called Key Activities Required in Q3?

18      Q.     (By Mr. Powers) Q3 refers to the third

19  quarter of that year; is that right, Mr. Cox?

20      A.     I'm sorry.  I didn't quite hear.

21      Q.     Yes.

22              Q3, when it says Key Activities Required in

23  Q3 --

24      A.     Yes, okay.

25      Q.     -- that's a reference to the third calendar

1   quarter of that year of 2003, correct?

2        A.    I'm sorry.  I'm going to have to ask you to

3   repeat that.

4        Q.    All I'm asking you is that Q3 in the document

5   means third quarter?

6        A.    Yes.

7        Q.    Now, the very first sentence under Key

8   Activities Required, it says, quote, with revenue

9   continuing to be pushed off due to product quality

10  issues, do you see that?

11       A.    Yes.

12       Q.    Does that help you recall that there were

13  product quality issues that were hurting i4i's revenues?

14       A.    I'm not sure.  I don't have the context of

15  this, but my guess is at that time it was probably an

16  attempt to -- I don't know if this might have been the

17  time of large documents or tracking requirements.

18  It doesn't necessarily mean that the product that was in

19  the marketplace was having -- it may have been the

20  development of the product that was having quality

21  issues.

22       Q.    Whichever type of quality issues they were,

23  they were hurting the revenues for i4i?

24       A.    It would seem so, yes.

25       Q.    All right.  So you no longer deny that there

1  were product quality issues at i4i in 2002?

2       A.    Yes.   But, again, I would like to make it a

3  point, it may not be product quality issues with the

4  released product in the marketplace.

5       Q.    As of 2002, there was a released product,

6  right?

7       A.    Yes.

8       Q.    And the statement says:   Revenue was pushed

9  off due to product quality issues.   Revenue is going to

10  come from a released product, wouldn't it?

11       A.    No.   The only point I'm making is that if you

12  had product quality issues with the developing product,

13  i.e., enhancement or an extension, then that would not

14  have reached the marketplace, and, therefore, it would

15  not be customer concerns.

16            We would still have revenue concerns if, in

17  fact, it was not --

18       Q.    So what you're saying is you could have two

19  types of product quality issues.   One is quality with an

20  existing product that's in the marketplace, and quality

21  issues with -- with developing future versions; is that

22  fair?

23       A.    It's unlikely it would be a quality issue

24  with the released product, because our quality assurance

25  management was very tight.

1    Q.    Would you turn to the next page under the

2  conclusion section.

3              MR. POWERS:  And, Chris, could you bring

4  up just the entire conclusion section?

5    A.    Yes.  I think that confirms it; it's product

6  and readiness issues.  So the product quality problems

7  were within the development environment, not in the

8  customer environment.

9              MR. POWERS:  Chris, could you bring up --

10  could you highlight, please, the very first sentence?

11    Q.    (By Mr. Powers) It says, quote:  The product

12  readiness issues have continued to put a strain on

13  revenue and our ability to close prototypes -- to close

14  prototypes into real software revenue.

15              So that's a reference to what you were

16  talking about earlier of product quality problems in

17  i4i's product development; is that fair?

18    A.    That's the interpretation I would put on it,

19  yes.

20    Q.    All right.  But you also had product quality

21  problems with existing customers, specifically, the

22  Patent & Trademark Office that you discussed earlier.

23    A.    No, not that I'm aware of.  I'm sorry.

24              MR. POWERS:  Chris, could you highlight

25  the next sentence.

```
 1        Q.    (By Mr. Powers) And I'll read it.  Quote:
 2  The perception problems continues at the USPTO.
 3  Let me stop there for a minute.  USPTO is the Patent &
 4  Trademark Office?
 5        A.    Yes.
 6        Q.    That was your first big customer that you
 7  just testified about, right?
 8        A.    Yes, yes.
 9        Q.    The perception problems continue at the
10  USPTO, although some progress has been made, but the
11  problems they have incurred.
12              Let me stop you there.  That's where an
13  existing current product that they're using, right?
14  That's not a possible product?
15        A.    Yes.  But I don't understand why it calls
16  them perception problems.  That would suggest to me that
17  they're not really problems.  It's just that they're
18  perceived as such.
19        Q.    That your customer thinks there's a problem?
20        A.    Yes, yes.
21        Q.    If your customer thinks there's a quality
22  problem, there's a problem, isn't there?
23        A.    Again, though, it's possible that the
24  customer had a data release of the extension.  I
25  don't -- I don't know the actual details of the context
```

1  of that one.

2      Q.    You don't know, but you're not denying that

3  your first biggest customer, the Patent Office, had

4  quality problems with your existing product; you're not

5  denying that now, are you?

6      A.    I'm questioning it, yes, I am.

7      Q.    Even though that's what was said at the Board

8  of Directors?

9      A.    Even though it was stated perception problems

10 continue at the PTO.

11     Q.    I'll read the rest of the quote:  The

12 problems they have incurred, the PTO incurred, are

13 spreading to other government departments, JPO and most

14 likely have affected the EPO as well, close quote.

15         Do you see that?

16         So that's a reflection at the Board of

17 Directors that the product quality concerns that your

18 biggest customer, the PTO, had were spreading to other

19 government agencies as well?

20     A.    It would appear so.

21         MR. POWERS:  Chris, could you bring up

22 the last, starting with, A New Release of PASAT, at the

23 bottom of that page.

24         There we go.

25     Q.    (By Mr. Powers) A new release of PASAT was

1  delivered to the USPTO with minor usability bugs.

2  However, the product specification exercise has yielded

3  a number of potential severe bugs that also need to be

4  corrected.

5          Does that help you recall that there were a

6  number of severe bugs in the products of i4i in 2002?

7      A.    I have no knowledge of this.  I'm sorry.

8      Q.    No knowledge.

9          Okay.  Now, the product quality concerns were

10  also being expressed internally at i4i, not just by

11  i4i's customers; isn't that true?

12      A.    I'm sorry.  You will have to go back and give

13  me some context.

14      Q.    Do you remember any discussion within i4i

15  about product quality problems with i4i's product?

16      A.    Only in terms of worrying about the

17  development major enhancements, such as large documents

18  or track changes.

19      Q.    Nothing else?

20      A.    Nothing that I recall.  I'm sorry.

21      Q.    Would you turn to Exhibit 2016, please?

22          MR. POWERS:  Chris, can you bring up just

23  the from and the to at the top, please?

24      Q.    (By Mr. Powers) This is an e-mail in July of

25  2000 from Keith Thomas to you, right?

```
 1        A.    Yes.

 2        Q.    Keith Thomas is the VP of Technology at i4i,

 3   right?

 4        A.    Yeah.  He was the senior technologist at that

 5   time, yeah.

 6        Q.    So he was the senior-most -- other than

 7   Mr. Vulpe, the senior-most technology person at i4i?

 8        A.    Of a group of three or four, yes.

 9        Q.    So he's a senior technology person; is that

10   fair?

11        A.    Yes.

12        Q.    Okay.

13              MR. POWERS:  And, Chris, could you bring

14   up this -- let's say, the first half of the third

15   paragraph?

16              Let's just -- we'll take it in pieces.

17        Q.    (By Mr. Powers) This -- and the subject of

18   Mr. Thomas' e-mail was the S4 technology that we've been

19   talking about, right?

20              See that on the subject line?

21        A.    He's talking about the S4 technology, yes.

22        Q.    All right.  So this is an e-mail to you from

23   one of those senior technology people at i4i, and he

24   says, quote:  Our patent is, in my opinion, something of

25   a red herring in a discussion of S4's value.  The patent
```

1  speaks of separating markup from content and building

2  markup maps of content, which are not directly

3  interlaced with markup.  Many SG/XML experts consider

4  the separation of markup from content, at worst, as

5  defeating the purpose of markup, and at best, as

6  introducing enormous complexity and processing overhead

7  to coordinate the two.

8           Do you see that?

9      A.   Yes.

10     Q.   So Mr. Thomas, one of the senior technical

11 people at i4i, was telling you in this e-mail in 2000

12 that the patented approach was viewed by many as wrong.

13     A.   No, I don't think that's what he's saying.

14     Q.   So when he says that many experts consider

15 the separation of markup from content, at worst, is

16 defeating the purpose of markup, you don't think that

17 that's disagreeing with the approach of the patent?

18     A.   No.  I think all it suggests is that they

19 have to find a way of bypassing that or mitigating it.

20     Q.   So you don't think it's a negative at all?

21     A.   No.

22     Q.   Mr. Thomas' next sentence is:  They are

23 certainly right on the latter point.  Our implementation

24 of the patent idea in V2 and V3.

25           Let me stop you there for a minute.  When he

1  says V2 and V3, that's a reference to Version 2 and

2  Version 3 of the S4 technology?

3      A.    Yes.

4      Q.    All right.  So Mr. Thomas says:  Our

5  implementation of the patent idea.

6            And you understood him to be referring to the

7  separation of markup codes and content?

8      A.    That would appear to be the focus of this

9  particular issue, yes.

10      Q.    All right.  He says:  Our implementation of

11  the patent idea in V2 and V3 had two serious defects.

12            First, it locked us into an inefficient

13  mechanism where the average execution times of all

14  search and manipulation operations were exponential in

15  document size.

16      A.    Yes.

17      Q.    And, second, it created maps which were not

18  truly independent of the content, because the map had to

19  be in the same order and cover all the offset space of

20  the content.

21            Let's stop there.  You understood Mr. Thomas

22  to be saying that i4i's products, which had implemented

23  the patent idea, had these two serious defects, as he

24  put it?

25      A.    That's what he's saying, yes.

1    Q.    And he's one of those senior technical people

2  at i4i?

3    A.    He was a senior technologist.

4    Q.    All right.

5         MR. POWERS:  So, Chris, can we scroll

6  down and pick up the rest of the quote of the paragraph

7  now?

8    Q.    (By Mr. Powers) Mr. Thomas then says:  The

9  fact that these versions were also very buggy and

10 error-prone is a different problem.

11         Let's just stop there.  You understood

12 Mr. Thomas to be acknowledging or admitting that

13 Version 2 and Version 3 of i4i's products were very

14 buggy and error-prone, correct?

15    A.    Yes.  I think, though, that you need to

16 have -- you need to have Mr. Thomas explain what he was

17 trying to say with these words.

18    Q.    Well, the words --

19    A.    They're not necessarily the words that other

20 people would use.

21    Q.    Well, the words, on their face, you would

22 agree as someone who received the memo are pretty clear.

23 They are very buggy and error-prone.  That's not a

24 positive, is it?

25    A.    Again, it was stated in his terms and in his

1    opinion.

2        Q.    And he's one of the senior technical people

3    at i4i?

4        A.    I think he's the person who best can explain

5    what he meant by it.

6        Q.    Well, as someone who received the memo and on

7    the Board of Directors, you understood that when one of

8    the senior people -- technical people at i4i said that

9    i4i's products were very buggy and error-prone, that

10   wasn't a good thing?

11       A.    That was a surprise to me.

12       Q.    But it wasn't a good thing?

13       A.    I'm sorry.  This is a surprise to see this.

14       Q.    But you received the memo in 2000.

15       A.    I did in 2000, yes.

16       Q.    All right.  And you understood when he said

17   very buggy and error-prone, that was not positive?

18       A.    No, it was not positive, but it was not as

19   negative as you seem to suggest.

20       Q.    Buggy is a software term referring to

21   problems in the source code, right?

22       A.    Yes.  It's also open to interpretation as to

23   just how intensive the bugginess is.  Bugginess to one

24   person can be two bugs in a thousand.  To another

25   person, it's fifty bugs in a thousand.

1      Q.      And you understood that Mr. Thomas was

2   saying -- one of the senior technical people was saying

3   it was very buggy.

4      A.      He was trying to draw my attention to the

5   fact that we should do something about the product.

6      Q.      Now, in fact, what Mr. Thomas says next is

7   that i4i changed Version 4 from Version 3 to go away

8   from the patented approach, right?

9      A.      I don't understand that, no.

10      Q.      Well, let's read his next sentence.  He says,

11   quote:  We did not base V4 on the concepts of the patent

12   but rather chose to design for efficiency and

13   robustness.

14           Do you see that?

15      A.      Yes.

16      Q.      So he's saying Version 4 was not based on the

17   patent concepts in words that we could all understand,

18   isn't he?

19      A.      I believe at this time Version 4 was still in

20   the development.  It was not in production.

21      Q.      And he's saying that Version 4 went away from

22   the patent to be efficient and more robust, right?

23      A.      Because of the problems that he had mentioned

24   in 2 and 3 and the size -- I believe at this time, and

25   my memory doesn't hold too well, but we were trying to

1  come to grips with what we call large documents and to

2  find an efficient way to process large documents.

3      Q.    In your direct examination, you spoke a

4  little bit about McLean Watson.  McLean Watson owns

5  about 77 percent of i4i Inc.; isn't that true?

6      A.    It owns a great deal.

7      Q.    And Mr. Angus took over as CEO of i4i in

8  2002, didn't he?

9      A.    Yes.

10     Q.    And Mr. Stewart took over as CFO also in

11 2002?

12     A.    Yes.

13     Q.    CFO means Chief Financial Officer?

14     A.    Yes.

15     Q.    And McLean Watson owns a majority also of i4i

16 LP, which was formed to initiate this lawsuit; isn't

17 that true?

18     A.    Yes.

19     Q.    And the other major investor in i4i LP, which

20 was formed for this lawsuit, is called the Northwater

21 Patent Fund?

22     A.    Yes.

23     Q.    On your direct examination, you refer to some

24 valuations that were done of the company.  I'd like to

25 show you one.

1          MR. POWERS:  Exhibit 2088, please.

2          Chris, could you bring up just the --

3    first bring up the bottom half, just the original part.

4          Q.    (By Mr. Powers) The bottom half of

5    Exhibit 2088 is an e-mail from Mr. Vulpe to a number of

6    people, including you, correct?

7          A.    Yes.

8          Q.    Dated December of 2003?

9          A.    Yes.

10         Q.    So December of 2003 is right about the time

11   that Word 2003 was released, correct?

12         A.    Yes.

13         Q.    And at that time, Mr. Vulpe says that the

14   value of the company appears to be only $2 million,

15   right?

16         A.    I'm sorry.  Say again.

17         Q.    As of December of 2003, Mr. Vulpe, in Exhibit

18   2088 --

19         A.    Yes.

20         Q.    -- says that the entire value of the company,

21   with all its assets, is about $2 million?

22         A.    This is in response to a previous e-mail

23   which suggested that amount.  It is not Mr. Vulpe's

24   suggestion.

25         Q.    And, in fact, Mr. Vulpe in the very next

1  sentence says, quote:  Is that a realistic valuation of

2  the company, even in today's tough market?

3         He's suggesting it might be lower, isn't he?

4    A.    Or higher.

5    Q.    Does a tough market make a valuation higher?

6    A.    It could.

7    Q.    Is that what is happening today in your

8  company?

9    A.    It depends on who's using the valuation.

10   Q.    Usually, a tough market brings the value

11 down, doesn't it, Mr. Cox, in your experience.

12         You've got many, many years of experience.

13 Doesn't a tough market usually bring the valuation down?

14   A.    I think the valuations in private companies

15 are made for a purpose.  You have to understand the

16 purpose of the person making the valuation before you

17 can assess the valuation.

18   Q.    We're in a pretty tough market right now,

19 you'd agree?

20   A.    I'm sorry?

21   Q.    We're in a pretty tough market right now,

22 you'd agree?

23   A.    Well, not for some things.  You mean, about

24 for computer software?

25   Q.    In general?

```
 1      A.      Well, some people are doing very well at the

 2 present time actually.   If they're in the right business

 3 for this economic recession, then they're making a lot

 4 of money.

 5      Q.      Is that true for most folks as you understand

 6 it?

 7      A.      Sorry?

 8      Q.      Is that true for most folks as you understand

 9 it?

10      A.      Is that my --

11      Q.      Isn't it fair to say that today is a pretty

12 tough market in general?

13              Wouldn't you agree with that?  Can't you

14 agree with that?

15      A.      Well, if you want to look at it from 40,000

16 feet, yes.

17      Q.      And in today's tough market, aren't most

18 valuations going down?

19      A.      Most public valuations, yes.

20      Q.      All right.  So now let's go up to the top

21 half of Exhibit 2088.

22              This is Mr. Loudon Owen's response to

23 Mr. Vulpe's e-mail, right?

24      A.      Yes.

25      Q.      Mr. Loudon Owen was the Chairman of the
```

1    Board?

2        A.    Yes.

3        Q.    And he's at McLean Watson, this investment

4    fund, right?

5        A.    Yes.

6        Q.    And he says in the second bullet, quote:

7    Valuation probably not far off, given tax loss value.

8              Do you see that?

9        A.    Yes.

10       Q.    So Mr. Loudon Owen, the Chairman of the

11   Board, is saying that the entire value of i4i as of

12   December in 2003 is about $2 million?

13       A.    Well, again, I don't know if that valuation

14   includes a valuation for the patent or not.

15       Q.    It's the entire value of the whole company,

16   right?

17       A.    I'm sorry.  I don't know the context like

18   that.  Seems to me, again, that this is a valuation for

19   a purpose.

20       Q.    Now, one last question, Mr. Cox.  You've

21   testified about how you think the patent has a lot of

22   value and how you were blown away by the technology and

23   how you have options in i4i LP.

24              Do you recall all that?

25       A.    Yes.

```
 1        Q.     You actually haven't invested any of your

 2  money --

 3        A.     No.

 4        Q.     -- in i4i or i4i LP, have you?

 5        A.     No.

 6               MR. POWERS:  No further questions.

 7               THE COURT:  Redirect?

 8                    REDIRECT EXAMINATION

 9  BY MR. CAWLEY:

10        Q.     Just a few more questions, Mr. Cox.

11  You haven't invested any of your money.  Have you

12  invested any of your time?

13        A.     I'm sorry.  Say again, please.

14        Q.     Have you invested any of your time in i4i?

15        A.     Yes.  A great deal of my time, yes.

16        Q.     Have you been paid for that?

17        A.     No.

18        Q.     Let's just go over a few of the points, and I

19  won't bother to pull up most of these documents.

20               You were just taken through a long list of

21  losses year by year.  Do you remember that?

22        A.     Yes.

23        Q.     Is it unusual, in your experience, for a

24  company like i4i to have losses year after year at that

25  time in its growth?
```

```
 1        A.    It's very common.

 2        Q.    Why is that?

 3        A.    Because of the cost of establishing your

 4   product in the first place in advance of sales.

 5        Q.    All right.  You were also shown some

 6   documents that supposedly talked about quality issues

 7   and that i4i was focusing on the quality of its

 8   products.

 9              In your experience, is that unusual that a

10   technology company focuses on the quality of its

11   product?

12        A.    No.  In fact, it's a sign of a good software

13   company.

14        Q.    Is it also true that in many instances a

15   focus on quality may require some resources?

16        A.    Indeed.

17        Q.    And cost money?

18        A.    Indeed.

19              MR. CAWLEY:  If we could, let's pull up

20   Defendant's Exhibit 2056 again.  And go to the next page

21   and let's highlight -- I'm looking for the portion of

22   the PTO.  The next page, I'm told.

23              It's right in the middle under

24   conclusion.  Let's highlight that.

25        Q.    (By Mr. Cawley) In the second paragraph there
```

1  says:  The perception problems continues at the USPTO,

2  and then goes on.

3              Does that paragraph talk about quality at

4  all?

5       A.   I -- I don't know.  I don't know what the

6  perception of the problems were at the PTO at that time.

7       Q.   What could it be in an organization under

8  these circumstances, if not quality?

9       A.   Well, it could be the --

10              MR. POWERS:  Objection, Your Honor.  It's

11  calling for speculation at this point.

12              THE COURT:  Overruled.

13       A.   It could be the way in which the system

14  interfaces with maybe existing systems or the way in

15  which you have to create an instruction for the user.

16  It could be anything.

17       Q.   (By Mr. Cawley) All right.  Let's look

18  briefly now again at Defendant's Exhibit 2016.

19              This is the e-mail that Mr. Thomas wrote that

20  you were asked a lot of questions about.

21       A.   Yes.

22       Q.   Tell us now -- now that we've been taken

23  through some of this stuff out of context, tell us now

24  the context in which this e-mail was sent to you by

25  Mr. Thomas.

1      A.      Well, I'm -- I don't remember receiving the

2  e-mail particularly, but I also can't remember making a

3  fuss about it.  So it was always the case of there's

4  something here that's being drawn to my attention as

5  CEO, and I have to do something about it, because the

6  wording is that important.

7      Q.      What was being drawn to your attention?

8      A.      The fact that the architecture of the product

9  was in dispute.

10     Q.      When you say the architecture of the product,

11 what do you mean by that?

12     A.      Well, building a software product is kind of

13 like building a house.  You have to decide how many

14 floors you're going to have, whether bedroom or den or

15 living room or whatever.

16             And in this case, if I could draw an analogy,

17 the laundry equipment was in the basement, and the

18 suggestion was instead of being in the basement, it

19 should be on the bedroom floor which is where most of

20 the dirty linen comes from in terms of optimal

21 processing.

22     Q.      Was Mr. Thomas, in your understanding,

23 telling you at this time that the washing machine needed

24 to be moved to a different part of the house?

25     A.      That's what he was suggesting, yeah.

1     Q.    And did you -- did that get your attention?

2     A.    Yes, indeed.

3     Q.    Were their discussions about that?

4     A.    Well, my style of management was not to talk

5 one-on-one with this kind of thing, but I insisted there

6 be a meeting of the senior technologists, and they would

7 hammer out a solution.

8     Q.    Did they?

9     A.    Yes, they did.

10     Q.    What happened in response to this memo?

11     A.    I believe they changed the architecture of

12 the product.

13     Q.    All right.  Now, this same memo -- and I

14 won't take the time to find that particular sentence --

15 talks about bugs and things being buggy.

16     Is it unusual that computer software may be

17 buggy during its development?

18     A.    Of course.

19     Q.    Okay.  Once again, actually, what I asked is

20 it unusual or usual?

21     A.    No.  In fact, when I worked with the PROMIS

22 system, they were under an assurance program, which is

23 also practiced by Motorola, and at that time, the Space

24 Shuttle had bugs in its computer code.  So it's not

25 unusual for that at all.

1    Q.    Is part of the development process of a

2  product to de-bug the product to the greatest extent

3  possible?

4    A.    Absolutely, yes.  That's why you have alpha

5  version and beta versions and client pilots and so on,

6  to make sure that when it does go into production it's

7  clean.

8    Q.    Now, on the last subject, Mr. Cox, does it

9  surprise you that a company in the condition that i4i

10  was in, in 2003, with no money, could be given an

11  valuation as being worth as little as $2 million?

12    A.    No, it doesn't surprise me.

13    Q.    But does that valuation tell you anything

14  about what that company's patent is worth?

15    A.    Nothing.

16    Q.    And more particularly, does that valuation

17  tell you anything about what a reasonable royalty would

18  be for someone else's use of that patent?

19    A.    Not in my opinion.

20              MR. CAWLEY:  Thank you, Your Honor.  Pass

21  the witness.

22              THE COURT:  All right.  Any recross?

23              MR. POWERS:  Nothing further, Your Honor.

24              THE COURT:  All right.  Thank you.  You

25  may stand down.

1        All right.  Very well.  I believe we will

2  take our morning break at this time, Ladies and

3  Gentlemen of the Jury.

4        We will be in recess until 10:35.

5        COURT SECURITY OFFICER:  All rise.

6        (Recess.)

7        COURT SECURITY OFFICER:  All rise.

8        (Jury in.)

9        THE COURT:  I bet y'all just sat down.

10       Please be seated.

11       All right.  Mr. Cawley, who will be your

12  next witness?

13       MR. WHITE:  Your Honor, the Plaintiffs

14  call John Tulley.

15       THE COURT:  All right.

16       MR. WHITE:  While we're getting

17  Mr. Tulley from the witness room, I'll hand to the Court

18  a copy of Mr. Tulley's -- you already have one?

19       THE COURT:  He has been sworn, hasn't he,

20  Mr. White?

21       MR. WHITE:  Yes, Your Honor.

22       THE COURT:  All right.  You may proceed.

23       MR. WHITE:  Thank you, Your Honor.

24  JOHN DAVID TULLEY, PLAINTIFFS' WITNESS, SWORN

25            DIRECT EXAMINATION

1    BY MR. WHITE:

2        Q.    Good morning, Mr. Tulley.

3        A.    Good morning.

4        Q.    Would you please introduce yourself to the

5    jury?

6        A.    My name is John David Tulley.

7        Q.    Mr. Tulley, where are you employed?

8        A.    At Teradata Corporation.

9        Q.    Is Teradata Corporation a U.S. or a Canadian

10   company?

11       A.    It's a U.S. corporation.

12       Q.    And where is it headquartered?

13       A.    Miamisburg, Ohio.

14       Q.    And what is the business of Teradata?

15       A.    It's the largest company in the world for

16   data warehousing and business intelligence.

17       Q.    What do you do for them?

18       A.    I'm the Vice President of Sales for Canada.

19       Q.    How long have you worked for Teradata?

20       A.    For five years.

21       Q.    Briefly summarize for the jury your

22   educational background.

23       A.    I have a Bachelor of Science from the

24   University of Bristol in England.

25       Q.    Did you receive a degree from them in any

1   sciences?

2       A.    Biochemistry.

3       Q.    And how do you -- did you come to live in

4   Canada?

5       A.    My wife of 31 years is a Canadian citizen.  I

6   met her in London, England.  And after a year, we

7   decided to move to Canada to be closer to her parents.

8       Q.    Do you have any children, Mr. Tulley?

9       A.    I have a son, 26; a daughter, 29.

10      Q.    Any grandchildren?

11      A.    On the way.

12      Q.    Well, congratulations.

13            Please summarize, if you would, Mr. Tulley,

14  your work experience since graduating from college.

15      A.    Since graduating in 1973, I've spent 35 years

16  in the computer industry working for Phi vendors.

17      Q.    Have you had any particular specialty in the

18  computer industry during that time?

19      A.    My first 10 years were as a technical person;

20  my remaining 25 years have been in the sales side.

21      Q.    All right.  What are some of the companies

22  you have worked for over those 35 years?

23      A.    Okay.  I worked for International Computers

24  in England.  I worked for Honeywell Corporation in

25  Canada for about 13 or 14 years; Cray Research, which is

1    a supercomputer company, for five years.

2          Then I joined NCR's Teradata division, worked

3    for them for five years; worked for i4i for a year; and

4    then I went back to the Teradata division of NCR.

5          Q.    When did you work for i4i?

6          A.    In 2001.

7          Q.    And when you went to work for them in 2001,

8    what was the position you held?

9          A.    The Vice President of Sales.

10         Q.    And you say you worked for them for a year?

11         A.    Yes, sir.

12         Q.    When you interviewed for your position with

13   i4i, did they tell you anything about a patent that they

14   had?

15         A.    Yes, they did.

16         Q.    What did they -- what did they tell you?

17         A.    They explained to me that the invention was

18   patented, and it belonged to them; that it was the heart

19   of the product we would be selling.

20         Q.    There's a binder of exhibits in front of you,

21   Mr. Tulley.  If you would turn, please, to Plaintiffs'

22   Exhibit No. 1.

23         I would ask you, is this -- the patent that

24   you were explained about or had explained to you, when

25   was the first time you saw a copy of that patent?

1        A.    When I went into the i4i office, it was

2  hanging on the wall in a picture frame.

3        Q.    Did you hold any views, while you were

4  employed at i4i, about the value of the company's -- the

5  value of the company's patent to your ability to sell

6  products for i4i?

7        A.    Yes.  It's very important in sales that when

8  you're selling to large corporations, that they

9  understand that you -- you own the technology that you

10  are selling.

11        Q.    And how would that influence sales?

12        A.    Because there are many companies out there

13  trying to sell other people's technology.

14             In this case, with the patent, I saw that the

15  technology was that of i4i's.

16        Q.    Where were most of i4i's potential customers

17  located?

18        A.    In the United States.

19        Q.    What did you do for i4i as the Vice President

20  of Sales when you joined them?

21        A.    I organized the sales team.  I got rid of

22  some non-performing salespeople.  I started organizing

23  my vertical markets.

24        Q.    Did the fact that i4i had a patent play any

25  role in the marketing of i4i's products?

1        A.     Yes, it did.

2        Q.     And how was that done?

3        A.     We put the fact that there was a patent in

4   our documentation.

5        Q.     If you would, please, turn to Plaintiffs'

6   Exhibit 13, Mr. Tulley, and ask you if you can identify

7   that document.

8        A.     Yes, sir.

9        Q.     What is that?

10       A.     That is an i4i-at-a-glance marketing sheet

11  that we give to our prospects.

12       Q.     And how would you do that?

13       A.     We would put it in a sales kit, which would

14  be a cardboard binder.  It would have this document and

15  a technical glossy sheet on the i4i product.

16       Q.     Now, in connection with that Exhibit 13,

17  there are a number of bulleted items.  Let me ask you

18  first, who authored this document?

19       A.     I did from a -- from a previous version that

20  existed.

21       Q.     Now, you've identified a number of features

22  of i4i's that you wanted to point out to prospective

23  customers.  We have here on the screen a blowup of the

24  first bullet.  Could you read that to the jury, please?

25       A.     Inventor of the patent -- the whole

1    paragraph?  I'm sorry.

2         Q.    Yes, please.

3         A.    Inventor of the patented S4 technology,

4    brackets, U.S. Patent No. 5,787,449, close bracket,

5    which helps different proprietary software applications,

6    like word processors, e-mail packages, CAD tools, and

7    databases, structure information in XML/SGML and share

8    it instantly without converting or duplicating.

9         Q.    Now, why did you deem it important to put the

10   patent number on this document?

11        A.    It's a very specific reference to customers

12   that they can actually check what the patent is about.

13   We didn't just say we had a patent; here is the actual

14   proof that we have the patent.

15        Q.    Do you know if a copy of this document,

16   Plaintiffs' Exhibit 13, the i4i-at-a-glance, was ever

17   given to any employees of Microsoft?

18        A.    Yes.

19        Q.    When did that happen?

20        A.    At a meeting April the 18th in Washington,

21   D.C., at Microsoft's federal offices there.

22        Q.    Were you involved in those meetings in any

23   way?

24        A.    Yes.

25        Q.    If you would turn in your binder, Mr. Tulley,

1  to Plaintiffs' Exhibit No. 18, and I'll ask you if you

2  recognize that e-mail.

3       A.    Yes, I do.

4            MR. WHITE:  May I have...

5       Q.    (By Mr. White) What -- this e-mail is from

6  John Winter.  Do you see that?

7       A.    Yes, I do.

8       Q.    Who was John Winter?

9       A.    John Winter was the salesperson I hired in

10 the U.S. to look after the U.S. marketplace.

11      Q.    What is this e-mail about?

12      A.    John Winter had been to a Logicon XML

13 briefing in San Diego, and based on the presentation

14 given there, two people from Microsoft approached him

15 and asked i4i to give them a briefing in their

16 Washington office.

17      Q.    Do you know the reason why Microsoft was

18 inviting i4i to attend those meetings?

19      A.    Yes.  Because they had a contract at the DLA,

20 the Defense Logistics Agency, that was looking for an

21 XML editing solution.

22      Q.    And at that time, did Microsoft provide an

23 XML solution?

24      A.    No, sir.

25      Q.    If you would turn now to Exhibit 19, it's

1  another e-mail from Mr. Winter, and I'll ask you if you

2  recognize that document.

3      A.    Yes, I do.

4      Q.    What is this e-mail about?

5      A.    This is an e-mail from John Winter to myself

6  reminding me of the dates of the meeting in Washington,

7  April 18th to 19th, and there would be a two meetings --

8  there would be a meeting with Microsoft and a meeting

9  with an integrator called SAIC.

10     Q.    Did you attend those meetings?

11     A.    Yes.

12     Q.    Who attended them from i4i?

13     A.    Myself, Keith Thomas, Shard McKee.

14     Q.    And do you know who attended from Microsoft?

15     A.    There were two people whose names I remember,

16 Mark Belk and Susie Adams, and there were about four or

17 five other Microsoft people there.

18     Q.    Now, the e-mail suggests there were two --

19 two days of meetings.  Can you tell us about those?

20     A.    Yes.  There was a meeting on the 18th at the

21 Microsoft office, and then on the next day, there was a

22 meeting at SAIC in McLean with Microsoft and with SAIC

23 and the intelligence agencies.

24     Q.    Now, the SAIC, do you know what that stands

25 for?

1      A.     I don't remember what the initials stand for,

2  but it's a very large systems integrator in the United

3  States.

4      Q.     Now, let's focus first on the meeting on the

5  18th.  You say that you attended that.  What did you do

6  at that meeting?

7      A.     I gave out the sales kits I mentioned

8  earlier, and I also gave a corporate presentation.

9      Q.     If you would turn to Exhibit 92 in the

10  binder, and there's a slide presentation there entitled

11  Company Briefing.  Is this the PowerPoint slide you used

12  in your presentation?

13      A.     Yes, sir.

14      Q.     Did you prepare those slides?

15      A.     Yes, I did.

16          MR. WHITE:  If I could have the second

17  page of that slide presentation.

18      Q.     (By Mr. White) I have here on the screen a

19  blowup of a bullet on one of the pages.  Do you see

20  that?

21      A.     Yes, sir.

22      Q.     Now, this bullet makes reference to patented

23  markup management technology.  Could you explain the

24  purpose behind why you put that in your slides?

25      A.     Again, to reemphasize that the invention

1  belonged to i4i.

2      Q.     Now, just a moment ago, you indicated that

3  you had handed out a copy of the i4i-at-a-glance that

4  had the patent number to attendees at the meeting on the

5  18th?

6      A.     Yes.

7      Q.     How did you hand those -- those sales kits

8  out at that meeting?

9      A.     As people came into the room, I gave them the

10  sales kits.

11      Q.     So you're quite certain that you distributed

12  those sales kits to the attendees from Microsoft?

13      A.     Yes, because they were all given out.

14      Q.     And in those sales kits were copies of

15  i4i-at-a-glance?

16      A.     Yes.

17      Q.     And it contained the patent number; is that

18  correct?

19      A.     Yes.

20      Q.     How many -- how many employees of Microsoft

21  received one of those sales kits on that meeting?

22      A.     To the best of my knowledge, six people.

23      Q.     Were there any subsequent meetings between

24  i4i and Microsoft?

25      A.     Yes.

1      Q.      When did that happen?

2      A.      That happened at the end of June, June 28th,

3  29th.

4      Q.      Would you turn to Exhibit 23 and tell me if

5  you can identify that document?

6      A.      Yes.

7      Q.      What is it?

8      A.      It was -- was an e-mail from myself to the

9  sales team forwarding an e-mail that I had sent to a

10  number of senior people at i4i summarizing the actions

11  of the meeting June 28th, 29th, with Microsoft.

12      Q.      Now, that meeting on the 21st, was there an

13  agenda for that meeting?

14      A.      Yes, there was.

15      Q.      Would you turn to Exhibit 21?

16      A.      Yes.

17      Q.      And can you identify for us what that e-mail

18  is?

19      A.      This is the agenda I --

20      Q.      It's the agenda.

21      A.      Oh, I'm sorry.

22      Q.      Could you identify what it is?

23      A.      Yes.  It's the agenda for the meeting.

24      Q.      Did you prepare that agenda?

25      A.      Yes.

1     Q.    Did you attend the meeting?

2     A.    I only attended the very first welcome for

3 about five minutes, and I had to leave for other

4 meetings.

5     Q.    Who attended on behalf of Microsoft?

6     A.    Mark Belk, Susie Adams.

7     Q.    And who attended, as you recall, from i4i?

8     A.    Some of the people on the agenda, Rick Makos,

9 the President, Shard McKee, and then throughout the day,

10 other people.  I believe Keith Thomas was there, too.

11    Q.    What was the purpose -- well, first of all,

12 who requested that meeting in June?

13    A.    From the meeting April 18th in Washington,

14 Microsoft had requested was for the deep dive into i4i

15 solution.

16    Q.    Deep dive?  What do you mean by that?

17    A.    A deep dive -- well, it's -- if you go for a

18 drive in a car, then the people wanting you to buy the

19 car say, so how does it run so well, a deep dive is when

20 you actually lift the hood and look under and see all

21 the engine and electronics underneath.

22    Q.    So the purpose of the meeting in June at the

23 i4i facilities in Toronto was to explore more of the

24 technology of i4i?

25    A.    That is correct.

1      Q.     Now, turn back to Exhibit 23.   That's the

2  summary of the meeting.   Did you prepare that summary,

3  sir?

4      A.     Yes.

5      Q.     Now, you indicated you did not attend the

6  meeting.   On -- what was the basis for your information

7  that you reported in this summary of the meeting?

8      A.     After the meeting, the following week -- that

9  was a long weekend in Canada -- I met with Rick Makos

10  and Shard McKee, and I believe I had input from other

11  people -- I don't remember who -- to actually generate

12  this e-mail.

13      Q.     Now, in this e-mail -- and we have a blowup

14  of a paragraph that you included in this summary as

15  paragraph one.   Would you read that to the jury?

16      A.     In terms of the relationship with Microsoft;

17  one, the Office Dev Team, brackets, diehard old school

18  Redmond types, feel they can do basic XML out themselves

19  in about two years, even --

20      Q.     Let me stop you there and ask you a question.

21  There's some quotes in this -- this comment.   Are those

22  supposedly quotes made by someone from Microsoft?

23      A.     Yes.   My recollection is that I was told that

24  was a quote by Mark Belk.

25      Q.     All right.   Now, to do basic XML out

themselves in about two years, what did that mean?

A.    That means to save the document in an XML format, so it does not include the editing or creation of the document.

Q.    So that the Office Development Team at Microsoft in Redmond, Washington, felt that they could do basic saving of XML documents, even though they had been trying for over two years?

A.    Yes.

Q.    What did that mean to you?

A.    Well, they didn't have it today -- or sorry -- at that time.

Q.    Then you go on to say, As Mark said, quote, they just don't get what customers want.  Office Dev Team thinks producing well formed is enough, end quote. What do you understand Mr. Belk was saying there?

A.    That the Office products would only do well formed, which means it has the tags.  It wasn't valid, which means it wasn't mapped to what's called a DTD.

Q.    Well, now, well formed versus valid, does that in any way relate to the products of i4i?

A.    Yes.  The i4i product, which is well formed and valid.

Q.    Microsoft, at that time, was not providing that; is that right?

1          A.      That is correct.

2          Q.      Did you take it from this comment here that

3    was given to you that Mark Belk said that I -- that

4    Microsoft's plan, as of the date of this e-mail, was not

5    to provide valid XML in its Office products?

6          A.      Yes.

7          Q.      Okay.  If you would turn to Exhibit 271.  Do

8    you recognize this document?

9          A.      Yes.

10         Q.      What is this document?

11         A.      It's a -- excuse me -- one of the -- well,

12   the first part is myself forwarding to my sales team an

13   e-mail I received from Mark Belk explaining that

14   Microsoft, through its Microsoft Development Network,

15   was going to issue an exemplar code how to save a Word

16   document in XML.

17         Q.      Now, that is what your summary of the

18   meetings that occurred in June is referring to --

19         A.      Yes.

20         Q.      -- is that correct?

21         A.      Yes.

22         Q.      So now Microsoft was going to make available

23   on its MSDN network an example of how someone could save

24   a document in Word in XML?

25         A.      Yes.

1      Q.     Did it go on to say anything else about what

2  Microsoft's plans were with respect to XML?

3      A.     Yes.  Well, it says it was not a supported

4  example, and it's not complete.  It shows some

5  commitment, but as the -- the last part is, it showed an

6  opportunity for i4i since we -- it says, You have the

7  capability, as i4i, that Microsoft only has on the

8  drawing board.

9      Q.     What did you understand that comment to mean?

10     A.     Well, the fact i4i had well formed and valid

11 in its product, and this was only pointing -- or looking

12 at well formed.

13     Q.     And did the comment about only having on the

14 drawing board, did that have any meaning to you?

15     A.     It meant it wasn't a released product.

16     Q.     Well, did there come a time in 2001 when you

17 had additional contacts with Microsoft over the issue of

18 their plans to support XML in Word?

19     A.     Yes, in November of 2001.

20     Q.     And what was that contact?

21     A.     Mitsubishi was looking to become an investor

22 in i4i.  They knew that we were talking to Microsoft

23 about the i4i solution, and Mitsubishi wanted to talk to

24 Microsoft to find out what they were interested in in

25 i4i.

1        Q.      Could you turn to Exhibit 616?  Can you

2   identify this document?

3        A.      Yes.

4        Q.      What is it?

5        A.      Yes.  This is a two-part document.  The first

6   part is a fax of questions from Mitsubishi that they

7   wanted to ask Microsoft about their relationship with

8   i4i.

9                The second part are my handwritten notes.

10       Q.      Was a teleconference set up between

11  Mitsubishi, i4i, and a representative from Microsoft?

12       A.      Yes.

13       Q.      And who was the representative from

14  Microsoft?

15       A.      Mark Belk.

16       Q.      And how did Mark Belk come to agree to have a

17  teleconference with Mitsubishi?

18       A.      I asked him if he would participate in the

19  call.

20       Q.      And what was the reason that Mitsubishi sent

21  these questions to be answered in that teleconference?

22       A.      They wanted to understand, first of all, why

23  Microsoft wanted to deal with i4i.

24                And secondly, they wanted to find out if

25  there, you know, was any plans for Microsoft, on where

1  they were in this phase.

2      Q.    What had you told Mitsubishi about the

3  relationship between i4i and Microsoft in late 2001?

4      A.    That Microsoft had a number of federal

5  customers, particularly in the intelligence community,

6  that were looking for XML editing and that we felt that

7  our solution was good for that.

8      Q.    Did you indicate to Mitsubishi that i4i was

9  working in some sort of a partnership with Microsoft?

10     A.    Yes.  I mean, we had become a certified

11 partner, and we were looking to develop a standard of

12 work.

13     Q.    Who set up the teleconference call?

14     A.    I did.  I set up the teleconference call

15 number.

16     Q.    Were you on the call?

17     A.    If you remember my deposition, I hadn't seen

18 those notes for five or six years, but in reviewing the

19 notes, once I saw them, I believe I was a silent

20 observer on the call.

21     Q.    So the handwritten notes that appear at the

22 last two pages of the document are your handwritings?

23     A.    Oh, yes, absolutely.  It's my handwriting,

24 yes.

25     Q.    And what are -- what are you trying to note

1   in those -- the various comments you've written down?

2       A.    They're -- as the questions on the fax went

3   through in the conference call, I was capturing the

4   comments of people in that call.

5       Q.    Well, on the first page of that exhibit,

6   there was a Question No. 8.

7       A.    Yes.

8               MR. WHITE:  Can I go back?

9       Q.    (By Mr. White) Would you read to the jury,

10  Mr. Tulley, Question No. 8 from Mitsubishi?

11      A.    Yes.

12              Without considering or addressing any

13  potential patent issues or other intellectual property

14  issues, are you aware if Microsoft is currently

15  developing the same type of solution/technology as i4i?

16      Q.    Was that question posed and answered during

17  the teleconference?

18      A.    Yes, it was.

19      Q.    Would you turn to the last page of your

20  handwritten notes?  It's the one with the Page 2 with a

21  circle around it.  And I've taken the liberty of blowing

22  up a section of your handwritten comments.

23              There's the heading for this.  Q -- I assume

24  that stands for question?

25      A.    Yes.

1      Q.     It says patents i4i, dash, Microsoft?

2      A.     Yes.

3      Q.     I've highlighted two of the comments there.

4  Would you -- would you explain to the jury, Mr. Tulley,

5  what you wrote down there?

6      A.     Yes.  I was capturing Mark Belk's -- what he

7  was saying to Mitsubishi, and the highlight in yellow

8  was, Will develop XML next rev, meaning next release,

9  next revision of the software.

10     Q.     The next revision of Office would contain

11 some sort of XML support?

12     A.     Yes.

13     Q.     Now, the last comment there, would you read

14 that to the jury.

15     A.     Won't org DTD or schema value of i4i; is to

16 allow org to use their DTD.

17     Q.     What did Mr. Belk say that you recorded in

18 that note?

19     A.     Well, the value for i4i is to allow org,

20 which is short for organizations, to use -- and

21 actually, their, I misspelled it; I should have put

22 their -- their DTD.

23     Q.     Well, what was he saying about Microsoft's

24 plans with respect to supporting valid XML?

25     A.     Well, it's not supporting valid XML because

1  it wasn't using DTDs.

2      Q.    So it's your understanding, if you look at

3  all of the comments about -- from Mark Belk about what

4  Microsoft's plans were, Microsoft's plans were to

5  support XML in the next rev, but it wouldn't be

6  supporting valid XML; is that right?

7      A.    I agree.  Yes, that's correct.

8              MR. WHITE:  I'll pass the witness, Your

9  Honor.

10             THE COURT:  All right.  Cross-exam.

11                  CROSS-EXAMINATION

12  BY MR. LENDER:

13     Q.    Good morning, Mr. Tulley.

14     A.    Good morning.

15     Q.    You testified about some contacts that you

16  had with Microsoft in the April 2001 time period, right?

17     A.    Yes.

18     Q.    And the two folks that you remember meeting

19  with specifically were Mark Belk and Susie Adams?

20     A.    Yes.

21     Q.    Those two folks were salespeople, right?

22             They were in charge of selling Microsoft

23  products to the Government?

24     A.    Yes.

25     Q.    They were not technical people, correct?

1      A.      That is correct.

2      Q.      And Mark Belk and Susie Adams, those were

3  your primary contacts at Microsoft, correct?

4      A.      Yes.

5      Q.      To your knowledge, neither Mark Belk or Susie

6  Adams had any involvement in developing the source code

7  for Word 2003; is that correct?

8      A.      That's correct.

9      Q.      Now, one of the markets that you focused on

10 in the one year that you worked at i4i were sales to the

11 U.S. Government, correct?

12     A.      Yes.

13     Q.      And the product that you were responsible for

14 selling was called S4/TEXT; is that right?

15     A.      That was part of it, yes.

16     Q.      And S4/TEXT was, in fact, an add-on product

17 that worked on top of Word, correct?

18     A.      Word was used as the rendering engine for

19 S4/TEXT.

20     Q.      But the S4/TEXT product was designed to work

21 with Microsoft Word.

22     A.      Yes, it was.

23     Q.      And, in fact, it wouldn't work unless it was

24 used on top of Word, correct?

25     A.      I believe it could work without the products,

1  too.

2       Q.    It worked without the products as well?

3       A.    Uh-huh.

4       Q.    But there was an interdependence between

5  i4i's product and Microsoft Word, correct?

6       A.    Yes, there was.

7       Q.    And because of that interdependence between

8  i4i's product and Microsoft Word, i4i followed

9  Microsoft's Word product very closely as it related to

10  XML; isn't that right?

11       A.    Yes.

12       Q.    In fact, in your position as the Vice

13  President of Sales, it was important to you to be

14  knowledgeable about Microsoft's Word and its XML

15  capabilities, yes?

16       A.    At the sales level, yes.

17       Q.    Now, in your meetings and conversations with

18  Microsoft, it's fair to say that i4i was pursuing

19  Microsoft; isn't that correct?

20       A.    Yes.

21       Q.    From a strategic perspective, i4i was very

22  interested in pursuing a relationship with Microsoft.

23       A.    Yes, it was.

24       Q.    And that's because, through a potential

25  relationship with Microsoft, i4i could reach potential

1  new customers.

2       A.    Yes.

3       Q.    In fact, the benefit to reach customers, the

4  existing and potential customers of Microsoft, was the

5  reason for, in fact, a prime driver in your undertaking

6  to try to partner with Microsoft; isn't that right?

7       A.    Well, it was one of them.  There was a strong

8  drive from the Government customers for an XML editing

9  solution.

10       Q.    But one of the prime drivers from your

11  perspective in becoming a partner with Microsoft was to

12  be able to reach those existing and potential customers

13  of Microsoft, right?

14       A.    Yeah.

15       Q.    And, in fact, i4i did apply to become a

16  Microsoft certified partner.

17       A.    Yes.

18       Q.    And by being a Microsoft certified partner,

19  i4i joined the club and was able to get access to all

20  kinds of information about Microsoft Word's products.

21       A.    Yes, sir, we did.

22       Q.    Including beta copies and advanced copies of

23  their products.

24       A.    Yes.

25       Q.    Now, in all your dealings with Microsoft, Mr.

1  Tulley, it's fair to say that you were very careful

2  about not disclosing any confidential information to

3  Microsoft.

4       A.    Yes.

5       Q.    In fact, you talked about the company

6  briefing that was Plaintiffs' Exhibit 92 that you were

7  asked about.  This is a copy of the presentation that

8  you gave --

9       A.    Yes.

10      Q.    -- in the meeting?

11      A.    Yes.

12      Q.    And this same presentation was the type of

13  presentation that you routinely gave to other customers,

14  right?

15      A.    Yes.

16      Q.    And I noticed that on the bottom of this

17 document, it says highly confidential, attorneys' eyes

18 only.  That was not on the document when you presented

19 it to Microsoft; isn't that right?

20      A.    That is correct.

21      Q.    That's a label that was added to the document

22 by i4i's lawyers before they produced it to Microsoft?

23      A.    Yes.  I would point out on -- we had i4i

24 confidential on the other slides in the middle of the

25 slide, which was on the original slides.

1          Q.     We'll get to that.

2          A.     Okay.  Sorry.

3          Q.     But the designation, the highly confidential

4    that's on every page, that was put on by i4i's lawyers?

5          A.     That's right.

6          Q.     Now, let's turn to the second page of the

7    document that you were asked about.  This is -- this is

8    where you wrote patented markup management technology?

9          A.     Yes.

10         Q.     We're not going to find any reference to

11   i4i's patent number on this document, correct?

12         A.     Not on this document, no.

13         Q.     Okay.  And, in fact, in this document, you

14   also noticed that one of the commercial products from

15   custom development was S4?

16         A.     Yes.

17         Q.     And there's nothing confidential that's

18   contained in this presentation, Plaintiffs' Exhibit 92;

19   isn't that right?

20         A.     That's right.

21         Q.     In fact, it's your view that no confidential

22   information whatsoever was ever disclosed to Microsoft

23   in your meetings with them; isn't that right?

24         A.     At the meeting on the 18th.

25         Q.     And, in fact, in the meeting on the 19th as

well; no confidential information was disclosed to

Microsoft about the i4i solution, correct?

     A.    I wasn't at the Microsoft meeting on the

19th.

     Q.    The meeting with the SAIC on the 19th?

     A.    No.  I was to the SAIC meeting on the 19th.

I found that there was a meeting on the morning of the

19th with Microsoft.

     Q.    And isn't it your view that there was no

confidential information ever disclosed to Microsoft

about the i4i solution?  Isn't that correct?

     A.    Yes.

     Q.    In fact, in the course of all of your

dealings with Mark Belk and Susie Adams, you never

disclosed -- you personally never disclosed any

confidential information about i4i's products, right?

     A.    No, I didn't.  That's correct.

     Q.    Now let's talk about the '449 patent.  You

never told Microsoft in your meetings with them any

details about the '449 patent or what it would cover,

correct?

     A.    I did not.

     Q.    In fact, there was never a discussion at all

in those meetings about the actual claims of the '449

patent, right?

1    A.    I do not believe so.

2    Q.    You never provided that kind of an

3 explanation to Microsoft, did you?

4    A.    I did not.

5    Q.    For example, you never told Microsoft as an

6 example that the patent or the product was involved in

7 creating a map of metacodes, correct?

8    A.    I did not.

9    Q.    Now, you mentioned that there was a sales kit

10 that was handed out to Microsoft --

11    A.    Yes.

12    Q.    -- in your direct, correct?

13          And the sales kit, that was just basically

14 marketing materials that you would hand out?

15    A.    That was the i4i-At-A-Glance, and there was a

16 product sheet on the S4 solution.

17    Q.    Those are the two things that you recall

18 being included in the sales kit?

19    A.    Uh-huh.  Yes.

20    Q.    You didn't go over the information in the

21 sales kit in your meeting with Microsoft; you just

22 handed those out?

23    A.    We gave it out, yes.

24    Q.    Let's take a look at the i4i-At-A-Glance

25 document, which is Plaintiffs' Exhibit 13.

1          Now, this is the document that you testified

2   that you believe was included in the sales kit?

3      A.    Yes.

4      Q.    Mr. Tulley, to be clear --

5             MR. LENDER:  And let's pull up the line

6   with the patent number on it.

7      Q.    (By Mr. Lender) This is -- in the document,

8   it says, Inventor of the patented S4 technology, U.S.

9   Patent No. 5,787,449.

10          You prepared this document, Mr. Tulley?

11     A.    Yes.

12     Q.    And so in this document, you tied the patent

13  to this -- to i4i's S4 technology?

14     A.    Yes.

15     Q.    Now, let's be clear, Mr. Tulley.  The

16  i4i-At-A-Glance document is the only document that you

17  believe was provided to Microsoft that identifies the

18  patent number specifically, correct?

19     A.    By myself, yes.

20     Q.    And you testified earlier that this

21  i4i-At-A-Glance document was actually drafted from a

22  prior version; isn't that right?

23     A.    Yes.

24     Q.    Do you know for certain -- do you know for

25  certain that PX13 that we're looking at is, in fact, the

1  actual version of the document that was provided to

2  Microsoft in the sales kit?

3       A.    It was the one that we used throughout that

4  year.

5       Q.    I'm going to ask the question again.  I just

6  want to make sure that we're all clear.

7            Mr. Tulley, is it your view, with a hundred

8  percent certainty, that PX13 is the version of the

9  i4i-At-A-Glance document that was included in the sales

10 kit given to Microsoft?

11      A.    Yes.

12      Q.    Okay.  Thank you.

13           Do you have any evidence whatsoever that

14 Microsoft ever looked at the i4i patent at any time?

15      A.    No.

16           MR. LENDER:  Can you put that up one more

17 time?

18      Q.    (By Mr. Lender) In the i4i-At-A-Glance

19 document, you also touted the fact that i4i was a

20 Microsoft partner?

21      A.    Yes.

22      Q.    That was something that i4i used to try to

23 enhance their image to customers?

24      A.    No.  It was so the customers understood that

25 we worked with Microsoft.

1    Q.    And the reason why you were a Microsoft

2 partner was because you-all had signed up to become a

3 certified partner, right?

4    A.    Yes.

5    Q.    That's the Microsoft software developing

6 network that we talked about a moment ago?

7    A.    Yes.

8    Q.    Now, you mentioned that there was a meeting

9 in Canada in June 2001?

10    A.    Yes.

11    Q.    And to be clear, at that meeting in Canada,

12 the only people that were there from Microsoft were the

13 two sales folks, Mr. Belk and Ms. Adams?

14    A.    That's correct.

15    Q.    And as we've established, neither of them are

16 technical people, correct?

17    A.    That's correct.

18    Q.    And you talked about a deep dive, but, of

19 course, you didn't attend the meeting, so you can't

20 testify what, if anything, was discussed during that

21 conversation, correct?

22    A.    That's correct, yeah.

23    Q.    But you do understand -- excuse me -- you do

24 know that it's i4i's position that no discussion of the

25 data structures that were included in i4i's S4/Text

1  product that were used to produce the XML codes, that

2  that was not discussed with Mr. Belk or Ms. Adams; isn't

3  that right?

4      A.   Yes.

5           MR. LENDER:  Could we put up Plaintiffs'

6  Exhibit 23?

7      Q.   (By Mr. Lender) This is another document you

8  were asked some questions about.  This is an e-mail that

9  you wrote in July of 2001 based on the Canada meeting.

10     A.   (Nods head affirmatively.)

11     Q.   And, again, you have no personal knowledge of

12 any of this; this is you just writing what other people

13 told you?

14     A.   That is correct.

15     Q.   In the first part, you'll see they say:  They

16 were very impressed with S4E.  Do you see that?

17          MR. LENDER:  Can you blow that up, Chris?

18     Q.   (By Mr. Lender) This is you writing what

19 Microsoft said to you and Mr. Belk told you?

20     A.   Yes.

21     Q.   And S4E, that's i4i's Enterprise product,

22 correct?

23     A.   That is correct.

24     Q.   And that product has nothing to do with this

25 case in your understanding.

```
 1        A.      In my understanding, that's correct, yeah.

 2        Q.      Now, let's go down further to where you

 3  talked about -- the part that -- in response to i4i's

 4  lawyers, where you talked about what the Office

 5  Development Team said -- and this is, again, you writing

 6  what Mr. Belk told you, and this is where you wrote that

 7  the Office Development Team (the diehard, old-school

 8  Redmond types) feel they can do basic XML out themselves

 9  in about two years, right?

10        A.      Yes.

11        Q.      And that's what Mr. Belk told you?

12        A.      Yes.

13        Q.      And, in fact, that's exactly what happened,

14  right?  Because two years later, Word 2003 did come out

15  with XML capabilities, correct?

16        A.      Uh-huh.

17        Q.      And Mark also talked to you about the issue

18  of well-formed, correct?

19        A.      Yes.

20        Q.      And just so we're all clear, well-formed, all

21  that means is that there's an opening tag and a close

22  tag, and they both have those brackets around the code,

23  correct?

24        A.      That's right.

25        Q.      Now, you also --
```

1            MR. LENDER:  Can you put up PX316?

2       Q.    (By Mr. Lender) This is the notes that you

3   wrote about the Mitsubishi meeting?

4       A.    Uh-huh.

5       Q.    And this was a conversation that you asked

6   Mr. Belk to have with Mitsubishi, correct?

7       A.    Yes.

8       Q.    So he was doing this as a favor to i4i,

9   correct?

10      A.    Yes.

11      Q.    And one of the things that you learned was

12  that during that conversation between Mark Belk and

13  Mitsubishi in November of 2001, that Mitsubishi was told

14  that Microsoft would be developing XML capabilities for

15  its next version of Word, correct?

16      A.    Yes.

17      Q.    And, again, as we talked about, that's

18  exactly what happened?

19      A.    Yes.

20      Q.    So in November of 2001, you knew that in Word

21  2003, Microsoft would be adding XML capabilities,

22  correct?

23      A.    Yes.

24      Q.    In all of your dealings with Microsoft, you

25  never gave Microsoft any object code, source code, or

1   executable code that could ever be de-engineered by

2   Microsoft, correct?

3        A.     That's correct.

4        Q.     And you're not aware of anyone at i4i ever

5   giving Microsoft any of its source code, correct?

6        A.     Source code, no.

7        Q.     Okay.  And the same would be true for object

8   code and executable code, correct?

9        A.     We did sign an evaluation license agreement

10  with Microsoft, and I don't know if that evaluation copy

11  was actually sent to them.

12               MR. LENDER:  Your Honor, may I approach

13  the witness, please?

14               THE COURT:  Yes, you may.

15       Q.     (By Mr. Lender) I'm going to hand you a copy

16  of your deposition, Mr. Tulley.

17       A.     Sure, yeah.

18       Q.     I'm going to ask you to turn to Page 113 --

19       A.     Yes.

20       Q.     -- Line 15 through 24.

21       A.     Yes.

22       Q.     And you were asked these questions and gave

23  these answers, correct?

24       A.     That's right.

25       Q.     QUESTION:  Okay.  So you are aware -- are you

1  aware of any object code, source code, or executable

2  code that could be de-engineered being delivered to

3  Microsoft by you or anybody on your team?

4          ANSWER:  Not by myself or anyone on my team.

5      A.    That's right.

6      Q.    QUESTION:  Are you aware of anybody outside

7  your team, anybody at i4i outside your team delivering

8  object, source, or executable code that can be

9  de-engineered to Microsoft?

10          ANSWER:  I'm not aware of anyone doing that,

11  correct?

12      A.    Yes, absolutely.

13      Q.    Last -- last -- last two questions.

14          Mr. Tulley, you've testified about various

15  meetings and communications that happened in that 2001

16  time period between Microsoft and i4i, correct?

17      A.    Yes.

18      Q.    But to be very clear, you know that i4i is

19  not arguing that Microsoft copied anything from i4i,

20  correct?

21      A.    That's right.

22      Q.    Thank you.

23          MR. LENDER:  No further questions.

24          THE COURT:  All right.  Redirect?

25          MR. WHITE:  Just a couple of questions.

1                  REDIRECT EXAMINATION

2    BY MR. WHITE:

3        Q.    Mr. Tulley, you testified regarding two

4    meetings that occurred in Washington, D.C., on the 18th

5    and 19th of April in 2001?

6        A.    Yes.

7        Q.    And then later in that year, in June, there

8    was a two-day meeting between i4i representatives and

9    i4i in Toronto?

10       A.    Yes, sir.

11       Q.    In regard to those meetings, who contacted

12   who to set them up?

13       A.    The first meeting, it was Microsoft

14   contacting i4i to set up the meetings.

15       Q.    And in the June meetings, who requested that

16   meeting?

17       A.    Microsoft.

18       Q.    So in both two-day meetings that occurred in

19   the year 2001, it was Microsoft who contacted i4i; is

20   that right?

21       A.    Yes.  Yes, sir.

22       Q.    Now, let's, if you would, turn back to your

23   Exhibit 616.

24              MR. WHITE:  Can I have my slide with the

25   blowups, please?  The next slide.

1      Q.    (By Mr. White) Let me direct your attention,

2   Mr. Tulley, to your handwritten notes in answer to

3   Question No. 8.

4      A.    Yes.

5      Q.    And once again, there's two highlighted -- in

6   fact, I don't want to limit you just to the two portions

7   that I highlighted, but you consider all the comments

8   that Mr. Belk made, and I believe there's one, two,

9   three, four, five, six, seven comments.

10          Would you consider those comments,

11  Mr. Tulley, and tell us, what was Microsoft telling

12  Mitsubishi and i4i, in November of 2001, what its plans

13  were to support XML?

14     A.    That its plans were to support well-formed

15  only.

16     Q.    Does that mean that if Microsoft fulfilled

17  the -- what it was telling Mitsubishi in November, if

18  that's what the next revision was of Office product that

19  had XML, it would not be in competition with what the

20  products of i4i could do?

21     A.    That's correct.

22          MR. WHITE:  No further questions.

23          THE COURT:  All right.  Thank you.

24          Any further recross?

25          MR. LENDER:  No, Your Honor.

```
 1                    THE COURT:  All right.  You may step

 2   down, Mr. Tulley.  Thank you.

 3                    Who will be your next witness?

 4                    MR. WHITE:  Your Honor, we would call

 5   Keith Thomas.

 6                    THE COURT:  Keith Thomas.

 7                    MR. WHITE:  May I begin, Your Honor?

 8                    THE COURT:  Yes, you may.

 9          KEITH THOMAS, PLAINTIFFS' WITNESS, SWORN

10                    DIRECT EXAMINATION

11   BY MR. WHITE:

12        Q.    Hello, Mr. Thomas.

13              Would you please introduce yourself to the

14   jury.

15        A.    My name is Keith Thomas.

16        Q.    Where do you -- where do you live,

17   Mr. Thomas?

18        A.    I live in Toronto, Canada.

19        Q.    Are you currently employed?

20        A.    Yes.  I work part-time for Infrastructures

21   for Information.

22        Q.    That's i4i?

23        A.    i4i.

24        Q.    Is it true that you're essentially retired?

25        A.    Yes, sort of.
```

1    Q.    What is your position at i4i?

2    A.    I'm a product strategist.

3    Q.    And what do you do as a product strategist

4  for i4i?

5    A.    I maintain contact with standards bodies,

6  regulatory groups, and industry groups that influence

7  our major marketplace to identify new opportunities and

8  requirements for our product.

9    Q.    Does that market focus involve XML in any

10 way?

11   A.    Yes, it does.

12   Q.    Does i4i have a vertical market it focuses

13 most of its sales for its product?

14   A.    Yes, in the U.S. pharmaceutical market.

15   Q.    Well, in addition to your duties at i4i, do

16 you do any work as an independent consultant?

17   A.    I do a little, yes.

18   Q.    Do you have any other form of employment?

19   A.    Yes.  I've continued to teach part-time at

20 the University of Toronto.

21   Q.    And what courses do you teach there?

22   A.    I teach in the Faculty of Information, the

23 so-called I-school, and I teach computer-related

24 courses.

25        This past winter, I taught an information

1  retrieval systems course, a telecommunications course,

2  and an information systems design course.

3      Q.    Do your courses generally focus on

4  undergraduate or graduate level?

5      A.    These are graduate programs.

6      Q.    Give us a brief summary of your work

7  experience.

8      A.    I started working with computers in 1963.  I

9  have spent a fair amount of my working career in library

10  automation first with the University of Toronto

11  automation library systems and then for a company called

12  GEAC.

13          I was Director of Information Systems at the

14  College of Physicians and Surgeons of Ontario before I

15  joined i4i as an employee.

16      Q.    What year did you join i4i?

17      A.    As an employee, 1997.

18      Q.    Now, you said as an employee.

19          Did you have some working relationship with

20  i4i before then?

21      A.    Yes.  I had known the founder for many years,

22  and I had been on the Board for about two years prior.

23      Q.    Who do you report to at i4i?

24      A.    Michel Vulpe.

25      Q.    How do you know Mr. Vulpe?

1    A.    We first met at GEAC when we were both

2  employed there in 1984.

3    Q.    When you were at GEAC, did you and Mr. Vulpe

4  work on any projects together?

5    A.    Not directly.

6    Q.    What was your position when you joined i4i in

7  1997?

8    A.    I was titled as Director of Research &

9  Development.

10    Q.    Describe for the jury the kind of work you

11  have done for i4i.

12    A.    I have been responsible for several years,

13  from 1997 through 2000, for organizing and managing the

14  process to develop product software.

15    Q.    You're a little bit close to the

16  microphone -- no, you're too close.

17    A.    Oh.

18    Q.    You were getting a popping sound.  I'm sorry.

19  Please continue.

20    A.    And after 2000, I took over duties as a

21  products strategist and continued to do that full-time

22  till 2004.

23    Q.    Over the many years you have worked in the

24  computer industry, have you developed any expertise

25  regarding the computer industry?

1      A.     I have some technical skills in the database

2  area and some skills in the management of software

3  development projects.

4      Q.     When you hired on with i4i, what did

5  Mr. Vulpe tell you was the reasons why he wanted you to

6  come to work for them?

7      A.     They had a product called S4/Desktop and a

8  custom application built around S4/Desktop, which he

9  wanted to turn into a product to be called S4/

10 Enterprise.  And my job was to manage the productization

11 effort.

12     Q.     In connection with i4i's products, have you

13 done any work with standards organizations?

14     A.     Yes, I have.

15     Q.     Would you tell us a little bit about that?

16     A.     Currently, as part of my product strategist

17 duties, I am a member of the Structure Product Labeling

18 Implementation Working Group.  That is a joint effort

19 between Health Level 7, the standards body, the FDA, and

20 industry representatives.

21     Q.     Is that in the United States FDA?

22     A.     That's the United States FDA.

23     Q.     If you -- in front of you, Mr. Thomas, is a

24 binder of exhibits.  If you would turn to Plaintiffs'

25 Exhibit No. 1, the '449 patent.

1      A.      Yes.

2      Q.      When was the first time you became aware of

3  the existence of this patent?

4      A.      That would have been shortly before or after

5  it was filed, around the time that I joined the Board of

6  i4i.

7      Q.      Do you have some general understanding of

8  about what the invention of this patent is about?

9      A.      I do.  I have a general understanding.

10     Q.      What is that understanding?

11     A.      That it is -- defines a method for extracting

12  and managing the metacodes of a document in markup in a

13  way that is physically separated in memory but

14  coordinated such that you can work with it, too, with

15  some degree of independence.

16     Q.      How did you come to have that understanding

17  of this patent?

18     A.      First from descriptions from Mr. Vulpe's and

19  then later from actually reading the patent.

20     Q.      Are you a computer programmer by training?

21     A.      No.  I was a programmer, but I -- I can still

22  write code, but I haven't been paid to do that for some

23  time.

24     Q.      Well, did you write any of the source code of

25  any of i4i's products?

1      A.      I did not.

2      Q.      You indicated that managing software program

3 development was one of your expertise.

4      A.      Yes.

5      Q.      Is that why you were hired at i4i?

6      A.      That is why I was hired.

7      Q.      When you joined i4i in 1997, what was the

8 situation regarding the state of their software

9 development?

10     A.      Well, as I said, they had the S4/Desktop

11 product and the custom application built around it,

12 which they wanted to productize, but there were a number

13 of problems and issues with that -- that software.  And

14 I fairly quickly came to the conclusion that it needed

15 to be rewritten.

16     Q.      What were some of the products -- the

17 commercial products that i4i had at the time that you

18 joined in 1997?

19     A.      Well, it had the -- as I said, the S4/Desktop

20 and a variant that they called S4/Enterprise that

21 existed at that point only as one custom installation.

22     Q.      Did S4 -- S4/Text exist when you organized?

23     A.      It was in planning at that point.

24     Q.      Was there a prototype?

25     A.      I don't think there was a prototype at that

1    exact time.

2         Q.    Tell the jury what S4/Desktop was for, as far

3    as what functions it performed.

4         A.    S4/Desktop was a software component module

5    that manipulated a document in markup, and it did this

6    by embodying the invention and providing a series of

7    interface calls so a programmer could write software to

8    easily manipulate documents in markup.

9         Q.    Now, you indicated that when you joined the

10   company that you discovered very quickly that there was

11   some issues for the software company that you considered

12   needed to be rewritten, right?

13        A.    Yes.

14        Q.    Now, I asked you if you would prepare a

15   series of slides for us today to explain to the jury

16   what it was that happened in connection with the

17   rewriting of that software.

18            Did you do that?

19        A.    I did that, yes.

20        Q.    Well, let me show you the first of the

21   slides.  I think there are three of them, and I have

22   presented it on the screen.

23            Explain to the jury what you are showing here

24   in this slide.

25        A.    This is a block diagram of the S4/Desktop

module.  This is labeled V3, and it indicates that it

contains maps and mapped content.  It has the software

to manipulate this, and it has an interface at the top

to customer applications; that is to -- software written

by other programmers.

    Q.    Would someone characterize this box called

S4/Desktop, Version 3, a set of libraries or utilities?

    A.    Yes, that would be a way to describe it.

    Q.    What would those utilities provide to a

customer application?

    A.    A programmer could call upon the Desktop to

import an XML document or an SGML document from a file

to prepare it for manipulation.  They could search in

that document.  They could add content.  They could add

markup.  They could delete markup.  They could move

things around, and they could, when finished --

    Q.    And that would be accomplished using the

utilities provided in S4/Desktop?

    A.    That is correct.

    Q.    Now, based on your understanding of the

invention of the '449 patent, did S4/Desktop, Version 3,

practice that invention?

    A.    Yes, it did.

    Q.    Explain in what way that's true.

    A.    When the document was imported, the markup

1  was extracted, recorded in the map.  The associated

2  content was referenced through pointers in the map.

3       Q.    Is that shown in any fashion in this slide?

4       A.    It's shown by the bidirectional arrow between

5  maps and mapped content.

6       Q.    Now, the box says maps, not map.  What does

7  that mean?

8       A.    The patent allowed the ability to have more

9  than one map for a particular set of content.

10       Q.    And what would you accomplish with that?

11       A.    That would allow you to create different

12  views of the same content, different perspectives,

13  different points of view, if you will.

14       Q.    Having multiple maps as opposed to a single

15  map, did that in any way influence the complexity of

16  S4/Desktop, Version 3?

17       A.    The capacity for more of the maps did make it

18  more complex, yes.

19       Q.    All right.  Now, here I'm going to show you

20  your second slide.

21            This is labeled S4/Text, Version 1.0.  What

22  are you showing here?

23       A.    This is an application in which the word

24  processor, Microsoft Word, has been connected to or

25  bound to S4/Desktop through an application software

1  layer.  This was similar to a product that we had

2  already in or a component that we had already in the S4/

3  Enterprise system.

4          This was later developed on that idea to

5  provide XML or SGML -- valid SGML through a standard

6  word processor.

7      Q.    In regards to S4/Text, Version 1.0, was that

8  the very first version of that product?

9      A.    That is the very first version of S4/Text.

10      Q.    Who wrote the software for the application

11  layer box that's shown in your slide?

12      A.    i4i programmers.

13      Q.    And the S4/Desktop, Version 3.0 box, that's

14  the box that was in the standard Desktop product; is

15  that right?

16      A.    That is correct.

17      Q.    Now, in the Microsoft Word, that is a display

18  content.  What's that?

19      A.    That is the content that Word would use to

20  display on the screen as part of the interaction with

21  the user.

22      Q.    Did that display content in any way relate to

23  the mapped content of the S4/Desktop?

24      A.    It was -- it was related, because it was a

25  projection, if you will, of the mapped content held in

1  S4/Desktop, Version 3.

2      Q.    Now, I'll ask you again, Mr. Thomas, based on

3  your understanding of the patent, did the product

4  S4/Text, Version 1.0, practice the patent -- the

5  invention of the patent?

6      A.    It did, because it was practiced in the

7  Desktop V3 component.

8      Q.    All right.  Now, you indicated that when you

9  arrived at i4i that there were some problems that you

10 believed needed to be rewritten.

11         Can you tell us what those problems were and

12 how it relates to this slide?

13     A.    Well, aside from some performance problems,

14 it seemed that the invention was being practiced in the

15 wrong layer and in an inappropriate way; that we weren't

16 getting the benefit from it that we should be.

17     Q.    And what way is that illustrated in this

18 drawing?

19     A.    Well, if you can see that we have the maps

20 and the mapped content concealed down in the Desktop

21 module, which is responsible also for maintaining

22 validity and other activities, and then we have to have

23 some convoluted mechanism to correlate that with the

24 display content in Word and communicate actions from the

25 user back and forth between these two.

1      Q.     Now, I asked you the question earlier whether

2    the presence of multiple maps and the mapped content in

3    S4/Desktop in any way increased the complexity of it.

4             Do you recall that?

5      A.     Yes.

6      Q.     In regard to S4/Text, adding a binding layer

7    to Microsoft Word, did that in any way increase the

8    complexity of the software of this product?

9      A.     Yes.  I think more code increases complexity.

10     Q.     Was this in any way part and parcel of the

11   problem that you believed needed to be solved by

12   rewriting the source code?

13     A.     That is correct, yes.

14     Q.     All right.  Now, the next slide you provided

15   is a block diagram of a product S4/Text, Version 2.0.

16     A.     Yes.

17     Q.     What is Version 2.0?

18     A.     That is the next generation of S4/Text.

19     Q.     Does this product contain the rewritten

20   software?

21     A.     It does.

22     Q.     Explain to the jury how that is shown here.

23     A.     The S4/Text Desktop, Version 4.0, doesn't

24   show the map or mapped content.  It now maintains valid

25   XML in a different form.

1          But the map has been moved up into the

2     application layer, and the mapped content now resides in

3     the processor.

4          Q.     Are the map and mapped content bound together

5     in some way?

6          A.     They are correlated.  The map contains the

7     metacodes, and it contains pointers to the content.

8          Q.     Is that binding in the same way that it was

9     done when the map and mapped content was contained in

10    S4/Desktop?

11         A.     In the same architectural form, the same form

12    but not in the same detail.

13         Q.     Now, is it true that the S4/Desktop is

14    sometimes referred to as S4?

15         A.     Yes.  I almost always refer to it as simply

16    S4.

17         Q.     Has i4i ever used the terminology S4/Engine?

18         A.     Yes.

19         Q.     S4/Technology?

20         A.     S4/Technology, S4/Engine.

21         Q.     But it's all referring to what's contained in

22    this box that's labeled here S4/Desktop?

23         A.     That is correct.

24         Q.     Now, this box, S4/Desktop, doesn't show

25    anything inside of it.

1              Does it contain any source code?

2    A.    It is -- contains a lot of source code.

3    Q.    Is that the source code that was rewritten?

4    A.    Yes, and the application error as well.

5    Q.    Now, what was the source code for S4/Desktop,

6    Version 4, written to accomplish?

7    A.    It was written to accomplish a way to

8    maintain validity, to handle very large instances, very

9    large documents in a very efficient fashion and to be

10   very robust; that is, resistant to failure.

11   Q.    Did that rewrite occur?

12   A.    That rewrite did occur, yes.

13   Q.    Did you accomplish the objectives that you

14   just stated?

15   A.    Yes, those objectives were accomplished.

16   Q.    Were those present in the S4/Desktop, Version

17   4.0?

18   A.    Yes.

19   Q.    Was this product buggy?

20   A.    There were -- software always has bugs, but

21   this was considerably more reliable and more effective

22   than the previous version.

23   Q.    Did this rewrite in any way enable i4i to

24   deliver S4/Enterprise that it had under development?

25   A.    It contributed to that.

```
 1       Q.    Would you take a look, Mr. Thomas, at

 2  Plaintiffs' Exhibit 19?

 3             I tell you what, Mr. Tulley -- sorry --

 4  Mr. Thomas, before we get to that, let me back up and

 5  ask you to refer to Plaintiffs' Exhibit 630.

 6       A.    630.  Yes.

 7       Q.    Do you recognize this document?

 8       A.    I do.

 9       Q.    What is it?

10       A.    I beg your pardon?

11       Q.    What is it?

12       A.    It is an e-mail that I wrote to Mr. Bill Cox

13  in July of 2000.

14       Q.    And it is regarding S4?

15       A.    That is correct.

16       Q.    Now, we understand now that S4, within i4i's

17  vernacular, that refers to S4/Desktop?

18       A.    That is correct.

19       Q.    And that S4/Desktop --

20             MR. WHITE:  Could I have the previous

21  slide, please?

22       Q.    (By Mr. White) That is S4/Desktop,

23  Version 4.0 here?

24       A.    Yes.

25       Q.    All right.  Now, back to Exhibit 630, why did
```

1  you write this e-mail to Mr. Bill Cox?

2      A.    I wanted to clarify some possible

3  misunderstandings that had arisen in a meeting about

4  resource allocation, and particularly to clarify the

5  role and importance of S4 in our product line.

6      Q.    What occurred during that resource management

7  meeting that prompted you to feel the need for you to

8  communicate with Mr. Cox?

9      A.    For one thing, Mr. Cox was under the mistaken

10  impression that the patent was still embodied in the S4

11  component.

12      Q.    When did the rewrite of S4/Desktop,

13  Version 4.0, occur relative to this resource meeting?

14      A.    That was completed nearly nine months before

15  the S4/Text, Version 2, had been delivered in the

16  form --

17      Q.    Your comments that you express here with

18  respect to S4 is not comments regarding the practicing

19  of the invention of the '449 in the S4/Text, Version 2.0

20  product, was it?

21      A.    No.   This is entirely about S4 as in

22  S4/Desktop.

23      Q.    Well, now you say in the third paragraph of

24  your e-mail:  Our patent is, in my opinion, something of

25  a red herring in a discussion of S4's value.

1          Do you see that?

2    A.    Yes.

3    Q.    What did you mean by that statement?

4    A.    I meant it, discussing the patent when

5 discussing S4 was something of an irrelevant

6 distraction.

7          If I could go back to my -- the previous

8 slide.

9             MR. WHITE:  Yes, please.

10    A.    The patent is -- the invention is no

11 longer embodied in S4/Desktop, Version 4.  It's

12 embodied in the application layer.

13          So my point was that discussing the patent is

14 something of a distraction.  And the only issue related

15 to the patent would be whether something that was done

16 in S4/Desktop could constrain the full facility

17 projected by that invention.

18             MR. WHITE:  If I could go back to Exhibit

19 630.

20    Q.    (By Mr. White) In the next sentences, you say

21 the patent speaks of separating markup from content and

22 building markup maps, plural, of content which are not

23 directly interlaced with markup.

24          What did you mean there?

25    A.    Speaking of the fundamental nature of the

1  patent where the markup exists separately from the

2  content tied to it only by the addresses of

3  effectiveness.

4      Q.    And that's an expression of your

5  understanding of this patent?

6      A.    That is correct.

7      Q.    Now, in the next sentence, you say:  Many

8  SG/XML experts consider the separation of markup from

9  content, at worst, as defeating the purpose of markup,

10 and, at best, as introducing enormous complexity and

11 processing overhead to coordinate the two.

12          Now, with respect to the first part of that

13 statement where it says that experts consider the

14 separation as defeating the purpose of markup, who were

15 the experts you were referring to?

16     A.    I can't think of any particular names off the

17 top of my head, but there were -- at least one expert in

18 Toronto whom I discussed this with, who said, well, the

19 point of markup is to constrain the possible meaning of

20 the content to one exact meaning.  And this had probably

21 been a recent occurrence.

22     Q.    And the idea of separating that out from the

23 document, somehow the expert just thought that was

24 foolish?

25     A.    Yes, because you could have content with two

1  different apparent meanings.

2      Q.    Was that in any way an expression of the fact

3  that the invention in the '449 patent was revolutionary?

4      A.    In retrospect, I think that was true, yes.

5      Q.    Now, the second part of this statement you

6  say:  At best, as introducing enormous complexity and

7  processing overhead to coordinate the two.  They are

8  certainly right on the latter point.

9      A.    That is true.

10     Q.    What did you mean there?

11     A.    When you have the two separated, you have to

12 develop software that can keep the two in appropriate

13 synchronie and take actions that when they were

14 interlaced might not be necessary, extra work.

15     Q.    Was this the problem you wanted to correct

16 with the rewrite?

17     A.    In S4, yes.

18              MR. WHITE:  Can I go back to the previous

19 slide?

20     Q.    (By Mr. White) Mr. Thomas, you stated in your

21 e-mail that the value of the patent is, in your opinion,

22 a red herring in a discussion of the value of the S4.

23 Let me ask you the question.  In regard to the product

24 S4/Text, Version 2.0, what is your opinion of the value

25 of the patent to that product?

1      A.      The patent is essential.  It's the heart of

2 that product.

3      Q.      In what way is it the heart?

4      A.      It enables you to bind to a word processor, a

5 conventional word processor, that is utterly ignorant of

6 the markup and still coordinate that through the mapping

7 layer through -- into the valid XML that you maintain in

8 the Desktop module.

9      Q.      Because of the presence of the invention in

10 this product, S4/Text, what was S4/Text able to

11 accomplish?

12      A.      It provided the framework on which we could

13 deliver valid XML through a standard word processor.

14 And it provided the basis for the next generation, the

15 Tagless Editor, where we could provide XML -- valid XML,

16 offering capability without revealing the details in any

17 way of the underlying markup to the user.

18      Q.      Would you turn to Plaintiffs' Exhibit 19 in

19 your binder and tell me if you can identify that

20 document?

21      A.      Yes.

22      Q.      What is this?

23      A.      This is an e-mail from one of our salesmen in

24 the United States to John Tulley.  It was copied to me.

25      Q.      That e-mail -- and I have a portion of it

1  blown up on the screen -- indicates there's going to be

2  an upcoming Microsoft meeting in April 18th and 19th.

3          Did you attend those meetings?

4      A.    I did.

5      Q.    Did you make any presentations at those

6  meetings?

7      A.    I made a presentation on the 18th and a

8  presentation on one of the meetings on the 19th.

9      Q.    Let's talk about the meeting on the 18th, and

10 let me see -- if you would, turn to Plaintiffs'

11 Exhibit 20, and tell me if you can identify what

12 Exhibit 20 is.

13     A.    These are the slides that were used to

14 accompany my presentation on the 18th.

15     Q.    Did you prepare those slides?

16     A.    I did.

17     Q.    Do you know who from Microsoft attended the

18 meeting on the 18th?

19     A.    Mark Belk and Susie Adams, and there were

20 several other people whose names I'm not entirely sure

21 of.  Marjorie Reynolds and Lisa Ruff (phonetic spelling)

22 come to mind.

23     Q.    Would you just briefly summarize the

24 substance of the presentation that you gave to that

25 group on the 18th?

1      A.     Presentation:  Present a brief description of

2  the problem of creating documents with valid markup in a

3  conventional authoring environment describes the

4  architecture of our problem.  There was a -- of our

5  product; the demonstration of the product; and then a

6  discussion of how the product is customized with

7  particular kinds of documents and further demonstration.

8      Q.     The information that you discussed with

9  Microsoft, that wasn't confidential information, was it?

10     A.     No.

11     Q.     It's the kind of information you would

12 provide to all of your prospective customers that you

13 made this presentation to?

14     A.     Yes, it is.

15            MR. WHITE:  Could I have my next slide,

16 please?

17     Q.     (By Mr. White) You mentioned in the

18 presentation you discussed the architecture.

19 Is this the slide of the architecture of the S4/Text

20 Tagless Editor product?

21     A.     That is the slide, yes.

22     Q.     Now, you mentioned the Tagless Editor

23 product.

24            Was this the one you were referring to?

25     A.     That is correct.

1      Q.     Again, what was that product designed to do?

2      A.     That was designed to provide valid XML

3   through a standard word processor in the way that

4   concealed from the user of the word processor the

5   details of the markup underneath it, express things in

6   terms that the user would understand rather than in

7   terms of the metacodes.

8      Q.     I tried to draw a comparison between this

9   block diagram and the ones the jury has looked at that

10  you prepared of the S4/Text, Version 2.0 product.

11  The box here in your architecture labeled data services

12  layer, S4 and SP --

13     A.     Yes.

14     Q.     -- would that correspond to the S4/Desktop

15  version?

16     A.     The S4 would be the S4, Version 4.

17     Q.     For Desktop?

18     A.     Desktop, Version 4.

19     Q.     The data pipe layer, that would be the

20  binding layer or the application layer?

21     A.     Yes.

22     Q.     And then off to the right is Microsoft Word?

23     A.     That's true.

24     Q.     Now, the Tagless Editor, that's the third box

25  called the application layer, Tagless Editor?

1      A.     Yes.

2      Q.     That's where this new functionality was added

3  to the S4/Text?

4      A.     That is correct.

5      Q.     Now, in connection with your presentation,

6  what did you say about this architectural drawing?

7      A.     I had a sort of standard pattern that would

8  work its way up from the bottom what each layer did from

9  the foundation up.  And I would have described in the

10 data pipe layer that it contained the tags for the XML

11 and that they were mapped to the content in Microsoft

12 Word.

13     Q.     Now, you indicated that you gave two

14 presentations; one on the 18th and one on the 19th.

15     A.     Yes.

16     Q.     Tell us about the presentation on the 19th.

17     A.     The presentation on the 19th was to a small

18 group of Microsoft staff, the Microsoft XML for Word

19 team.  It was --

20     Q.     Do you know who the individuals who attended

21 that presentation were?

22     A.     Well, the names I remember are Chris Pratley,

23 Martin Sawicki, Brian Jones, and Andy Zukerberg.

24     Q.     What did you know -- what did you know about

25 those gentlemen prior to that presentation?

1    A.    Very little, other than that they were from

2  the Word Development Group in Redmond and that they were

3  traveling around to collect information requirements and

4  to present their general plans for XML in Microsoft

5  Word.

6    Q.    How would you characterize them?  Were they

7  computer programmers or managers or sales folks?

8    A.    I don't know their specific duties, but they

9  were all technical and all very smart.

10    Q.    Now, how long did that presentation last on

11  the 19th?

12    A.    It was very rushed, because we had little

13  time before we had to leave for another meeting.  It

14  lasted at least 15, probably 20 minutes and certainly

15  less than 30 minutes.

16    Q.    What happened at the demonstration?

17    A.    Because we were rushed and it was conducted

18  in a small conference room, I gave it from my laptop to

19  the team looking over my shoulder.

20    Q.    The microphone -- Mr. Thomas, can you turn --

21  I don't believe anybody could hear that.

22    A.    Oh, sorry.

23          I gave the demonstration from my laptop at a

24  table in a small conference room and with the team

25  looking over my shoulder.  Because we were short of

1  time, I had only this architecture slide as an

2  introduction.

3      Q.    You discussed the architectural slide in this

4  presentation?

5      A.    Yes.  I felt that was necessary.

6      Q.    You gave an actual demonstration of your

7  product on your laptop?

8      A.    Yes.  Then I moved directly into the

9  demonstration.

10     Q.    Now, what were your impressions of the level

11 of interest of the individuals from Microsoft in

12 attending your presentation?

13     A.    When we started, I didn't think they were

14 particularly interested in spending the time.

15     Q.    What gave you that impression?

16     A.    I don't know exactly.  It's body language,

17 whatever.

18     Q.    Well, in the course of your demonstration,

19 discussion of the architecture slide, as well as the

20 demonstration of the i4i product, did you sense that the

21 level of interest of those individuals changed in any

22 way?

23     A.    I think that once we got in through the

24 architecture and some of the basic ideas were conveyed,

25 they were more interested in the demo and in the

1  mechanisms that we were using at various levels in this.

2  And they asked some very good technical questions.

3      Q.    Now, you indicated that standard spiel with

4  respect to this slide was to explain to the listener

5  from the bottom up of the functions.

6          What did you say to this group from

7  Microsoft?

8      A.    I do not remember the exact words, but I'm

9  sure I went through the standard patter probably rather

10  quickly, and I would have mentioned that the S4/Text

11  layer contained the tags and pointers to the content in

12  Microsoft Word and links to the XML nodes in the lower

13  layer.

14      Q.    Would you understand if the terminology of a

15  rendering engine were used to characterize the use of

16  Word in that block diagram?

17      A.    Yes.

18      Q.    What would that mean?

19      A.    That means that Word is very largely passive

20  in this context; that the input from the user key

21  strokes most events is first filtered through the

22  application layer, the Tagless Editor, to do context.

23  And some actions that involve only positioning of menus

24  or acting only on markup would be taken care of entirely

25  behind Word, and actions that involved changing content

1   would be reflected through Word and in Word and appear

2   on the screen as though you were working with Word.

3       Q.    Do you think that that explanation in any way

4   surprised the Microsoft folks?

5       A.    I think so.  I can't say for sure, but I

6   think that they were expecting a more standard form

7   using hidden text or some artifact inside Word to

8   represent the XML.

9       Q.    Well, following the meeting on the morning of

10  the 19th, was there another meeting you attended?

11      A.    Yes.

12      Q.    And what was that meeting?

13      A.    That was a meeting to which the i4i had been

14  invited as observers.  It was held at Microsoft's

15  Applications international corporation, and it was a

16  meeting where Microsoft Word, XML for Word team, were

17  meeting with representatives of the United States

18  intelligence community and some of the people from ASIC.

19      Q.    Did you have a speaking role at that meeting?

20      A.    No, I did not.

21      Q.    Let's turn to Exhibit 39.

22  Can you tell me if you can identify that document?

23      A.    Yes, I can.

24      Q.    What is that?

25      A.    That is a transcription of some handwritten

1  notes that I made during that meeting.

2      Q.    Let me show you an excerpt from one of the

3  pages of your notes, and I have it presented on the

4  screen.

5          Did anything happen in the course of the

6  meeting that you recall as being noteworthy that you

7  have remembered all these many years?

8      A.    Yes.  I have retold the story many times.

9  Chris Pratley, who was the leader of the XML for Word

10 team, was describing some of their general plans for XML

11 in Word.

12     Q.    This excerpt that's in your transcribed notes

13 referring to that?

14     A.    It is.

15     Q.    The CP -- the CP that's referenced there,

16 does that stand for Chris Pratley?

17     A.    It does.

18     Q.    Does this indicate that Chris Pratley was

19 speaking?

20     A.    Yes.

21     Q.    Would you tell the jury the substance of what

22 you recorded?

23     A.    He was talking about their general plans and

24 the fact that they didn't have any specific plan at this

25 point for doing it.  But he used, in the course of this

1  discussion, the phrase Word M-L or Word XML two or three

2  times.

3      Q.    And what happened?

4      A.    At one of the points, one of the

5  Government -- one of the intelligence community

6  representatives took issue with this and said we want

7  our own custom valid XML, not Microsoft's formatting

8  XML.

9      Q.    And what did Mr. Pratley say to him?

10     A.    And Mr. Pratley said that they need to

11  understand that Word was a mass-market problem and that

12  when they, Microsoft, were confronted with specialized

13  requirements such as that of the intelligence community,

14  they often turned to third-party folks such as these,

15  and indicated us sitting along the wall.

16     Q.    i4i?

17     A.    i4i.

18     Q.    And how did that make you feel?

19     A.    It made me feel very good that we had been

20  somehow given a place at this table and an indication

21  and acknowledgment from Microsoft that we had something

22  of use and interest.

23     Q.    Look at Plaintiffs' Exhibit 257.  In fact,

24  Mr. Thomas, if you would back up to Exhibit 101 first

25  before you look at that one.

1                Do you recognize this e-mail?

2         A.    Yes, I do.

3         Q.    What is it?

4         A.    This is an e-mail that I received June 26th,

5    2001, from Mark Belk of Microsoft, and it's a -- it's

6    carrying, as copied into it, an e-mail from Andy

7    Zukerberg announcing an invitation to join the Microsoft

8    Advisory Council.

9         Q.    Is that invitation being extended to you?

10        A.    That's the way I read the --

11                THE COURT:  Mr. Powers, let me ask you

12   how much longer do you anticipate with direct

13   examination?  It's 12:00 noon.

14                MR. WHITE:  Your Honor, I have probably

15   10 more minutes.

16                THE COURT:  All right.  Let's go ahead

17   and we will break for lunch, and then we will come back

18   right after lunch and finish up with the direct

19   examination of the witness.

20                And, Ladies and Gentlemen of the Jury, I

21   will just remind you of my instructions:  Don't discuss

22   this case among yourselves or with anyone else.

23                Have a nice lunch, and we will be back

24   here at 1:15.  So we will plan to start back at 1:15.

25                COURT SECURITY OFFICER:  All rise.

1          (Jury out.)

2          (Recess.)

3          *        *        *        *        *

4

5

6                      CERTIFICATION

7

8          I HEREBY CERTIFY that the foregoing is a

9   true and correct transcript from the stenographic notes

10  of the proceedings in the above-entitled matter to the

11  best of my ability.

12

13

14

15  /s/_____        _____

    SUSAN SIMMONS, CSR                  Date
16  Official Court Reporter
    State of Texas No.:  267
17  Expiration Date:  12/31/10

18

19

20  /s/_____        _____

    JUDITH WERLINGER, CSR              Date
21  Deputy Official Court Reporter
    State of Texas No.:  731
22  Expiration Date  12/31/10

23

24

25