```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                         TYLER DIVISION

3   i4i LIMITED PARTNERSHIP      *    Civil Docket No.
                                 *    6:07-CV-113 (LED)
4   VS.                          *    Tyler, Texas
                                 *
5                                *    May 13, 2009
    MICROSOFT CORPORATION        *    9:00 A.M.
6
                      TRANSCRIPT OF TRIAL
7          BEFORE THE HONORABLE LEONARD E. DAVIS
               UNITED STATES DISTRICT JUDGE
8                       AND A JURY

9   APPEARANCES:

10  FOR THE PLAINTIFF:     MR. GORDON WHITE
                           MR. KEVIN BURGESS
11                         MR. JOHN CAMPBELL
                           MS. GRETCHEN HARTING
12                         McKool Smith
                           300 West Sixth Street
13                         Suite 1700
                           Austin, TX    78701
14
                           MR. DOUGLAS CAWLEY
15                         MR. JEFFREY CARTER
                           MR. TOM FASONE
16                         MR. JONATHAN YIM
                           MR. JOHN CURRY
17                         McKool Smith
                           300 Crescent Court, Suite 1500
18                         Dallas, TX    75201

19  APPEARANCES CONTINUED ON NEXT PAGE:

20

21  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. JUDITH WERLINGER, CSR
22                         Official Court Reporters
                           100 East Houston, Suite 125
23                         Marshall, TX    75670
                           903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

1

2  <u>APPEARANCES CONTINUED</u>:

3  FOR THE PLAINTIFF:      MR. ROBERT M. PARKER
                           Parker Bunt & Ainsworth
4                          100 East Ferguson, Suite 1114
                           Tyler, TX   75702
5

6

7  FOR THE DEFENDANT:      MR. MATTHEW POWERS
                           Weil Gotshal & Manges
                           201 Redwood Shores Parkway
8                          Redwood City, CA   94065

9                          MR. DAVID LENDER
                           MR. PAUL TORCHIA
10                         MR. STEVEN KALOGERAS
                           MS. ARIAN NEWELL
11                         Weil Gotshal & Manges
                           767 Fifth Avenue
12                         New York, New York   10153

13                         MR. KEVIN KUDLAC
                           MS. AMBER ROVNER
14                         MR. TODD PATTERSON
                           Weil Gotshal & Manges
15                         8911 Capital of Texas Highway
                           Building One, Suite 1350
16                         Austin, TX   78759

17                         MR. ANDREW CULBERT
                           Microsoft Corporation
18                         One Microsoft Way, Building 8
                           Redmond, WA   98052
19

20           *      *      *      *      *      *      *

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  I understand the parties have a matter before we bring the jury in.

MR. CAWLEY:  Yes, Your Honor. I guess this is a good time to do it.  We need to address the issue of some exhibits that we've not been able to reach agreement on the admissibility of.

THE COURT:  All right.

MR. CAWLEY:  I don't know that any of them are necessary in terms of we need to show them to a witness, display them to the jury, but on the other hand, if we are able to rest today, we need to get these either admitted or not.

THE COURT:  Okay.

MR. CAWLEY:  The bad news is, there's about 50 of them.  But the good news is, is that most of them can be grouped into categories, because they have common characteristics and there are common objections to them.

THE COURT:  Okay.

MR. CAWLEY:  So it seems to me that the

 1  most efficient way to get through this is that I can

 2  just go through the list and explain to Your Honor what

 3  the -- what the exhibit is and why it's being offered

 4  and what my understanding is of the objection to it.

 5                 And then I guess the Court can hear on --

 6                 THE COURT:  How many groups are there?

 7                 MR. CAWLEY:  Well, there are probably

 8  five to six exhibits that aren't in groups at all; they

 9  are just free-standing.  And then there's three -- well,

10  really two groups after that.

11                 THE COURT:  All right.  Well, I don't

12  want to keep the jury waiting in there.  If you don't

13  need them for the witnesses, let's proceed on, and we'll

14  catch them at either the morning break or the lunch

15  hour.

16                 MR. CAWLEY:  Yes, sir.

17                 THE COURT:  All right.  Ms. Ferguson,

18  bring the jury in, please.

19                 COURT SECURITY OFFICER:  All rise.

20                 (Jury in.)

21                 THE COURT:  All right.  Please be seated.

22                 MR. CAMPBELL:  May I?

23                 THE COURT:  Good morning, Ladies and

24  Gentlemen of the Jury.

25                 A JUROR:  Good morning.

1               THE COURT:  Welcome back.  Did everyone

2  have a good evening?

3               Everyone bright-eyed and ready to go this

4  morning?

5               Well, all right.

6               [Laughter.]

7               THE COURT:  Well, you're here and we're

8  glad you're here and you're still smiling, so we'll

9  proceed with the case today.

10               I've been informed by the Plaintiffs that

11  they will probably rest their case late in the day

12  today.  So then we'll start on Friday with Defendant's

13  case, if that happens.  It could bleed over into Friday

14  or it may be earlier than that, so we'll just have to

15  see.  But we're on schedule, so we'll proceed on.

16               Keep paying good attention like I know

17  you have been.

18               All right.  You may proceed,

19  Mr. Campbell.

20               MR. CAMPBELL:  Thank you, Your Honor.

21   VERNON THOMAS RHYNE, III, Ph.D., PLAINTIFFS' WITNESS,

22                    PREVIOUSLY SWORN

23               DIRECT EXAMINATION (CONTINUED)

24  BY MR. CAMPBELL:

25      Q.   Good morning, Dr. Rhyne.

1      A.     Good morning, Mr. Campbell.

2             Good morning, Ladies and Gentlemen.

3      Q.     Let's just do a two-minute recap to remind

4  everybody where we left off.

5                  MR. CAMPBELL:   If I can have Slide 72.

6      Q.     (By Mr. Campbell) Dr. Rhyne, we reviewed

7  Claim 14, and did you find that when someone uses Word

8  2003 or 2007 to open an XML document with custom XML

9  that all the limitations of Claim 14 are satisfied?

10     A.     Yes.  And I think we actually -- did put a

11 check down here in this last box as well at some point.

12     Q.     Yes.  And can you just very briefly, using

13 the poster board, remind us why that's true?

14     A.     Well, it's implemented in Word 2003 and Word

15 2007.  There is a method for producing this first map of

16 metacodes, which I identified here, including all the

17 green stuff as Dr. Martin has referred to it from time

18 to time.

19             And also with the mapped content, which is

20 the information that's been put into this so-called CP

21 stream that I marked with the lower red box, and they

22 are stored separately, so they're stored in a distinct

23 map storage means.

24             And then when you open that XML document with

25 custom XML tags in it, you have provided the mapped

1   content as you -- the term is parse.  As you work

2   through the original input data, you create this mapped

3   content storage means full of data.

4        We talked about the menu of metacodes; that

5   the information shown over on the right where the --

6   where the various available metacode names are shown,

7   then creates a menu on the screen when you're using Word

8   2003 or 2007.

9        And as you read that document in, you do

10  compile that map of metacodes.

11       And then there are a couple of ways to

12  provide it.  One is in memory and one is when you save

13  it back out.  And we looked at the fact that there was

14  both a separate way to save them on disk, and then

15  there's together way to save them on disk.

16       Collectively, those were my opinions relative

17  to infringement of Claim 14.

18       Q.    Thank you, Dr. Rhyne.

19            MR. CAMPBELL:  If we could show Claim --

20  or I'm sorry -- Slide 90.

21       Q.    (By Mr. Campbell) And, Dr. Rhyne, for

22  Claim 18, if someone opened the custom XML -- XML

23  document with custom XML in it in Word 2003 or Word 2007

24  and they have a schema attached --

25       A.    Uh-huh.

1     Q.    -- did you find that Claim 18 is also

2  satisfied?

3     A.    If they have that schema.  Since the schema

4  gives you a list of available codes -- metacodes and can

5  also give you, if you place it in there, attribute

6  information.

7          And I talked about things like dates,

8  numbers.  If it's only a number, then you can't put a

9  letter into the name of it.  Then in that circumstance,

10 if the schema is attached, then this claim is also

11 infringed.

12              MR. CAMPBELL:  Slide 1 of 7.

13    Q.    (By Mr. Campbell) And finally, Dr. Rhyne, if

14 someone uses Word 2003 or 2007 to open an XML document

15 with custom XML, did you find that Claim 20 is

16 satisfied?

17    A.    Yes.  The first several steps, the preamble

18 appear and the Steps A, B, C, and D are very similar to

19 what I explained relative to Claim 14.

20          The big difference here is the separately.

21 And so there was a requirement in order to provide the

22 information separately.

23          There are two ways.  They certainly are

24 separate in memory, but if you save it, we looked at a

25 couple of formats that you can save the document in.

1   And in particular, I think it's the two binary formats:

2   The so-called -- well, I guess doc X or dot, T, D-O-T,

3   that provide that separate requirement.

4        Q.    I believe you explained yesterday that

5   Claim 14 and Claim 20 are independent claims.

6        A.    Yes.  Uh-huh.

7        Q.    Does that mean that these are evaluated

8   separately in terms of infringement?

9        A.    Yes.

10        Q.    Okay.  So it's possible to infringe one claim

11   and not the other and still be liable for infringement;

12   is that your understanding?

13        A.    Yes.

14        Q.    Let's look at Claim -- or let's look at Slide

15   8.

16            Now, you briefly talked about this yesterday,

17   but let's get on -- let's deal with this in a little bit

18   more detail.

19            Can you explain again the summary of the

20   different ways that you found that Microsoft infringes?

21        A.    Well, I've looked at three ways.  And, again,

22   I've looked at them based on my understanding of the

23   legal requirements as I said yesterday.

24            It is Judge Davis who will tell the jury how

25   the law reads here, but I'll explain how I viewed it

1   when I formed my opinions.

2          Direct infringement means that someone at

3   Microsoft used Word 2003 or Word 2007 in a manner that

4   met the limitations of one of these three claims.

5          Inducement means that Microsoft has provided

6   a product and has -- if -- if people who -- if people

7   who purchase it use it as Microsoft directs and

8   encourages them to do, if that results in infringement,

9   then Microsoft is liable, as I understand it, for what's

10  referred to as induced infringement.

11         Then contributory infringement is a situation

12  where Microsoft provides a product which essentially

13  must be used substantially to -- in a way that will

14  infringe the claims.

15     Q.   And are -- these three different ways of

16  infringement, are those also evaluated independently?

17     A.   Yes.

18     Q.   And under your understanding of the law, does

19  the patentee need to prove copying to prove any of these

20  ways of infringement?

21     A.   No.  No.  That's not a requirement for

22  infringement.

23     Q.   Let's look at -- let's look at direct

24  infringement.

25                 MR. CAMPBELL:  If I could have Slide 108.

1    Q.    (By Mr. Campbell) Did you find any evidence

2 that Microsoft itself directly infringes by opening XML

3 documents using custom -- with custom XML?

4    A.    I found a number of examples.  I think I've

5 prepared slides.  These are -- these are documents and

6 other sources of information that were -- I placed in my

7 expert report.  But this is a response to an

8 interrogatory.

9    Q.    Could you explain what an interrogatory is?

10 That's probably not a term familiar to a lot of people.

11    A.    Again, I'm not an attorney here, but it's my

12 understanding, having been in several -- a number of

13 trials, that there are points in the proceedings before

14 we come to Court here where each side has the right to

15 pose written questions to the other side.  And those are

16 called interrogatories.  I've heard the lawyers call

17 them rogs.

18        But they list them out, and then the other

19 side is compelled to provide a response.  And the

20 response has to be provided on behalf, in this case, of

21 Microsoft.  The person who -- who -- someone has to

22 basically sign off and say I've looked at that answer to

23 that question and Microsoft agrees with that; we'll

24 stand by it.

25        And in answering one of the interrogatories,

1    the following statement was made on behalf of Microsoft

2    that certain of Microsoft's developers -- people like

3    Mr. Little and others -- program managers and testers of

4    Word 2003 and 2007, used arbitrary or custom XML

5    features of Word 2003 and 2007 in connection with the

6    design, development, and testing of Word 2003 and 2007.

7              And I -- the interrogatory answer, not just

8    to say that but to name some people, and the names of

9    the people were Chris Pratley, Mark Sunderland, Robert

10   Little, Martin Sawicki, and Brian Jones.  We've seen

11   their names several times.

12             Others at Microsoft, such as Joe Andreshak

13   have used arbitrary or custom XML features in connection

14   with the marketing of Word 2003 and 2007.

15        Q.   Did that interrogatory response go on to

16   describe any other uses by Microsoft of custom XML?

17        A.   It did.  It said that Microsoft further

18   states that the following groups have used Word 2003

19   and -- excuse me -- or 2007, arbitrary or custom

20   XML-related features at Microsoft.  And then they listed

21   three instances.

22             Number one, up to approximately 800 to a

23   thousand Microsoft employees have used arbitrary or

24   custom XML-related features in the design specification

25   process.

1    Number two, up to approximately 200 Microsoft

2 employees have used arbitrary or custom XML-related

3 features to prepare product documentation.

4    Number three, up to approximately 50 to a

5 hundred Microsoft employees have used arbitrary or

6 custom XML-related features in connection with the user

7 assistance group.

8    Q.    Let's go back and talk about testing for a

9 second.

10    Is testing something that's necessary in

11 developing software?

12    A.    If you want to produce quality software and

13 deliver it to your customers as free of bugs as you can

14 make it, internal testing is important.  And I think

15 somebody referenced it the other day.  There's a

16 terminology.

17    Once you get a product kind of ready for

18 review, you do what's called alpha testing.  And the key

19 there is that you have people who weren't the developers

20 of the software start using it.

21    One of the things I found in software

22 development is that no matter how hard I try to test my

23 own software, I don't use it in the way someone besides

24 myself will use it.  And sometimes they'll do something

25 that seems very logical to them that I never thought

1   they would do.

2            Well, the alpha testers are people that

3   weren't the developers but usually inside the company at

4   Microsoft who do testing.

5            Then you have another layer called beta

6   testers, and those are some select people who have

7   experience outside, and you work with them in confidence

8   and say we're going to give you a very early version of

9   this.  It may have bugs.  We want you to go out and

10  check it and see what you can do.  And you're under an

11  obligation to report back to us.

12           So you always do that kind of testing.

13           And then, ultimately, you give it to your

14  real customers, and things still happen, but that's --

15  the testing is important to try to expose what might

16  possibly be a problem in your software products.

17     Q.    Dr. Rhyne, does Microsoft agree that testing

18  is essential?

19     A.    Sure.  They are a very serious software

20  development company, and they certainly seek quality

21  software.

22           But Mr. Little was asked the following

23  questions:  Okay.  Would it -- would it be -- would it

24  have been possible for Microsoft to develop the custom

25  XML support that is in Word 2003 without doing any

1    testing?

2              And he said no.

3              Testing is essential in software development;

4    would you agree?

5              And Mr. Little said:  I would agree with

6    that, yes.

7              As do I.

8         Q.   Let's turn to inducing and contributing to

9    infringement.

10             What is your understanding of the law on

11   inducing infringement?

12        A.   Again, this is my understanding, and I

13   basically listed out the things that I have been told by

14   attorneys who are associated currently in the law with

15   inducement.

16             The inducing party in this case, Microsoft,

17   must have knowledge of the patent.  They must have

18   encouraged or instructed other people to perform the

19   acts that infringe.

20             Remember, all three of the claims, 14, 18,

21   and 20, are method claims.  So something has to be done.

22   So they must have encouraged other people to perform the

23   method.  The others must perform the method.

24             And Microsoft in this case knew or should

25   have known that encouraging others or instructing others

1   to perform the claim method or to use their product

2   would result in those other people infringing.

3        Q.    Okay.  Let's turn to the first element there,

4   knowledge of the patent.

5             Did you find evidence that Microsoft knew

6   about the '449 patent?

7        A.    I did.

8        Q.    And what -- let's look at PX49.

9             Is this what you're referring to?

10       A.    Okay.  This is an e-mail and it's -- it's

11  what's commonly called a chain of e-mail.  And sometimes

12  when people -- if someone sends me an e-mail and I

13  forward it to someone else for their attention, in the

14  forwarded message, the original e-mail will be there,

15  plus I might attach a little note above it that says

16  read this; I think you will be impressed or something.

17  And so you really see a sequence of e-mails.

18             And this is a portion of the original e-mail

19  that was sent to a gentleman at Microsoft from a person

20  at i4i.  And included in that original e-mail going to

21  the person at Microsoft from a person at i4i was the

22  following information:

23             They say that i4i's the world's leading

24  provider of XML offering.  They've pointed to i4i's

25  Tagless Editor.  I think we've heard some terminology

1  for that.  It allows users to gain all the benefits of

2  XML content development while preserving their

3  investment in Microsoft Word.

4         If you recall, this i4i product worked in

5  conjunction with Microsoft Word.  The two together

6  created the XML environment.

7         And in the second paragraph they say the R&D

8  team at i4i evolved the patented, and they cite the U.S.

9  patent number, 5,787,449, S4 Technology that is at the

10 heart of the Tagless Editor.

11        So this e-mail certainly reached a person at

12 Microsoft coming from a person at i4i.

13    Q.    You talked about what an e-mail string was.

14 What did Microsoft say internally in response to this

15 e-mail?

16    A.    Let me -- I believe you said this was No. 49,

17 did you not?

18    Q.    PX49, yes, sir.

19    A.    Okay.  Just a second.

20        Just for the record, the original e-mail was

21 sent by a person at i4i by Stephen B-A-K-S-H.  I guess

22 Baksh (pronounces).  And it was sent to a gentleman

23 on -- at least one gentleman, maybe others, at Microsoft

24 named Stuart Stuple, S-T-U-P-L-E.

25        Mr. Stuple forwarded the message to this

1  gentleman, whose name we've heard before; two of them,

2  to Brian Jones and Mr. Martin Sawicki.

3          And his note said:  Thought you might find

4  this interesting.  Probably sent to me from some list

5  I'm on as an editor writer.

6          Then having received it, in particular,

7  Mr. Sawicki sent a response back to Mr. Stuple, and this

8  is what he said:  Thanks.  We saw this tool some time

9  ago and met its creators.  Word 11 will make it

10 obsolete.  It looks great for XP, which was the

11 preceding version of Word.

12          So it's clear that this document, this

13 e-mail, came in.  At least three people at Microsoft,

14 including these two key people, Brian Jones and

15 certainly Mr. Martin Sawicki, were aware of it.

16     Q.    So based on that e-mail, did you find that

17 Microsoft had knowledge of the patent?

18     A.    Yes.

19     Q.    Let's look at the next element, encouraged or

20 instructed others to perform the acts that infringe.

21          Did you find any evidence that Microsoft

22 encourages or instructs others to perform the acts that

23 infringe?

24     A.    Yes.

25     Q.    What did you look at?

1     A.    Here's another response to an interrogatory

2  in which Microsoft said:  Microsoft provides online

3  resources for general training and support for many

4  features and capabilities.

5            Also, MSDN; that's the Microsoft Developers

6  Network; it's a group of people who have affiliated with

7  Microsoft.

8            It provides online technical articles,

9  information, and other support for developers, including

10 support related to certain XML capabilities.

11           Developers can contact Microsoft on an ad hoc

12 basis for support related to the custom XML capabilities

13 in Word 2003 and Word 2007.  And Microsoft will decide

14 on a case-by-case basis whether that support can be

15 provided through a live meeting, a custom course, or

16 some other means.

17           So they provide this training for people as

18 to how to use the custom XML capabilities of those two

19 products.

20    Q.    It also notes that they provide things

21 online.

22           Did you identify any documents that Microsoft

23 provides online that encourages or instructs others how

24 to use custom XML in Word?

25    A.    I did.  Here's an online document relating to

1  Microsoft Office Word.  It's entitled About Documents in

2  Word.

3        It says that the document applies to

4  Microsoft Office Word 2003.  And the text of the

5  document includes the following:  Microsoft Word enables

6  you to work with XML documents.  You can create or open

7  a document in Word, attach any custom XML schema to it,

8  and apply XML tags to the content of the document.

9        When you save this document as an XML

10 document, the XML tags define the structure of the

11 documents in terms of the XML schema that is attached to

12 it.

13       And that is an infringing act.

14   Q.    That, for the record, is PX 390.

15       Did you find any other documents online where

16 Microsoft encourages or instructs others to use custom

17 XML in Word?

18   A.    Yes.  If we could go -- this is a document

19 entitled XML in Office Developer Portal.  A portal is a

20 place that people who are developing against Microsoft

21 Office can go for information.

22       It says:  Welcome to the XML in Office

23 Developers home on the Microsoft Developers Network.  In

24 this section, you will find technical articles, code

25 samples -- that means software -- development -- excuse

1 | me -- developer documentation, and multimedia

2 | presentations on working with XML in Office.

3 |          Brian Jones, the Office Lead Program Manager,

4 | blogs about the XML functionality and file formats in

5 | Office.

6 |          Should I explain what a blog is?

7 | Q.    Probably should.  Sure.  What is a blog?

8 | A.    The origin of that term is the internet

9 | originally, and I guess to some degree it's called the

10 | worldwide web.  The people who developed it started out

11 | with that terminology.

12 |          And when people would log information in

13 | little places on the web that other people could come

14 | look at, it began to be known as a web log.  And

15 | finally, they shortened that web log.  They just said

16 | it's a blog.  And there are millions of them out there.

17 | People are doing it all the time, whether it's just

18 | posting their ideas and other people come and take a

19 | look at them.

20 |          So Brian Jones, the Lead Program Manager of

21 | Office, provides periodic information from his thoughts

22 | about XML functionality and file formats in Office.

23 |               MR. CAMPBELL:  For the record, that's

24 | PX519.

25 | Q.    (By Mr. Campbell) Did you also find a

1    tutorial that Microsoft provides online?

2        A.    I did.  We have reproduced just the first of

3    it, but it basically walks you through how to mark up

4    the data in a Word document with custom XML elements.

5    And as you go through it step by step, it gives you

6    examples and leads you through that process, and that is

7    an infringement -- performance of an infringing method.

8        Q.    So, Dr. Rhyne, did you find that Microsoft

9    encourages or instructs others to perform the acts that

10   infringe?

11       A.    Yes.

12       Q.    Let's look to see whether others performed

13   the claimed method.

14             Can you first explain what that means?

15       A.    It means that part of the test, as I

16   understand the law, for demonstrating induced

17   infringement is to identify an -- an inducee, a person

18   who has been induced to do it, okay.

19             You can't just abstractly show that Microsoft

20   did it, and it stopped there, but you have to have

21   reasonable evidence that the method is actually being --

22   being performed as Microsoft encourages or instructs.

23       Q.    Okay.  And did you find any evidence that

24   Microsoft's customers use custom XML with Word?

25       A.    I have.

1    Q.    What do we see here with PX474?

2    A.    Okay.  Microsoft -- if a customer of, in this

3 case, Word 2000 -- I believe this is 7 -- no, excuse me.

4 This is both, Word 2003 and Word 2007.

5         If a customer that has those products running

6 on his or her machine allows things to be exchanged with

7 Microsoft, there is a way that the Microsoft software

8 can use counters to keep up with certain things that are

9 done by those customers.  These are people who have

10 bought their product and are using them outside of

11 Microsoft.

12        And one of the counters has this long name:

13 Wordopennonwordml.  That is an indication that someone

14 has opened a document that has custom XML.  Microsoft's

15 own proprietary XML is that word ML.

16        If they have a document that they've opened

17 that had non-Word ML in it, then that's evidence that

18 they have opened a document that has custom XML in it.

19 And I just pulled out four cases here.  The first one is

20 Office 12 with Service Pack 1, which that's Word 2007.

21 And this 1-1, as I understand it, tells me they've done

22 it once.

23        And over here, you can see there's no line up

24 because of the way we blew them up, but the 7,447 is

25 session counts.  That's the number of times somebody did

1   that.  They opened a Word document with non-Word ML in

2   it -- custom XML in it.  And the number of users who did

3   that were 4600.

4         The next row is Office 11 with Service

5   Pack 3, which is Word 2003.  And over here, you can see

6   6100-and-some-odd people -- excuse me -- there were 6100

7   sessions where someone opened such a document, and there

8   were 3525 people who did it.

9         That's evidence that somebody did it, because

10  we've got nearly -- almost 8 -- I guess we have 8,000

11  people in that list who have opened the document that

12  had non-Word XML in it -- custom XML.

13      Q.    All right.  Did you find any other evidence

14  in Microsoft's documents that Microsoft customers use

15  XML with Word?

16      A.    I did.  I reported this in my expert report.

17  As part of, I guess, the sales information or marketing

18  information, Microsoft, in a document entitled, Office

19  Open XML Formats Fundamentals, listed a number of

20  customer-use case examples with Office 2003.

21        And I haven't listed them here.  They're in

22  my report, but, basically, the explanation says:  The

23  following table shows a few examples of how XML has been

24  used in real-Word situations, and then went on to

25  list -- I think there were some companies and maybe a

1   university or two.

2             MR. CAMPBELL:  For the record, that's

3   PX311.

4        Q.   (By Mr. Campbell) And I think we'll look to

5   read this into the record later.

6             But is there one more piece of evidence you

7   identified that Microsoft's customers use custom XML?

8        A.   And I've read it, and I'll leave it to you to

9   read into the record.

10            But it's my understanding it's a stipulation

11  between the parties that there has been use of custom

12  XML within an XML document.

13       Q.   All right.  And so, Dr. Rhyne, did you find

14  that others performed the claim method?

15       A.   Yes.

16       Q.   All right.  Let's turn to the next element,

17  knew or should have known encouragement or instruction

18  would result in others infringing.

19            Dr. Rhyne, I think we already talked about

20  this, but did you find that Microsoft knew of the '449

21  patent?

22       A.   We do -- I did.  I found that e-mail at least

23  that indicated to Martin Sawicki and Brian Jones that

24  ITI (sic) was there, and that they had a patent on --

25  that covered one of their products.

1        Q.     And then based on your review and analysis of

2    the source code, did you find that opening an XML

3    document with custom XML in Word infringes Claims 14

4    and 20?

5        A.     I did.

6        Q.     Is there a schema attached that Claim 18 is

7    also infringed?

8        A.     Yes.

9        Q.     So in your opinion, should Microsoft have

10   known that they were encouraging or instructing others

11   to do acts that would result in infringing?

12       A.     I think they, knowing about the patent, had

13   they done as I believe they should have looked at the

14   document -- at the patent, read through it; if some of

15   their technical people who knew their own software and

16   how it had been developed and how it operated, they

17   would have come to the same conclusion that I did.

18       Q.     Let's turn to contributing to infringement by

19   others.

20              The first element there is knowledge of the

21   patent.  We've already been through that.

22       A.     Yes.

23       Q.     And the second one is others perform the

24   claimed method.  We've already been through that.

25       A.     Yes.

1    Q.    Let's turn to the third one then, sale of a

2 component or apparatus for use in practicing a patented

3 method.

4         What did you identify as evidence that

5 Microsoft sells a component or apparatus for using the

6 patented method?

7    A.    Well, in particular, starting with Word 2003,

8 I pointed out yesterday that there were different

9 versions of Word 2003, and they did not provide the XML

10 capability in sort of the low-end versions, in the home

11 edition or standard edition, I guess it's called.

12 But they did have the software present, this software

13 component in the professional version and the standalone

14 version.  So they had the ability to leave it out or put

15 it in.

16         So that's what led me to conclude that they

17 could view this XML support software as a component.

18 And to just summarize my opinions, custom XML support is

19 clearly a component, as this component is included in

20 some version and not in others.  And I point to Office

21 2003.

22         And what they've done in 2007, I think for

23 all versions is they just have that component in there

24 and available all the time.

25    Q.    And so did you find that Microsoft sells a

1  product with a component or apparatus for use in

2  practicing the patented method?

3      A.    In at least two versions of 2003 -- Word

4  2003.  And in, to my understanding, all versions of Word

5  2007, they do that.

6      Q.    Let's talk about the last element here, no

7  substantial non-infringing uses of the component or

8  apparatus.

9           What is the substantial use of custom XML in

10 general?

11     A.    The substantial use is to open a document

12 with or without a schema; to add in some way

13 Microsoft -- excuse me -- XML metacodes; have them in

14 the document to identify the content of the document so

15 you know what data is in there along with the content;

16 and then to save it in a manner that makes that saved

17 version of the document available to other applications

18 that want to search through a large set of documents and

19 find instances where member IDs are present or instances

20 where suspected terrorists are present and things like

21 that.

22         That's -- that's what XML was designed for,

23 and that's what the XML support in Microsoft Word 2003

24 and 2007 was provided to enable.

25     Q.    To be fair, are there ways to work with

1  custom XML in Word that do not infringe?

2      A.    Yes.  Oh, yes.

3      Q.    What are those ways?

4      A.    Well, it depends kind of on which claim

5  you're talking about.  But take Claim 18, for example.

6  If you have a custom XML document and there's no schema

7  attached; you just wrote the metacodes in yourself and

8  didn't have a schema, then that combination does not

9  infringe.

10      Q.    Okay.

11      A.    If -- if you open a document, a blank

12  document, even with a schema attached and you create

13  some information in it; you type in some text and then

14  you tag it with metacode tags and you save it, at that

15  point, if you never reopen it, you haven't infringed.

16          If you open a document that was previously

17  saved, for example, in this binary format, either one of

18  these, in the process of opening it, because you

19  don't -- the document already has the separated metacode

20  map and already has the separated mapped content.  You

21  don't meet the requirement of Claims 14 and 20.

22          It's just like compiling.  It's already there

23  in the binary form, so you don't infringe Claims 14 or

24  20.

25      Q.    Do you think using the binary format for

1    custom XML is a substantial use?

2        A.    Not --

3              MR. POWERS:  Objection.  No foundation,

4    Your Honor.  This witness has no idea how many people

5    use that format.

6              MR. CAMPBELL:  Your Honor, he's not going

7    to testify about the number of people.  It's what the

8    intended use of XML is and how that would -- how XML --

9    the benefits of XML are derived from the XML file

10   format.

11             MR. POWERS:  In that case, Your Honor,

12   this witness is not an XML expert and hasn't claimed to

13   be and isn't one and is incompetent to say how people

14   would use XML or what --

15             THE COURT:  Overruled.

16       A.    Would you restate your question for me?

17       Q.    (By Mr. Campbell) Sure.  Dr. Rhyne, do you

18   think that using the binary file format would be a

19   substantial use?

20       A.    For the XML community, using the binary

21   format would not be.

22             The facts that have led me to form that

23   conclusion are that when you save a document with custom

24   XML in it in that binary format, you can't achieve the

25   benefit that XML is intended to provide, because another

1  program has great difficulty, if not impossibility, of

2  going in and understanding where the metacode tags are

3  in that binary document.

4          And, to me, one of the best points to show

5  how substantial this use of custom XML in an infringing

6  manner is to Microsoft is the fact, as I pointed out the

7  other day, in Word 2011, they made the docx, which is an

8  infringing way of storing the document, the default file

9  format.

10         So it's certainly substantial in the eyes of

11 Microsoft, and it's certainly substantial in the eyes of

12 the XML community.  And we looked at all those quotes

13 from e-mails and other sources where people like Bill

14 Gates and Kim Fields and Microsoft Press and Mr. Paoli

15 said we've got to have this capability; we've got this

16 community out there clamoring.  We tried to hold them at

17 bay.  We've provided this, and here it is.

18         I think certainly in the eyes of Microsoft,

19 it's a substantial use.

20     Q.    Did you identify any Microsoft documents that

21 support your opinion on this?

22     A.    I did.  Here's a document called, Introducing

23 the Office 2007 Open XML File Formats.

24         It says:  Likewise, with the adoption of

25 support for XML in Office 2000, developers began to see

1  the need to transition from the binary file formats seen

2  in previous versions of Microsoft Office to the XML

3  format.

4         And they specifically identified here these

5  binary files, formats:  Dot D-O-C or doc; dot, D-O-T,

6  the template.  And they say for years -- which, for

7  years, did a great job of storing and transporting data

8  -- were not able to meet the new workplace challenges

9  that included easily moving data between disparate

10 applications and allowing users to glean business

11 insight from that data.

12        Microsoft recognized that there were limits

13 with respect to using other applications and obtaining

14 business insight from the data when you use the doc,

15 D-O-C, and the dot D-O-T formats.

16    Q.    Do the XML file formats allow for easily

17 moving data between disparate applications and allowing

18 users to glean business insight from that data?

19    A.    Yes.  That's their fundamental purpose.

20    Q.    Could a user as an intermediary -- as an

21 intermediate step save their file in dot D-O-C or dot

22 D-O-T?

23    A.    Yes, they could.

24    Q.    Do you believe --

25    A.    When they open the file, they can save it as

1  a dot DOC.  They could mail it to somebody as a dot DOT.

2  But if they -- at the end of the process of annotating

3  their document with XML, custom XML, if they don't save

4  it in a dot docx or a dot XML form, then these benefits,

5  easily moving data between disparate applications and

6  allowing users to glean business insight from that data,

7  are not available.

8            MR. CAMPBELL:  And for the record, that's

9  PX427.

10      Q.    (By Mr. Campbell) Let's just talk about one

11  more thing that you mentioned, and that's the nature of

12  how computer or word processing documents are created.

13            How many times do you expect a computer word

14  processing document to be opened?

15      A.    Certainly more than once.

16      Q.    So would you think that the very first time

17  that you create a blank document, would that be a

18  substantial use?

19      A.    That's certainly not substantial in my

20  experience or the experience that I've observed in other

21  people.

22            Documents tend to be opened usually in a

23  draft form, sent for a review, generally edited,

24  modified.  And only at the end of the process are they

25  saved maybe for archival purposes, but often, then, they

1    are opened again.

2         Q.     So, Dr. Rhyne, did you find any substantial

3    non-infringing uses of the custom XML apparatus in Word?

4         A.     There are non-infringing uses, but they are

5    not substantial in my eyes nor do I think they're

6    substantial in the opinion of Microsoft themselves.

7                     MR. CAMPBELL:  No further questions.

8                     Thank you, Dr. Rhyne.

9                     THE WITNESS:  Thank you.

10                    THE COURT:  All right.

11                    MR. POWERS:  May I proceed, Your

12   Honor?

13                    THE COURT:  Yes, you may.

14                         CROSS-EXAMINATION

15   BY MR. POWERS:

16        Q.     Good morning again, Dr. Rhyne.  Good to see

17   you.

18        A.     Good morning, Mr. Powers.

19        Q.     Now, you don't claim to be an XML expert, do

20   you?

21        A.     I have -- I think, as I told Mr. Kudlac

22   during my deposition, I have some experience with it,

23   but I have not taught it as a topic, and I wasn't

24   involved in the development of it.

25        Q.     And, in fact, before this case, you had never

1   even used XML for a real task as opposed to just that's

2   how an article worked?

3       A.    That's right.  I have not used it for what

4   its fundamental purpose is, which is to allow other

5   applications to search through a lot of documents.  I

6   have not done that.

7       Q.    All right.  Let's turn to the issue of

8   whether what you call a metacode map in Microsoft Word,

9   quote, contains the metacodes.

10           Do you recall that issue?

11      A.    I believe, yes.

12      Q.    And do you recall testifying about your

13  belief that the metacodes contained in this green box --

14           MR. POWERS:  Your Honor, may I approach

15  Figure 12, just so we're all clear?

16           THE COURT:  Yes, you may.

17      Q.    (By Mr. Powers) This box that you put this

18  magnetic strip around, you're claiming that's the map of

19  metacodes?

20      A.    Well, that's the origin, but as I said

21  several times and told Mr. Kudlac during the deposition,

22  that box makes reference to the merged form to all the

23  rest of the green.

24      Q.    But the place where, in your view, the

25  containing metacode limitation is satisfied is this

1  green box here?

2      A.    That box as you expose the associated

3  information within the data structure, yes.

4      Q.    Now, in fact, what's in that box -- well,

5  let's start even earlier than that.

6          You'll agree with me that there's no such

7  structure in Word that looks the way you've put it on

8  that board.

9      A.    I don't think I agree with that.

10     Q.    Is there one single structure --

11              MR. POWERS:  May I approach again, Your

12  Honor?

13              THE COURT:  Yes, you may.

14     Q.    (By Mr. Powers) -- that -- well, let me put

15  it this way:  You took this column from over here

16  (indicating), right?

17     A.    Well, that top yellow box is the -- is the

18  way, using a handle, that you access that piece of

19  information.  That's called CP first.

20     Q.    Let's try it this way.

21              MR. POWERS:  Chris, can you bring up the

22  patent, column tab?

23              COURTROOM DEPUTY:  I'm sorry.  I punched

24  the wrong button.

25              THE COURT:  It will come back down.

1   Ms. Ferguson punched the wrong button.

2                    MR. POWERS:  It happens to the best of

3   people.

4                    THE WITNESS:  I had no idea what that

5   noise was.

6                    MR. POWERS:  Still don't have it on the

7   screen.

8                    THE COURT:  It will take a minute.  The

9   lamp's got to cool off and come back on.

10       Q.    (By Mr. Powers) All right.  Why don't we --

11  let's put it this way.  I think you recall what Column

12  10 looks like.

13       A.    I can actually see it on my screen.

14       Q.    In the actual patent, the '449 patent --

15       A.    Yes.

16       Q.    -- they showed an example of the metacode

17  map, right?

18       A.    They showed it as part of the preferred

19  embodiment in the metacode map, yes.

20                    MR. POWERS:  Not yet, but we're getting

21  closer.

22       Q.    (By Mr. Powers) Okay.  And the metacode map,

23  as shown in the patent, is an actual single structure

24  that has element number and element and the address of

25  that particular element in the map, right?

 1       A.     Actually, I don't think they tell you what

 2   the underlying data structure is; they just show you the

 3   information that's captured in the metacode map.

 4       Q.     They show it as a data structure and call it

 5   a data structure, don't they?

 6       A.     I don't think that term is used in the

 7   patent.

 8       Q.     All right.

 9       A.     I believe it was used in the Court's

10   construction.

11       Q.     What's in that green box in what you call the

12   metacode map is not something that says chapter or

13   member ID, is it?  It's a point, isn't it?

14       A.     Well, the origin of this chain of linkages,

15   that's -- yes, it is.  It's a pointer that's there --

16       Q.     Right.

17       A.     -- at the beginning of the chain.

18       Q.     Now, as you go through that whole chain --

19              MR. POWERS:  May I approach again, Your

20   Honor?

21              THE COURT:  Yes.

22       Q.     (By Mr. Powers) -- you described that whole

23   chain for us yesterday, and we were wandering around --

24   and reminds me of those old Family Circus cartoons where

25   the mother tells Billy to go straight to the next-door,

 1  and he wanders all around the yard, stopping and playing

 2  all over the place.

 3         But, eventually, you go from here to here to

 4  here, here, here, and eventually, way over here

 5  (indicating), you get something that says member ID,

 6  right?

 7     A.    Yes.

 8     Q.    And you're calling that term, member ID, the

 9  metacode, right?

10     A.    Yes.

11     Q.    And member ID, if it doesn't have those

12  little brackets that we've been calling them -- those

13  are called delimiters, right?

14     A.    Yes.  That's actually two questions.

15         Yes, it doesn't have them, and yes, they're

16  called delimiters.

17     Q.    I appreciate that.  Thank you.

18         So what comes back is just the name of the

19  metacode but does not have the brackets --

20     A.    Well --

21     Q.    -- is that fair?

22     A.    -- I believe that the name or so-called tag

23  name or generic identifier is the metacode.  But you're

24  correct; in that final list, in that part of the data

25  structure, there are no little brackets.  They are not

1  present.

2      Q.    All right.  So if those brackets or that

3  slash, which is another -- are actually part of the

4  metacode, you'll agree that what you call the map does

5  not contain the full metacode.

6      A.    If the jury were to decide or the Court were

7  to direct that the metacode had to have those little

8  symbols, then, literally, they are not there.

9      Q.    Okay.

10            MR. POWERS:  Chris, could you put up,

11  please, Slide 39 from Dr. Rhyne's presentation.

12      Q.    (By Mr. Powers) Do you recall this slide,

13  Dr. Rhyne?

14      A.    Yes.

15      Q.    And you were showing what you called the

16  metacode, which is just what you put in the yellow, and

17  you're saying that those brackets are not part of the

18  metacode, right?

19      A.    Yes.

20      Q.    Those brackets are part of the tag, though,

21  aren't they?

22      A.    They're part of what the standard refers to,

23  in a global sense, as the tag.

24      Q.    And when you took -- you offered several

25  exhibits to argue that it's only the name of the tag and

1   not the brackets that are the metacode.

2           Do you recall that?

3       A.    I think there were several -- I had a

4   sequence of exhibits that I used to explain my opinion.

5       Q.    And the first one was the very next slide,

6   Slide 40.

7               MR. POWERS:  Let's go to that, if we can,

8   please, Chris.

9       Q.    (By Mr. Powers) You cited to PX131.  Do you

10  recall this slide?

11      A.    I actually think that was the last one.  I

12  think earlier than that, I had that K word section of

13  the specification.  I think this is the very last one.

14      Q.    This is the very next slide after the slide

15  we showed you.

16      A.    Oh.  If that's what you meant, then yes, sir.

17      Q.    Okay.  And PX131 that you reference on Slide

18  40 is the ISO standard for SGML.

19      A.    Yes.

20      Q.    Now, you highlighted for us a portion of that

21  standard on your Slide 40, which says best characterizes

22  it.

23           Do you see that?

24      A.    I -- unless I step out -- okay.

25      Q.    Well, it's on your screen, too, isn't it?

1   A.   Oh, you mean where I put the yellow?

2   Q.   Yes.

3   A.   I can't see your laser, but I did highlight a

4   portion that said best characterizes it.

5   Q.   Okay.  The very last bullet of the ISO/SGML

6   standard says that the combination of the GI -- let's

7   stop there for a minute.

8        The GI is generic identifier, right?

9   A.   Yes.

10  Q.   And that's the same thing as the name that

11  you referenced in Slide 39.

12  A.   In XML, I believe it's called the tag name.

13  Q.   Okay.

14       MR. POWERS:  So if we go back, Chris,

15  quickly to Slide 39.

16  Q.   (By Mr. Powers) The GI that's being

17  referenced in the standard is what you call member ID.

18  A.   Again, I can't see what you're looping with

19  that, but if you're talking about the two -- the yellow

20  part, member ID, that's correct.

21       MR. POWERS:  All right.  Let's go back to

22  Slide 40, please, Chris.

23  Q.   (By Mr. Powers) Now, the standard doesn't say

24  that just GI by itself is a tag, does it?

25  A.   No.

1    Q.    In fact, it says the combination of the GI

2  and its delimiters is called a start tag or an end tag.

3    A.    Yes.

4    Q.    All right.  And it's -- the tag is a

5  metacode, isn't it?

6    A.    No.

7    Q.    Okay.  The tag is what defines the content,

8  though, isn't it?

9    A.    Actually, I think, if you go back and read

10  what I identified in the first part, it says the generic

11  identifier characterizes it.

12    Q.    Your understanding of the Court's claim

13  construction of metacode is a metacode is what helps you

14  define the content of the text, right?

15    A.    You just paraphrased it.  That's not

16  precisely what the Court said.

17    Q.    You're right.  Let's do it exactly.

18            MR. POWERS:  Can we go the Slide 9,

19  please, Chris, Dr. Rhyne's slide?  We'll get it

20  precisely.

21    Q.    (By Mr. Powers) The exact words are, The

22  metacode is an individual instruction which controls the

23  interpretation of the content of the data, correct?

24    A.    Yes.

25    Q.    All right.  Now, on that slide, you cited a

```
 1   specific document, PX60, right?

 2        A.    Yes.

 3        Q.    Now, PX60 doesn't say that the name alone

 4   defines the content; it says the tags define the

 5   content, right?

 6        A.    Yes, it does.

 7        Q.    The tag, which is the delimiter, right?

 8        A.    Yes.

 9        Q.    All right.

10             MR. POWERS:   And if we can go to Slide

11   10, please, Chris, the very next slide of Dr. Rhyne's

12   presentation.

13        Q.    (By Mr. Powers) That presentation also says

14   that the tags are what define the content, not just the

15   name, right?

16        A.    That's the statement that was made in the

17   Microsoft document.

18        Q.    And that's the Court's construction of

19   metacode, is what defines the content, right?

20        A.    Well, again, you paraphrased it.  It's on the

21   left.  It's an individual instruction that controls the

22   interpretation of the content of the data.

23        Q.    And each of the supporting documents that

24   you're relying upon cites the tag as doing that, not

25   just the name which you cited.
```

1           That's true, isn't it?

2      A.    I can't tell you each of them does, but

3 certainly the two that you looked at.  I think in

4 Microsoft terminology, they tend to refer to tag.

5 Mr. Little would have to explain whether, by that, he

6 meant the tag name or the tag, including the brackets.

7 But, certainly, in the standard terminology, the term

8 tag includes the brackets.

9      Q.    All right.  And it's the tag that controls

10 the interpretation of the content, doesn't it?

11     A.    No.

12     Q.    Isn't that exactly what you put on your slide

13 it said?

14     A.    I found the closest Microsoft documents that

15 I could find to support the fact that I think Microsoft

16 understands that these metacodes, custom metacodes,

17 relate to the content of the data.  And certainly, the

18 people at Microsoft, somewhat loosely, use the term tag.

19     Q.    All right.  Let's go to the very next slide

20 that you cited, Slide 11.

21     A.    Uh-huh.

22     Q.    That refers to PX390.

23           That also references the tag, not just the

24 name of the tag.

25     A.    That's what the -- that's the terminology

1  that's used in Microsoft.

2      Q.    And the standard, the SGML standard, PX131,

3  also says the tag includes the delimiters, right?

4      A.    I think both it and the XML standard refer to

5  the combination of the tag name and the brackets on

6  either end, and additionally, to the slash as the tag.

7      Q.    And let's go to the last slide that you cited

8  to the jury for support of your position, and that's

9  Slide 12 referencing PX356.

10         That also addresses the tag, not the name,

11  right?

12     A.    I don't see the word tag there.  Perhaps

13  I'm --

14     Q.    Fair enough.

15         What the -- what the -- this is a portion you

16  cited from PX356, and it says that data is organized in

17  a manner that clearly and unambiguously identifies each

18  individual piece of information.

19         Without the brackets, it does not identify it

20  as a tag.  That's true, isn't it?

21     A.    Well, without the brackets, you don't have

22  the tag.  But without the brackets, you certainly have

23  member ID.

24     Q.    And if you were in text, you just had text,

25  and you didn't have the brackets that said member ID,

1   the computer would think that's just text.

2       A.    You have to have the brackets to be able to

3   distinguish the fact that the tag name is present; it's

4   not ordinary text.  But you use exactly the same

5   brackets for every one of these, so that's one of the

6   bases of which I don't think that the bracket is part of

7   the interpretation.

8       Q.    So let's go back.

9             The brackets are what makes the computer

10  recognize that term, member ID, as not being just

11  general text.  That's fair, isn't it?

12      A.    I agree with everything you said with one

13  exception.  It's not -- those brackets are not unique to

14  member ID.  They set off every one of the tag names --

15      Q.    Agreed.

16      A.    -- regardless of which tag name they are.

17      Q.    We totally agree on that, but let's just take

18  the member ID example, what you used.

19      A.    Okay.

20      Q.    If you had member ID without brackets, that

21  member ID name wouldn't control the interpretation of

22  any data; it would just be viewed as data, right?

23      A.    You would not be able to recognize it in the

24  string of content as being a metacode without the

25  brackets to differentiate it from the text.

1    Q.    And without the bracket to differentiate it

2  from the text, the term member ID would not control the

3  interpretation of the content of the data; it would just

4  be data; is that correct?

5    A.    Well, if it doesn't have the brackets, then

6  it's not identifiable as a metacode.

7          But you and I have a difference of opinion.

8  I can persist in my opinion that the brackets simply are

9  there to do the very thing you're asking about:   To

10  distinguish the fact that between those brackets is a

11  metacode.

12    Q.    And, Dr. Rhyne, let's -- please listen to the

13  question I'm asking you.  This is a slightly different

14  question.

15    A.    All right.

16    Q.    If you don't have the brackets and you

17  have -- but you still have your name, member ID, and

18  it's sitting there in text, that same name, member ID,

19  without the brackets would not, quote, control the

20  interpretation of the content of the data.

21    A.    I think --

22    Q.    Do you agree with that statement?  Yes or no.

23    A.    I'm not sure I can answer it yes or no

24  without some clarification, but let me try.  I'll say

25  yes, because you wouldn't be able to recognize the

1  presence of member ID as being special and different

2  from the rest of the text.

3      Q.    Okay.  Now, the XML spec also recognizes that

4  it's the tag which controls the interpretation of the

5  content as well, correct?

6      A.    I -- I'm not in a position to disagree with

7  that.

8      Q.    All right.  And the patent, the '449

9  patent-in-suit here, repeatedly refers to the tag as the

10 whole thing, the name plus the brackets and the slash,

11 where appropriate, doesn't it?

12     A.    Yes, but I don't recall ever searching for

13 the word tag.  But I think I pointed out to the jury an

14 instance where that is not true.  It was that K word

15 example where they specifically dealt with the word

16 without the delimiters as being what they felt

17 characterized some Canadian industry.

18     Q.    If you'll turn to Column 9 --

19     A.    All right.

20     Q.    -- of the '449 patent.

21     A.    I have that.

22          MR. POWERS:  And, Chris, could you bring

23 up -- oh, it's going to be a little hard to read,

24 because the font is so small, but start at about Line 25

25 on the -- in Column 9.  Let's bring that up and see if

 1   we can see it.

 2               Can you all read that okay?

 3       Q.    (By Mr. Powers) Dr. Rhyne, do you see the

 4   portion I've brought up on the screen so we're both

 5   talking about the same thing?

 6       A.    I do.

 7       Q.    You see about Line 28 where it says, Read

 8   characters until code reads to, bracket, chapter, close

 9   bracket, which is a complete code.

10               Do you see that?

11       A.    Yes.

12       Q.    So that's the '449 patent itself teaching you

13   that a code isn't complete until it has the brackets,

14   right?

15       A.    Actually, what it's teaching is the way in

16   which the algorithm set forth at this part operates to

17   identify the metacodes.

18       Q.    You'll at least agree with me that the '449

19   patent calls the complete code the name plus the

20   brackets, not just the name.

21               That's fair; am I correct?

22       A.    At that point, they refer to the fact that

23   they don't know that chapter is present away from the

24   text until they get both the left and right bracket,

25   you're right.

1    Q.    And each place in Column 9 -- and we'll walk

2  through a few of them -- you'll agree with me that every

3  time they call something a code, it has the name and the

4  brackets, not just the name.

5          That's fair, isn't it, Dr. Rhyne?

6    A.    That's right.  In this preferred embodiment,

7  this one way of doing the claim, that's the term that

8  they use.

9          MR. POWERS:  So let's go down to about

10 Line 31, Chris.

11   Q.    (By Mr. Powers) You see there where it talks

12 about title, that has a bracket, too, doesn't it,

13 Dr. Rhyne?

14   A.    Yes.

15   Q.    And then you go down to, let's say, Line 36,

16 which is the next code, again, that's the title with the

17 brackets, correct, Dr. Rhyne?

18   A.    Let me be sure.  And the slash.

19   Q.    And the slash.

20   A.    Yes.

21   Q.    Let's talk about what that slash means.  That

22 slash actually means something special, doesn't it?

23   A.    It does.

24   Q.    It means that's the end of the text that

25 should be treated specially by this title metacode,

1    right?

2         A.    Right.  It tells you -- I think the term in

3    the claim is addresses of use, and it gives you the

4    extent to which the originally found metacode is

5    supposed to apply.

6         Q.    So without that slash, you don't know where

7    the content that's to be interpreted, according to the

8    metacode, ends, do you?

9         A.    That's correct.  That's part of the same

10   thing.

11        Q.    Now, in your expert report in this case, you

12   also treated the tag as the metacode, not just the name

13   of the tag; isn't that right?

14        A.    You need to show me exactly -- I think I told

15   Mr. Kudlac at my deposition that, not realizing that

16   this was going to be an infringement -- a

17   non-infringement argument, I may have, much like

18   Microsoft does, just used the term tag as a general

19   term.

20             But -- and I think you're talking about in my

21   original expert report, correct?

22        Q.    Do you have your reports with you?

23        A.    I do not.

24        Q.    Okay.  I've got a couple of copies.

25                  MR. POWERS:  May I approach, Your Honor?

1          THE COURT:  Yes, you may.

2          THE WITNESS:  Thank you.

3          MR. POWERS:  Would Your Honor like a

4 copy?

5          THE COURT:  Okay.

6     Q.    (By Mr. Powers) Dr. Rhyne, referring to your

7 December 8 expert report, would you look at Page 8,

8 please.

9     A.    This is the one -- this is the first report,

10 right?

11    Q.    Yes, sir.

12    A.    I didn't remember the date.  And what page?

13    Q.    Page 8, please.

14    A.    8.  I have that.

15    Q.    There are two lines above --

16          MR. POWERS:  We don't need to put it up,

17 Your Honor.

18    Q.    (By Mr. Powers) But two lines above 4.2 says

19 Custom XML tag, they are a metacode, right?

20    A.    Uh-huh.

21    Q.    And you refer then specifically to the

22 Court's construction of that.

23    A.    I did.

24    Q.    So there you're specifically saying that tags

25 are metacodes.

1      A.     I certainly said that.

2      Q.     And tags include brackets and the slash;

3  they're not just the name.  You've already testified to

4  that, right?

5      A.     Well, I understand that the word tag has some

6  looseness about it, and I'm loose there, but I believe

7  the way XML designs it, that the tag includes the

8  metacode --

9      Q.     All right.

10     A.     -- surrounding the tag name.

11     Q.     And you say the same thing on Page 12 in

12  Paragraph 37, don't you?

13     A.     I'll take a look.

14            All I did there, I think, was to explain the

15  syntax of an XML tag, including the tag name surrounded

16  by the brackets and the -- what's called a data element.

17     Q.     So in that additional example in your expert

18  report, you refer to a tag including the brackets.

19  That's fair, isn't it, Dr. Rhyne?

20     A.     A tag -- the term tag includes the brackets.

21  There's no question about it.

22     Q.     All right.  And the tag is a metacode, at

23  least on Page 8.

24     A.     I said that --

25     Q.     All right.

1       A.      -- there.

2       Q.      Now, you -- when you were doing your expert

3   reports, you considered specifically the testimony of

4   Keith Thomas, who testified yesterday.

5               Do you recall that?

6       A.      I believe there are a couple of references to

7   Mr. Thomas' testimony in my report.  I don't have exact

8   recollection of it, so if you would point me to some

9   particular page.

10      Q.      Mr. Thomas of i4i also testified that the tag

11  includes brackets.

12              Do you recall that?

13      A.      I do not.

14              MR. POWERS:  Your Honor, I'll read from

15  Mr. Thomas' deposition of July 16th from Page 16, Line

16  20 -- actually, 16 -- 17, Line 12 will be quicker,

17  through 17, Line 21.  So it's 12 to 21.

18              QUESTION:  As a default mechanism, is

19  that XML code or XML tag, I guess it's referred to, is

20  that what you're referring to as metacodes?  Right?

21              ANSWER:  Uh-huh.

22              QUESTION:  That they start with a

23  less-than sign and end with a greater-than sign?

24              ANSWER:  That's correct.

25      Q.      (By Mr. Powers) That was the testimony of

1   Mr. Thomas that you read and considered and relied upon

2   in your report, correct, Dr. Rhyne?

3       A.    I don't recall relying upon that testimony in

4   my report.  I don't believe that I did.

5       Q.    You certainly didn't cite it, I'll agree with

6   that, but you did read his testimony.

7       A.    I have read his testimony once or twice, I

8   think.

9       Q.    And you listed it in the material that you

10  considered in coming to your opinions?

11      A.    I'm -- I'm -- I would believe I did.  I

12  certainly read it.  So I think it was probably listed on

13  the set of materials that I read.

14      Q.    And Dr. Martin, whose testimony you've relied

15  upon extensively here --

16      A.    Yes.

17      Q.    -- also testified that a tag includes the

18  brackets and the slashes, right?

19      A.    I'm not sure that I've read all of his

20  testimony.  Are you talking about his deposition

21  testimony?

22      Q.    His deposition testimony, but you also had

23  discussions with him.

24      A.    Oh, at length, yes.

25      Q.    And you understand that Mr. Martin --

1  Dr. Martin understands that the tag includes the

2  brackets, as well as the slash.

3      A.    He may have said that in his deposition.

4  We've never talked about that particular issue.  You

5  have to remember that I was responsible for

6  infringement, and he was responsible for understanding

7  the details of the software.

8            But I doubt -- I'm surprised if he was ever

9  even asked about metacode.  That's not a term he was

10  familiar with since it's a patent term.

11      Q.    You wouldn't be surprised, though, if

12  Dr. Martin considered the brackets and the slash to be

13  part of the tag.

14      A.    If he didn't, he would be wrong.  They are

15  part of the tag.

16      Q.    Now, let's talk about another issue.  You --

17            MR. POWERS:  Let's go back, Chris, to his

18  slide with the Court's definition, Slide 9, I think will

19  do it.  There we go.

20      Q.    (By Mr. Powers) You testified -- do you

21  recall testifying yesterday at some length about your --

22  in your mind, the difference between the formatting and

23  metacodes?

24      A.    I think I -- I think it was a little bit

25  differently, but I understand what you're asking about.

 1      Q.    All right.  As I understand your testimony,

 2 your testimony is that something like bolding or italics

 3 is formatting but not a metacode; is that fair?

 4      A.    It's -- it's not represented by a metacode in

 5 Custom XML.  In fact, I think primarily I've cited to

 6 people like Mr. Paoli that made that distinction.

 7      Q.    I'm referring, not to something Paoli might

 8 have said but to the Court's construction that you're

 9 applying.  Let's stay with that.

10           That's on Slide 9.  Do you have that in front

11 of you?

12      A.    Yes.

13      Q.    Okay.  The Court's construction of metacode

14 says that it's an individual instruction which controls

15 the interpretation of the content of the data, right?

16      A.    Yes.

17      Q.    Now, you do consider a paragraph instruction

18 to be metacode.  That's one that's shown actually in the

19 patent, right?

20      A.    Well, it's interesting, because it just says

21 P-A-R-A.  You know, I think it probably meant paragraph,

22 but that would be probably better asked of Mr. Owens.

23 It's whatever he thought it meant when he said P-A-R-A.

24      Q.    And in the example of the patent, it actually

25 is a start of a paragraph.

1      A.      It appears to be.

2      Q.      Okay.  So let's assume that it is what we

3  both think it is, that para means paragraph.

4      A.      I have no problem with that.

5      Q.      And your interpretation, a paragraph

6  instruction is a metacode within the Court's

7  construction; is that right?

8      A.      Whatever Mr. Owens intended the P-A-R-A to

9  mean, it certainly was used to identify the paragraph

10  indentation.

11          But whether there was additional content or

12  interpretation that needed to be taken from that data,

13  as is true with many metacodes, we don't know.  They're

14  in the mind of the person that created the metacode.

15      Q.      You don't know what a paragraph means

16  something more than paragraph.

17      A.      That's correct.

18      Q.      Let's just assume it means paragraph.

19      A.      Well, I'm willing to make that assumption for

20  the purpose of your hypothetical.

21      Q.      Okay.  So under your interpretation,

22  something which just says we're going to start a new

23  paragraph, that is a metacode?

24      A.      No, I wouldn't agree with that.

25      Q.      Even though that's shown to be a metacode in

1    the patent?

2        A.    Well, you just said if I agreed with you, if

3    I took it for -- I'm really not trying to mince words

4    with you, but if all he meant by para, P-A-R-A, was just

5    a simple indentation, then that kind of crosses the

6    border between meaning and formatting.

7                But, again, we don't know.  He didn't say

8    something simple.  He said P-A-R-A.  And I don't know

9    what he may have meant by that.

10       Q.    Well, the patent certainly doesn't say that

11   para means anything other than paragraph, does it?

12       A.    I don't think it ever explains it, to the

13   best of my recollection.

14       Q.    But it does show it being used to start a new

15   paragraph.

16       A.    That may be one of the characteristics of

17   what that particular metacode has incorporated.

18       Q.    So let's just assume that it's what it seems

19   to be, which is it's just saying -- para just means

20   start a new paragraph, okay?

21               Are you with me?

22       A.    If that's all it meant, then it would be a

23   metacode that dealt with formatting.

24       Q.    All right.  But it is a metacode.

25       A.    Para is a metacode.

1      Q.    Within the meaning of the Court's

2  construction.

3      A.    Yes.

4      Q.    Even though it's just saying, instead of

5  starting over here, we're going to indent and start a

6  new paragraph.

7      A.    You're asking me to assume that to be the

8  case.  I don't agree with that, but I mean, if I assume

9  that, that's a tautology, as they say.  You're asking me

10 to assume it's nothing but a paragraph, and then you're

11 saying isn't it just a paragraph.  Yeah, sure.

12     Q.    In fact, the bold tells you more about the

13 content in the data than paragraph, doesn't it?

14     A.    Bold certainly can -- you can use it to make

15 something seem more important.

16     Q.    In fact, that's typically how it is used in

17 documents, to say this content is important.  You bold

18 it, right?

19     A.    It tells you that the letters are important,

20 but it doesn't tell you what the content means.  It

21 tells you it's just -- it's important.

22     Q.    It tells you something about that content; is

23 that fair, Dr. Rhyne?

24     A.    It says pay more attention to this.

25     Q.    All right.  So that is something that affects

1 the interpretation of the content.

2     A.   I don't think that.  I think it interprets

3 the -- affects the presentation of the content -- or

4 excuse me -- the presentation of the data.

5     Q.   But it also tells the reader this is

6 important.  That's -- that's the interpretation of the

7 content, isn't it, Dr. Rhyne?

8     A.   It's interpretation but not of the content.

9 You don't know any necessary meaning as to what the

10 emboldened letters are.

11     Q.   But it tells you something about that; i.e.

12 that it's important.

13     A.   It tells you to pay attention to it.

14     Q.   All right.  That it's important.  That's the

15 common use, right?

16     A.   I can imagine a use where they told you it

17 wasn't important.  I don't know.  It certainly does not

18 tell you --

19     Q.   Is that how you use bold when you're creating

20 your charts for the jury, that you bold something that's

21 not important?

22     A.   I'd have to see where I bolded something.

23 Generally, I use bold to highlight something.  Either

24 that or italics or underline.

25     Q.   So bolding, italics, and underlining all are

1  signals to the user that there's something important

2  about that content.

3      A.    That's correct.  They don't tell you what the

4  content is, but they say this -- this is something

5  different from the rest of the characters that are not

6  bolded, underlined, or italicized.

7      Q.    And paragraph, which you said -- and you

8  said -- so your position is that bold, italics, and

9  underline aren't metacodes.

10      A.    Yes, not in and of themselves.

11      Q.    But paragraph is under our assumption?

12      A.    No.  P-A-R-A is.  And you said to assume it

13  was a paragraph.  Under your assumption, it would be.

14      Q.    Under my assumption that's all it means is

15  paragraph, you still think it's a metacode, if it just

16  means paragraph.

17      A.    I got lost in that question.

18      Q.    Sure.  I probably just established that if it

19  just meant paragraph and nothing else, you would still

20  call it a metacode.

21      A.    I would call it a metacode because of the way

22  it's used in the patent example.

23      Q.    Okay.

24      A.    And if it only meant paragraph, then that's

25  all it meant.

1        Q.      But paragraph doesn't tell you anything about

2   the content, does it?

3        A.      I agree with that.

4        Q.      Doesn't even tell you to pay attention to it,

5   not as much as bold.

6        A.      We're getting metaphysical here.  I -- it

7   might, but it doesn't tell you anything about it other

8   than the fact that it's a new idea.

9        Q.      So paragraph that doesn't tell you anything

10  about content is a metacode, but bold that tells you to

11  pay attention to the content, that it's important, does

12  not.

13              Is that a fair summary of your position?

14       A.      Under the assumption you've asked me to

15  agree, which I don't agree with, then under that

16  assumption, your statement is correct.

17       Q.      All right.  Let's turn to the second issue of

18  whether there's a data structure within Word within the

19  meaning of the Court's construction.

20              MR. POWERS:  And, Chris, could you pull

21  up Slide 3 from Dr. Rhyne's presentation?  I think that

22  might be the easiest way to do it.

23       Q.      (By Mr. Powers) Do you see the Court's

24  construction that you put off to the left there that

25  says, A map of metacodes means a data structure that

1  contains a plurality of metacodes and their addresses of

2  use corresponding to a mapped content?

3       A.    Yes.

4       Q.    So that's what you have to find in Word in

5  order to find that mapped -- map of metacodes means in

6  the Court's construction?

7       A.    Yes.

8                 MR. POWERS:  Now, Chris, could you pull

9  up Page 45 from Dr. Rhyne's report, please.

10                And could you just call out the map of

11 metacodes portion, the whole thing.

12      Q.    (By Mr. Powers) This was how you presented

13 your findings in your report to us about why you thought

14 there was a metacode map in Word.  Straight out of your

15 report, correct?

16      A.    That's a copy of the way the figure was

17 reproduced in my report.

18      Q.    And you represented that metacode map as a

19 three-column structure, correct?

20      A.    Yes.

21      Q.    And -- and I'm not saying you did it

22 deliberately, Dr. Rhyne.  We know each other too well in

23 order to say that.  But behind that red bar, there's

24 something that says merge for display purposes.

25      A.    Yes.

1      Q.     Merge structure for display purposes.

2      A.     That's correct.

3      Q.     Okay.  And when you said --

4             MR. POWERS:  Can we bring that out,

5   Chris?  It's okay if we can't.

6      Q.     (By Mr. Powers) You said merged structures.

7      A.     Yes.

8      Q.     So you knew, when you did your report, that

9   there wasn't a single structure, that there were

10   actually multiple structures that you were smooshing

11   together to present that as a single structure.

12      A.     Well, smoosh is not a technical word, but as

13   I said yesterday, data structure is a hierarchical term,

14   and there are actually, at a lower level, seven

15   structures that go together to make that.

16      Q.     So you recognize that in Word, you were

17   taking multiple structures and presenting them as one.

18      A.     As a single higher-level data structure,

19   that's correct.

20      Q.     Okay.  But there were --

21             MR. POWERS:  And, Chris, if we can go

22   back to the entire document.

23      Q.     (By Mr. Powers) There were, as you counted

24   them, at least seven structures shown in that overall

25   figure that you were merging together to present it as

1   if it were a single structure; is that fair?

2       A.    Well, everything's fair, except as if it

3   were.  In my opinion, it is a single structure at the

4   higher level, but it is composed of, I think, seven --

5   seven other structures.

6       Q.    Well, you know in Word, there are things

7   called structures, right?

8       A.    You mean in the C language?

9       Q.    Exactly.  Exactly.

10      A.    That there is a -- that there's class and

11  structure, in plus, plus at least, but there is a

12  structure that you can define in C called a struct,

13  S-T-R-U-C-T.  I know that.

14      Q.    All right.  And struct is a term in the

15  source code of the Word software that tells you what

16  structure is.  And that's what you were calling

17  structure.

18      A.    It tells you what one type of data structure

19  is, the type that's called struct.

20      Q.    All right.  So you've talked a couple of

21  times about there being seven structures.  Let's make

22  sure it's clear what they are.

23            You marked on this board Figure 12 in red, so

24  I'll mark on it in blue so there's no doubt about who

25  marked what.  Let's look at each of the structures.

1          One structure that you described is this

2     hplcbkf first.  That's one structure, right?

3          A.    Well, that's the -- it is a form of data

4     structure, that's correct.

5          Q.    All right.

6               MR. CAMPBELL:  Excuse me.  I'm sorry.  I

7     don't mean to interrupt, Your Honor.  Do you have a dry

8     erase, just so we don't destroy the board?

9               MR. POWERS:  Well, as long as it's not

10    erased, that's fine.

11              MR. CAMPBELL:  Thank you.

12         Q.    (By Mr. Powers) So Structure No. 1 that you

13    were referring to when you said were a structure, it's

14    right there, what I've circled in blue and labeled it as

15    1, Dr. Rhyne?

16         A.    That's not where I started my count.

17         Q.    All right.  Well, let's use your count and do

18    it the way you did it.

19              What was the first structure you were talking

20    about as No. 1?

21         A.    We were looking for the metacodes, and the

22    question, at least the way it was kind of raised in your

23    opening, as to whether or not that green box right there

24    within that red thing, in and of itself, had the

25    metacodes.

1          So I started my count with basically the

2  first structure over here that says pointer on top of

3  it.

4     Q.    So let's circle that one.  That's the one

5  that's labeled sdtix?

6     A.    Well, it's the pointer.  I think that's the

7  label below it, but the pointer sits a little bit

8  separate from it.  You can see there's a little bit of a

9  space right between the green unlabeled box and the

10  first part.  But that's okay to call it that --

11     Q.    Okay.

12     A.    -- for the purpose of the record, the sdtix

13  box.

14     Q.    All right.  So the first structure is the

15  sdtix; that you were referring to the pointer inside

16  that?

17     A.    Yes.

18     Q.    All right.  That's structure one.

19          Structure 2, was that the one next to it,

20  sdti?

21     A.    Yes.

22     Q.    All right.  Let's circle that and label it 2.

23  And the third structure, I take it, goes down --

24     A.    That's the tiq.

25     Q.    The tiq.  All right.

1           So I've circled the tiq and labeled it No. 3.

2   And I -- I've accurately reflected your testimony, Dr.

3   Rhyne?

4       A.    You're doing fine.

5       Q.    Okay.

6       A.    Counting it this way, I think we'll get six,

7   but that's okay.

8       Q.    Now, No. 4, where is that?

9       A.    You can put it -- it's one of these three

10  down here.  I don't care which one you number No. 4.

11  Probably the white one, this one with this incredibly

12  long name on the lower left.

13      Q.    Right here (indicating)?

14      A.    Yes, sir.

15      Q.    All right.  So I've labeled that one 4, and

16  that's the one that's labeled X -- vxsdt.hplxsdr.

17          All right.  What's No. 5?

18      A.    Probably the one above that.  It's the xsdr.

19      Q.    And No. 6?

20      A.    Would be the one over here that's labeled

21  just simply a list of possible tag names.

22          And to complete the map of metacodes, which

23  must also, I think, include the addresses of use, then

24  you kind of get back over to the two things on the left

25  side of the map that have the CP first and the CP limit.

1    Q.    And those come from up here from the bmdx,

2  right?

3    A.    They're pointed to with the handle from

4  there, but they are -- they are simply pointed to -- no,

5  no.

6    Q.    So you don't agree with that?

7    A.    No.

8    Q.    All right.

9    A.    I would put them down here inside the map of

10  metacodes.

11        And you could call that 7 or 7 and 8.  I

12  really wasn't addressing what I thought the issue you

13  had raised in the opening was there.

14    Q.    All right.  So you're saying that this here

15  and this here (indicating) where the 2 and 9 are, that's

16  7 and 8?

17    A.    The column.

18    Q.    Oh, the whole column.

19    A.    The column structures.

20    Q.    I got it.

21    A.    You can make those 7 and 8, if you want to

22  look -- they are -- they are two separate pieces that

23  have the first and last -- or limit and the first.

24    Q.    And those values, from what we've labeled as

25  7 and 8, CP first and CP limit, come from up here in the

1  BMDX version; is that fair?

2       A.    No.

3       Q.    You don't think that's --

4       A.    That's certainly not the way I would explain

5  it.

6       Q.    All right.

7       A.    The structure that holds those values is

8  pointed to by the handle that's held up in those two

9  yellow boxes.  But the data that the 2 and the 9 and the

10  other numbers -- are not up there; they're pointed to by

11  the handle, which is defined up there.

12       Q.    Okay.

13            THE COURT:  Mr. Powers, when you get to a

14  stopping place, we'll take our morning break.

15            MR. POWERS:  That's fine, Your Honor.

16            THE COURT:  Okay.  We'll take our morning

17  break at this time.  At this time, we'll be in recess

18  until 10:45.

19            COURT SECURITY OFFICER:  All rise.

20            (Jury out.)

21            (Recess.)

22            COURT SECURITY OFFICER:  All rise.

23            (Jury in.)

24            THE COURT:  Please be seated.

25            All right.  Mr. Powers, you may proceed.

1              MR. POWERS:  Thank you, Your Honor.

2      Q.    (By Mr. Powers) Dr. Rhyne, when we broke, you

3  identified eight data structures on your Figure 12

4  board.  And I believe you testified yesterday that this

5  is shown at a high level, so there's other structures

6  that aren't shown.

7              Is that fair?

8      A.    There are some pointer boxes, and I think in

9  some cases where there's a handle up at the top, and I

10  added that little red box just to show.

11      Q.    Now, your position, as I understood it

12  yesterday --

13              MR. POWERS:  Chris, let's put up Slide 46

14  from Dr. Rhyne's presentation.

15      Q.    (By Mr. Powers) Was that this thing you've

16  shown on the left can still be considered as -- and I

17  think you said it today, too -- a single data structure

18  under this IEEE definition, right?

19      A.    Well, under the -- what one of ordinary skill

20  in the art would understand a data structure would be,

21  and this is an excellent example of that terminology.

22      Q.    Now, the IEEE dictionary definition that you

23  cited is that a data structure is a physical or a

24  logical relationship among data elements designed to

25  support specific data manipulation functions, right?

1     A.     Yes.

2     Q.     It doesn't say that it's -- that you can

3 combine a number of data structures and make a data

4 structure.  It says data elements can be combined.

5     A.     That's what it says.

6     Q.     Now, the term data element doesn't mean data

7 structure, does it?

8     A.     I think it depends on who thinks what, you

9 know.

10     Q.     Well, the term data element is defined in the

11 very same dictionary that you cited to the jury just

12 three pages earlier, isn't it?

13     A.     I believe that's correct.  I don't remember

14 what the definition is, but it does have a separate

15 definition.

16          MR. POWERS:  Your Honor, if I may,

17 we've -- I went and found the dictionary that Dr. Rhyne

18 had relied upon and found that earlier page.  And we've

19 marked it as Exhibit 2406.

20          If I may approach and introduce that into

21 evidence as well.

22          THE COURT:  All right.

23     Q.     (By Mr. Powers) Now, Dr. Rhyne, I've handed

24 you Exhibit 2406.

25     A.     Yes.

1      Q.     Now, do you see your definition of data

2   structure there on Page 308?

3      A.     Yes.

4      Q.     And if you go back to Page 305, at the very

5   bottom, and continuing on to 306.

6               MR. POWERS:  Chris, could you just bring

7   up the definition of data element, please?

8      Q.     (By Mr. Powers) Do you see that, Dr. Rhyne?

9      A.     At the bottom, if you're talking about what

10  carries over to the next page, I see that.  Uh-huh.

11     Q.     Okay.

12              MR. POWERS:  And, Chris, I think you need

13  a little bit more to finish it off from the bottom side.

14  There we go.

15     Q.     (By Mr. Powers) Now, the same IEEE dictionary

16  that you relied upon and said is reliable, defines data

17  element as not a data structure.  It doesn't say you can

18  combine those.  It says it's the smallest attribute;

19  just a single place where a piece of data is, right?

20     A.     I don't see the word smallest.  Am I missing

21  it?

22     Q.     Well, let's take Item A, a uniquely named and

23  defined component of a data definition, a data cell --

24     A.     Uh-huh.

25     Q.     -- into which data items' actual values can

1   be placed.

2        A.     Yes.

3        Q.     A data cell is not a data structure.  That's

4   a single place where a piece of data is stored, right?

5        A.     That could mean that.  And I -- obviously,

6   this thing makes reference to a data definition as well,

7   another term.

8        Q.     And second is a data definition that cannot

9   be divided into other individually named data

10  definitions, right?

11       A.     That's an alternate definition, yes.

12       Q.     And your data structures can be divided.

13  They're not that smallest unit, right?

14       A.     That alternate definition doesn't apply here.

15       Q.     Your definition -- a data structure doesn't

16  meet that definition, true?

17       A.     The data structures that I've pointed to here

18  don't meet that definition.

19       Q.     And don't meet the first one either, because

20  it's not a data cell.  Those are much larger than a data

21  cell, aren't they?

22       A.     I don't -- I don't think that there's a clear

23  definition here as to what a cell would be as a

24  component of a data definition.  These are defined data

25  structures, and they would meet the definition of data

1    definition, I think.

2        Q.    Well, a data cell, you know what that means,

3    don't you?  That's a -- that's a single place where a

4    single piece of data or value is entered.  That's what a

5    data cell is, right?

6        A.    That's -- that's one interpretation of the

7    term cell.

8        Q.    Okay.  That's a common interpretation, isn't

9    it, Doctor?

10        A.    I think that's common, uh-huh.

11        Q.    Right.  So it's not a data structure, is it?

12        A.    It is a data structure.

13        Q.    A single cell where a single piece of data is

14    stored?

15        A.    Yes.

16        Q.    So everything's a data structure then?

17        A.    If they're all abstract data types.  People

18    use the term data structure to mean pretty much any

19    place where you can save data, depending on how it's

20    organized, if it meets that logical and physical

21    relationship and if it meets the part that says there

22    has to be a functional purpose as to what you collected

23    them together for.

24        Q.    So under your interpretation, as I understood

25    it --

1          MR. POWERS:  May I approach the Figure 12

2   again, Your Honor?

3          THE COURT:  Yes, you may.

4     Q.   (By Mr. Powers) You felt comfortable calling

5   what you've created here as this map of metacodes, a

6   data structure, because there's pointers in other

7   relationships to all of these other data structures.

8          Is that fair?

9     A.   There -- they're well-established with clear

10  intent relationships that lead you from green box to

11  green box to green box, ultimately reaching what I

12  consider to be the list of metacode tag names.

13    Q.   The fact that those relationships let you

14  combine all of them into one in your view?

15    A.   That's correct.

16    Q.   But there's also a relationship between this

17  content and what you called the map of metacodes, isn't

18  it?

19    A.   There's a numerical identification process.

20    Q.   In fact -- so in your -- by your definition,

21  the content is also part of the data structure?

22    A.   No.  By your definition, not by mine.

23    Q.   Well, I thought you just said that if there's

24  a logical relationship, then it's part of the same data

25  structure.  And you just said that there's a

1  relationship between that mapped content and what you

2  called the map of metacodes.

3      A.    Yeah, there's a numerical identification that

4  this says 2.  It gives you the fact that if you count to

5  the second character over here, that's the point that

6  that CP first is identified.

7      Q.    Well, it's more than that, isn't it,

8  Dr. Rhyne, because -- in fact, the only way you could

9  start looking for this map of metacodes is when Word

10  reaches through here and sees something in the content

11  that says I don't recognize that; I have to go figure

12  out what it means, doesn't it?

13      A.    Not in that content.

14      Q.    In the mapped content?

15      A.    Not -- not in the mapped content.  You'd find

16  that in what the claims call the input content stream.

17      Q.    In that input content stream, you go look at

18  the content and say, uh-oh, here's a character I don't

19  recognize; I'd better go figure out what it means.

20              Is that fair?

21      A.    You already know what that character means.

22  It means it's the beginning -- it's the point at which

23  you transition from regular text to a tag name.

24      Q.    And so when you're reading the mapped

25  content, that tells you to go and you see -- and when

1  Word is reading the mapped content and it hits this

2  spot, it takes you up to the CP first table, doesn't it?

3      A.    No.

4      Q.    That's not how you understand it to work?

5      A.    No.

6      Q.    Would Dr. Martin know that better than you?

7      A.    I don't think he would know that any better

8  than I would, but it's something we've talked about at

9  length.  That 2 came from analyzing the input content

10 stream and not from analyzing the mapped data.

11     Q.    Let me ask that.  When you talk about that 2,

12 you're referring to the 2 in the CP first table?

13     A.    Yes.

14     Q.    But the 2 reflects the number here in the

15 mapped content data, right?

16     A.    It tells you where the effect, the

17 interpretation, of, in this case, member ID, should

18 begin to be applied.

19     Q.    Okay.  Now, yesterday you were talking about

20 what's in the house.  You were addressing my house

21 analogy, and you were saying everything's in the house,

22 because the house is Word, right?

23     A.    I couldn't help but notice that that same 2

24 intrigued you.

25     Q.    Now, if everything's in the house, that

1  mapped content is in the house, too, isn't it?

2      A.    Well, not -- everything is not in the house.

3      Q.    That's what you said yesterday, isn't it?

4      A.    No.   I said that it wasn't that we were going

5  to different houses.

6      Q.    You said that the house is Word.

7      A.    The house is Word.

8      Q.    And that mapped content is part of Word.

9      A.    It's somewhere in that house, but it's not

10 linked, according to that clearly defined pathway that

11 Mr. Little or somebody else said this is how you're

12 going to get from the starting point inside the map of

13 metacodes over to this location where it says member ID.

14     Q.    But it is linked by another path; you just

15 told us it was, right?

16     A.    I didn't -- I didn't understand what you just

17 said.

18     Q.    You see this arrow on your board from 2 down

19 to the mapped content?

20     A.    Yes.

21     Q.    That was a link between what you're calling a

22 map of metacodes and the mapped content, right?

23     A.    Yes.   It's a reference, I think, to use the

24 terminology that Dr. Martin -- it tells you that this

25 metacode is to be applied between the second character

1  and stop at the eighth character just before the ninth.

2      Q.    And there's a similar reference from what

3  you're calling a map of metacodes down to the mapped

4  content from the 9, right?

5      A.    There is a reference.

6      Q.    And so that reference establishes a

7  relationship between those two things, doesn't it?

8      A.    They have a relationship.

9      Q.    And so that relationship would make the

10  mapped content part of the same data structure as the

11  map of metacodes in the same way that these other

12  relationships made it part of the mapped metacodes,

13  wouldn't it?

14      A.    Well, I don't agree with that.  But,

15  actually, even if one were to take that interpretation,

16  it wouldn't affect anything in my infringement analysis

17  in that the only thing that has to be distinct is where

18  they are stored in memory.

19          I don't think they're linked in the sense

20  that the IEEE definition requires or suggests.  But even

21  if they were, it leaves -- the claims are still met.

22      Q.    Wasn't the whole point of this patent to

23  separate the metacodes from the content?  That's the

24  whole point of it, right?

25      A.    They are separated.

1      Q.    Well, but you just said they're linked.

2      A.    They are separated in memory.

3            No, I didn't say they were linked.  I believe

4  you said they were linked.

5      Q.    Well, they are -- I believe you said there's

6  a reference between them.

7      A.    No.  I said there's a relationship between

8  them.

9      Q.    And that relationship is based on the

10  reference between the 2 down in the content and the 9

11  down in the content, right?

12     A.    It's based on the fact that -- we're cycling

13  here.

14           That 2 points to the second character

15  location starting at 0.  Those are not linked in the

16  sense that the head-to-tail relationship between the

17  pointers and the indices that were defined by the

18  programmer who created that high-level data structure

19  established.

20           There's two different intents here between

21  those two sets of information.

22     Q.    All right.  So as I understand your position

23  now, it's that these relationships that you've traced

24  among the greens make all of that part of this one data

25  structure, but the relationships between the yellows

1  don't?

2      A.    They're different relationships.  This is

3  just a numerical identifier.  There's not a pointer in a

4  sense as a -- as a construct.  They're different ways of

5  identifying the -- where in that mapped content they go.

6      Q.    In your prior answer, you said that's based

7  on the intent of the designer.

8      A.    Well, somebody wrote that software, okay?

9  And when David and I -- I've liked through this with

10  him, but when he originally found that process, he

11  traced these paths.  And that's what the programmer

12  intended to do when they set that structure up.

13      Q.    And they also had paths between what you're

14  calling the map of metacodes and the mapped content?

15      A.    Those aren't paths.  Those are numerical

16  identifiers.

17      Q.    So when you wrote on your board these dashed

18  lines, from 2 and 9, those are -- those don't make it

19  part of the same data structure, whereas these dashed

20  lines do.

21          Is that your position?

22      A.    Yes.

23      Q.    Okay.  Now, I believe you will agree with me,

24  as you did in your deposition with Mr. Kudlac, that

25  there's no objective way of drawing a line between the

1  relationships that you've described as being a part of

2  the data structure in green and the ones -- the

3  relationships that you don't think make it part of the

4  structure, which are yellow.

5          There's no objective way to figure that out,

6  because it's all based on intent?

7      A.   Well, let me see.  I thought Mr. Kudlac

8  deposed me for about 10 hours, and I don't remember

9  exactly that sequence of stuff.

10          But he raised the same argument that you

11  have:  Can't you just connect everything together and

12  call it one big data structure, or something along that

13  line.

14      Q.   And you recall there, as here, relying on an

15  inference from the intent of the designer to try to draw

16  a line between the green being all part of one

17  structure, but for some reason, the yellow not being.

18          That's fair, isn't it?

19      A.   It's not -- the intent, as expressed in the

20  actual lines of code that form these linkages, that's

21  correct.

22      Q.   And you will agree with me, as you did in

23  your deposition, that there's no objective way to draw

24  the line that you're drawing for the jury right now?

25      A.   Again, I don't remember exactly what I may

1  have said there, but I think that there is -- there's

2  not -- I couldn't find anything in the code, nor could

3  Dr. Martin, that said, hey, you know, we're going to

4  call this a data structure ourselves.

5       Q.    Let me read --

6       A.    They basically just define the software.

7       Q.    Let me read to you from your deposition,

8  Dr. Rhyne.

9       A.    Would you mind giving me a copy of it?

10      Q.    Of course not.  There's not one in that big

11 binder that I gave you?

12      A.    I think there may be.

13            MR. POWERS:  Would Your Honor like a

14 copy?

15            THE COURT:  No, thank you.  I'm fine.

16      Q.    (By Mr. Powers) Dr. Rhyne, would you look at

17 Page 121.

18      A.    All right.

19      Q.    Beginning at Line 17.

20      A.    Okay.

21      Q.    And it will continue to Page 122, Line 1.

22      A.    All right.

23      Q.    QUESTION:  Under what circumstances would a

24 pointer be used to include something into a data

25 structure?  How do you determine whether the pointer

1  actually causes inclusion versus not inclusion?

2          Let me stop you there.  You understand that's

3  addressing the same issue we're just talking about now?

4      A.    It is.  I remember that particular question.

5      Q.    All right.  Back to the answer.

6          ANSWER:  I think you have to look carefully

7  at what -- what's pointed to and why it was used at some

8  point in the software that define the place where the

9  pointer lives and the place that it points to.

10          QUESTION:  Is there an objective way to do

11  that?

12          ANSWER:  I'm not sure that there is.

13          That was your testimony at deposition, wasn't

14  it, Dr. Rhyne?

15      A.    It was, uh-huh.

16      Q.    Now, let's talk about Word for a minute in a

17  little more detail.

18          You referenced earlier something in Word

19  that's called a struct, S-T-R-U-C-T.

20      A.    No.  You asked me about it, and I said that

21  in the C programming language, and also in the C++

22  programming language, there is a thing called a struct.

23      Q.    And that's short for structure, isn't it?

24      A.    I think there's -- there are differences of

25  opinion in the computer science community as to whether

 1  that's a fair characterization.  I don't mind thinking

 2  of it that way.  I often do.

 3      Q.    In fact, that's how you refer to it in your

 4  deposition?

 5      A.    May very well.

 6      Q.    That's a common and acceptable way of

 7  referring to it?

 8      A.    People will refer to the struct as a

 9  structure.

10      Q.    All right.  Now, it's not just a general

11  programming language.  Struct actually appears in the

12  Word code to describe these separate structures that

13  you've identified on Fig. 12 that I've circled in blue;

14  isn't that right?

15      A.    I think that's probably true for some of

16  them.  I don't recall that all of them are defined as

17  structures.  They may be.  I just don't recall that

18  particular detail.

19      Q.    So if you wanted to know what's a data

20  structure in Word, you could actually go look at the

21  Word source code, and it would tell you, right?

22          You could say here's struct, here's a struct,

23  here's a struct?

24      A.    If you wanted to find where the struct

25  capability of C or C++ is used, you could go look there.

 1        Q.    All right.  Now, I've given you a binder

 2    that's labeled source code.  Could you pull that out?

 3                  MR. POWERS:  And this, Your Honor, for

 4    the record, is Exhibit 454.  I've given counsel a copy.

 5                  Would Your Honor like a copy?

 6                  THE COURT:  No, that's alright.

 7        A.    Okay.  This is a small subset of the code, I

 8    think.

 9        Q.    (By Mr. Powers) It's a very small subset, but

10    it's relevant to what we're talking about.

11        A.    I understand.  There's a lot of it.

12                  Where would you like me to go?

13        Q.    Could you turn to the section that's called

14    455 -- 455.026?

15        A.    I -- excuse me.  I have that.

16        Q.    And go to the page that's 292.

17        A.    I have that.

18                  MR. POWERS:  Chris, if you could pull

19    that up, please.

20        Q.    (By Mr. Powers) Now, do you see at the very

21    top of the part that's on your screen, which is the

22    bottom of the page, it says, type def struct,

23    underscore, P-L-C in caps?

24        A.    Yes.

25        Q.    You understand that PLC refers to structures

 1  that we've labeled 7 and 8 here, the CP first and CP

 2  limit.

 3          Do you know that?

 4      A.    Again, it's been a while, but I believe that

 5  that is the generic struct definition for what is used

 6  to store the information in the CP first and the CP

 7  limit arrays.

 8      Q.    Now could you turn to 455.033?

 9      A.    Okay.

10      Q.    At Page 297.

11      A.    7?

12      Q.    297.

13      A.    I have that, uh-huh.

14          MR. POWERS:  Chris, could you pull up the

15  very bottom part of that, please?

16      A.    Uh-huh.

17      Q.    (By Mr. Powers) This says type def struct,

18  underscore, X-S-D-R.

19          Do you see that?

20      A.    Yes.

21      Q.    Now, xsdr is a reference to what we've

22  circled as Data Structure No. 5 on your Figure 12,

23  correct?

24      A.    Well, this is the generic struct definition.

25  In that particular figure, that's an instance of that

1   structure.

2        Q.    So when -- if you wanted to know what xsdr

3   was and whether it's a structure, you could look at

4   Page 295 to 297 and that tells you so?

5        A.    It would tell you what the generic definition

6   of that struct is.

7        Q.    Could you turn in the same section to

8   Page 299?

9        A.    I have it.

10             MR. POWERS:  At the bottom, Chris, could

11   you pull up the portion that relates to xsdc?

12        A.    Okay.

13        Q.    (By Mr. Powers) That relates to the portion

14   that we've labeled here No. 4 down at the bottom of your

15   Figure 12, correct, telling that structure?

16        A.    That's correct.  This one was actually

17   created by Mr. Little.

18        Q.    Now, if you go to Page 305.

19        A.    Okay.

20             MR. POWERS:  Chris, again, pull up the

21   bottom.

22        Q.    (By Mr. Powers) This tells you that sdti is a

23   structure, doesn't it?

24        A.    Yes, uh-huh.

25        Q.    That's the one that we've circled here as No.

1   2 on your Figure 12 in blue, right?

2       A.    It's implemented as a C struct.

3             It is -- is this 2003 or 2007?

4       Q.    This is 2007.

5       A.    So it's C++.

6       Q.    Now go to Page 307.

7       A.    Okay.

8             MR. POWERS:  Chris, pull up the part --

9   it's about, oh, a fifth of the way down from the top.

10      Q.    (By Mr. Powers) This tells you that sdtix is

11  a structure, doesn't it?

12      A.    Yes.

13      Q.    And that's the one that we circled in blue

14  and labeled No. 1, isn't it?

15      A.    I think the bottom part of that is, yes.

16      Q.    All right.  And all of that is straight out

17  of the source code that you and Dr. Martin have?

18      A.    Every one of those particular parts of that

19  set of green stuff is implemented as an instance of a

20  struct, using the C language, the C++ language.  That's

21  the way it was done there.

22      Q.    So given that struct is a way of saying

23  structure, you will agree that in Word software, what

24  you're calling a map of metacodes is not a single

25  struct.

1              That's true, isn't it?

2      A.    If you had left off the predicate of your

3    question, I would have agreed with you.

4              It is -- it is what is shown.  And I think

5    I've said several times there's six or seven, depending

6    on how you count, eight separate data structures that

7    are implemented as C structs.  That's correct.

8      Q.    And there's multiple structs?

9      A.    I don't understand that.

10     Q.    Multiple structs?

11     A.    I thought I just said that.

12     Q.    Okay.  Then we're on the same page.

13              All right.  Now, let's turn to your opinion

14   regarding the Doctrine of Equivalents, and that was --

15   that's sort of a fall-back position where you said if

16   the jury doesn't agree with you, that this thing you

17   call a map of metacodes is a data structure within the

18   meaning of the Court's construction that doesn't really

19   matter, because it's close enough.

20              Is that fair?

21     A.    I don't think I said it that way.

22              I said from the point of view of one of

23   ordinary skill in the art, if you elected to identify

24   the individual structures and didn't accept the fact

25   that in common computer science terminology, a group of

1  data structures can be referred to as a higher data

2  structure, that in that case, even if you counted them

3  as eight separate data structures, they still are, from

4  a point of view of operation of the software,

5  indistinguishably different.

6      Q.    Now, you're familiar that if you're applying

7  the Doctrine of Equivalents, the typical way to

8  determine whether that difference is substantial is to

9  apply what's called a function-way-result test?

10     A.    That's one way to do it.  I believe it's also

11 called a Graver Tank test.

12     Q.    You've done that many times in many cases,

13 haven't you?

14     A.    I've done that a number of times.  I would

15 not agree that I've done it many times.

16     Q.    Now, with regard to the map of metacodes, the

17 way this patent teaches the way it should work is that

18 that map should be a small and simple structure,

19 correct?

20     A.    That's the way they did in terms of the

21 preferred embodiment.

22     Q.    And they teach that there's a benefit to

23 having that small and simple structure shown in the

24 patent, true?

25     A.    They did.

1      Q.     And in terms of function, way, and result,

2   the result that's achieved by that way is the ability to

3   manipulate the metacodes without touching the content,

4   right?  That's what the patent teaches?

5      A.     You asked -- they work together, but that you

6   could go into either area and manipulate the metacodes

7   or to manipulate the mapped content.

8            You can -- you can move either one of them,

9   and you personally don't have to touch them.

10     Q.     You don't have to touch the one you're not

11   trying to --

12     A.     Right.  It will be affected, but you don't

13   have to touch it yourself.

14     Q.     And that's the result of the function-way-

15   result analysis?

16     A.     That's correct.

17     Q.     All right.  Now, you're also aware that the

18   file history or what happened between the applicant and

19   the Patent Office is important in deciding whether you

20   can apply the Doctrine of Equivalents.

21     A.     I agree with that.

22     Q.     Are you aware of that?

23     A.     It's something called, to use your

24   terminology, final history estoppel or something like

25   that.

1              If you make a statement to the Patent

2    Examiner to try to get your patent approved, you can't

3    disavow that statement later after it's been approved.

4         Q.    Now, in fact, in this case, when the Examiner

5    objected to the applicant's claims, the applicant

6    specifically said that what makes them different, in

7    terms of their result, was that you could edit the

8    metacode without touching the content, right?

9         A.    I -- I don't recall that.  I'm -- I'm -- I

10   can't agree or disagree.

11        Q.    Fair enough.

12              Could you turn to Exhibit 4?  It should be in

13   that book right there.

14        A.    I have it.  I don't have the page yet, but

15   I've got this file history.

16        Q.    Do you recognize Exhibit 4 to be the file

17   history, which is the record between i4i's attorney --

18        A.    Yes.

19        Q.    -- and the Patent Office back and forth till

20   the patent issued?

21        A.    For the jury's interest, it's about that many

22   pages (indicates), I think, if that's all of them.

23        Q.    And in that file history, no other party is

24   allowed to be present, right?  That's private and

25   confidential between i4i and the Patent Examiner?

1       A.      That's right.  At that point, no other party

2  would be aware that there was an application pending

3  before the Patent Office.  That's the way it works.

4       Q.      I'm sorry.  I didn't mean to interrupt you.

5  So no other party can come in and say, wait, here's a

6  piece of prior art you're missing; none of that's

7  possible, right?

8       A.      Not -- not at that point.  There is a

9  well-defined procedure that's available after the patent

10  is issued, but at this point, no other party would be

11  aware that this is taking place.

12       Q.      All right.  So if you could look, Dr. Rhyne,

13  at -- there's an F-H and then a page number on the

14  bottom right-hand side.

15       A.      Okay.

16       Q.      And I'm going to direct you using those

17  pages.

18       A.      Okay.

19       Q.      Go to Page 64, if you would.

20       A.      Okay.  All right.

21       Q.      Now, this is a statement by the Examiner that

22  says:  We're rejecting or objecting to all the claims;

23  we're not going to give you anything yet.

24               Is that fair?

25       A.      Some claims were rejected and some were

1   objected to; that's correct.

2        Q.    But nothing was allowed at this stage?

3        A.    There was something wrong with some of them,

4   and some of them were outright objected.

5        Q.    And nothing was allowed?

6        A.    They were not allowed at this point.  There's

7   a difference between rejection and objection, but none

8   were allowed so far.

9        Q.    So if you go to the next page, one of the

10  points the Examiner makes in this particular rejection

11  is down at the bottom of the page.

12              MR. POWERS:  And, Chris, could you bring

13  up -- this is at Page 6 -- sorry -- it's Page 66.

14       A.    All right.  Thank you.

15       Q.    My apologies.

16              At the very bottom, it says Claims 2, 3, 5,

17  6, 13, and 16 recite features which would have been

18  obvious in a computer storage and retrieval system.

19  Storage is always distinct, even if at distinct

20  addresses.

21              Do you see that?

22       A.    And I think I remember Mr. Kudlac and I had

23  some little discussion about that observation by the

24  Examiner.

25       Q.    You did.

1              So when you were earlier referring to the

2  storage of what you're calling the metacode map and the

3  storage of what you're calling the content being

4  distinct, you don't just mean that they're not stored in

5  exactly the same place, because that's impossible.

6              Is that fair?

7       A.    I didn't understand your question right at

8  the very end.

9       Q.    It was a little long.  Let me back up.

10             You earlier testified that in your view Word

11 meets the requirements of the claim, because what you're

12 calling the metacode map is stored in a different place

13 than what you're calling the mapped content, correct?

14      A.    It uses a different set of memory addresses,

15 if you want to call it that way.

16      Q.    Well, you'd agree with me that even within

17 the map of metacodes, you're storing things at different

18 addresses?

19      A.    Each metacode is stored either in an address

20 or some related set of addresses, depending on how you

21 store it.

22      Q.    You can't store two things at the same

23 address, can you?

24      A.    That's too general a statement.

25             You can.  There are ways to do that.  It

1  depends on what the things are and how much you're

2  addressing.

3      Q.    The point the Examiner is making here is

4  distinct storage can't just mean you're storing

5  different addresses.

6      A.    I thought the way he -- the point he was

7  making there is that that limitation is going to be met

8  often in memory.

9      Q.    Because memory always stores different things

10 in different places?

11     A.    At least at the level of discussion that the

12 Examiner was doing at this point in the file history, I

13 think that's the point he was making.

14     Q.    Fair enough.  We're on the same page.

15           And now let's look at how i4i responded.

16           Could you turn to Page 76, Exhibit 4, please?

17     A.    Okay.

18           MR. POWERS:  And, Chris, could you bring

19 up that middle paragraph, and specifically the last

20 couple of sentences starting with in other words.  We

21 seem to have lost --

22     Q.    (By Mr. Powers) Do you see that middle

23 paragraph, Dr. Rhyne?

24     A.    I do.

25     Q.    And you see the sentence starts, in other

1 words?

2      A.    Yes.

3      Q.    Here, the -- here, i4i is telling the Patent

4 Office, in response to that rejection, in other words,

5 using the present invention, one could change the

6 architecture, layout, structure, or presentation format.

7 There, you understand they're referring to the metacode?

8      A.    I wouldn't agree with that with respect to

9 that presentation format.

10      Q.    Architecture, you understand, refers to

11 metacodes?

12      A.    In some context it does.  The structure, I

13 think, refers to the metacodes, is also the way that

14 they refer to it.

15      Q.    But here, i4i is referring to architecture as

16 including layout, structure, and presentation format?

17      A.    But they are differentiating between

18 structure and presentation format.

19      Q.    True, but all of them are within

20 architecture?

21      A.    At this point, the applicant's attorney or

22 agent used that term within the term architecture.

23      Q.    All right.  So continuing on, using the

24 present invention, one could change the architecture of

25 a document without even having access to the actual

1   content of the document?

2       A.    Yes.

3       Q.    This is achieved by extracting metacodes from

4   an existing document and creating a map of the location

5   of the metacodes in the document and then storing the

6   map and the content of the document separately?

7       A.    Yes.

8       Q.    That was the argument made to the Patent

9   Office, right?

10      A.    Yes -- let me say, in terms what they were

11  trying to deal with.  Give me just a second.

12      I think they are just making a general

13  observation without dealing with a specific objection,

14  it appears.

15      Q.    They are specifically making the argument

16  that the result that this invention can achieve by the

17  separate storage is that you can edit the architecture

18  without accessing the content.

19      That's the benefit that they're saying you

20  achieve in this function-way-result test on the Doctrine

21  of Equivalents, right?

22      A.    It didn't say with them accessing it.  It

23  said without having access, and there's a subtle

24  difference there, I think, from a computer point of

25  view.

 1      Q.    All right.  Without having access?

 2      A.    Yeah, accessing has a computer science

 3  meaning.

 4      Q.    All right.  Let's turn to another issue then,

 5  and that relates to input data stream.

 6            Do you recall this issue from your direct

 7  testimony yesterday?

 8      A.    I -- I recall addressing it, yes.

 9      Q.    Let's go the Slide 24 of your presentation so

10  we can reorient ourselves.

11            Do you recall that the patent requires the

12  step of compiling a map of the metacodes?

13      A.    One claim does, yes.

14      Q.    Actually, two of the three do, right?

15      A.    I think the language is a little different

16  between 14 and 20, but -- but -- okay.

17      Q.    And 18 depends on 14?

18      A.    Yes.

19      Q.    Okay.  So this compiling step, as the Court

20  has interpreted it, requires that you find the positions

21  of the metacodes in and relative to an input content

22  stream, and that's what you were doing when you did this

23  analysis that you walked us through yesterday.

24            Is that fair?

25      A.    Yes.  Yes.

1    Q.    Now, one of the steps that you didn't

2  highlight on the right is Step No. 3.  I want to talk

3  about that step a little bit.

4    A.    Yes.

5    Q.    In Word, when you bring in what you're

6  calling custom XML, Word, as you put it, writes out the

7  content in metacodes to this temporary file?

8    A.    Yes.

9    Q.    And so it's duplicating that original file

10  but writes it to a temporary file, but it also does

11  something else to it then, doesn't it?

12    A.    It does.  It depends -- it depends on what --

13  there are certain circumstances in which you don't hit

14  those steps.  But if you have the kind of input file

15  that is going to trigger moving through those steps to

16  Step 3, they will add the additional formatting

17  information.

18    Q.    Now -- and I believe you testified yesterday

19  that what happens is that Word takes that raw content, I

20  think you called it.

21    A.    Yes.

22    Q.    And transforms it by adding, I think you

23  called it, anchor characters and control characters into

24  something that Word can read.

25    A.    No.  Either I misspoke or didn't do a very

1    good job of my explanation or you misunderstood.

2              That formatting information there is not the

3    anchor characters that show up over here.

4        Q.    All right.

5        A.    It's Word ML, if that will help you.

6        Q.    Fair enough.  That's exactly where I wanted

7    to go.

8              So Word -- so what Word does, when it takes

9    in this raw custom XML, is it effectively transforms the

10   raw custom XML into Word ML so it can understand it?

11       A.    No.

12       Q.    It doesn't convert it to Word ML?

13       A.    It -- it adds Word ML characters, and it has

14   a -- I guess we're both right.  It will re -- it will

15   express the custom XML in a way that is compliant -- is

16   compliant with Microsoft's view of what Word ML should

17   look like.

18             But they have a special tag.  I'd have to

19   look at like Figure 9 of Dr. Martin's report to be sure.

20   But my recollection is, is that they had a little

21   header -- W, colon, something or other -- that says this

22   is how I'm going to map the custom tag.

23             But then it also puts in, at its own

24   volition, a set of other formatting codes that are in

25   Word ML, pure Word ML as well.

1    Q.    Exactly.  So in this conversion step of No. 3

2    that you've described as adding -- it's taking the

3    custom XML and making that into Word ML so we can

4    understand it; is that correct?

5    A.    It's kind of putting a Word ML wrapper around

6    it, if you want.  Plus, it's adding a great deal of

7    other Word ML stuff that wasn't even in the original

8    document.

9    Q.    Now, that conversion process that you just

10   described, there's nothing like that in the patent, is

11   there?

12   A.    I don't think that's -- no.  I don't know how

13   to answer a negative question.

14         Yes, okay, there's nothing like that in the

15   patent.

16   Q.    Okay.  And, in fact, i4i specifically claimed

17   that the benefit of its '449 patent is that you don't

18   have to go through that type of process where you

19   duplicate and convert the file, isn't it?

20   A.    I don't think their patent addresses this

21   particular desire to insert Word ML one way or the

22   other.

23   Q.    Could you look at Exhibit PX13, which I

24   believe you referenced yesterday?

25         This is that i4i-At-A-Glance.  Should be

```
 1   in --

 2       A.    I'm sure I have it here.

 3             I do.  I have that, uh-huh.

 4       Q.    Do you recall testifying based on and relying

 5   upon this document yesterday?

 6       A.    No, I didn't.

 7       Q.    I'm sorry?

 8       A.    I decided not to testify about it.

 9       Q.    But it was part of your report and part of

10   what you considered?

11       A.    It's in my report, and I did look at it.

12       Q.    But you took it out of the presentation?

13       A.    After some testimony about it yesterday, I

14   decided I wouldn't deal with it at all.

15       Q.    Okay.  But you're aware, based on what you've

16   looked at and read and the testimony you've heard, that

17   PX13 is i4i-At-A-Glance is the piece that i4i would hand

18   out to promote its technology?

19       A.    That's what was testified about yesterday.

20       Q.    Okay.

21             MR. POWERS:  And, Chris, could you bring

22   up the very first bullet on this list of bullets?

23       Q.    (By Mr. Powers) In the very first bullet,

24   when i4i is describing its technology, it says, quote:

25   Inventor of the patented S4 Technology, and then there's
```

1  a parens, and it lists the actual patent number in this

2  case, the '449 patent, right?

3           Is that right, Dr. Rhyne?

4      A.   I'm sorry.  Yes.

5      Q.   Now continuing on:  Which helps different

6  proprietary software applications, like word processors,

7  e-mail packages, CAD tools and databases, structure

8  information in XML/SGML and share it instantly, without

9  converting or duplicating.

10          Without converting and duplicating, that's

11 what i4i touted as the benefit of its own patent, right?

12     A.   Yes.

13     Q.   And Word has to both duplicate and convert,

14 doesn't it?

15     A.   Under some circumstances, it does.

16     Q.   That's Step 3 in your own chart, isn't it?

17     A.   Yes.  If the entry point passes the document

18 through Steps, 1, 2, 3, and I think 4 as well, but I

19 think I also testified yesterday, Mr. Powers, that you

20 can apply -- the infringement can occur beginning at

21 Step 5, and that's basically what I illustrated in my

22 animation.

23     Q.   But you don't know how many times that

24 happens, if at all, versus starting with Step 1 and

25 going through Step 3, do you?

1       A.    I don't know what you mean by that.

2       Q.    What you just described, starting at -- after

3  Step 3, you don't know -- you have no idea whether

4  anybody ever starts after Step 3 or whether everybody

5  goes through Step 3, do you?

6       A.    Yes, I do.  I do know.

7             I mean, I don't know how many people, but I

8  know that if they enter it with a document that's in dot

9  XML already, they will not have to go through the

10 initial process.

11      Q.    And you just have no idea how many people do

12 that, do you?

13      A.    As I say, as it mentions on the part of

14 Microsoft that some do, and we looked at that -- people

15 who were opened that counter that was Wordnonwordml

16 would be that very type of document.  And I think we had

17 7500 examples, at least.

18      Q.    Let's turn to the concept of inducement of

19 infringement.

20            MR. POWERS:  And, Chris, I think this

21 will be in the next part of his presentation.  And if

22 you would pull up Slide 6 from that next part.  I will

23 give you a little bit of time.

24            Your Honor, may I -- we've brought a flip

25 chart here and prewritten some material out to save some

```
 1  time.  May I pull that out --
 2                  THE COURT:  Sure.
 3                  MR. POWERS:   -- so the jury can see it?
 4       Q.   (By Mr. Powers) Can you still see that,
 5  Dr. Rhyne?
 6       A.   I can, yes.
 7       Q.   Okay.  We've got it up.
 8            All right.  Do you recognize on the screen
 9  one of the slides you used for testifying about the
10  concept of inducement infringement?
11       A.   Yes.
12       Q.   Now, the first element that you've listed as
13  knowledge of the patent, and you cited something where
14  the patent number was in an e-mail to Microsoft.
15       A.   Yes.
16       Q.   Do you recall that?
17       A.   Yes.
18       Q.   You've not seen any evidence anywhere that a
19  copy of the actual patent was given to Microsoft.
20            That's true, isn't it?
21       A.   That's true.
22       Q.   All right.  And you've seen no evidence
23  anywhere that anyone at Microsoft actually looked at the
24  patent ever?
25       A.   That's true.
```

1    Q.    And just looking at the patent number won't
2 tell you anything about what it covers?
3    A.    If you want to stick your head in the sand,
4 that's true.
5    Q.    You're not here to testify about what parties
6 should or shouldn't do, are you?
7    A.    No.
8    Q.    That's not your role, is it?
9    A.    I'm not -- I'm here as an opinion witness
10 about the technology.
11    Q.    So you're here to talk about whether they
12 knew of the patent, and that doesn't mean just knowing
13 the number, does it?
14    A.    I don't know what the legal definition there
15 is.  It seems to me that if I told you I have a patent
16 and it's readily available on the internet that you know
17 about it.  But, again, that's just my opinion.
18    Q.    If I just told you a number, that doesn't
19 tell you anything about what that patent covers, does
20 it?
21    A.    No, but I know what I would do, once you told
22 me that number.
23    Q.    Okay.  Now, you also know that from your
24 review of the evidence that i4i never said anything to
25 Microsoft that Microsoft was doing anything against the

1   patent.  There was no allegation of infringement.  There

2   was no statement ever that said you ought to be worried

3   about this patent.

4             That's true, isn't it?

5       A.    You've just asked me what my scope of

6   testimony here is, and this is a little beyond it.

7   But I certainly heard testimony to the effect that up

8   until they were noticed -- noticed about this suit,

9   there had been no discussion between i4i and Microsoft

10  about potential infringement.  I haven't seen anything

11  like that.

12      Q.    In fact, you have seen evidence to the

13  contrary where i4i is saying positive things to

14  Microsoft about the products it's now accusing of

15  infringement?

16      A.    I saw one piece of e-mail where somebody

17  congratulated Microsoft on bringing out an

18  XML-compatible version of Word and said I hope we can

19  work together from here on.

20      Q.    It wasn't just somebody, was it?  It was

21  Mr. Vulpe, the lead inventor on the '449 patent.

22      A.    Frankly, I don't remember that, so I wasn't

23  trying to minimize who it was.  I just didn't remember

24  who it was.

25            So if it was Mr. Vulpe, he's one of the two

1  inventors.

2      Q.    So if you were sitting there and you got a --

3  you were being told by the person who's the inventor of

4  the patent, who's looked at your software and said, hey,

5  congratulations, says nothing about infringement, you'd

6  think that you would be okay, wouldn't you?

7      A.    That's sort of a subjective point of view.

8  If I knew there was a patent out there that had similar

9  characteristics to something that I was doing or my

10 company was doing, I think I would direct somebody to

11 investigate.

12          You just asked me what I would do, and having

13 that question, I'll tell you that I would find out

14 something about the patent.

15     Q.    Fair enough.

16          Look at the second item where it's encouraged

17 to perform the acts that infringe.

18          Now, Microsoft created its own proprietary

19 form of XML called Word; am I right?

20     A.    Right, also called Word Processing ML, but

21 it's shortened term is Word ML.

22     Q.    So Microsoft went to the whole trouble to

23 create its own XML language that you admit would never,

24 ever infringe, if that's all that's used, right?

25     A.    I don't know if that's an admission or not.

1  It's not custom XML to anybody, except Microsoft made

2  it.  But if you only have Word ML in a document, it's

3  XML-compliant, but it would not infringe any of these

4  claims.

5      Q.    So Microsoft is certainly encouraging its

6  customers to use the form, the non-infringing form of

7  XML that it created, right?

8      A.    I -- I haven't seen a lot of -- you'd have to

9  show me a document that encouraged people to use the

10  docx or the dot XML without custom XML.  I have not seen

11  any documentation or something supporting that view.

12      Q.    Well, you looked on the website, right?

13      A.    I have.

14      Q.    And the website has help materials for Word

15  ML, doesn't it, or did you not look for that?

16      A.    I've looked through it.  I don't recall any

17  particular explanation of why you would want to save a

18  document in dot XML or docx format, pro or con, if you

19  didn't put custom XML in it.

20          What I looked at is how does Microsoft

21  recommend handling custom XML.

22      Q.    So is it your testimony that your opinion is

23  that Microsoft went to the trouble of creating this

24  whole non-infringing Word XML and then doesn't want its

25  customers to use that, doesn't encourage that?

1    A.    No, I didn't -- you're reading something into

2  it.

3          I just remember I actually quoted, I believe

4  it was an e-mail from one of the developers who said

5  that was our original goal and we weren't even sure we

6  could do that.

7          And then 10 -- what, from March to October of

8  the next year, they said, hey, we were not only able to

9  do that, but we were even successful in supporting

10  custom XML.

11    Q.    Let's turn to your opinion about contributory

12  infringement.

13    A.    Okay.

14          MR. POWERS:  Chris, pull up Slide 21,

15  please, from Dr. Rhyne's presentation.

16    Q.    (By Mr. Powers) This was your attempt to show

17  what you thought the legal requirements were?

18    A.    That was my attempt to show what I used as

19  the legal requirements in effect at this point in time

20  in forming my opinions regarding contributory

21  infringement.

22    Q.    Now, you've admitted that there were -- I

23  think you listed three ways that you can use Word 2003

24  and Word 2007 and do XML in a way that doesn't infringe.

25  You listed three, I believe, in your direct testimony.

 1          Do you recall that?

 2      A.    I think -- yeah.  I'm not trying to say

 3  that's an exhaustive list, but I did identify three that

 4  I, just in passing, pointed out.

 5      Q.    All right.  I'd like to talk about a few

 6  others, and I've -- someone, who has much better

 7  handwriting than me, has written them out.  I think

 8  we're going to -- we should achieve agreement that

 9  these -- this is also a non-exhaustive list, but it's a

10  longer list.

11      A.    It's -- six is bigger than three.

12      Q.    It doesn't stop at six.

13      A.    Oh, okay.  Well, that's fine.  Well, this

14  many of them is bigger than three.

15              MR. POWERS:  May I approach, Your Honor?

16              THE COURT:  Yes, you may.

17      Q.    (By Mr. Powers) Let's see if we can reach

18  agreement.

19          The first one --

20              MR. POWERS:  Can y'all see this?  Sort

21  of?  I'll read it aloud so that we can at least have a

22  record of it.

23      Q.    (By Mr. Powers) The first one says opening a

24  dot doc file with Custom XML.

25          Now, it's true that if you do that in Word

1   2003 and 2007, even though you're using Custom XML,

2   you're not infringing.  That's true, isn't it?

3        A.    Yes.

4        Q.    So I'll -- let me, if I may, since -- so we

5   have a clear record, I'll write yes in red everywhere

6   that you say yes.

7              MR. POWERS:  Your Honor, may we mark this

8   as an illustrative exhibit, so we can keep track of it?

9              THE COURT:  Any objection?

10             MR. CAMPBELL:  No, Your Honor.

11             MR. POWERS:  Shall we call it Defendant's

12  Illustrative 1?

13             THE COURT:  All right.

14             MR. POWERS:  Thank you.

15       Q.    (By Mr. Powers) No. 2 on Defendant's

16  Illustrative 1 is opening a dot doc file that does not

17  have Custom XML, that also does not infringe in Word

18  2003 or Word 2007?

19       A.    Yeah.  And that's almost off the table, but

20  it certainly is not infringing.  You're not using the

21  Custom XML capability at all.

22       Q.    No. 3 is opening a dot dot file with Custom

23  XML.  That also does not infringe, correct?

24       A.    Essentially, the same thing as No. 1 with the

25  exception that it's a template, but that's correct.

1    Q.    No. 4 is the same as No. 2 really except the

2 dot dot file.  No. 4 is opening a dot dot file without

3 Custom XML.

4    A.    That file has no Custom XML.  It really

5 makes -- those really are kind of the same thing.

6 Anytime you open a dot doc or dot D-O-T, you will not do

7 the compiling step, because they're already in the

8 binary format.

9    Q.    No. 5 is opening a dot docx file without

10 Custom XML.

11    A.    And, again, that's kind of what I said about

12 2.  You really are not using the Custom XML capability.

13 So, yes, it's not infringing because you're just not

14 even taking advantage of the capability.  That's only

15 in -- you've got 2003 there.

16    Q.    It's showing 2007, correct?

17    A.    Yes, sir.

18    Q.    That's format 2007.

19    A.    There is a translator or something that you

20 can buy that makes it backwards compatible, but the

21 basic 2003 doesn't do that.

22    Q.    And if you use that backwards compatible, it

23 still does not infringe the 2003.

24    A.    Yeah.  Yeah.  But your slide was wrong, if

25 you'll forgive me.

1     Q.    I'll mark it out to reflect that.

2     A.    That's correct.

3     Q.    No. 6, opening a dot docm file without Custom

4  XML, that doesn't infringe either, does it?

5     A.    You need to scratch out 2003.  And that's

6  essentially the same thing, again, with macros enable.

7  But if you don't have Custom XML, you won't infringe.

8     Q.    So all six of these --

9     A.    I just didn't know what you wrote, not

10 infringing.

11    Q.    I wrote at the top, not inf, short for not

12 infringing, on all of these.  Am I accurate so far?

13    A.    So far you're okay, with those two

14 corrections.

15    Q.    I believe someone skipped some pages.  I'm

16 not quite sure why.

17    A.    I'm sure it's to prevent the bleed-through.

18    Q.    So now No. 7, opening a dot XML file

19 containing only Word ML and content.  That doesn't

20 infringe either, does it?

21    A.    Yeah, because there's no -- basically, you're

22 saying without Custom.  The way you phrased it earlier

23 was with no Custom XML.  That's correct.

24    Q.    In this case, it's a dot XML file, but it has

25 only Word ML, no infringement.

1    A.    No Custom XML, so there would be no

2 infringement.

3    Q.    No. 8 is opening a dot XML file containing

4 only Word Processing ML and content.  That also wouldn't

5 infringe, would it?

6    A.    I don't understand why that is in any way

7 different from 8.  I -- maybe I'm wrong here, but I

8 thought Word ML and Word Processing ML were the same

9 thing.

10    Q.    I think your testimony would be that they're

11 slightly different in different versions, but in your

12 view, neither one would infringe.

13    A.    Well, I can only tell you that from my point

14 of view -- well, in my point of view, to my knowledge, 8

15 and 7 are the same thing, so really they -- you

16 should -- somebody can correct me.

17    Q.    Right.  Well, we'll call it --

18    A.    7B.

19    Q.    -- 7B.

20    A.    Okay.  If they're -- if they're not

21 materially different.  I think they're the same thing.

22    Q.    Fair enough.  We'll let the testimony play

23 out on that.

24    A.    Okay.

25    Q.    No. 9, opening a dot XML file with Custom XML

1  but no content.  That does not infringe, does it?

2      A.    Well, I'd have to think about that.  You are

3  going to have to help me understand what you mean by

4  that.  It's got some empty Custom XML?

5      Q.    No content.

6      A.    There's nothing like -- like it would say

7  bracket, member ID, with nothing in between?

8      Q.    Exactly.

9      A.    I -- it's okay to put yes there for now, but

10  I want to reserve the right to think about that a little

11  more.  I just can't imagine anybody ever doing that.

12      Q.    But you're not an XML user, so you don't know

13  whether they do.

14      A.    Well, but I understand exactly -- you're,

15  basically, saying somebody has gone in and put some XML

16  tags in their document and used them to identify

17  nothing.

18      Q.    Create a form.

19            Let's go to --

20      A.    Okay.  That might be -- that's -- you

21  actually made a point there, so I'll -- thank you.

22      Q.    No. 10, opening a dot XML file with Custom

23  XML as plain text.  That also would not infringe, would

24  it?

25      A.    I'm trying to think of how you would do that,

 1  okay?  I don't think I've ever done that, and I'm not --

 2  it probably doesn't, but I don't --

 3       Q.    Can I write yes with a question mark?

 4       A.    I'd prefer -- just put a question mark, okay?

 5  I can't give you an answer one way or the other.  I

 6  don't think I've ever opened a dot XML file as plain

 7  text and sort of said ignore all that other stuff, so...

 8       Q.    You're not now giving an opinion that it

 9  infringes, are you?

10       A.    No.

11       Q.    All right.  11 is opening a dot doc file --

12       A.    Okay.

13       Q.    -- attaching a Custom XML schema?

14       A.    Okay.

15       Q.    -- that you testified about, marking up the

16  content with Custom XML that you've testified about,

17  Custom XML elements, and saving the file to disk.  That

18  doesn't infringe, does it?

19       A.    At the point that you saved it, if you never

20  reopen it, it -- certainly just the saving of it will

21  not infringe.

22       Q.    And finally, No. 12, opening a dot doc file,

23  attaching a Custom XML schema, just as you testified

24  about, marking up the content, editing it, and saving it

25  as a dot doc file however many times you want to save,

1  that won't infringe either.

2      A.    As long as you stay in the binary format,

3  that's correct.  You can put yes there.

4      Q.    Thank you.

5      A.    You're welcome.

6      Q.    Now, Dr. Rhyne, we've listed 12 -- 11 and a

7  half maybe --

8      A.    Okay.

9      Q.    -- and we've got 10 and a half agreements, I

10  think, with one question mark.

11     A.    Well, again, I think there's a way to convert

12  that list down to about six or seven, because some of

13  them are essentially the same thing.  But the way you've

14  broken them out, drawing fine distinctions, you've got

15  somewhere in the neighborhood of 10 to 12.

16     Q.    And you don't know personally -- you're not

17  an XML expert -- how many of those 12 uses are used by

18  people who are using Word 2003 or 2007.

19     A.    I can't put any numerical values on them.

20     Q.    So you don't know whether those uses are

21  substantial or not, do you?

22     A.    Not if you consider substantial to be based

23  solely on the number of times people do or don't do it.

24          It's my understanding that that's not the

25  only way somebody might argue the question of

1  substantialness.

2      Q.    But if a whole bunch of people use Word just

3  for those 12 uses and you -- or use them extensively in

4  those 12 uses, that would be substantial, wouldn't it?

5      A.    It would have to be -- if you're going to do

6  it on that basis, you would have to compare it to the

7  number of people who did the other infringing

8  approaches.  You'd have to look at a relative -- in a

9  relative balance between the two.

10     Q.    You're not here -- well, let's go back to

11  your slide, Slide 21.  Slide 21 doesn't say that the

12  legal requirement you applied is that the non-infringing

13  uses, and we've listed these 12, have to be substantial

14  compared to what you consider to be infringing, right?

15     A.    I'm sure you listened carefully, and I very

16  carefully explained my view that I think this is

17  substantial, as much as anything else, based on the way

18  in which Microsoft has brought it out, touted it,

19  modified the default form, and those were the points

20  that I made.

21     Q.    But you're not here to instruct the jury on

22  the law, are you?

23     A.    I've said that at least five times so far.

24     Q.    I believe you're right.

25     A.    I believe this gentleman to my left will do

1  that very well.

2      Q.    We'll leave it to that gentleman on your

3  left.

4              MR. POWERS:  I have no further questions.

5              THE COURT:  All right.  Redirect?

6                    REDIRECT EXAMINATION

7  BY MR. CAMPBELL:

8      Q.    Good morning, Dr. Rhyne.  Still barely.

9      A.    Still morning.  Good morning.

10     Q.    You had a lot of discussion with Microsoft's

11 attorney about a tag.

12            Do you recall that?

13     A.    Yes.

14     Q.    Is tag a term used in the claims?

15     A.    No.

16     Q.    You also had a lot of discussion about the

17 word code.  Is code a term used in the claims?

18     A.    You're talking about when he took me through

19 the algorithm as described, and it talked about the

20 code?

21     Q.    Yes, Doctor.

22     A.    No.  That term is not used either.

23     Q.    Let's look at the term that is used in the

24 claim.

25              MR. CAMPBELL:  Can I get Slide 51?

1    Q.    (By Mr. Campbell) The term used in the claim

2  is metacode.

3    A.    Yes.

4    Q.    And what is the definition of a metacode?

5    A.    You have it here.  It's an individual

6  instruction which controls the interpretation of the

7  content of the data.

8    Q.    What do the delimiters do?

9    A.    They tell you where that metacode is found in

10  and amongst the text, that they use the same delimiters

11  for every single occurrence of any of the metacodes in

12  the document, and they just tell you where the metacodes

13  can be found.

14    Q.    So what part of the tag provides the

15  instruction which controls the interpretation of the

16  content of the data?

17    A.    It's my opinion that it's the tag name.

18    Q.    And let's go to Slide 76.

19         If we look at the patent, what does the

20  patent tell us about this?

21    A.    I showed this slide yesterday.  It's a

22  portion of the patent, and they are talking about an

23  example where they have a delimiter and then a tag -- a

24  tag name, K word, and another delimiter on either side

25  of the word industry.  You can see that here.

1        And then they go on to say the tag -- it

2  would be the proper phrase -- the tag, K word and K word

3  with a slash, are used to mark the beginning end of a

4  section of content, which is to be traded -- treated as

5  a -- whatever a K word means to the person who defined

6  it.  Then they say the meaning of K word is up to the

7  interpreter.

8        Q.    And so what does that paragraph out of the

9  specification tell you about what is the metacode there?

10       A.    It says that it's the term K word, K-W-O-R-D,

11  which is the tag name.

12       Q.    And they don't put the brackets in there.

13       A.    No.

14             MR. CAMPBELL:  Do we have Dr. Rhyne's

15  expert report?  Can we bring up Page 46?  Blow up the

16  top figure.

17       Q.    (By Mr. Campbell) In your expert report, did

18  you show in this figure what you think the metacodes

19  are?

20       A.    I did.  And the top drawing here, which I

21  circle with the box, what I had done, following from a

22  portion of Dr. Martin's report, is I had kind of tried

23  to abstract out -- and you can see to the right, since

24  that data structure does involve some traversing, I

25  simply typed in the letter, element, member ID,

1  et cetera, what I considered to be the metacodes, and I

2  did not include the brackets at either end of these.

3      Q.    Are you familiar with the term metadata?

4      A.    Yes.

5      Q.    What does meta mean?

6      A.    Meta, when you say something like metadata,

7  it means data about the data.  It's the next higher

8  level up.

9      Q.    Is the tag name there, the data about the

10 data?

11     A.    It is.

12     Q.    Do you have an example that might help the

13 jury understand what those delimiters are in terms of

14 something that they may use every day?

15             THE WITNESS:  Your Honor -- if I may step

16 to the flip chart.

17             MR. CAMPBELL:  Your Honor, may Dr. Rhyne

18 step down to the flip chart?

19             THE COURT:  Yes, he may.

20             THE WITNESS:  May I use one of the blank

21 pages behind yours?

22             MR. POWERS:  Please do.

23             THE WITNESS:  It looks like there might

24 be something else in here, your plans for last night,

25 and I'll leave that alone.  I don't want to expose

1    anything.

2                    MR. POWERS:  I appreciate it.

3        A.    One of the letters that we had that was used

4    as an example earlier had, I think, a local telephone

5    number.  I believe that was it.  That's your area code,

6    903, here.

7                    And if I understand, the idea is that this is

8    the telephone number, but if I only wrote it like that,

9    I've left out the delimiters, and it's no longer a

10   telephone number, but I think it's still important.

11                   And, in fact, I think the important part

12   here, regardless of the formatting -- they've put a

13   blank and a hyphen and a couple of parenthesis -- I

14   think that's the important thing.  That's the telephone

15   number.

16       Q.    Thank you, Dr. Rhyne.

17                   Let's turn to -- let's turn to a different

18   issue.

19                   You had a discussion with Microsoft's

20   attorney about the para tag --

21       A.    Yes.

22       Q.    -- in the specification.

23                   How can the para metacode be used in terms of

24   what the patent teaches?

25       A.    Well, the discussion was whether it was

1  simply like a paragraph marker as, for example, you find

2  in Word ML.

3         In Microsoft's proprietary RTF format and in

4  their Word ML format, there is a paragraphs symbol that

5  can be inserted.  But it basically tells you nothing

6  more than to do a carriage return, kind of a line feed,

7  just indent and go to the next one.

8         If you look at the way the para, P-A-R-A, is

9  used, it carries more semantic value.  It tells you it's

10 used twice.  It says here's the beginning of a

11 paragraph, and here's the end of a paragraph.

12        And since the conventional strategy in

13 writing a document is to lump together ideas -- I

14 remember my English teacher saying put a topic sentence,

15 and then explain the topic, and then the next paragraph

16 has a new topic sentence.

17        When they said para at the beginning of a set

18 of text and para at the end of a set of text, they are

19 carrying information about that content over and above

20 the fact that if you elect to format it with a return

21 and an indent, that's okay, but they're telling you this

22 is a collection of text that forms a paragraph.

23    Q.    Could para then mean something to someone and

24 could someone use the para tag to pull out all the para

25 information?

1    A.    They could tell that every time they saw that

2    pair of -- that sounds bad -- that pair of P-A-R-A tags,

3    that the text between them would be expected to be of

4    the same general topic, and you would expect them to be

5    able to pull out -- if I want the third paragraph in

6    something, that would be a way to do that.  And you

7    would know where it started and where it ended.

8        Q.    Let's turn to the issue of data structure.

9            MR. CAMPBELL:  Can I have Slide 84?

10       Q.    (By Mr. Campbell) Is data structure a term of

11   art?

12       A.    It's a term of computer science or computer

13   engineering art, yes.

14       Q.    Okay.  And you had a lot of discussion with

15   Microsoft's attorney about the definition in the IEEE

16   dictionary.

17            Do you recall that?

18       A.    Yes.

19       Q.    And there was a lot of discussion about the

20   logical relationships, but the full definition is not

21   just logical relationships, is it?

22       A.    No.  It -- they have to be -- the physical or

23   logical relationships has to be designed to support

24   specific data manipulation functions.

25            MR. CAMPBELL:  Your Honor, may I approach

1    the poster board?

2                    THE COURT:  Yes, you may.

3        Q.    (By Mr. Campbell) The Microsoft's attorney

4    broke those down into a number of different data

5    structures, but in terms of the IEEE dictionary

6    definition, is this right here a data structure designed

7    to support specific data manipulation functions?

8        A.    Yes.

9        Q.    What specific data manipulation function is

10   this data structure designed to support?

11       A.    It's designed to identify the metacode that's

12   associated in the map of metacodes with the characters

13   in that content area between 2 and 8, one less than 9.

14       Q.    In terms of Word, is it designed to support

15   the Custom XML manipulation function?

16       A.    Everything to the right of what I have

17   identified with that first red box is something that was

18   added, as I understand it, and I believe Dr. Martin may

19   further explain, solely for the purpose of supporting

20   the Custom XML feature.

21            And even if there's something in there that

22   had been used before -- in use in Word X -- in Word 2003

23   and 2007, its purpose is to allow the knowledge of where

24   each of the metacodes is applicable to the mapped

25   content.

1    Q.    Microsoft's attorney brought up the analogy

2  of this as being like Family Circus and little Billy.

3  Is that -- is that --

4    A.    Yeah.  I've got a grandson who reminds me of

5  that character.  But if -- and if you've seen it, he

6  always leaves the house to go get the mail and ends up

7  going all over.

8         But that's -- that analogy just doesn't apply

9  here, because there's no uncertainty as to where little

10 Billy is going to go when he leaves the green box over

11 on the left.

12        He's going to go up to that one and directly

13 to that one and over to this one (indicating), and using

14 the index, he's going to end up at member Id with no

15 diversion and no uncertainty.  There's no ambiguity

16 there as to how that's going to map out.

17   Q.    You also had a lot of discussion about the

18 Word source code.  The Word source code is written in a

19 particular programming language.

20   A.    Yes.

21   Q.    What -- what programming language is the Word

22 source code written in?

23   A.    It's called C, the letter C.  It's

24 actually -- they were developing it, I think, at Bell

25 Labs.  I know one of the developers, and I asked him

1  once about it, and he said, well, we tried A, and it

2  didn't work very well, and we tried B, and it got a

3  little better, and we tried C, and it worked real well.

4  And then there have been several extensions to C.  The

5  one that was used, as I understand it, for 2007 was C++.

6      Q.    Is there anything in the patent that suggests

7  that a structure or a data structure is limited to the C

8  programming language?

9      A.    No.   There's no specific language requirement

10  in any of the claims or the specifications that I

11  recall, and I don't think there is one.

12      Q.    Let's look at the definition that you were

13  provided in the IEEE dictionary definition for data

14  element.

15              MR. CAMPBELL:   Do we have Defendant's

16  2406?  We don't have Defendant's 2406?

17      Q.    (By Mr. Campbell) Okay.   Dr. Rhyne, do you

18  have Defendant's Exhibit 2406, the IEEE definition?

19      A.    Yes.

20      Q.    Okay.   Let's look at that definition for data

21  element.   And it says, a uniquely named and defined

22  component of a data definition; a data, quote, cell,

23  unquote, into which data items -- and it's got a

24  parenthetical -- actual values, end parenthetical, can

25  be placed.

1           Data items is plural, isn't it?

2      A.    Yes.

3      Q.    Actual values is plural, isn't it?

4      A.    Yes.

5      Q.    So a data item -- a data element can have

6  more than one value.

7      A.    Yes.

8      Q.    More than one data item.

9      A.    Yes.

10     Q.    And then it goes on to say, for example, the

11  data element AGE into which data items 1, 2, dot, dot,

12  dot can be placed.

13     A.    Yes.

14     Q.    That 1, 2, dot, dot, dot, what does that --

15  what does that mean?

16     A.    That means like an array, for example.  It's

17  an example -- an array is an example of what they are

18  calling here a data item or element, that it could have

19  the numerical values 1, 2, 3, 4, et cetera.

20     Q.    So a data element can have multiple values in

21  it.

22     A.    Yes.

23           MR. CAMPBELL:  If we can put Slide 84

24  back up for just a minute.

25     Q.    (By Mr. Campbell) A data element can have

1  multiple values, and a data structure can have multiple

2  data elements.

3       A.    Yes.

4       Q.    Let's look at -- I won't take you through all

5  of it, but you had a discussion of some of the Word's

6  source code?

7       A.    Yes.

8       Q.    Can you turn to Exhibit 455.026?

9       A.    Okay.

10      Q.    And you were shown the -- where it said type

11 def struct underscore plc.

12            Do you see that?

13      A.    That was on Page 292, yes.

14      Q.    Page 292.

15            If you go down to Line 42, there's another

16 struct there; is that correct?

17      A.    Yes.

18      Q.    Is that showing there's a struct within a

19 struct?

20      A.    Yes.

21      Q.    Let's look at another one.

22            You were shown -- if we go to 455.033 --

23      A.    I have that.

24      Q.    -- Page 297 --

25      A.    I have that.

1    Q.    -- Line 46, there's the type def struct

2  underscore xsdr?

3    A.    Yes.

4    Q.    If you turn to the next page, 298, Line 57,

5  there's another struct there.

6    A.    Yes.

7    Q.    Okay.  Is that struct -- is that another

8  struct within a struct?

9    A.    That's right.  That's a hierarchical use of

10  the C++ struct construct.

11    Q.    That's similar to what you explained on

12  direct about a data structure being hierarchical.

13    A.    I believe that's the way people in computer

14  science, such as myself and Dr. Martin, think of these

15  things, that you build higher-level data structures by

16  combinations of lower-level data structures.  I used the

17  phrase yesterday abstract data types.

18    Q.    I said I won't take you through all of them,

19  but let's do one more.

20    A.    Okay.

21    Q.    In the same one, 455.033, if you go to

22  Page 307 --

23    A.    I have that.

24    Q.    -- Line 543, there's the type def struct

25  underscore sdtix.

 1      A.     I see that.

 2      Q.     And on Line 558, is there another struct

 3  within that struct?

 4      A.     Yes.

 5             MR. CAMPBELL:  Your Honor, as a matter of

 6  housekeeping, Plaintiffs would like to mark the poster

 7  board -- we'll take a picture of it -- as an exhibit,

 8  similar to the way the flip charts were marked as an

 9  exhibit.

10             THE COURT:  All right.  Any objections?

11             MR. POWERS:  No objection as an

12  illustrative, Your Honor.

13             THE COURT:  Okay.

14      Q.     (By Mr. Campbell) Just one more series of

15  questions, Dr. Rhyne.

16             You were asked about the patent number

17  showing up in the e-mail.  Dr. Rhyne, if you have the

18  patent number, how long does it take to get the patent?

19      A.     It's very quick.  And, in fact, Mr. Campbell,

20  that happens to me often.  I get a call maybe once or

21  twice a month from an attorney looking for an expert.

22  And the first thing I ask them is, I say, well, I'll

23  need to find out if it's in an area that I have

24  expertise in.

25             And they'll usually give me the patent

1  number.  And there are two or three sources.  The United

2  States Patent & Trademark Office has a website.

3           I tend to, these days, use a cite that's

4  based on Google, if you're familiar with that, there's

5  a -- it's google.com/patents, and you enter the number,

6  and you can get the text of the patent, the pictures.

7  It takes about a minute.

8       Q.    Let's go back to the flip charts.

9              MR. CAMPBELL:  Your Honor, may I use the

10  flip chart?

11              THE COURT:  Yes, you may.

12      Q.    (By Mr. Campbell) And, Dr. Rhyne, we've been

13  talking about the Custom XML feature within Word.

14      A.    Yes.

15      Q.    A number of these examples specifically don't

16  use Custom XML.

17      A.    I tried to make that point with Mr. Powers.

18      Q.    Example 2 doesn't use Custom XML.

19      A.    Right.

20      Q.    Exhibit 4 doesn't use Custom XML.

21      A.    Right.

22      Q.    Example 5 doesn't use Custom XML.

23      A.    Right.

24      Q.    Example 6 doesn't use Custom XML.

25      A.    Yes.

1    Q.    So all we have left on this page is Examples

2 1 and 3.

3    A.    And they're essentially the same example,

4 except 3 treats the document as a template for other

5 documents as opposed to a standalone document.

6    Q.    And remind us, 1 and 3, the dot doc and dot

7 dot, those are binary files.

8    A.    Those are the kind of file formats that when

9 you save them on disk, it's virtually impossible, or at

10 least very difficult, for another program, outside of

11 Microsoft Word or one of their related Office tools, to

12 open that document and search, for example, for member

13 IDs, because it's in a proprietary -- what was at one

14 time a proprietary Microsoft format.  It loses the

15 advantage that the Custom XML provides.

16    Q.    Let's go to Page 2 here.

17         Example 7 doesn't use Custom XML.

18    A.    That's correct.

19    Q.    7B doesn't use Custom XML.

20    A.    Yes.

21    Q.    Example 9, you had a little bit of a

22 discussion about that.  What did you -- what did you

23 think about Example 9?

24    A.    Well, he said it could be -- I can't remember

25 a template.  It could be kind of like a form that you

1 would go type into.  It could be, but there's no content

2 there.  So you have tags, but you have no content to be

3 tagged.

4       Q.     What is the point of a form?

5       A.     Well, it would be that somebody could open it

6 and start entering content.

7       Q.     And so if someone entered content, saved it

8 out, and opened it back up, would that be infringement?

9       A.     Yes, if they preserved the dot XML.

10       Q.     Opening an XML file as plain text, does that

11 use the Custom XML functionality within Word?

12       A.     Well, I said -- I don't -- I probably don't

13 know how to do that in Word.  I know how to do that

14 maybe in a related simple word processor, like Notepad,

15 but I'd have to -- I don't think it would be.  You,

16 basically, would be avoiding identifying the metacodes

17 as being metacodes.  You just would look at it all as

18 being the same text.

19       Q.     And then on 11 and 12, we're back to our dot

20 doc binary file.

21       A.     Yes.  You would not have the benefit that

22 Custom XML is expected to provide.

23       Q.     Just a couple of last questions.

24             You were asked about notice of a patent and

25 what you would do if you are notified of a patent number

1   but not the patent.

2       A.    Yes.

3       Q.    If you didn't have the patent.

4           MR. CAMPBELL:  Can we put up Slide 115?

5       Q.    (By Mr. Campbell) Dr. Rhyne, if you were

6   notified of a patent number and a product that was

7   patented and your intention was to make that patented

8   product obsolete, would you go check out that product or

9   that patent?

10      A.    I -- I've never been in a circumstance where

11  my goal was to make somebody else's product obsolete,

12  but I'll tell you this:  I have been retained by

13  attorneys representing clients not to go into litigation

14  but simply to compare an existing product to a patent

15  that had been found.

16          And I can tell you also that when I worked at

17  Motorola for years in the technology transfer group,

18  which dealt with intellectual property that was owned by

19  others than Motorola all the time, whenever we thought

20  there was the possibility that somebody had had a patent

21  that might relate to something that we were doing at

22  Motorola, we -- we spent a lot of time making sure we

23  either did or we didn't and try to resolve that issue

24  amongst ourselves.

25          MR. CAMPBELL:  No further questions.

1          THE COURT:  All right.  Any recross?

2          MR. POWERS:  Very brief, Your Honor.

3          THE COURT:  All right.

4                    RECROSS-EXAMINATION

5    BY MR. POWERS:

6      Q.    Dr. Rhyne, at the beginning of your redirect

7    examination, you were asked whether the words tag or

8    code are in the claim.

9          Do you recall that?

10     A.    I couldn't remember whether it was in the

11   patent or in the claim, but yes.

12     Q.    Now, the word metacode is a requirement of

13   the claim, right?

14     A.    Yes.

15     Q.    And your position in your expert report that

16   I showed you and read to you was that the tag is a

17   metacode.

18     A.    I certainly made that statement somewhat

19   loosely at -- on Page 8.

20     Q.    And you also said you took that position

21   before you knew this was an infringement issue, right?

22     A.    In the same sense I didn't think that anybody

23   was going to argue that this wasn't one data structure

24   at the top level.

25          As these things begin to be clear, I

1   clarified myself, and I asked Mr. Campbell to point to

2   that later section of my report where it is very clear

3   what I considered the metacode to be.

4         Q.    You did agree with me that those brackets are

5   a tag.

6         A.    Everything from the first bracket through the

7   tag name to the end bracket are what the standards call

8   a tag.

9         Q.    So if the tag is a metacode, then those

10   brackets are part of that metacode, right?

11        A.    Again, that's -- what did I call it earlier?

12   Tautology.  That's correct.

13        Q.    All right.

14        A.    If a tag includes the brackets and that is

15   what the jury feels is the appropriate definition of

16   metacode, then the tags would have to be included within

17   the metacode.

18        Q.    So if the jury follows what you said on

19   Page 8 of your expert report, they should find no

20   infringement.

21        A.    That's -- if they want to take that outside

22   of everything else that's in that report, and it's

23   pretty lengthy, that's what they should do.

24        Q.    All right.  Now, on the specification, you

25   were shown by Counsel for i4i Slide 38.

1              MR. POWERS:  Let's put that up, Chris.

2       Q.   (By Mr. Powers) Do you recall being shown

3  this just a few minutes ago, Dr. Rhyne?

4       A.   Yes.

5       Q.   Now, this portion you were shown doesn't even

6  use the word metacode, does it?

7       A.   No.

8       Q.   It's not saying that the tag name, K word, is

9  a metacode.  Doesn't say that anywhere, does it?

10      A.   It doesn't use that language, but it does

11 tell you that it's the key to interpreting what the

12 meaning of the term industry is in the context of the

13 high-level document.

14      Q.   Doesn't use the word metacode anywhere in

15 this portion.

16      A.   I've already said --

17      Q.   All right.

18      A.   You asked me that.

19      Q.   If you go to Column 9, where it does use the

20 word code and metacode, and Column 10, the brackets are

21 there, aren't they?

22      A.   I will agree with you that it uses the word

23 code.  If you'll point to me where it uses the word

24 metacode other than in the map at the top of Column 10,

25 I may agree with you, or I may not.  You'll have to --

1       Q.      Very top of Column 10 --

2       A.      Right.

3       Q.      -- where it says metacode map, and it shows

4  brackets, doesn't it?

5       A.      In the preferred embodiment of this patent,

6  when they wanted to talk about the elements, they

7  used -- they included the brackets, and in fact, they

8  used -- you'll see chapters actually in there twice.

9  That's what they did in this preferred embodiment.

10      Q.      And the reason it's there twice is because

11  one of them has the slash that tells you it's the end of

12  the chapter, right?

13      A.      That's correct.

14      Q.      And without that slash, you don't know

15  whether the content is done or not as being a chapter.

16      A.      If you don't have the closing tag, to use the

17  term properly now, you won't know where the end of the

18  chapter is, and you'll get kicked out by the parser

19  that's trying to look through and find, is there a valid

20  XML or SGML in this document?

21      Q.      And there's no place, you'll agree with me,

22  anywhere in that whole patent where it uses the term

23  metacode to refer just to the name of the metacode, as

24  opposed to name plus the brackets; there's no place.

25      A.      I don't think that the patent offers a

```
 1  definition.  What resolved the issue to me was when the
 2  Judge gave me a definition about interpreting the
 3  content of the data.  And that's the definition that
 4  I've used.
 5       Q.    And what determines the content is the tag,
 6  not the name, right?
 7       A.    I don't agree with that.
 8       Q.    Can you go to your Slide 9 that you relied on
 9  in your presentation.
10       A.    Okay.
11       Q.    And there you say -- there you're citing a
12  document that says XML tag -- and this is what you
13  highlighted, isn't it, Dr. Rhyne?
14       A.    Yes.
15       Q.    XML tags define the meaning of those
16  elements.
17       A.    Yes.
18       Q.    And that's -- you were trying to say that
19  maps exactly with the Court's claim construction.
20       A.    It relates to the Court's claim construction.
21  It shows that the tag -- and the tag, which includes the
22  tag name, which I believe is the metacode, the tag --
23       Q.    It also includes the brackets, doesn't it,
24  Dr. Rhyne?
25       A.    I'm just waiting a moment to be sure we don't
```

1  talk at the same time.

2      Q.    The tag also includes the brackets, doesn't

3  it?

4      A.    The tag, as defined in the standard, includes

5  the delimiting brackets.

6      Q.    And the slash.

7      A.    One of them, the ending one, will have that

8  slash.

9            MR. POWERS:  No further questions.

10            THE COURT:  All right.  Anything further?

11            MR. CAMPBELL:  No, Your Honor.

12            THE COURT:  All right.  Thank you.  You

13  may stand down, Dr. Rhyne.

14            THE WITNESS:  Thank you, sir.

15            THE COURT:  All right, Ladies and

16  Gentlemen.  We're going to take our noon recess at this

17  time.  I'll remind you of my instruction.  Still don't

18  discuss the case among yourselves or with anyone else,

19  and we'll be in recess until 1:30.

20            COURT SECURITY OFFICER:  All rise.

21            (Jury out.)

22            (Lunch recess.)

23            *     *     *     *     *

24

25

## CERTIFICATION

        I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____                    _____
SUSAN SIMMONS, CSR                          Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10

/s/_____                       _____
JUDITH WERLINGER, CSR                       Date
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date  12/31/10