```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     TYLER DIVISION

 3  i4i LIMITED PARTNERSHIP    *   Civil Docket No.
                               *   6:07-CV-113 (LED)
 4  VS.                        *   Tyler, Texas
                               *
 5                             *   May 13, 2009
    MICROSOFT CORPORATION      *   1:30 P.M.
 6
                        TRANSCRIPT OF TRIAL
 7          BEFORE THE HONORABLE LEONARD E. DAVIS
                UNITED STATES DISTRICT JUDGE
 8                      AND A JURY

 9  APPEARANCES:

10  FOR THE PLAINTIFF:    MR. GORDON WHITE
                          MR. KEVIN BURGESS
11                        MR. JOHN CAMPBELL
                          MS. GRETCHEN HARTING
12                        McKool Smith
                          300 West Sixth Street
13                        Suite 1700
                          Austin, TX    78701
14
                          MR. DOUGLAS CAWLEY
15                        MR. JEFFREY CARTER
                          MR. TOM FASONE
16                        MR. JONATHAN YIM
                          MR. JOHN CURRY
17                        McKool Smith
                          300 Crescent Court, Suite 1500
18                        Dallas, TX    75201

19  APPEARANCES CONTINUED ON NEXT PAGE:

20

21  COURT REPORTERS:      MS. SUSAN SIMMONS, CSR
                          MS. JUDITH WERLINGER, CSR
22                        Official Court Reporters
                          100 East Houston, Suite 125
23                        Marshall, TX    75670
                          903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE PLAINTIFF:      MR. ROBERT M. PARKER
                        Parker Bunt & Ainsworth
                        100 East Ferguson, Suite 1114
                        Tyler, TX   75702


FOR THE DEFENDANT:      MR. MATTHEW POWERS
                        Weil Gotshal & Manges
                        201 Redwood Shores Parkway
                        Redwood City, CA   94065

                        MR. DAVID LENDER
                        MR. PAUL TORCHIA
                        MR. STEVEN KALOGERAS
                        MS. ARIAN NEWELL
                        Weil Gotshal & Manges
                        767 Fifth Avenue
                        New York, New York   10153

                        MR. KEVIN KUDLAC
                        MS. AMBER ROVNER
                        MR. TODD PATTERSON
                        Weil Gotshal & Manges
                        8911 Capital of Texas Highway
                        Building One, Suite 1350
                        Austin, TX   78759

                        MR. ANDREW CULBERT
                        Microsoft Corporation
                        One Microsoft Way, Building 8
                        Redmond, WA   98052

            *      *      *      *      *      *      *

```
 1                    P R O C E E D I N G S

 2               (Jury out.)

 3               COURTROOM DEPUTY:  All rise.

 4               THE COURT:  Please be seated.

 5               All right.  Mr. Cawley, would you like to

 6   offer those exhibits now?

 7               MR. CAWLEY:  Yes, Your Honor.

 8               Would the Court like for me to rattle off

 9   the ones we're offering or to discuss --

10               THE COURT:  Well, just take them one at a

11   time.  However you want to do it is fine.

12               MR. CAWLEY:  Well, it seems to me that

13   the easiest way is not trying to group them --

14               THE COURT:  Okay.

15               MR. CAWLEY:  -- and just sort of offer

16   them.  These will be the exhibits that we are offering,

17   and I'll try and group them sort of by issue.

18               THE COURT:  Okay.

19               MR. CAWLEY:  The first is Plaintiff's

20   Exhibit 78.  That is an e-mail string from one Microsoft

21   employee to another.

22               One of the e-mails attaches an article

23   from USA today which contains a quote by a Microsoft

24   employee.

25               There's an objection there as to hearsay.
```

1    It is hearsay within hearsay, but both the hearsay and

2    the within hearsay are both statements by a party

3    opponent.  So we believe that that's -- we don't believe

4    that's objectionable.

5                    THE COURT:  Any response?

6                    MR. SILVA:  I don't have this on the list

7    of exhibits that was presented to us today, so I don't

8    have a response to it right now.

9                    THE COURT:  What's the -- Exhibit 78?

10                   MR. SILVA:  Yeah.  I have several --

11   yeah, it was Exhibit 78, but I don't see it on my list.

12                   THE COURT:  Okay.  Do you have any

13   objections to it?

14                   MR. SILVA:  We do have an objection on

15   our list, and I -- and I can't -- I can't address right

16   now whether I withdraw it.  I can take a look at the

17   exhibit and do that in a moment, but this was not on the

18   list that they provided us.

19                   THE COURT:  Okay.  Well, we'll let you do

20   that, and we'll go on to the next one.

21                   MR. CAWLEY:  144, is that on the list?

22                   MR. SILVA:  Yeah.  We would like to

23   address 144, Your Honor.

24                   MR. CAWLEY:  Well, 144 is a copy of

25   Microsoft's 10-K that's being offered to show revenues

1    and profits of Office products, obviously, relevant to

2    damages.

3              Microsoft -- we had some dialogue with

4    Microsoft in which they seemed to indicate that they

5    wanted us to somehow limit the entire 10-K down to just

6    the portion we want, which we are willing to do, but we

7    never heard back from them, so at this point, we're

8    offering the whole document.

9              THE COURT:  All right.

10             MR. SILVA:  Your Honor, we -- the reason

11   why we objected to the exhibit, we asked them to

12   identify what they thought was relevant about it and

13   what they wanted to get in.

14             We view the document as irrelevant, and

15   more importantly, there are portions of the document

16   that are -- would be highly prejudicial and totally

17   irrelevant to any issue in the case.

18             THE COURT:  What portions are those?

19             MR. SILVA:  And, Chris, if you can pull

20   up the exhibit for us.

21             Specifically, Your Honor, this is a 10-K,

22   so there are portions of the document that relate to

23   past litigations involving Microsoft, including

24   judgments and verdicts.  That's precisely the kind of

25   information that Rule 403 was designed to exclude.

1                    And I'll ask Chris to pull up --

2                    THE COURT:  Okay.  Which part do you want

3    to put in?

4                    MR. SILVA:  We want the -- there are

5    sections dealing with their revenues, and we can

6    identify the specific pages for counsel.

7                    THE COURT:  Okay.  Do you have any

8    objection to the pages --

9                    MR. SILVA:  I have no objection just to

10   revenue numbers, Your Honor.

11                   THE COURT:  All right.  They'll be

12   admitted, the pages dealing with revenue.

13                   Y'all should really be able to have this

14   conversation without having to talk through me.  It

15   sounds like, you know, if you could just discuss it, you

16   could agree.

17                   What's next?

18                   MR. CAWLEY:  Next is a category, but

19   since the numbers are not necessarily completely

20   inclusive, I'm going to have to read all the numbers.

21   And this first category -- and let me just telegraph a

22   bunch here -- these are all exhibits to the reports of

23   two experts.  They're basically schedules, mostly

24   calculations, and so forth.

25                   Plaintiff's Exhibit 364, 366, 367, 368,

```
 1   478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488,

 2   489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499,

 3   500, 501, 505, 506, 507, 508, 509, 510, 511, 512.

 4               Those are all -- as I said, Your Honor,

 5   all occurred under Rule 1006 as summaries of voluminous

 6   data.  They show the calculations based on all kinds of

 7   underlying data by Mr. Wagner and Dr. Wecker.

 8               THE COURT:  Who are your damage experts?

 9               MR. CAWLEY:  Yes.  One of those is the

10   damages expert, and one is sort of an adjunct to

11   damages, which is the survey expert.

12               THE COURT:  All right.

13               MR. CAWLEY:  Now -- and maybe it will

14   simplify or shorten matters.

15               In addition to that group of documents,

16   there's another set of schedules, which is 631 through

17   641.  Those are also schedules from those same expert

18   reports.

19               And the only difference between those and

20   some of the earlier schedules is that this group, 631

21   through 641, has been objected to as not in the expert's

22   timely report, because these are supplements to the

23   report that was delivered to Microsoft about two weeks

24   ago that do nothing more than bring the damages current

25   through the new trial date.
```

1              The Court will remember this case was

2    continued from its original setting in -- I guess it was

3    early April, so we did a supplement to those schedules

4    to calculate the damages through the date of this trial

5    as opposed to that trial.

6              THE COURT:  Okay.  All right.

7              MR. SILVA:  So, Your Honor, the exhibits

8    actually fall into two categories, so I'd like to break

9    my response into two categories.

10             THE COURT:  All right.

11             MR. SILVA:  The first category, which

12   related to Exhibits PX364 through 368 relate to

13   attachments to the report of one, Mr. Wecker, who is

14   Plaintiff's survey expert.

15             And our objection to those exhibits is

16   the same objection that we raised in our Daubert.  We

17   believe that the survey is not reliable, that it's

18   hearsay, that the survey results were manipulated and

19   changed by Dr. Wecker without disclosing them to us, and

20   for that reason, we move to strike the report.

21             And we'd just like to, again, raise that

22   for the record, so we can preserve it.

23             THE COURT:  Okay.  That's overruled.

24             MR. SILVA:  Okay.

25             THE COURT:  What's next?

1            MR. SILVA:  The next is the -- the next,

2   as Mr. Cawley said, do relate to schedules attached to

3   Dr. Wagner's report.

4            And our reason for objecting to those is

5   they are not simple compilations of underlying data;

6   they're manipulations of data.  They have the expert's

7   own opinions and analyses intertwined in them.

8            We believe they're more properly used as

9   demonstratives, and we have no objection to them being

10  used as demonstratives, but we do object to them being

11  introduced into evidence.

12            THE COURT:  Okay.  Does that include 631

13  through 641?

14            MR. SILVA:  Yeah.  Yes.  And 631 to 641,

15  just to clarify it, we're not objecting to the

16  supplementary nature of these exhibits; we're objecting

17  to the fact that they're being used on -- offered into

18  evidence rather than just used as demonstratives, which

19  is what we believe they should properly be limited to.

20            THE COURT:  Objection's overruled.

21            MR. SILVA:  Okay.

22            MR. CAWLEY:  Just a couple more, Your

23  Honor.

24            365 is another exhibit to Dr. Wecker's

25  report, but it's not a compilation of data; it is the

1   survey -- the survey script that was used to call

2   respondents to get the survey responses.

3            MR. SILVA:  I believe Your Honor has

4   already overruled my objection to that exhibit.

5            THE COURT:  Okay.

6            MR. CAWLEY:  There are three exhibits,

7   once again, schedules to Mr. Wagner's report.  These

8   three also are not compilations of data; they are

9   summaries of license agreements.  These are Exhibits

10  502, 503, and 504.

11           We don't insist that these be offered

12  into evidence, but we note that Mr. Ugone, the

13  Defendant's damages expert, also has similar exhibits,

14  so we'd like to either get them both admitted or

15  neither.

16           MR. SILVA:  We'd like to use these as

17  demonstratives, and we'd like them to be limited.

18           THE COURT:  And you'll use yours as

19  demonstratives as well?

20           MR. SILVA:  Correct, Your Honor.

21           MR. CAWLEY:  That's acceptable.

22           THE COURT:  Okay.  I think that's -- they

23  said that was agreeable.

24           MR. CAWLEY:  Yes.

25           THE COURT:  Glad I could help with that.

1  What else?

2              MR. CAWLEY:  That's it.

3              THE COURT:  All right.  Bring in the

4  jury.

5              MR. CAWLEY:  Oh, oh, oh, I'm sorry.  Not

6  quite yet.

7              We would like to offer into evidence,

8  again as a summary of voluminous data, a clean copy of

9  the Figure 12 that Dr. Rhyne has already been referring

10  to.

11              To lay the foundation for that, if we

12  need to do it further, the next witness will testify

13  that he printed off approximately 10,000 pages of the

14  source code of Microsoft Word, many of which he used to

15  prepare that summary.

16              That's, obviously, voluminous.  It's,

17  obviously, impractical to use in the courtroom.  It's,

18  obviously, available to Microsoft, since they own the

19  code.  And it's, obviously, relevant to infringement,

20  since this is the instrument that carries out

21  infringement.

22              The second thing we'd like to offer is

23  that we want to take a photograph -- obviously, the

24  Court's told us we'll have to photograph both of these

25  things, just for purposes of managing the size.

1          But we also want to take a photograph of

2   the marked-up exhibit, including the red boxes, as

3   they're currently situated, and offer that as an

4   exhibit.

5          MR. POWERS:  Your Honor, if I may, our

6   position is that both are entirely appropriate as

7   illustrative or demonstrative exhibits, and they could

8   be marked in the same way we've done other demonstrative

9   exhibits, but Rule 1006 is not designed for a graphic

10  argumentative statement of an interpretation by an

11  expert of source code.

12          That's a classic demonstrative example --

13  exhibit, and it should be limited to that purpose.

14          THE COURT:  All right.  All of these

15  objections, I don't know why we're having to take these

16  up outside the presence of the jury.  I mean, when I

17  tried lawsuits, I mean, we would object when the

18  evidence is offered.

19          So as far as I'm concerned, all this,

20  just offer it in front of the jury.  If you want to

21  object for the record, you can, and I'll rule on it

22  then.

23          MR. CAWLEY:  Thank you, Your Honor.

24          THE COURT:  All right.  Bring the jury

25  in.

```
 1                    (Jury in.)

 2                    THE COURT:  Please be seated.

 3                    All right, Ladies and Gentlemen of the

 4   Jury.  I hope you had a good lunch and all rested and

 5   didn't eat too much, so you don't get sleepy this

 6   afternoon.  And continue to pay attention, like I know

 7   you've been doing.

 8                    So at this time, we'll proceed.  Who will

 9   Plaintiffs' next witness be?

10                    MR. CAMPBELL:  Your Honor, if it's all

11   right with the Court, we'd like to read in a joint

12   stipulation from the pretrial order at this time.

13                    THE COURT:  All right.  Let me explain to

14   the jury what a stipulation is.  That's something that

15   both sides have an agreement that they've entered into,

16   and they've stipulated as to specific facts, which you

17   will accept as true, whatever's been stipulated to.

18                    So they're going to offer one of the

19   stipulations that's been entered into in this case.

20                    MR. CAMPBELL:  Plaintiffs and Microsoft

21   makes the following joint stipulation for entry into

22   evidence in this case:

23                    (1) Plaintiffs have accused certain

24   specific ways of using Microsoft Word 2003 and 2007 of

25   infringement in this case.
```

1          (2)  Plaintiffs allege that users of Word

2  2003 and 2007 infringe U.S. Patent No. 5,787,449, the

3  '449 patent, when they open certain types of XML

4  documents containing what are known as Custom XML tags.

5          (3)  Microsoft denies these allegations.

6          (4)  The parties agree that there are many

7  uses of Word 2003 and 2007 that are not accused of

8  infringement, that are not at issue in the case.

9          (5)  The parties agree that Word 2003 and

10  Word 2007 may be used without ever using the methods of

11  using Custom XML tags that are accused of infringement.

12          (6)  The parties agree that there are ways

13  of using Custom XML tags in Word 2007 and Word 2000 --

14  I'm sorry -- Word 2003 and Word 2007 that are not

15  accused of infringement.

16          (7)  The parties further agree that the

17  following acts have been performed by at least one user

18  other than Microsoft itself, hereinafter user of Word

19  2003 or Word 2007, hereafter referred to as Word:

20          A copy of Microsoft's word program was

21  installed on a computer within the United States.

22          A user of the installed Word program used

23  the program to open a document containing content and

24  also containing XML tags that conform to the XML

25  specification as standardized by the Worldwide Web

1  Consortium, W3C, for the XML tags of the open document

2  were not natively exported by the installed Word

3  program, quote, the XML document, unquote.

4          Microsoft generally refers to these XML

5  tags as Custom XML or Arbitrary XML.

6          A custom transform was not applied to the

7  XML documents during the open operation.

8          Furthermore, the XML document was not

9  opened as plain text.

10          The opened XML document was displayed to

11  the user by the installed Word 2003 program's graphical

12  user interface, which displays a graphical

13  representation of the XML document.

14          THE COURT:  You might slow down just a

15  little bit for the court reporter.

16          MR. CAMPBELL:  Thank you, Your Honor.

17  Sorry about that.

18          The graphical user interface includes the

19  XML structure pane showing the Custom XML elements in

20  the document.  The XML structure pane allows a user to

21  choose an element to apply to your current selection.

22          Microsoft further stipulates that the

23  user added or deleted a Custom XML element by the user

24  interface of the installed Word program.

25          (12) The user saved the open XML document

1   in one of the XML file formats supported by Word, and a

2   custom transform was not applied during the save

3   operation.

4                    (13) A user has opened an XML document,

5   per paragraphs 9 through 12 of this stipulation, with a

6   schema attached to the XML document.

7                    The user has opened the XML document, per

8   Paragraphs 9 through 12 of this stipulation, without a

9   schema attached to the XML document.

10                   (14) Microsoft does not stipulate,

11  concede, or suggest that any of the foregoing acts are

12  acts of infringement in this case.

13                   THE COURT:  Okay.  Thank you.

14                   MR. CAMPBELL:  Thank you, Your Honor.

15                   THE COURT:  All right.  Who will be your

16  next witness?

17                   MR. CAMPBELL:  Plaintiffs call Dr. David

18  Martin.

19                   THE COURT:  All right.  Mr. David Martin.

20                   All right.  You may proceed.

21                   MR. CAMPBELL:  Your Honor, may I

22  approach?

23                   THE COURT:  Yes, you may.

24                   THE WITNESS:  Thank you.

25                   MR. CAMPBELL:  Your Honor, those

```
 1   notebooks are source code.  Would you like copies?
 2                   THE COURT:  I don't think so.  Thank you.
 3                   MR. CAMPBELL:  May I proceed, Your Honor?
 4                   THE COURT:  Yes, you may.
 5           DAVID MARTIN, PLAINTIFFS' WITNESS, SWORN
 6                       DIRECT EXAMINATION
 7   BY MR. CAMPBELL:
 8       Q.    Good afternoon, sir.
 9       A.    Good afternoon.
10       Q.    Can you please introduce yourself.
11       A.    My name is David Martin.
12       Q.    And can you briefly explain what you were
13   asked to do in this case?
14       A.    Yes, sir.  I was asked to analyze the Custom
15   XML feature in Microsoft Word 2003 and 2007 by primarily
16   analyzing the source code.
17       Q.    Okay.  Let's discuss your qualifications for
18   performing the analysis of the Microsoft Word source
19   code.
20             Can you briefly discuss your educational
21   background?
22       A.    Certainly.
23             I studied computer science and mathematics at
24   Iowa State University.  I got my undergraduate degree
25   there in 1993.  I continued my education by studying
```

computer science at Boston University where I obtained

my Ph.D. there in 1999.

Q.    Have you taught at any universities?

A.    Yes, sir.  I have taught computer science for

the past 10 years at multiple computer science

departments.  I was on the faculty at the University of

Denver.  I was also on the faculty of the University of

Massachusetts Lowell.

Q.    So did you teach computer science courses?

A.    Yes, sir, I did.

Q.    Have you received any awards for your work?

A.    Yes.  I received some teaching awards at the

University of Massachusetts Lowell in 2004 and 2007.

Q.    What work experience do you have in the

computer science field.

A.    I have been working in the software field for

30 years now.  I have a lot of experience.

Q.    What kind of work have you done, in the past

30 years, in the software field?

A.    I have done programming work.  I've done

analysis work.  I have led students in research.  I've

taught courses.  I've read books.  I've done a lot of --

a variety of different things.

Q.    Very good.

Are you a member of any professional

1   societies related to computer science?

2       A.    Yes, I am.   I'm a member of the ACM, the

3   Association for Computing Machinery.   And I joined when

4   I was an undergraduate student in computer science.

5       Q.    What is the Association for Computing

6   Machinery?

7       A.    It's the professional organization for

8   computer scientists, for people in the software field.

9   It's comparable to the IEEE that Dr. Rhyne mentioned

10  earlier.

11          IEEE is really more for people from

12  electronics engineering, and ACM is specifically for

13  people in the software field.

14      Q.    Do you have any experience with XML?

15      A.    Yes, I do.

16      Q.    What experience do you have with XML?

17      A.    I'm remembering a project I worked on in

18  2001, and I worked on this project with a graduate

19  student of mine at the university, and our goal was to

20  run a survey of a number of websites and extract some

21  information from those websites.   We had some questions

22  we wanted to answer about these websites.

23          However, the process of getting the

24  information out of the websites took a long time, so we

25  were going to approach this project in two steps.

1          First, we would gather all the information,

2   and that took a long time to do, and then we would

3   separately analyze the information that we obtained

4   through the first step.

5          We used XML in this project, because after

6   running the first step, we needed a way to take the data

7   that we had gathered from the websites and then store it

8   somehow in a way that we could later decide how we were

9   going to analyze it.

10          And indeed later, when we analyzed it, we

11   analyzed it one way, and then we decided we need to look

12   at this data in a different light, and so we analyzed it

13   a second way.

14          We were able to do this because the data

15   produced in the first phase of the project was all

16   labeled indicating the type of data that it was.

17          So in the second phase of the project, when

18   we changed our approach and said we're going to analyze

19   it differently, we could just point to the data in a

20   different way.

21      Q.    I believe you mentioned that you were asked

22   to study the operation of Custom XML in Word.  Can you

23   describe the work involved with your study of Custom XML

24   in Microsoft Word?

25      A.    Yes, sir.  As I said, my work was

1   primarily -- my work was primarily studying the source

2   code of Microsoft Word.

3           And of the large amount of source code that

4   constructs this project, I studied 220 different source

5   code files related to the XML support, the Custom XML

6   support, in these two products.  These are listed, I

7   guess, as PX454 and 455.

8           I reviewed thousands of pages of that source

9   code.  I determined which of the files I needed to look

10  at, and I printed them out.  It turned out to be an

11  enormous amount of source code.

12          When I printed it out, it turned out to be 18

13  binders of source code, really longer than I can reach

14  with my arms.  And that was just for one of the two

15  versions of the project.

16          So I needed all of this in order to

17  understand the feature and to be able to condense it

18  down into a diagram, such as this that we've seen

19  throughout the trial.

20          I also devoted upwards of 350 hours to

21  studying the source code so that I knew what the data

22  structure in the source code was, and I knew exactly how

23  the various functions that we've been discussing are

24  achieved by the product.

25      Q.    You referenced the diagram next to you,

1  Figure 12.  Is this a summary of your analysis of the

2  source code?

3      A.    Yes, it is.  This summarizes the data

4  structure that is part of providing the Custom XML

5  feature in Word 2007.

6              MR. CAMPBELL:  Your Honor, Plaintiffs

7  have marked this diagram as PX537 and would offer it

8  into evidence as a summary of the source code.

9              MR. KUDLAC:  Renew our objection to this

10  being entered into evidence, other than as an

11  illustrative, because of the argument that was made

12  before.

13              This is -- the source code works as the

14  source code works.  This can be used as an illustrative,

15  but to allow this into evidence for how the source code

16  works seems to be misleading.  But it can be used as an

17  illustrative.

18              THE COURT:  Overruled.  Be admitted.

19      Q.    (By Mr. Campbell) Dr. Martin, did you also

20  create a diagram to summarize how the Word 2007

21  source code works?

22      A.    Yes.  I created a similar diagram for Word

23  2003, and I think we'll see it later.

24              MR. CAMPBELL:  Your Honor, we've marked

25  the diagram for Word 2003 as PX541, and we'll offer it

1    into evidence as well.

2                    THE COURT:  Same objection?

3                    MR. KUDLAC:  Same objection.

4                    THE COURT:  It will be admitted.

5                    MR. CAMPBELL:  Thank you.

6        Q.    (By Mr. Campbell) Dr. Martin, you mentioned

7    source code.  Can you -- and we've heard about source

8    code, but can you briefly describe what is source code?

9        A.    Certainly.  Source code -- you can think of

10   source code as being like the blueprint for a building.

11   We're all sitting in this courtroom now, and we can

12   experience what the building provides for us.

13                   We can experience the lighting and the air

14   conditioning and the heating maybe during certain times

15   of the year, but it doesn't tell you how all of those

16   features come to this room.

17                   The blue -- the source code are the

18   blueprints for a product, and they are what an engineer

19   uses to actually build those features into the product.

20                   We've seen some examples from source code

21   earlier today, and indeed on the slide, we also have an

22   example of source code.  It's not -- it's not source

23   code from this case.  This is separate source code.

24   However, source code looks roughly like this.

25       Q.    Dr. Martin, did you study anything else

1    besides the source code in performing your analysis?

2        A.    Yes, sir.  I studied many of the documents.

3    Among them was one called the Word binary file format

4    dot doc structure specification.

5            This is a very large document, and it

6    describes what happens when you use Microsoft Word to

7    create a document, and then you save it to the disk as

8    what's called a doc file.  We heard about doc files

9    earlier as well.  And this document sets out exactly

10   what needs to be put in that file that makes it a doc

11   file.

12       Q.    Why -- why was the binary specification

13   relevant to your analysis?

14       A.    It was particularly relevant to my analysis

15   because the doc file format, the way it's written into

16   the file closely matches -- not exactly, but closely

17   matches the structure that is in Word's memory when a

18   user is using the product in order to edit the document.

19           So in a way, the doc file can be seen as a

20   snapshot of a diagram like this or some other diagram

21   that also reflected the data structure.

22       Q.    And, Dr. Martin, did you write a report

23   describing your findings relating to Custom XML in

24   Microsoft Word?

25       A.    Yes, I did.  I wrote a 91-page report.  It

1  explains the operation of the Custom XML within

2  Microsoft Word 2003 and 2007.

3          Within this report, I also provided citations

4  to the specific places in the source code that justified

5  my explanations of what the source code was doing.

6      Q.    Dr. Martin, do you understand what this

7  lawsuit is about?

8      A.    Yes.  This is a patent lawsuit.

9      Q.    Did you review the patent at issue in this

10  case, the '449 patent, in the preparation of your

11  report?

12     A.    No, sir, I did not.

13     Q.    Why not?

14     A.    The patent is irrelevant to me in

15  understanding how Microsoft Word operates underneath.

16  What I needed to see was the blueprints.

17          The patents aren't the blueprints.  They

18  offer no guidance to me about what the blueprints say.

19  So I did not consider the patent in the preparation of

20  my report or the preparation of this diagram.

21     Q.    Let's talk a little bit about this diagram.

22  I believe you mentioned already that you drew this

23  diagram?

24     A.    That's correct, yes, sir.

25     Q.    What is the box there labeled merge

1   structures for display purposes?

2       A.    That box provides the support for the Custom

3   XML elements within the current document.

4       Q.    Okay.  Did you call this something else in

5   your report?

6       A.    Yes.  In my report, I refer to this as the

7   SDT bookmark table.  I don't believe we have -- I don't

8   believe I've heard this name in the trial so far.

9           However, this is the name that I used in my

10  report to describe this table.

11      Q.    Why did you call this table merged

12  structures?

13      A.    It's called merged, because if you look at

14  the diagram in the top left here -- I can circle it.  I

15  can sort of circle it.  There.

16          In the top left, it's labeled BMDS.  There

17  are three fields on the top that have arrows that point

18  down to the STD bookmark table that we just discussed,

19  okay?

20          And so it's merged in the sense that we have

21  the three top elements from the top box that are going

22  sideways to provide the elements down below.  I'm

23  merging them sideways.

24          The merging shows the logical relationship

25  between each one of these elements.  And we've seen

1  examples before wherein each row of the table below

2  describes a single Custom XML element in a document.

3  And it says where the element begins in the document and

4  where the element ends in the document and also says

5  what the tag name for that element is.

6      Q.    Dr. Martin, if a user adds or deletes a

7  custom XML tag in a document, does Word access all three

8  columns of data?

9      A.    Yes, sir.  If the user inserts an element

10  into the document, then it must be described in the

11  table somewhere.  So let me draw a line somewhere in the

12  table.

13          Let's imagine this is where the element needs

14  to be placed.  Word would have to open up space in the

15  table in order to describe that new element.  And so it

16  would shift some of the elements in the table around to

17  make room for it.

18          In shifting, it has to visit each column of

19  this table.  This is the sense in which they're merged.

20  They all work together to describe a single Custom XML

21  element.

22      Q.    Dr. Martin, as a computer scientist, do you

23  consider the SDT bookmark table to be a single data

24  structure?

25      A.    Yes, sir, I do.

1    Q.    Being a little more specific, do you consider

2  the table containing the CP first, CP limit, and ELMT

3  info columns to be a single data structure?

4    A.    I think that's the same thing, but yes.  Yes,

5  sir, I do.

6    Q.    And do you also consider the data elements

7  containing the green boxes to be part of this data

8  structure?

9    A.    The green boxes, starting from the element

10 info -- it's kind of hard to draw on this thing --

11 starting from the element info and the other green boxes

12 on the diagram, yes, I consider that to be part of this

13 data structure.

14   Q.    Okay.  I realize it may be somewhat tedious,

15 but for the record, can you identify those data

16 elements, and as you read the letters that identify

17 them, can you tell them -- tell us what those stand for?

18   A.    Yes, sir.  Starting from the element info

19 box -- I guess I missed it.

20        Starting from the element info box, we see a

21 little magnifying glass that shows us an expanded view

22 of what's actually in that green box.  There was not

23 space to include all the information I needed to there.

24 It expands into a structure that has a green box on top

25 and is followed below by an sdtix structure.  You'll see

1  below sdtix a file name and line number.  That's the

2  citation to the place in the source code where I found

3  the definition for this struct; sdtix stands for

4  structured document tag information extra.

5         This struct provides access to the next

6  struct on my diagram, which, to the right, is simply

7  labeled sdti.  That stands for structured document tag

8  information.

9         That, in turn, provides access to the next

10  struct on my diagram, which is the tiq, the T-I-Q, which

11  stands for tag information qualified, T-I-Q.

12         Going further, the document refers, in the

13  lower left, to maybe the longest name.  The name is

14  vxsdc.hplxsdr, and that stands for -- the V -- following

15  the V, we have sxdc -- that means XML schema definition

16  collection -- dot hplxsdr.

17         Within that structure, we see Schema No. 0

18  pointing above it to xsdr; xsdr stands for XML schema

19  definition record.

20         And then the green element in that field is

21  called hsttbElements, and that is the name that I use

22  when I'm describing the final table on the right.  It

23  does not have that label down below, but due to the way

24  the expansion happens here, that's the name that I used

25  to refer to it.

1    Q.    A couple of those first structures started

2  with STD, and you said that was structured document tag.

3         Do you know why it's called structured

4  document tag?

5    A.    Well, I'm not sure why someone shows that

6  name, but it makes a lot of sense to me, because

7  structured document tag describes what happens when you

8  take a word document and you add structure to it by

9  bracketing certain elements -- certain areas of the

10  document with tag names that say what the meaning of

11  this region of the document is.

12         It turns -- takes a document and turns it

13  into a structured document through the use of tags.  So

14  that's how I understand it.

15    Q.    Dr. Martin, during your education, did you

16  ever take a course on data structures?

17    A.    Yes, sir, I did.

18    Q.    Did you ever teach any computer science

19  courses related to data structures?

20    A.    Yes, I did.  I should say, though, that I

21  didn't teach a course that was entitled data structures.

22  At my last university, I taught the third semester

23  programming course.  Our data structures course was the

24  second semester programming course.  So I'd like to say

25  something about these two courses and how they're

1   related to each other.

2          First, the students had to take the second

3   semester course and pass it in order to get into the

4   third semester course.

5          During the second semester course, they took

6   up the topic of data structures, and I know one example

7   that was used in that course.  They investigated a data

8   structure called a polynomial.

9          This was meant to medal -- to model a concept

10  from mathematics called a polynomial.  You may have

11  heard of this or maybe not.  But they wanted to model

12  the polynomial, and they did this without actually

13  programming it.

14         They just described what they wanted this

15  data structure to mean, and they analyzed its

16  performance without even putting it on a computer.  This

17  is an abstract data-type phase.  So that was the data

18  structure there.

19         And then later in the course, they took this

20  abstract data structure, and they implemented it in one

21  programming language, the C programming language, and

22  that pretty much wrapped up that second semester course.

23         I taught the third semester course, and one

24  of the exercises that I routinely used in this course

25  was to go back to that same data structure introduced a

1 semester earlier and to have my students reconsider this

2 using object-oriented programming techniques.

3        And so the students would take the data

4 structure, and then implement it a different way.  So

5 what we had was one data structure that first existed

6 without any program behind it whatsoever, and then it

7 was used once as an implementation in the course and

8 then as a separate implementation; yet it was always one

9 data structure.

10     Q.    Were you qualified to teach the second

11 semester data structures course?

12     A.    Yes.  It was well understood at my university

13 that every faculty member was qualified to teach most of

14 the undergraduate courses, certainly including that one,

15 and may be called upon to teach that course at any time.

16        I simply never was called upon to teach the

17 second semester course.  I only taught the third.

18     Q.    Let's just very briefly take a look at one

19 piece of the Word 2007 source code.  I believe you

20 referenced this already in your discussion of the

21 diagram, but can you tell us what's been highlighted

22 here on this page?

23     A.    Yes.  We're seeing the beginning of the

24 definition for the sdtix struct.

25     Q.    And then later -- later on down is another

1    struct declared within that struct?

2        A.    Yes.  That's highlighted, I guess, at Line

3    558.  What we see here is the -- the first highlighting

4    on the page shows the introduction of the struct, and

5    then as we read down the page, there's more information

6    about what is in the struct, because it's not completed

7    yet.

8            We see on Line 558 that the sdtix struct

9    actually contains another struct.  This data structure

10   is made up of -- at least this other data structure --

11   in fact, there's a lot of other stuff that makes up this

12   data structure.

13       Q.    Dr. Martin, how does Word first create the

14   STD bookmark table?

15       A.    Well, the first thing that Word does, when

16   creating the SDT bookmark table, is to allocate memory

17   for the STD bookmark table --

18       Q.    How does Word create the CP stream?

19       A.    It -- similarly, it first allocates memory

20   for the PC stream.

21       Q.    Okay.  So this diagram here that's in front

22   of you, that's the diagram for Word 2007?

23       A.    Yes, sir.

24       Q.    Okay.  And I believe we already mentioned

25   that you have a diagram for Word 2003?

1    A.    Yes, I do.

2              MR. CAMPBELL:  Your Honor, may I approach

3    the poster board and change it?

4              THE COURT:  Yes, you may.

5    Q.    (By Mr. Campbell) Dr. Martin, is this your

6    diagram for Word 2003?

7    A.    Yes, sir, it is.

8    Q.    How is this different from the Word 2007

9    diagram?

10    A.    This diagram is different in two small ways.

11    The first I'll mention is that it's a different product,

12    so it has different source code, different blueprints,

13    and so the citations to where in the source code these

14    structures are defined are different.

15              Besides that, the only other difference in

16    this diagram is in the upper left-hand corner.  On the

17    previous diagram, we saw a box there labeled BMDS, and

18    that stood for bookmark data structures.

19              On this diagram, it's no longer visible,

20    because in the source code for Word 11, the -- there's

21    no name BMDS used to refer to those three or four pieces

22    of information.

23              Instead, they are present in what remains on

24    the top of my diagram.  You can see the yellow, yellow,

25    and green highlighting there.  They have simply moved

1   from the BMDS in Word 2007, and they're located

2   elsewhere in Word 2003.

3        Q.    Are the elements of the SDT bookmark table in

4   Word 2003 the same as in Word 2007?

5        A.    Yes, sir, they are.

6        Q.    And are all the other structures you

7   described that make up the STD bookmark table the same

8   in Word 2003 and 2007?

9        A.    Not all of the structs are exactly the same

10   between Word 2003 and Word 2007; however, the relevant

11   materials that I've presented on this diagram are the

12   same.

13        Q.    You described how certain information was

14   moved into the BMDS for Word 2007.  Does it make sense

15   to have those data elements in the BMDS in Word 2007?

16        A.    Yes, I think it does.  It -- to me, this

17   is -- well, what happened -- what must have happened was

18   a Microsoft engineer of some sort looked at the

19   definition in Word 2003 and decided to draw a box around

20   it.  They actually introduced this name BMDS.

21             They decided to call it a struct, and they

22   did that for a reason.  And I don't know the actual

23   reason the Microsoft engineer did it; however, it seems

24   to me that it -- it's consistent with my understanding.

25             It -- together those three fields expressed a

1  logical relationship that provide the Custom XML feature

2  in Microsoft Word 2003 and then 2007.

3      Q.    Dr. Martin, does Word create the SDT bookmark

4  table when an XML file is open that contains Custom XML?

5      A.    Yes, sir, it does.

6      Q.    What if someone has Custom XML and an RTF or

7  html file.  Will Word create the SDT bookmark table?

8      A.    Yes, sir, it will.  If the Custom XML is

9  expressed in -- appropriately in those file formats

10  after reading and parsing those input files, we'll end

11  up with a data structure that is very similar -- no --

12  that is exactly the same, in terms of what it contains,

13  as the structure -- as the two diagrams that we have

14  seen.

15      Q.    If the user used an RTF or html file, will

16  the SDT bookmark table be constructed in a comparable

17  manner to if the user had an XML file?

18      A.    Yes, sir.  The approach to creating this data

19  structure by reading in the file is comparable between

20  the file formats.

21      Q.    What file type do you expect users of Custom

22  XML would use?

23      A.    Well, just like in my project in 2001, our

24  goal was to take data produced by one process and then

25  do something with that.  And so we needed to be able to

1  actually get it out of the first step of our project.

2            So I would expect that someone who wanted to

3  use XML would naturally produce a file as output that

4  expressed the data in XML format.

5            MR. CAMPBELL:  No further questions, Your

6  Honor.

7            THE COURT:  Thank you.  Cross-exam.

8            MR. KUDLAC:  I have a couple of binders.

9  I don't think I'm going to use very much, but just to

10  facilitate things, if you would give me a moment.

11            Your Honor, again, it's source code.

12            THE WITNESS:  Oh, great, more.

13                      CROSS-EXAMINATION

14  BY MR. KUDLAC:

15       Q.    Good afternoon, Dr. Martin.  How are you?

16       A.    I'm fine.  Thank you.

17       Q.    Good to see you again.

18            You were just mentioning the BMDS.  That's a

19  data structure that has what are called handles, right,

20  pointers to pointers to other data structures?

21       A.    Yes, sir, that's correct.  The BMDS does

22  contain handles.

23       Q.    Before your work on this case, is it correct

24  that you had not done any Custom XML work in Word 2003?

25       A.    That's correct.  I had not used that feature

1    in Word 2003.

2         Q.    And before your work on this case, you didn't

3    have Word 2007 -- well, you hadn't used Word 2007; is

4    that right?

5         A.    That's correct.

6         Q.    Now, you were here for Dr. Rhyne's testimony;

7    is that right?

8         A.    Yes, sir, I was.

9         Q.    And so you've now heard what i4i is alleging

10   to be what is called a metacode map and the mapped

11   content.

12        A.    Yes, sir, I have heard that.

13        Q.    All of the structures that you've identified

14   on your Figure 12 and Figure 24, those are defined in

15   the Word source code in a bunch of different files or a

16   number of different files as either structs or classes;

17   is that correct?

18        A.    They're partially defined that way, as

19   structures or classes.  What I've actually illustrated

20   on my diagram is the data structures that together

21   comprise the data structure that provides the Custom XML

22   feature.  And sometimes that is via a struct definition.

23             However, in many cases, it was critical to

24   read functions to actually understand what the code does

25   over time in order to understand the meaning of the

1  individual pieces that I've shown on my diagram.

2      Q.    Sure.  And the data structures that you've

3  shown, the individual boxes, they're either structs or

4  classes in Word, the big boxes.

5      A.    Well, let me take a shortcut.  Yes.

6            Ultimately, they are all expressed through

7  the use of a struct or class mechanism somehow in the

8  source code, that's correct.

9      Q.    Now, you've drawn a dotted line on the

10 right-hand side from the ixsdr, that top green box.

11     A.    Yes, sir.

12     Q.    And that goes down to a box labeled with

13 circles all the way down around the bottom to

14 vxsdc.hplxsdr; is that right?

15     A.    That's correct, sir.

16     Q.    I'm glad I got that right.

17            MR. KUDLAC:  Could I have S306?

18     Q.    (By Mr. Kudlac) And if you'd look -- like to,

19 we'll pull it up on the screen, but in your binder, at

20 PX45-033, which will be your Page 299, if you would go

21 to Line 128.

22     A.    Yes, sir.

23     Q.    Now, there we have the definition of the

24 struct xsdc; is that right?

25     A.    Yes, sir.

```
 1        Q.     And that's a structure that we don't have up

 2   on the Figure 24 or Figure 12.

 3        A.     That's incorrect, sir.

 4        Q.     Is that part of what you have as a

 5   vxsdc.hplxsdr?

 6        A.     Yes.  It is the container for the hplxsdr.

 7   So not the entire sxdc structure is depicted on my

 8   diagram.

 9        Q.     So there are two parts to that, the vxsdc and

10   the hplxsdr?

11        A.     That's correct, sir.

12        Q.     You mentioned the hsttbElements that are part

13   of the xsdr.

14               Do you see that?

15        A.     Yes, sir.

16        Q.     And that provides a handle again; is that

17   right?  Another pointer to a pointer to a structure

18   called an STTB?

19        A.     My recollection is that that element is

20   declared as a handle, that's correct.

21        Q.     You mentioned on direct testimony inserting a

22   tag into -- a Custom XML tag into a document.

23               Do you recall that?

24        A.     Yes, sir, I do.

25        Q.     And you were -- you were in the courtroom
```

1  when Dr. Rhyne testified about the Doctrine of

2  Equivalents and that the result of the separation or the

3  separate storage of what has been called the metacode

4  map and the mapped content allows access to mapped

5  content -- I'm sorry -- you can edit the metacode map

6  without access to the mapped content.

7           Do you recall that?

8     A.    Not exactly, no.

9     Q.    Okay.  Were you here for his testimony about

10  the Doctrine of Equivalents?

11    A.    I remember testimony regarding that topic,

12  yes, sir.

13    Q.    And concerning the patent, that the

14  separation of the metacode map and the mapped content

15  would allow you to access the metacode map to change the

16  metacode map without having access to the mapped

17  content?

18    A.    I remember the concept of what you're asking

19  about.  I don't remember his testimony.

20    Q.    Fair enough.

21           In Word 2003 and 2007, when you add -- when

22  you testified about adding a Custom XML tag, you can't

23  do that without also having access to the mapped

24  content, what he's calling the mapped content, because

25  you have to put the anchor characters into the mapped

1  content; is that right?

2      A.    Yes, that's essentially correct.  In order to

3  insert a Custom XML tag, you need to make room in the

4  SDT bookmark table.  In addition, you need to add some

5  anchor tags -- some anchor characters, I should say, to

6  the CP stream.

7      Q.    Those are those less-than and greater-than

8  signs, right?

9      A.    They are, coincidentally, the less-than and

10  greater-than signs that we've been talking about for

11  other purposes throughout the trial.  It's very

12  confusing, and I apologize.

13      Q.    Not a problem.

14          Similarly, when you delete a Custom XML tag

15  from a Word document using Word 2003 and 2007, you

16  access the -- what you called the SDT bookmark table,

17  the -- those three columns, correct?

18      A.    Yes.

19      Q.    And you also have to access the -- what has

20  been called the mapped content to take out those anchor

21  characters; is that right?

22      A.    That's correct, yes, sir.

23          MR. KUDLAC:  That's all the questions I

24  have.  Thank you.

25          THE WITNESS:  You're welcome.

```
 1                    MR. CAMPBELL:  No questions, Your Honor.

 2                    THE COURT:  Very well.  You may step

 3   down.

 4                    THE WITNESS:  Thank you.

 5                    THE COURT:  All right.  Who will be your

 6   next witness?

 7                    MR. CAWLEY:  Your Honor, i4i will call

 8   Mr. Michael Wagner.

 9                    THE COURT:  All right.  Mr. Wagner.

10   Mr. Cawley?

11                    MR. CAWLEY:  Yes, Your Honor.

12                    THE COURT:  The ELMO goes down, and you

13   push a button rather than pushing on it.  Ms. Ferguson's

14   afraid you're going to break it.

15                    MR. CAWLEY:  That's why I decided to

16   leave it alone.

17                    May I proceed, Your Honor?

18                    THE COURT:  Yes, you may.

19                    MR. CAWLEY:  May I approach the

20   witness?

21                    THE COURT:  Yes, you may.

22                    MR. CAWLEY:  And the bench?

23        MICHAEL WAGNER, PLAINTIFFS' WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MR. CAWLEY:
```

```
 1          Q.      Can you state your name, please.

 2          A.      Michael Joseph Wagner.

 3          Q.      Why are you here today, Mr. Wagner.

 4          A.      I have been asked to calculate the damages

 5   for i4i, assuming that the '449 patent is valid and that

 6   you find that Microsoft infringes that patent.

 7          Q.      And what makes you qualified to do that job?

 8          A.      My education and experience.

 9          Q.      Well, tell us about your education, first of

10   all.

11          A.      I have a Bachelor of Science degree in

12   engineering from the University of Santa Clara, which I

13   received in 1969.  I have a Master's in Business

14   Administration, which I received from UCLA in 1971.  And

15   I have a juris doctorate degree from Loyola University

16   School of Law, which I received in 1975.

17          Q.      Do you have any professional licenses?

18          A.      I do.

19          Q.      Tell us what those are.

20          A.      Currently, the active license I have, I am a

21   Certified Public Accountant in the state of California.

22                  I'm also a licensed attorney in the state of

23   California.

24          Q.      Tell us now about your professional

25   experience.  How have you spent your career?
```

1    A.    Well, for the last 32 years, I have been the

2  type of work I'm doing for you in this case, and that is

3  calculating commercial damages.  And I've really done

4  that for four different firms during that period of

5  time.

6         The longest time I was with PriceWaterhouse,

7  which is one of the Big 8 accounting firms.  And I was a

8  partner in that firm.

9         And I was with two very large management

10 consulting firms that were publicly traded.  The last

11 was called CRA International, and, actually, that firm

12 supported me in this work.

13        And, currently, I'm with a small firm in the

14 Silicon Valley, California called LitiNomics.

15    Q.    Are you a member of any organizations that

16 deal with valuation issues?

17    A.    I am.

18    Q.    What are they?

19    A.    The American Institute of Certified Public

20 Accountants and also The California Society of CPAs.

21    Q.    And have you written anything about doing

22 this kind of work?

23    A.    I have.

24    Q.    How many papers or other publications?

25    A.    I have 25 professional publications.

1    Q.    All right.  Are there any that are

2 particularly cited or consulted in this field?

3    A.    Yeah, I think one of them is.  I am the

4 founding co-editor of a book called The Litigation

5 Services Handbook.  It's now in its fourth edition,

6 published by John Wiley.

7         And it is cited in the treatise of scientific

8 evidence that is published by the Federal Judicial

9 Center to give federal judges guidance on economic

10 damages.  And my book is only one of five sources

11 referenced in that work.

12    Q.    Wait a minute.  I think that I may have a

13 copy of it here.

14         Is this the book that you're referring to?

15    A.    It is.

16    Q.    Okay.  Have you provided expert opinions

17 before to help juries understand the amount of a

18 reasonable royalty when a patent has been infringed?

19    A.    I have.

20    Q.    What kind of information did you consult or

21 study doing your work on this case?

22    A.    Well, the entire record produced by both

23 parties was made available to me and my staff, but the

24 types of things that I looked at would inform of the

25 value of the patent.

1                And those are things like the license

2    agreements that these two parties have entered into in

3    the real world; all the financial information from

4    Microsoft as to the amount of sales and the types of

5    profits they earned when they sell their products; and

6    then a lot of internal information, usually e-mails or

7    internal presentations or external presentations that

8    talk about the technology that's at issue in this case.

9                I also collected public information about XML

10   and this industry.  I looked at depositions that were

11   relevant to the work that I'm doing in the case.  I

12   reviewed a number of the expert reports in this case,

13   both the technical and damage experts on both sides of

14   the case.

15               And I had conversations with a number of the

16   executives at i4i to understand their business, and that

17   was principally Michel Vulpe and Loudon Owen.  Then my

18   staff talked with Dr. Martin to understand the

19   technology at issue.

20        Q.    And have you also attended the trial thus

21   far?

22        A.    I've been here painfully since it started.

23        Q.    Why do you do that?

24        A.    I do so I can understand the record, because

25   I'm really trying to address what's happening here in

1   the courtroom, not what's done before.

2       Q.    All right.  If the jury in this case decides

3   that Microsoft infringes i4i's patent and finds that the

4   patent is valid, how do you go about figuring out the

5   amount of i4i's damages?

6       A.    Well, in this case, I've calculated a measure

7   called a reasonable royalty amount of damages.

8       Q.    Okay.  And just so we're all clear, I know

9   we're in East Texas here, so this is probably mother's

10  milk to many people here, but what is a royalty?

11      A.    Well, a royalty is simply a payment for use

12  of someone else's property.  And a very common form of

13  royalty here in Texas is, if you're lucky enough to own

14  land that has oil or gas underneath it and the oil and

15  gas company wants to extract that material, they may pay

16  you a royalty check every month, if they're trying to

17  get that oil out of your property.

18      Q.    Okay.  Well, since we're not talking about

19  mineral rights, instead we're talking about patent

20  rights, tell us how someone like you goes about

21  determining the amount of a reasonable royalty for using

22  someone's patent.

23      A.    Well, the term we all use is called a

24  Georgia-Pacific analysis.

25      Q.    And what does Georgia-Pacific mean?

1    A.    Well, it's actually a case and it was a case

2  that a federal judge in 1970, which is a long time ago,

3  actually wrote out 15 different factors that someone

4  like me, a damage expert, should consider in arriving at

5  a conclusion as to what a reasonable royalty rate should

6  be.

7         And he laid out 15 different factors, the

8  last which was called a hypothetical negotiation.

9    Q.    Okay.  Let's -- let's understand that a

10 little bit better.

11        What is a hypothetical negotiation?

12   A.    Well, it's, by definition, a negotiation that

13 didn't occur.  There was no actual negotiation between

14 these parties for these patents.  If there was, we

15 wouldn't be here.

16        So we go back in time to the date right

17 before the first infringement and assume the parties

18 would get together and try to figure out what the patent

19 was worth, and they would use all the information that

20 was known both then and subsequent to inform each other

21 as to what the patent was worth.

22   Q.    How do you go about, then, calculating the

23 amount of a reasonable royalty?

24   A.    Well, first off, I'm going to have to start

25 with some type of baseline or starting point to what I

1    think the parties would begin their negotiation with.

2        Q.    Okay.  And is there a formula that you use

3    once you get that baseline?

4        A.    Yes, there is, and it's a pretty simple

5    formula.

6        Q.    Are we on the -- there we go.

7        A.    And it's a very simple equation.  I first

8    have to determine a reasonable royalty rate, and that is

9    the amount that Microsoft would pay for each accused

10   product that is infringing the patent.

11            And I have to apply that to something, which

12   is called a royalty base.  It could either be the

13   revenues from the products sold or the actual units of

14   products sold.

15            And once I have the reasonable royalty rate

16   and the base, I multiply the two together and that would

17   give me the reasonable royalty.

18       Q.    All right.  And let's start with your

19   formula.  You said that the first thing that you have to

20   decide is a reasonable royalty rate?

21       A.    That is correct.

22       Q.    Okay.  So I want to -- I want to talk some

23   more about how you did that, but let's go ahead and jump

24   to your conclusion.

25            What did you conclude was a reasonable

1  royalty rate in this case?

2      A.    $98 per infringing unit actually used in an

3  infringing manner.

4      Q.    Okay.  Let's make sure we understand that.

5  Are you saying that you believe that i4i is entitled to

6  $98 for every copy Word 2003 or 7 that is sold?

7      A.    No.

8      Q.    Why not?

9      A.    Because your client is only -- they should

10 only receive a payment for products that were actually

11 used in an infringing manner.  Most of the products that

12 are capable of infringing were not used in an infringing

13 manner.

14     Q.    Is that for anybody who used it in an

15 infringing manner?

16     A.    Well, no.  The only people that I've

17 calculated a royalty for are business users of these

18 products.

19     Q.    All right.  Well, I can't help but remember

20 that it was only two days ago now that Microsoft's

21 lawyers stood here and held up in front of the jury a

22 yellow box, and he said that that was a copy of

23 Microsoft Word 2007 that he bought on Amazon, and he

24 told this jury that you were going to say that i4i

25 should get a hundred dollars for that.

1          Is that true?

2     A.     Well, first off, it should have been $98.

3  But, no, for that particular product, it would have been

4  zero.

5     Q.     Why is that?

6     A.     It's because I'm only calculating damages for

7  business users.  I'm not calculating damages for

8  individuals, either students or home users who brought

9  products, even if they did use it in an infringing

10 manner.

11          So Mr. Powers is safe to use that for the

12 rest of his life, and he's not going to pay any

13 royalties to i4i.

14    Q.     All right.  And you're not suggesting that

15 any businesses out there pay i4i royalties, other than

16 Microsoft, are you?

17    A.     That's correct.

18    Q.     Now, we also heard that Mr. Powers paid,

19 what?  I think he said $97, something in that vicinity.

20          Are you aware of whether or not businesses

21 out there get that price for Microsoft Word?

22    A.     No.  That is not a price that businesses pay.

23 That's the cheapest version of the product.  And the

24 versions of the products that you incorporate these

25 features and are used allegedly in an infringing manner

1  are significantly more than that amount of money.

2      Q.    Okay.  Let's get on now then.  I told you I

3  wanted to come back to this.  I want to understand how

4  you reached your conclusion that $98 per copy for a

5  business that actually uses it to infringe, how you

6  reached that conclusion.

7          What did you do?

8      A.    Well, I did the Georgia-Pacific analysis as

9  I've explained.

10     Q.    Okay.

11     A.    But before I did that, I had to come up with

12 a starting point, and that's what I call a baseline

13 rate.

14     Q.    All right.  And how did you determine the

15 baseline rate?

16     A.    Well, I started the record for what this type

17 of technology is worth at or around the time of the

18 hypothetical negotiation, which is in around October of

19 2003.

20          And I looked at documents that, according to

21 Microsoft, as to what the competitive offerings were at

22 that time.

23     Q.    Okay.  And is there a certain rule of thumb

24 that you're gathering that information for?

25     A.    Yes.  Now once I find a yardstick, I'm going

1  to have to determine what it's worth, and I used what is

2  called the 25-percent rule.

3      Q.    What's that?

4      A.    The 25-percent rule is a rule of thumb in

5  licensing that everything else being equal, that when an

6  inventor allows someone else to use their invention,

7  they'll keep 25 percent of the profits from the sale of

8  that infringing product.  And that will leave 75 percent

9  to the person who uses it, here Microsoft.

10     Q.    Is this an approach that's well-recognized in

11 your field?

12     A.    Yes.  Many people use this approach.  Some

13 people don't like it, but it's widely used.

14     Q.    And how did you estimate the profits that

15 Microsoft made due to infringement?

16     A.    Well, first, I had to come up with what is a

17 product that would have these types of features worth in

18 the marketplace.  And so I determined the revenues first

19 before I determined the profits.

20     Q.    Okay.  Tell us how you went about identifying

21 something to use as a benchmark to apply this 25-percent

22 rule to.

23     A.    Well, I looked at internal information of

24 Microsoft as to who they thought had competitive

25 products to offer XML to their customers instead of

1  getting it from Microsoft themselves.

2      Q.    Okay.  And what did you find?

3      A.    Well, I found that at or around or before the

4  time of the hypothetical negotiation, they looked at

5  three principal products as being their most significant

6  competitor, the first one being a product called

7  FrameMaker 7.0, and the retail price for that, if

8  someone wanted to use that with Word, they would have to

9  pay $799.

10         And also there was a product called Arbortext

11 Epic Editor 4.2, and that also offered XML editor

12 capability, and that sold for $695.

13         Then there was a third product called

14 XMetaL for Authors, which was selling for $499 a unit.

15     Q.    And you've got Plaintiffs' Exhibit 51 here,

16 and I don't want to have to take the time to go look at

17 that, but is it fair to say that it's in that exhibit

18 that Microsoft itself identified these three products as

19 competitors?

20     A.    Yes, these and others.  But these are listed

21 as the primary competitors at that point in time.

22     Q.    Okay.  Did you consider anything else?

23     A.    Yes.  I considered two other possible

24 baseline rates, and that, in the middle here, I have

25 what's listed as Microsoft SGML author.

1         And that is a -- not an XML editor, because

2    it was back in 1995, but is another type of editor for

3    this type of markup language.  And Microsoft thought

4    that their customers who had Word who wanted this type

5    of functionality would buy, as an add-on to Word, this

6    product, and they would charge $595 for this capability.

7         And then the bottom one is what was i4i

8    selling its product for that had this functionality, and

9    that was the S4/Text product, and they sold it for $275.

10   But I have a plus sign after that, because they also,

11   besides selling the product, were going to do consulting

12   services with their clients and would earn more money

13   than that from their customers.

14        Q.    Okay.  Now, just so we can make sure that we

15   understand why we're even looking at these products and

16   the prices for them, are all of these things that people

17   might buy if they were in the market for something that

18   helped them do XML?

19        A.    Yes.

20        Q.    Okay.  So which one of these  products that

21   allow people to do XML did you choose as your benchmark?

22        A.    I chose XML for Author at $499.

23        Q.    And why?

24        A.    Well, one thing, this is the product that

25   Microsoft had bought and was using internally before

1    they put this functionality in their own product.  And

2    it's cheaper than all the other alternatives, except for

3    S4/Text, which may be even more expensive than that when

4    you consider all the consulting services as well.

5           So I thought it was a reasonable and most

6    conservative starting point for what this type of

7    functionality is worth at the hypothetical negotiation.

8        Q.    All right.  Having picked this benchmark of

9    the value in the marketplace of a product that helped

10   people who wanted to do XML do XML, what's the next

11   step?

12       A.    Well, the next step is to determine what is

13   the profits that Microsoft earns when they sell their

14   products.

15       Q.    Okay.  Well, they didn't sell XMetaL for

16   Author, right?

17       A.    They did not.

18       Q.    So what's their profit got to do with

19   anything?

20       A.    Well, it's because you have to figure out a

21   profit split between the licensee and the licensor for

22   the use of the invention.

23       Q.    Okay.  So are you saying that the $499

24   represents some value you believe Microsoft could have

25   gotten in the marketplace from customers who

1   specifically wanted XML?

2       A.    Right.  For the small percentage of the

3   customers who really needed that functionality in Word

4   and if it was not in Word, this is what they would have

5   done.  They would have had to buy one of these types of

6   products.

7       Q.    And you assumed that if Microsoft had chosen

8   to do that, it could have achieved the same profit

9   margin selling this product as it does in selling other

10  products?

11      A.    That is correct.

12      Q.    What is Microsoft's profit margin?

13      A.    I have calculated their profit margin during

14  the entire period that I've calculated damages to be

15  approximately 76.6 percent, which means for every dollar

16  of revenue Microsoft earns, they have profits of 76.6

17  cents.

18      Q.    What's the source of that calculation?

19      A.    That's the internal financial statements for

20  the operating business unit that Microsoft sells the

21  infringing or allegedly infringing products.

22      Q.    And have you shown us that calculation here?

23      A.    Well, just that I've got a chart that shows

24  the $499 starting price or benchmark.  The 76.6-percent

25  profit margin would leave Microsoft with profit margins

1  of $382 dollars per unit.

2      Q.    Okay.  And then what do you do about the

3  25-percent rule?

4      A.    Well, then I apply the 25-percent rule to

5  that and say the starting point of this hypothetical

6  negotiation would be $96 a unit is what the parties

7  would start then negotiating about.

8      Q.    Okay.  Now, just so there's not any

9  confusion, has Microsoft actually sold Word for $499?

10     A.    Well, they sold products that incorporated

11  the infringed unit for that and more, and they've also

12  sold it for less.

13     Q.    Has Microsoft actually made $96 in profits

14  selling Word?

15     A.    Again, on some products they have, and others

16  they have not.

17     Q.    Then why -- why are you using this $96 as a

18  starting point?

19     A.    Well, I have a problem, and it's no one's

20  fault, but Microsoft has a business strategy, when they

21  put a new feature in their products, they do not raise

22  their price for that feature.  That's just not their

23  business strategy.

24          Their business strategy is to make sales, and

25  you have to understand who Microsoft's biggest

1 competitor is, and that is itself.  Microsoft has the

2 largest install base of any company in the world.

3         And they have to try to induce their

4 customers, who have perfectly good Microsoft Word

5 product, to upgrade or buy a new copy of that software.

6         So that Microsoft Word product, in this

7 example here, would be -- would be Word XP, which is the

8 version -- the successor version before Word 2003, that

9 someone doesn't need that product anymore but has to

10 upgrade to the next edition.

11         That old edition has the thousands of

12 features that Microsoft has put in its product already.

13 You don't need to pay for that again.  The reason why

14 you upgrade is you get something new, and that's what

15 I'm -- I have to try to value, when they don't put an

16 additional price on that.

17     Q.    Let me make sure that I understand what you

18 just said.

19         If there's a business and it uses Microsoft

20 Word, and let's assume that since it uses -- has a lot

21 of computers with Microsoft Word.  It's paid $50,000 to

22 Microsoft to be able to use Microsoft Word, and it had

23 the XP version that, as I recall, came out around 2000.

24 Then Microsoft decides to come out with a new -- with a

25 version of Word, Microsoft 2003, but it says to this

1  business, you know, there's really nothing new in 2003.

2  Then what do you think the business is going to do?

3       A.    I don't think they would buy 2003.  I still

4  use Word XP on my business computer.  I have three

5  personal computers at home.  They are all Vista, but

6  never upgraded XP, because I don't need to.

7       Q.    Okay.  But now let's say on the other hand,

8  instead of saying to the world, well, here's a new

9  version, but there's nothing new, let's suppose

10  Microsoft says Word 2003 supports XML and you need it.

11  Then what do you think might happen?

12       A.    Well, if you believed that you may need it

13  and you understand what Microsoft is trying to sell you,

14  you may upgrade or buy a new version.

15       Q.    And if you do that, would you expect that

16  that business might well pay Microsoft another $50,000

17  for the new version?

18       A.    That's very possible.

19       Q.    So has Microsoft made money without having to

20  raise its price for the new feature?

21       A.    They have, in my opinion.

22       Q.    So based on your calculations, what

23  percentage of Microsoft customers who purchased a

24  version of Word that was capable of infringing the

25  patent in the United States would Microsoft have to pay

1  a royalty on?

2      A.    Approximately 2 percent.

3            I have calculated during the damage period

4  approximately 2.1 million users have used Word in an

5  infringing manner.  And the source for my work or the

6  evidence of that is in Plaintiffs' Exhibit 631, which is

7  Schedule 1 to my damage model.

8            Then I've estimated the total amount of Word

9  products that are capable of infringing the patent sold

10 during the same time period in the United States.  And

11 that's 108,900,000 copies.  And the work I did to

12 support that calculation is Plaintiffs' Exhibit 635,

13 which is Schedule 5 to my damage model, which relies

14 upon Plaintiffs' Exhibit 636, which is Schedule 6,

15 Plaintiffs' Exhibit 484, which is Schedule 7, and

16 Plaintiffs' Exhibit 485, which is Schedule 8.

17     Q.    Okay.  So I want to make sure we understand

18 this pie.

19           Are you saying that the whole pie is all the

20 copies of Word that could be used to infringe this

21 patent that have been sold by Microsoft?

22     A.    If they used the method that your client is

23 accusing of practicing their invention, yes.

24     Q.    And that's in the United States?

25     A.    This is only in the United States.

1       Q.      Okay.  But the red little slice out of the

2  pie at the top, that represents only the customers who

3  bought it and actually used it to infringe the patent?

4       A.      Based on my estimates, yes.

5       Q.      And your reasonable royalty, is that going to

6  apply to the whole pie?

7       A.      No.  It's only to that little red sliver of

8  people who actually used the invention.

9       Q.      And, again, you're not talking about

10  expecting those customers of Microsoft to pay anything,

11  are you?

12      A.      No.

13      Q.      You're expecting Microsoft to pay fair value

14  for the use of the patent, if their customers have

15  chosen to use Microsoft's product to infringe; is that

16  right?

17      A.      That is correct.

18      Q.      Okay.  So based on your calculations, what

19  percentage -- what percentage would this be?  Two

20  percent you said?

21      A.      Yes.  Approximately two percent of

22  Microsoft's customers in the United States actually used

23  the product in an allegedly infringing manner.

24      Q.      All right.  So if instead of just asking a

25  royalty from Microsoft for the customers who actually

1  use it to infringe, if you just spread it across all the

2  copies of Word capable of infringing that could be used

3  to infringe, about how much are you talking about per

4  copy?

5      A.    A little bit less than $2 per copy.  So as an

6  example of Mr. Powers' 98-dollar version, it would be $2

7  from that.  It would be $2 on a 500-dollar product or a

8  700-dollar product.

9      Q.    Okay.  All right.  After you determined the

10 baseline royalty rate, what did you do then?

11     A.    I then did the Georgia-Pacific analysis,

12 analyzing the 14 factors that lead up to the

13 hypothetical negotiation.

14     Q.    Okay.  So you took those 14 things that the

15 judge wrote about in 1970 and considered all those

16 factors?

17     A.    I did.

18     Q.    Do we have to talk about them all?

19     A.    Well, only five of them, based on my

20 analysis, would cause me to change my starting point

21 position.

22     Q.    Okay.

23     A.    And that's G-P Factors No. 3, 5, 6, 9, and

24 11.

25     Q.    Well, let's just talk about those.

1            Tell us about Factor 3.

2       A.     Well, G-P Factor No. 3 up at the top is

3  called the nature and scope of the license as exclusive

4  or nonexclusive, or as restricted or nonrestricted.

5       Q.     Okay.  And -- and what does that mean?

6       A.     Well, what that means is you have to look at

7  the license that we're talking about.  At the

8  hypothetical negotiation -- the hypothetical license

9  we're talking about here, it's a non-exclusive license.

10  That's all Microsoft gets.

11            It's also restricted to the United States;

12  it's not worldwide.  And there's no cooperation or

13  know-how or special treatment they get from the inventor

14  i4i.

15            They have to figure out how to use it

16  themselves.  So that's the nature of this hypothetical

17  license that is being granted here, assuming my client

18  prevails.

19       Q.     All right.  So what effect do you think that

20  this Factor No. 3 would have on what the parties would

21  have negotiated as a fair rate?

22       A.     Well, I have to compare that to my starting

23  point.  The basis for the 25-percent rule are licenses

24  in the real world where people got more than just this

25  non-exclusive restriction to the United States with no

1  other cooperation.

2          In those licenses that form the basis of the

3  25-percent rule, the licensee or the user got more than

4  that.  They got things like know-how, cooperation, maybe

5  some trade secrets.  And often they were worldwide.

6  So those are a more powerful arsenal of assets that the

7  licensee got.  So, therefore, because there's less being

8  given here, this would lower my royalty rate for my

9  starting point.

10     Q.    Okay.  What's the next factor you considered?

11     A.    The next factor is Georgia-Pacific No. 5, and

12  that's the commercial relationship between i4i and

13  Microsoft.

14     Q.    Okay.  Tell us what your analysis is of that

15  factor.

16     A.    Well, I want to try to understand.  Is i4i

17  going to lose sales of their product, if they license

18  Microsoft?

19          And I talked, again, to the executives at i4i

20  as to what they viewed happened to them after Microsoft

21  incorporated XML -- custom XML capability in their

22  product.  And I also looked at public information and

23  then internal statements within Microsoft as to whether

24  they thought their putting this functionality in the

25  product would take business away from i4i.

1    Q.     What did you conclude?

2    A.     That these parties are clear competitors.

3           Now, Microsoft would not consider i4i a

4    competitor; they're not.  But Microsoft is a competitor

5    to i4i.  If they do what they did here, it destroys a

6    very large segment of the market that i4i could possibly

7    address.

8    Q.     Can you give us some examples of documents

9    which you considered to arrive at this conclusion?

10   A.     Yes.  Here are two statements.

11          The first one, which is Plaintiffs'

12   Exhibit 49, a statement by Martin Sawicki, where he said

13   Word 11, which is Word 2003, will make i4i's product

14   obsolete.

15          And then Andy Zukerberg, in Plaintiffs'

16   Exhibit 100, said:  My main concern with i4i is that if

17   we do the work properly, there won't be a need for their

18   product.

19          So those statements tell me even Microsoft

20   recognized that i4i was going to lose market opportunity

21   if they used this technology.

22   Q.     And did you consider other documents in the

23   case that confirmed your conclusion that Microsoft was a

24   competitor of i4i?

25   A.     Yes.  In my report, I listed a number of

1   other documents that also support my conclusion that

2   these companies were competitors.

3       Q.    All right.  In the interest of time, we don't

4   need to read those, but let's just go on.

5           And let me ask you, what did you conclude

6   about this factor?

7       A.    This factor would increase the reasonable

8   royalty from my starting point.

9       Q.    Okay.  What's the next factor you considered?

10      A.    Factor No. 6, and that is the effect of sales

11  of the accused features on sales of other products,

12  which are often called convoyed sales, or sales that go

13  along with the accused product.

14      Q.    And what -- what information did you consider

15  in evaluating this factor?

16      A.    Well, again, I looked at internal statements

17  of Microsoft, deposition testimony of Microsoft's

18  witnesses as to the effect of promoting the

19  functionality here on sales of other products,

20  principally Microsoft Office.

21      Q.    Okay.  And can you tell us what some of those

22  documents said that you considered?

23      A.    Yes.  The first one is a quote from Guy

24  Gilbert in Plaintiffs' Exhibit 180 where he said:  To

25  encourage more people who need XML to buy Pro.

1            Now, Pro is short for Professional Edition of

2    Office.  So that's the most important product that

3    Microsoft sells to its business customers.

4            And he goes on in the same document in the

5    middle quote where he said:  Pro is at risk of losing

6    its market share to Standard.

7            Standard is another edition of Microsoft

8    Office but has less functionality and sells for a

9    cheaper price.

10            Since Access no longer provides sufficient

11    justification for people to spend the extra money on

12    Pro.

13            Access is a data management program within

14    Office, which a lot of businesses use in their practice.

15    But it was not generating the value that Microsoft

16    needed to induce their customers to buy this more

17    expensive product.

18            He then goes on to say that arbitrary XML,

19    which is the use of customer-defined schema, is one of

20    the most important ways we're trying to stop that trend.

21            And then the last statement I have is

22    Plaintiffs' Exhibit 73.  It's a statement by Microsoft,

23    and they said:  Foremost, among the improvements in Word

24    2003, is the deep support for customer-defined XML

25    available in the Professional Edition.

1      Q.     Okay.  And did you rely on other documents

2 that you haven't given us excerpts from here in reaching

3 your conclusion here about this factor?

4      A.     Yes.  This other document for this next slide

5 shows other documents that I used to support my

6 conclusions here that are in my report.

7      Q.     Okay.  And then what is your conclusion about

8 this factor?

9      A.     That, again, this would increase the

10 reasonable royalty, because Microsoft is selling very

11 expensive Office products by trying to encourage their

12 customers to upgrade those products using custom XML

13 functionality.

14      Q.     All right.  What's the next factor you

15 considered, Mr. Wagner?

16      A.     Factor No. 9, which is the utility and

17 advantages of the patented technology over the previous

18 technology.

19      Q.     All right.  Tell us about that.

20      A.     Well, here you're trying to see is this

21 really a major advance over the prior art or is it just

22 a small, trivial advance?

23           And also, can Microsoft do this another way?

24 Do they need to enter this license, or is this really

25 their only choice?

1     Q.    All right.  How did you conclude -- or what

2  conclusion did you reach about whether there were any

3  commercially acceptable non-infringing alternatives

4  available to Microsoft?

5     A.    Well, based on the record that I have seen

6  both at the time of my report where I reached this

7  conclusion, and also since then with subsequent

8  production of information that there are no commercially

9  acceptable non-infringing alternatives to using i4i's

10  patent, if Microsoft wants to offer custom XML.

11     Q.    Do you have slides that show us some examples

12  of Microsoft's statements about its inability to offer

13  custom XML in any way, besides the one they actually

14  used?

15     A.    Yes.  There was a Microsoft white paper,

16  which is Plaintiffs' Exhibit 205, which said:  Although

17  some capabilities enabled by custom XML's schemas could

18  have been implemented previously with clever and

19  extensive coding, these solutions were fragile and

20  difficult to create, which shows it's going to be very

21  difficult.

22         Even with all the really terrific software

23  designers at Microsoft, they didn't know a way to do it.

24         Then there was a Microsoft brochure that

25  said:  While many companies and industries have seen

1  great benefit from the use of XML, the introduction of

2  XML-enabled desktop applications with support for

3  customer-defined schemas carries the potential for even

4  greater benefit.

5         This shows how important custom XML, not just

6  plain vanilla XML, was to Microsoft's customers.

7     Q.    What did you conclude about this factor and

8  its effect on the hypothetical negotiation?

9     A.    That, again, since Microsoft had no other

10 alternative, this would raise the rate.

11    Q.    What's the next of these Georgia-Pacific

12 factors that you considered?

13    A.    Well, the last one that I considered that had

14 an effect on the rate was the extent to which Microsoft

15 has made use of the technology and the value of that

16 use.

17    Q.    Can you give us a brief summary of what you

18 found in your review of the evidence on that issue?

19    A.    Yes.  Again, I have some quotes from internal

20 Microsoft documents, the first from Jean Paoli, which is

21 Plaintiffs' Exhibit 211, where he said:

22         Customer-defined schemas are the most

23 important effort we did on XML in Office since ever.

24         And then Chris Pratley in Plaintiff's Exhibit

25 212 said:  We love XML, especially arbitrary or

1   customer-defined XML.  We emphasize customer-defined

2   schema because we truly believe with all of our hearts

3   that that is where the future is, seriously.

4          And Chris Pratley also said in Plaintiffs'

5   Exhibit 183:  I don't want it to seem that the

6   customer-defined schemas thing is a slight addition.

7   It's more like 90 percent of the value.

8          And then finally, a Microsoft presentation

9   where they said:  In many ways, XML support in the

10  Office system is the glue that holds the Office

11  ecosystem together.

12     Q.    And were there other documents that you saw

13  that confirmed your conclusion about this factor?

14     A.    Yes.  There are a number of other documents I

15  cite in my report that has the same type of information.

16     Q.    What did you conclude about the effect that

17  Factor 11 would have had on the negotiation?

18     A.    It increases the rate from my baseline rate.

19     Q.    Okay.  Now that you've described all of the

20  five factors you wanted to discuss, give us a summary.

21          In other words, how do they all come out in

22  the end?

23     A.    Well, they're not all weighted equally, but

24  four factors went up; one went down; and the rest were

25  neutral in my determination.

1    Q.    Okay.  And you told us that the 15th factor

2 was the hypothetical negotiation.

3          So how do you use that factor in this

4 hypothetical or pretend negotiation that would have

5 happened between Microsoft and i4i?

6          If they had a negotiation, how do you fit

7 these factors into that?

8    A.    Well, it's based on my professional judgment,

9 but it's using the information I gathered in these other

10 14 factors and synthesizing all of that together to

11 reach a final conclusion.

12   Q.    Okay.  So you've gone out and found a product

13 that you think is a fair representative of the value in

14 the marketplace of XML, right?

15   A.    At the time.

16   Q.    And then you've applied the 25-percent rule,

17 so that -- that you think that it's fair that the patent

18 owner get not 25 percent of the price but 25 percent of

19 the profit that someone makes from using the invention;

20 is that right?

21   A.    That is correct.

22   Q.    And then you calculated that that was -- what

23 did you say, $98?

24   A.    No, that was $96.

25   Q.    $96.  Okay.

1          And now you've applied the Georgia-Pacific

2   factors to see if you think that the four factors going

3   up and the one going down should change that $96?

4       A.    That's right.

5       Q.    And how much did you decide it should change

6   it?

7       A.    I increased it by $2 to $98.

8       Q.    Okay.  So you think that those four factors

9   all pointing up that we just discussed would really only

10  make a 2-dollar difference in the royalty?

11      A.    Based on my judgment and considering the

12  entirety of my analysis.

13      Q.    All right.  Now that we've determined what

14  you believe, in your opinion, is the reasonable royalty

15  rate, what's the next thing we need to talk about?

16      A.    Well, now we have to get the base.  What are

17  we going to apply that royalty rate --

18      Q.    What does base mean?

19              THE COURT:  Mr. Cawley, I think we'll

20  take our afternoon break, if this is a good time.

21              MR. CAWLEY:  Absolutely.

22              THE COURT:  We will take our break, and

23  we will be in recess until 3:10.

24              (Jury out.)

25              (Recess.)

1           COURT SECURITY OFFICER:  All rise.

2           (Jury in.)

3           THE COURT:  Please be seated.

4           All right, Mr. Cawley.  You may continue.

5           MR. CAWLEY:  Thank you, Your Honor.

6      Q.   (By Mr. Cawley) Mr. Wagner, we've made some

7  good progress.  I think we've got about 15 minutes to

8  go, but remind us now, what was the formula that we're

9  trying to fill in that you told us about near the

10 beginning of your testimony?

11     A.   It would be the royalty rate times a royalty

12 base equals the reasonable royalty.

13     Q.   Okay.  And the royalty rate, that's the

14 analysis you went through and told us how you arrived at

15 your conclusion that that would be $98 for every

16 business that uses it to infringe, correct?

17     A.   That's correct.

18     Q.   Okay.  Now let's talk about the next piece of

19 the formula you need to know.

20          The royalty base, what is that?

21     A.   Well, since my royalty rate is a dollar per

22 unit, I determined the number of units of products that

23 Microsoft sells that has an allegedly infringing product

24 that would practice the invention.

25     Q.   The number of units?

1    A.    Units.

2    Q.    Okay.  And units that are used in what way?

3    A.    That use the methods taught in the patent and

4  the claims that are being asserted in this case.

5    Q.    Once again, we're not talking about all the

6  units they sold, correct?

7    A.    That is correct.

8    Q.    We're not talking about the units they sold

9  to individual people, correct?

10    A.    That is correct.

11    Q.    We're talking about the units -- are you even

12  talking about all the units they sold to businesses?

13    A.    No.

14    Q.    What are you talking about?

15    A.    Well, I'm talking about the businesses that

16  have actually used it in an allegedly infringing manner.

17    Q.    Okay.  How did you estimate the number of

18  businesses that have used Microsoft's product to

19  infringe?

20    A.    I relied upon another expert who you

21  retained, Dr. Wecker, who is an applied mathematician,

22  who did a survey to determine that amount.

23    Q.    All right.  And we'll hear from Dr. Wecker

24  right after you; is that right?

25    A.    I believe that's correct.

1      Q.    Okay.  And now, is this survey that

2  Dr. Wecker was asked to do the kind of data that experts

3  in your field typically rely on when they need to know

4  something like how many businesses might use a product

5  in a certain way?

6      A.    It is.

7      Q.    How did you -- how did you come up with

8  Dr. Wecker as someone to use to do this survey?

9      A.    Well, I recommended him to you, because I

10  have worked with him a number of times over the last 30

11  years.

12      Q.    And are there also other experts in this case

13  that you have also relied on?

14      A.    Yes.

15      Q.    And who were they?

16      A.    Dr. Rhyne and Mr. Gilbane, who are technical

17  experts, who also helped in forming my opinion.

18      Q.    Okay.  And what are the specific results of

19  the survey that you arrived at in estimating the number

20  of Microsoft's customers who have infringed?

21      A.    Well, you may have said my survey.  It's not

22  my survey.

23      Q.    You're right.  I'm sorry.  The survey.

24      A.    The survey that Dr. Wecker performed, I

25  looked at the Exhibit D to his report, which I have just

1   put up on the screen, which is the conclusions he

2   reached based on his survey.

3        Q.    Okay.  Can you tell us what the conclusions

4   are.

5        A.    Well, the conclusions that I used are the

6   ones that are in yellow.  It's probably still not

7   readable.

8             But this is what he has estimated between

9   October of 2003 and November of 2008 when he completed

10  his survey as the number of customers who used Word in

11  an allegedly infringing manner.

12       Q.    Well, what's the total result of the survey?

13       A.    The total is about 1.8 million users, and

14  that's the two numbers -- the sum of the two numbers

15  over in the far right-hand column, for Word 2007, I'm

16  going to round this around 300,000 units, and for Word

17  2003, it's about 1.6 million.

18       Q.    Okay.  So is that figure of about 1.8 million

19  the figure that you plugged into the second step of the

20  formula?

21       A.    No.

22       Q.    Okay.  Why not?

23       A.    Because he only calculated units through

24  November of 2008.  I had to estimate units up until the

25  date of trial.

1      Q.    Okay.

2      A.    So I did that, and then that's the number

3  that I plugged in.

4      Q.    Okay.  Great.

5            Before we do the arithmetic in the formula,

6  though, I want to ask you a little bit more about the

7  survey, even though we're going to hear a lot more about

8  it from Dr. Wecker in a minute.

9            Why were the opinions of Mr. Gilbane and

10 Dr. Rhyne important in connection with the survey?

11     A.    Well, after Dr. Wecker performed his survey

12 and Microsoft received a copy, they complained -- or

13 they believe that there are certain problems with the

14 survey and that some of these users may not be using

15 Microsoft Word in an allegedly infringing manner.

16     Q.    And so what did you learn from Dr. Rhyne and

17 Mr. Gilbane about that?

18     A.    That if these occurrences occurred at all,

19 it's rare, and it's also, in their professional

20 opinions, that these same people would also use the

21 product in an allegedly infringing fashion.

22     Q.    All right.  So based on your conversations

23 with those two gentlemen, did you assume that in the

24 least, opening an XML dot docx or dot dotm document and

25 then saving it as a dot XML doc -- dot docx or dot dotm

1  document infringed the patent?

2       A.    Yes.  But I can't quite answer your question.

3  I didn't talk about that.  I reviewed their reports that

4  addressed these issues.

5       Q.    Okay.  And you've heard, at least,

6  Dr. Rhyne's testimony about that, too, haven't you?

7       A.    I was here today.

8       Q.    Okay.  There's also something -- I don't want

9  to spend a lot of time on this.  I just want to

10 understand how you treated it.  There's something called

11 a custom transform.

12            Have you heard that expression?

13      A.    I have.

14      Q.    And did Microsoft also criticize your report

15 by saying that it believed that in some instances, a

16 customer who does what you just described might do a

17 custom transform, which would strip out the custom tags

18 from XML?

19      A.    Yes.  I understand that was a criticism they

20 had of Dr. Wecker's survey.

21      Q.    Well, how did you address that issue?

22      A.    I used some information internally from

23 Microsoft from what they called the Customer Experience

24 Improvement Program or CEIP to try to estimate the

25 amount of customers or users that may have done that.

1      Q.    Okay.  So tell us a little bit more about

2   that.  How did you make that adjustment?

3      A.    Well, I looked at both the two products at

4   issue, Word 2003 and Word 2007, and with this

5   information from Microsoft, which is a program where

6   they get volunteers of their customers who, basically,

7   allow Microsoft to track all of their key inputs on

8   their computers to see how they use the Microsoft

9   products.

10         And they have a couple of counters that will

11  tell you if they want to track a certain feature, and

12  one of them was custom transforms.

13     Q.    Okay.  So did you look at that data, for

14  example, and assume how much difference it would make if

15  all of those reports from the CEIP were non-infringing?

16     A.    Well, if everyone who did a custom transform

17  did it in a way that would make the product or the use

18  non-infringing, I would calculate that amount and reduce

19  my numbers by 3-1/2 percent.

20     Q.    3-1/2 percent, assuming that every custom

21  transform reported by this Microsoft CEIP data wasn't

22  infringing?

23     A.    Right.  That it removed all of the custom

24  tags right at use.

25     Q.    In fact, you don't know that, do you?

1        A.      No one knows that.

2        Q.      So it might be none, or it might be all.

3        A.      That is correct.

4        Q.      And it makes a 3-1/2 percent difference one

5   way or the other?

6        A.      Correct.  And I believe it was Dr. Rhyne that

7   opined -- no.  It was actually Mr. Gilbane who said that

8   he sees no real practical use to do that; that he

9   doesn't believe that someone would strip out all of

10  those custom tags that cost a lot of time and money to

11  put in and just wipe them out.  He didn't understand why

12  that would be done.

13       Q.      Okay.  So you've already told us about the

14  numbers you got as a result of Dr. Wecker's survey,

15  correct?

16       A.      Yes.

17       Q.      And you said that you adjusted that number,

18  since it stopped in 2008, to be all the way through the

19  date of this trial, correct?

20       A.      I did it through May 15th.

21       Q.      And then you applied this 3-1/2 percent

22  higher or lower possibility due to the custom

23  transforms?

24       A.      I did.

25       Q.      Now, before we leave that subject, what about

1  the CEIP data?  This is something that we got in this

2  lawsuit from Microsoft, right?

3       A.    You did.

4       Q.    And it shows what some of their customers did

5  with some of their software, right?

6       A.    It does.

7       Q.    Well, why didn't you use that data in

8  determining how many customers infringe?

9       A.    Because I read the deposition of the person

10 at Microsoft responsible for this program, Mr. Timothy

11 Diggs -- Briggs, and I don't believe this is a reliable

12 source to estimate the use that's at issue in this case,

13 because the counters they had were not accurate.

14           And also a more important reason is that the

15 universe of people who allow their key strokes to be

16 tracked by Microsoft are not the type of users that

17 would probably be using Custom XML.

18           The type of customer that does that are

19 usually enterprise customers, large businesses with

20 sophisticated businesses and operations, and they are

21 underrepresented in this database.

22      Q.    Okay.  So this -- this reporting about how

23 customers are using XML, this is a strictly voluntary

24 program?

25      A.    Strictly voluntary, and about 1 percent of

1  their customers participate.

2      Q.    Okay.  And Microsoft doesn't go out and spy

3  on its customers who don't volunteer to participate, do

4  they?

5      A.    Oh, absolutely not.  They do it for a good

6  purpose, to try to make their product better.

7      Q.    Okay.  But, in fact, that deposition of the

8  Microsoft person responsible for this program showed you

9  that it's only a fraction of the Microsoft customers

10  that are included in those numbers.

11      A.    Right.  They have two counters that could be

12  used, and there's problems with both of them, and the

13  number could be in between those numbers, or it could be

14  higher than those numbers, and I can't tell.

15      Q.    All right.  So tell us, after getting the

16  numbers from the survey and making the adjustment to

17  bring it up through the date of trial, what's the

18  number?

19      A.    Well, I calculated a range of damages, based

20  on whether you include or exclude custom transforms, and

21  the reasonable royalty damages are between $207 million

22  and $200 million.

23          And those are calculated in Plaintiff's

24  Exhibit 631, which is Schedule 1 of my damage model.

25  And then the other numbers are schedules that support

1   that calculation.

2       Q.    So it's 270 million if we assume what about

3   the custom transforms?

4       A.    It's 207 million.

5       Q.    Sorry.  207 million if we assume what about

6   the custom transforms?

7       A.    That those do not eliminate the infringing

8   use.

9       Q.    And if you assume that all the custom

10  transforms that Microsoft complains about don't

11  infringe, what's the number?

12      A.    200 million.

13      Q.    Okay.  Would you say that those are

14  conservative numbers?

15      A.    I believe they're conservative.

16      Q.    Tell us why that is.

17      A.    Well, for two reasons:  First, the way that

18  Dr. Wecker conducted his survey.  He only got about a 5

19  percent response rate, and so 95 percent of the

20  businesses he contacted did not respond, and he made an

21  assumption that none of those 95 percent would ever use

22  their product in an infringing manner.

23          So I think that's a very conservative

24  assumption to do that.

25          The second reason is that he only surveyed

1  businesses.  So he has excluded all of the home use of

2  these products, student use, all individuals who

3  purchased these products.

4           And there's some likelihood that some of

5  those people also use the invention, and we have not

6  calculated any damages for them.

7      Q.    Okay.  And just, again -- I know that I'm

8  repeating myself, but if you will indulge me and

9  everybody will indulge me for just 30 seconds, I just

10 want to make sure this is crystal clear.

11          Are you saying that Microsoft customers

12 should pay i4i 200 to 207 million?

13     A.    No.  I don't think you're suing any of those

14 customers; you're suing Microsoft.

15     Q.    Okay.  So you think that the reasonable

16 royalty for whoever uses Microsoft's product in this

17 case should be paid my Microsoft?

18     A.    Yes.  And then there will be an implied

19 license to their customers.

20     Q.    Mr. Wagner, $200 million is a lot of money;

21 you agree?

22     A.    It is a lot of money.

23     Q.    When you do your work and reach a conclusion

24 like this with a significant amount of money as the

25 conclusion, do you do anything to double-check yourself?

1       A.      Yeah.  I do what's called a reasonableness

2  check.

3       Q.      Tell us what that is.

4       A.      Well, you want to make sure that what you're

5  doing makes sense when you compare it to some other

6  yardstick.

7       Q.      And have you done that in this case?

8       A.      I have.

9       Q.      Tell us about it.

10       A.      Well, I think you showed it in opening

11  statement, that I compared what I'm asking for from the

12  operating profits that Microsoft has earned from the

13  products that are sold in the United States that could

14  potentially practice this invention.

15       Q.      Okay.  Can you show us what that looks like?

16       A.      And this calculation shows that, again, it's

17  a very small piece of a very much larger pie of profits

18  that Microsoft earns.

19            Now, again, this whole pie isn't infringing.

20  They're just products that are capable of infringing.

21  But it's still a very small percentage of that.

22  And based on what I showed you, Microsoft used this

23  functionality to try and sell all of these products,

24  whether the customers used them or not.

25       Q.      And have you calculated -- if you're trying

1  to understand the relationship between the amount you

2  believe is a total reasonable royalty and Microsoft's

3  profits from all of its products capable of infringing,

4  what's the -- what's the relationship?

5      A.   It's less than 1-1/2 percent.

6      Q.   Less than 1-1/2 percent?

7      A.   Yes.

8      Q.   Thank you, Mr. Wagner.

9          MR. CAWLEY:  I'll pass the witness, Your

10 Honor.

11          THE COURT:  Cross-examination.

12          MR. LENDER:  Thank you, Your Honor.

13          Your Honor, I have some exhibits.  May I

14 approach the witness?

15          THE COURT:  Yes, you may.

16              CROSS-EXAMINATION

17 BY MR. LENDER:

18     Q.   Good afternoon, Mr. Wagner.

19     A.   Good afternoon, Mr. Lender.

20     Q.   Good to see you again.

21     A.   Good to see you, too.

22     Q.   You understand that Word 2003 and Word 2007

23 have thousands upon thousands of different features,

24 correct?

25     A.   I do.

1    Q.    And virtually all of those features have

2 nothing to do with this case, correct?

3    A.    I agree with that statement.

4    Q.    I actually created a little demonstrative

5 just to try to highlight this point.

6         MR. LENDER:  If we could put that up, the

7 first...

8    Q.    (By Mr. Lender) And this is a little wheel

9 that I put together of different features included

10 within Word 2003 and 2007, things like spellcheck,

11 saving documents, printing documents, track changes,

12 creating a table.

13        So we're all on the same page, Mr. Wagner,

14 none of these features have anything to do with this

15 case, correct?

16   A.    I agree with that.

17   Q.    So anytime someone uses any of the features

18 we see up on the screen, they're not accused of

19 infringement in this case, right?

20   A.    They are not.

21   Q.    And, therefore, i4i is not entitled to any

22 damages for anyone using any of these features.

23   A.    That is correct.

24   Q.    Now, you also understand that there are lots

25 of features included within both Word 2003 and Word 2007

1  that actually deal with XML that have nothing to do with

2  this case, right?

3       A.    I agree with that as well.

4       Q.    For example, you understand that the only

5  function included in Word that's relevant to this case

6  is opening a dot XML, dot docx or dot dotm document

7  containing Custom XML in Word, right?

8       A.    I do.

9       Q.    So, for example, if somebody uses a dot doc

10  file containing Custom XML, you know -- you sat here and

11  heard Dr. Rhyne -- that's not accused of infringement,

12  correct?

13       A.    That is correct.

14       Q.    So any user who opens a dot doc file

15  containing Custom XML, i4i is not entitled to one dime

16  for that, correct?

17       A.    I agree with that statement.

18       Q.    And Word ML -- we've heard a little bit about

19  Word ML in this case.  That's the proprietary XML, I

20  think, that Microsoft came up with?

21       A.    It is.

22       Q.    That's also not accused of infringement in

23  this case, right?

24       A.    Yes.  If it wasn't -- unless it's using

25  custom tags, it's not accused.

1    Q.    And you would agree that if I asked a fair

2  statistical sample of people whether they ever bought

3  Word 2003 or Word 2007 because it allowed them to open a

4  dot XML a dot docx or a dot dotm file containing Custom

5  XML and Word, the majority of people wouldn't know what

6  I was talking about, right?

7    A.    Unless you did a study, I don't know.  I

8  mean, I can have my own belief, but no study like that

9  has been done in this case as far as I know of.

10   Q.    And your belief is that the majority of

11 people wouldn't know what I was talking about.

12   A.    I agree, because only 2 percent do use it.

13 So I think that's probably a safe assumption, but you've

14 got to prove it scientifically.

15   Q.    And we'll talk about the survey, I promise

16 you.

17         Now, you also talked about the

18 Georgia-Pacific factors.

19   A.    I did.

20   Q.    And you used the Georgia-Pacific factors as

21 part of your analysis?

22   A.    Yes.

23   Q.    Now, one of the factors you didn't talk about

24 is Factor 10.  You know what that factor is about,

25 correct?

1        A.      I do.

2        Q.      And Factor 10 talks about the benefits of the

3   invention as claimed in the patent, right?

4        A.      That's one of the things it talks about, yes.

5        Q.      And you'd agree that the fact that companies

6   may have seen benefits from using XML in general is

7   irrelevant to this case, right?

8        A.      If they were not, in their mindset, thinking

9   about Custom XML, you are correct.

10       Q.      Okay.  And, in fact, it's fair to say that

11  you haven't seen -- strike that for a minute.

12               You've examined a lot of documents in this

13  case, right?

14       A.      I have.

15       Q.      Spent a lot of hours reviewing documents

16  produced by Microsoft documents, documents produced by

17  i4i?

18       A.      I did.

19       Q.      And, in fact, it's fair to say that you

20  haven't seen a single document where Microsoft has

21  touted the ability to open a dot XML, a dot docx or dot

22  dotm file containing Custom XML; isn't that right?

23       A.      That's true.  They've never used language

24  that specific.  They only talk about Custom XML.

25       Q.      And you understand that what I just

 1  mentioned, that's what's accused of infringement in this

 2  case, right?

 3       A.    I do.

 4       Q.    Now, in the last slide when you closed, you

 5  put up a pretty big number, and you said that those were

 6  the units that were capable of infringing, right?

 7       A.    You're close.  I think that that was profits.

 8  There's no units on the last slide.

 9       Q.    So that was profits.  I believe what it said

10  was --

11            MR. LENDER:  Well, would you mind putting

12  up the last slide for us, please?  Is there a way to

13  switch in the middle?

14            I don't want to misstate the slide, so

15  would you mind putting up that last slide for us?

16       A.    The sixth slide has units, if you want that

17  one.

18       Q.    (By Mr. Lender) Actually, I just want to show

19  the last slide with that big number with the little

20  sliver.

21            Okay.  And this is the document you closed

22  with where you said these were Microsoft's operating

23  profits from all units capable of infringing, right?

24       A.    I did.

25       Q.    That's the big number you talked about?

1    A.    That is -- they're both big numbers, but

2 that's the bigger number, yes.

3    Q.    And that big number of units capable of

4 infringing, that's Microsoft's profits from sales of all

5 of Office, correct?

6    A.    That's true.

7    Q.    And Office includes a lot of different

8 programs that have nothing to do with Microsoft Word,

9 right?

10    A.    It depends on how you define lot.  It has a

11 number of the other functionalities, principally Excel,

12 PowerPoint, Outlook, and Access.

13    Q.    And, in fact, Microsoft Word has thousands

14 upon thousands of features that have nothing to do with

15 the case.  You just talked about that, right?

16    A.    I already told you that, yes.

17    Q.    And you agree that Microsoft's profitability

18 is dependent on many factors that are completely

19 unrelated to the accused functionality; isn't that

20 right?

21    A.    I agree with that.

22    Q.    And let me make it very clear, because I want

23 to make sure we're all on the same page, you understand

24 that whether or not Word or Office is capable of being

25 used in an alleged infringing manner is completely

1  irrelevant to this case, right?

2      A.    I don't believe it's completely irrelevant,

3  no.

4      Q.    Well, you understand, let's be clear, that

5  i4i, if they prove infringement, they are only entitled

6  to damages to the extent that people are actually using

7  the accused functionality, right?

8      A.    I do understand that, and I've limited my

9  damage calculation to that.

10     Q.    Right.  They're not entitled to any damages

11 just because the products are capable of being used in

12 an infringing manner.

13     A.    They are not.

14     Q.    Now, you -- in response to some questions

15 from i4i's counsel, there was a discussion about the

16 student version of Office.

17           Do you remember that?

18     A.    Home and student, yes.

19     Q.    And Mr. Powers got up in opening, and he said

20 that he just bought a copy of the 2007 version of

21 student, and he paid $97, right?

22     A.    And change.

23     Q.    Right.  And you agree that's less than what

24 you're asking for in this case, right, per unit?

25     A.    I do.  If those were the base, I agree my

1  rate would be too high.

2      Q.    Well, let's just be clear about one thing,

3  the student version, the 2007 student version of Office,

4  that includes the accused Custom XML functionality

5  that's accused in this case, right?

6      A.    It is, and I included that in the capable of

7  infringing units on Slide 6.

8      Q.    So for that 97 bucks, if you bought the

9  student version of Office, you'd get the accused XML

10  functionality, as well as all kinds of other things, all

11  the functionality that's not accused in this case,

12  PowerPoint and Excel, right?

13     A.    That's correct.

14     Q.    Okay.  Now, you said that you focused on the

15  business version of Office, which you said was more

16  expensive, right?

17     A.    I think that's the type of product that the

18  people that Dr. Wecker surveyed would be using, yes.

19     Q.    And you understand that the business version

20  of Office is more expensive because it includes

21  additional programs that are actually not included in

22  the student version of Office, correct?

23     A.    It usually includes both Outlook and Access

24  as well.

25     Q.    But the accused Custom XML functionality,

```
 1   that's in both products, the more expensive business

 2   version and the 97-dollar version of the student

 3   version, correct?

 4        A.    That is correct.

 5        Q.    And by the way, the price of the business

 6   version of Office, I could probably go buy that for,

 7   what, about a hundred and fifty bucks?

 8        A.    You show me where.  The list price is 499.

 9        Q.    Well, you know people don't pay the list

10   price too often, right?

11        A.    Not always, but I seem to.

12        Q.    Have you ever tried -- have you figured out

13   how much you can pay on Amazon to buy the business

14   version?

15        A.    You know, I go to Microsoft's website, so I

16   guess I pay too much.

17        Q.    Do you know where Mr. Powers bought his

18   student version of Office?

19        A.    I understand on Amazon.

20        Q.    Okay.  Thank you.

21              Now, what you tried to do in this case,

22   Mr. Wagner, is you tried to calculate damages based on

23   the number of folks that you believe actually used the

24   accused functionality, right?

25        A.    That's what I tried to do.
```

1      Q.      And you agree that the amount that customers

2 actually use a particular feature is indicative of its

3 value, right?

4      A.      I do.

5      Q.      And you're not aware of having ever opened a

6 document containing Custom XML in Word, right, you

7 personally?

8      A.      I personally have not done that.

9      Q.      You've never even heard of Custom XML before

10 you started working on this case, right?

11      A.      That's true.

12      Q.      You don't know how many customers have ever

13 purchased Word 2003 or Word 2007 because it allowed them

14 to open a document containing Custom XML in Word, right?

15      A.      That information is not known by anyone.

16 Your client doesn't know it; I don't know it.  I just

17 know that your client was trying to convince customers

18 to buy the product and how they did that.

19      Q.      But sitting here, right here on the stand,

20 you can't identify a single person anywhere in the

21 entire world who bought Word 2003 or Word 2007 because

22 of the accused XML functionality; isn't that correct?

23      A.      No, that's not true.

24      Q.      That's not true?

25      A.      Yeah.  I know one person, Mr. Powers.  That's

```
 1  the only reason he bought it.
 2       Q.    Okay.  Fair enough.
 3             [Laughter.]
 4             MR. POWERS:  Well, I have a license.
 5       Q.    (By Mr. Lender) And you can't identify anyone
 6  anywhere in the entire world who upgraded to Word 2003
 7  or Word 2007 because of the accused XML functionality;
 8  isn't that also right?
 9       A.    That's true.
10       Q.    And you certainly didn't buy Word 2003 or
11  Word 2007 because of the accused XML functionality,
12  right?
13       A.    I did not.
14       Q.    Now, Mr. Wagner, you were sitting in the
15  courtroom when Dr. Rhyme testified and he talked about
16  the issues of direct infringement and indirect
17  infringement, right?
18       A.    He did.
19       Q.    And you remember, when he was talking about
20  inducement, which is a form of indirect infringement, he
21  talked about the fact that there needs to be evidence
22  that Microsoft directed or encouraged or instructed
23  others to use the accused functionality; isn't that
24  right?  Do you remember that?
25       A.    I do.
```

1    Q.    Now, the Wecker survey that you rely upon --

2 and we'll get into it in a little bit more detail in a

3 little bit, but the Wecker survey that you relied upon

4 to figure out the number of people who supposedly use

5 this technology -- right?

6    A.    Yes.

7    Q.    That Wecker survey that you relied on doesn't

8 tell you or tell anyone who opened an XML document

9 containing Custom XML in Word because of any

10 encouragement by Microsoft, right?

11    A.    I don't believe that that question was asked,

12 so I do not believe the survey addresses that issue.

13    Q.    And the survey also doesn't tell you whether

14 anyone who opened an XML document containing Custom XML

15 in Word did so as a result of some technical assistance

16 they received from Microsoft, right?

17    A.    I don't believe the survey addressed that

18 issue either.

19    Q.    All right.  Let's talk about direct

20 infringement then.

21        Now, in terms of direct infringement,

22 Mr. Rhyme, he put up an interrogatory response that he

23 got from Microsoft.

24        Do you remember that?

25    A.    I do.

1        Q.    And I think I counted it correctly, but I'm

2   going to walk through it.  This is -- I think he talked

3   about four different categories of people at Microsoft

4   who he said had actually used the accused functionality.

5   He first named six people by name.  It was Ms. Pratley,

6   Mr. Sunderland, Mr. Little, Mr. Sawicki, Mr. Brian

7   Jones, and Mr. Joe Andreshak.

8            Remember he first came up with those six

9   names?

10       A.    I do.

11       Q.    Then he had three groups.  He said there was

12  one group that could be between 800 and a thousand

13  people, a second group that could be as much as 200, and

14  a third group that could be as much as a hundred.

15           Do you remember that?

16       A.    I do.

17       Q.    And if I -- I'll give you the benefit of the

18  doubt and give you the maximum.  If I add that up,

19  maximum, the maximum number of people that Dr. Rhyme

20  identified who had directly used the accused

21  functionality in Word was 1,306 people, right?

22       A.    I'll accept your math, but I don't think he

23  did that; he just accepted Microsoft's information.

24       Q.    But that was the only evidence of direct

25  infringement that we saw from Dr. Rhyme in the entire

1  case, right?

2      A.     I believe that's correct.

3      Q.     And if I take that 1,306 folks and multiply

4  that by your 98-dollar royalty rate, that will get me to

5  a number around $130,000, right?

6      A.     I believe your math is probably correct.

7      Q.     And $130,000 is a lot less than 200 million,

8  right?

9      A.     Oh, it certainly is.

10     Q.     Okay.  Now let's talk about the Microsoft

11  customer experience data that you talked about versus

12  the Wecker survey.

13     A.     It's the Customer Experience Improvement

14  Program data.

15     Q.     Thank you.

16            Can we just refer to that -- I think we've

17  seen that sometimes as the CEIP data.

18     A.     Yes, we can.

19     Q.     Make the court reporter happy.  We don't have

20  to say it every time, so we'll call that the CEIP data,

21  so you and I will know what we're talking about.

22     A.     We do.

23     Q.     Now, in coming up with your damages

24  calculations, I know today you only talked about the

25  Wecker survey, but in your expert report, you actually

1  did calculations based on both pockets of data, correct?

2       A.    I did.

3       Q.    And the Microsoft CEIP data, that's actual

4  data that Microsoft collects as part of its business

5  practices of uses of certain features within Word by its

6  actual customers, right?

7       A.    It is.

8       Q.    And just so everyone's on the same page, this

9  data, whether it's the Wecker survey or the CEIP data,

10 that doesn't prove anything about infringement, correct?

11      A.    By itself, it does not.

12      Q.    That's just data that estimates the number of

13 people who may have used the accused functionality in

14 this case, right?

15      A.    In an allegedly infringing manner.

16      Q.    Okay.  And what you have done for purposes of

17 your analysis is that you've just assumed

18 infringement -- infringement, correct?

19      A.    Correct.  I have no opinion on liability in

20 this case.

21      Q.    Right.  If the jury were to find that there

22 was no infringement or they find that the patent is

23 invalid, your view would be the damages would be zero,

24 correct?

25      A.    There are no damages, and I've wasted

1  everybody's time.

2      Q.    Okay.  Thank you.

3            Now, you also said that in your view, the

4  CEIP, the Microsoft data, was less reliable.  That's

5  what you said?

6      A.    I did.

7      Q.    Let me ask you this, Mr. Wagner:  You know

8  that there's millions of people that actually

9  participate in Microsoft's CEIP data system, correct?

10     A.    I think the range is between 2 and 4 million.

11     Q.    All right.  2 to 4 million.

12           And how many people, to your recollection,

13  responded to Dr. Wecker's survey?

14     A.    Well, I don't think -- well, it was

15  businesses, and I believe that an individual, of course,

16  has to speak for the business, but I think it was 46.

17     Q.    Forty-six.

18           And the other thing you mentioned was that --

19  you said that there weren't a lot of large enterprise

20  businesses in the CEIP data.  Isn't that what you said?

21     A.    Yes.

22     Q.    But you can't tell us how many large

23  enterprise companies are included in the CEIP data,

24  correct?

25     A.    No.  I looked for that information, and it

1  was not produced.

2      Q.    But we do know how many large companies

3  actually responded to the Wecker survey, right?

4      A.    We do if you define large.

5      Q.    How do you define large for purposes of what

6  you said on direct?

7      A.    I'd say companies with more than a thousand

8  employees would be an enterprise.

9      Q.    Okay.  Well, how many of those 46 were

10  responding for more than a thousand employees?

11      A.    You'd have to show me his report.  I don't

12  remember the details.  But I'm going -- my recollection,

13  if I'm refreshed, is maybe three or four of them were in

14  that category --

15      Q.    Thank you.

16      A.    -- at most.

17      Q.    Okay.  Thank you.

18          Now, the Microsoft CEIP data, that showed

19  less than 1 percent of users had ever opened a document

20  containing XML in Word, right?

21      A.    Well, with the limitations of the counters,

22  yes.

23      Q.    Okay.  But that data showed less than 1

24  percent?

25      A.    It did.  It's a range between 2/10ths of a

1  percent and a half a percent.

2      Q.    And the survey that was conducted by the

3  expert that i4i hired, Dr. Wecker, that showed that only

4  approximately 2 percent of folks had ever opened a

5  document containing Custom XML in Word; isn't that

6  right?

7      A.    Yes, the business customers that he surveyed.

8      Q.    So using the Wecker survey, which you talked

9  about today in your direct examination, that would

10  suggest to you that 98 percent of Microsoft users are

11  simply not interested in opening an XML document

12  containing Custom XML in an alleged infringing way,

13  right?

14      A.    Well, for the reasons stated in my direct, I

15  think the numbers are higher than that, but I have no

16  ability to quantify it.  But at the minimum, that's the

17  number that were using it.  And so, yeah, it's possible

18  that 98 percent do not.

19      Q.    Okay.  And you're not a survey expert?

20      A.    No.

21      Q.    You're not vouching for the survey sitting

22  here on the stand, right?

23      A.    Well, I have no independent verification of

24  Dr. Wecker's work.

25      Q.    You have just accepted Dr. Wecker's numbers

1    and then used that as the base for your damages

2    calculation.

3         A.    That is accurate.

4         Q.    Okay.  Now, in this case, what you tried to

5    do was you tried to figure out what Microsoft would have

6    agreed to pay and i4i would have agreed to accept had

7    they actually sat down and negotiated a license for

8    i4i's patent, right?

9         A.    That is correct.

10        Q.    What you referred to as the hypothetical

11   negotiation?

12        A.    Yes.

13        Q.    And in your view, that negotiation would have

14   occurred right before the time of the first alleged

15   infringement.  And I believe in your report, the date

16   that you said was around October 2003?

17        A.    Everything you said is correct.

18        Q.    Thank you.

19              And your opinion is that the negotiation

20   would have included both Word 2003 and Word 2007, right?

21        A.    I do.

22        Q.    And that's your opinion even though Word 2007

23   had not yet been developed, correct?

24        A.    Well, it was in development.  It, of course,

25   wasn't sold until, I think, January 30th, 2007.

1    Q.    And your view is that because of the ease of

2  administration, Microsoft would have wanted to cover

3  everything in one sitdown, correct?

4    A.    Yes.

5    Q.    Now, in the hypothetical negotiation, there's

6  an assumption that both parties come to the table with

7  full information, correct?

8    A.    I agree with that statement.

9    Q.    And the result of the hypothetical

10  negotiation is trying to figure out what Microsoft would

11  have agreed to pay and i4i would have been willing to

12  accept, assuming both of them are acting reasonably,

13  correct?

14    A.    Yes.

15    Q.    And for purposes of your hypothetical

16  negotiation we talked about, you simply assumed

17  infringement, correct?

18    A.    That is correct.

19    Q.    And you also simply assumed validity,

20  correct?

21    A.    Correct.

22    Q.    Now, the result of the hypothetical

23  negotiation, what Microsoft gets is simply a

24  nonexclusive license to the patent, right?

25    A.    In the United States.

1     Q.    Right.  They don't get to own the patent,

2  correct?

3     A.    They do not.

4     Q.    They don't get exclusive rights to the

5  exclusion of anybody else?

6     A.    They do not.

7     Q.    They don't get -- we've heard a lot about

8  source code in this case.  They don't get any of i4i's

9  source code, correct?

10     A.    They do not.

11     Q.    They don't get any of i4i's technical

12  documents, correct?

13     A.    No.

14     Q.    All they get is what you referred to in your

15  direct examination as a naked license.

16     A.    I didn't say naked, but that's what it's

17  referring to.

18     Q.    You've referred to it as a naked license in

19  prior cases, haven't you?

20     A.    Well, certainly, and probably in my

21  deposition.

22     Q.    And all a naked license means is that

23  Microsoft gets a promise that i4i won't sue them,

24  correct?

25     A.    It's a covenant not to sue.

1    Q.    Okay.  Now, the jury heard some testimony a

2  few days ago from Mr. Cox, and there was a discussion

3  about valuations and about the issue of whether the

4  value of a company can be less than the value to a

5  license to a patent owned by the company.

6         Do you remember that testimony?

7    A.    Yes.

8    Q.    I want to be clear about something.  In your

9  expert opinion, you agree that someone would likely pay

10  less for a nonexclusive license to a patent than they

11  would pay to purchase the entire company that had the

12  rights to that patent, right?

13    A.    I would believe that's a reasonable

14  conclusion.

15    Q.    And you know that as of October 2003, right

16  in the period of the time when you say the hypothetical

17  negotiation would have taken place, that i4i was headed

18  towards a cliff, correct?

19    A.    They had a financial problem, and they needed

20  money, yes.

21              MR. LENDER:  Can we put up Exhibit --

22  Defendant's Exhibit 2225?

23    Q.    (By Mr. Lender) And I believe you should have

24  a copy of that in your book.  Let me know when you're

25  there.

1      A.    I'm there.

2      Q.    Okay.  You've seen this document before, yes,

3   Mr. Wagner?

4      A.    I have.

5      Q.    And Defendant's Exhibit 2225 is an internal

6   i4i document which was an update for McLean Watson,

7   right?

8      A.    Yes.

9      Q.    And at this point in time, McLean Watson was

10  considering alternatives for how to deal with i4i,

11  right?

12     A.    They were.

13     Q.    And if we turn to the second page of the

14  document, you'll see first there's the discussion in the

15  middle that i4i is headed towards a cliff.

16     A.    That is the title of the middle section of

17  that page.

18     Q.    And that's -- this is in the time and the

19  period of the hypothetical negotiation, October of 2003,

20  right?

21     A.    Yes.

22     Q.    And McLean Watson -- just so we're all clear,

23  McLean Watson is the -- the bankers who invested in i4i

24  Limited Partnership, the entity that brought this

25  lawsuit, correct?

1    A.    Well, it's an investment firm.  I don't

2  know -- you can call them bankers.  That's a loose term.

3    Q.    Okay.  Now, if we go down further, there's a

4  section that talks about alternatives going forward.

5        Do you see that?

6    A.    I do.

7    Q.    And these were alternatives that i4i was

8  considering and McLean Watson was considering in October

9  of 2003, right?

10    A.    Yes.

11    Q.    And the first one that they were considering

12  was discontinuing operations ASAP, right?

13    A.    That is the first one that they have listed.

14    Q.    And discontinuing operations ASAP means

15  shutting the doors and going out of business, right?

16    A.    It does.

17    Q.    Now, the fourth alternative that they were

18  considering in October of 2003 was selling the company

19  to Michel and the employees for a nominal amount.

20        Do you see that?

21    A.    I do.

22    Q.    And, Mr. Wagner, you understand that a

23  nominal amount is a lot less than $200 million, right?

24    A.    Absolutely.

25    Q.    In fact, a nominal amount is a lot less than

1 a million dollars, right?

2     A.    It could be.

3     Q.    Now, in this case, your opinion is that

4 Microsoft would have agreed to pay a running royalty of

5 $98 every time one of its customers used the accused

6 functionality, right?

7     A.    Every time one of their business customers

8 did so, yes.

9     Q.    But you agree and understand that the result

10 of the hypothetical negotiation can be either a running

11 royalty or a lump sum payment, correct?

12     A.    That is also a possibility, yes.

13     Q.    And what a lump sum means is that rather than

14 getting a royalty every time the product is sold and

15 used in an accused way, that the parties would sit down

16 and agree on an amount upfront, and Microsoft would pay

17 that, and no other payments after that, right?

18     A.    That is the nature of the lump sum.

19     Q.    And in your hypothetical world, it's your

20 opinion that the parties would have agreed to a running

21 royalty, right?

22     A.    Correct, because the best way to compensate

23 for patent infringement is the actual use of the alleged

24 infringer.

25     Q.    You know -- that's your opinion in the

1   hypothetical world, even though you know, in the real

2   world, Microsoft seeks lump sum licenses, correct?

3       A.   In the real world, outside the context of

4   litigation, that's what they seek.

5       Q.   And you also know that in the real world, no

6   one, no one from i4i told you that they would have

7   demanded a running royalty rather than a lump sum from

8   Microsoft, right?

9       A.   That is true.

10      Q.   Now, Dr. Wagner -- Dr. Wagner -- Mr. Wagner,

11  during your examination, you were asked about the book

12  that you were the coauthor of.  It's that book that you

13  talked about that judges had looked at called the

14  Litigation Services Handbook?

15      A.   Yes.

16           MR. LENDER:  Your Honor, may I approach?

17           THE COURT:  Yes, you may.

18      Q.   (By Mr. Lender) I brought actually a copy of

19  the latest version that I was able to find.  It's -- I

20  guess it's the fourth edition.  And I'm going to hand

21  that up to you, and I'm going to ask you, if you

22  wouldn't mind turning to the tabbed page, which is

23  Page 71.

24           MR. LENDER:  And for purposes of the

25  record, this document is also Defendant's Exhibit 2351.

1      Q.    (By Mr. Lender) Now, it's your opinion that

2  in the hypothetical world, the parties would have agreed

3  to a reasonable royalty --

4             MR. LENDER:  If you could just turn to

5  Page 71, please.  And if you can turn it to Section --

6  I'm sorry.  It's actually on -- why don't you turn up

7  the Page 43 of the exhibit, but it will be the same --

8  the same point.

9      Q.    (By Mr. Lender) If you want to look at

10 Exhibit 2351, it's the -- I think 2351 is the 2008

11 supplement.

12     A.    I'm sorry.  Now you've confused me.  What --

13     Q.    Why don't you use 2351, which is the later

14 version of that document.

15     A.    Oh, I see.

16     Q.    And if you go on Defendant's Exhibit 2351 and

17 turn to Page 43.  Let me know when you're there.

18     A.    I'm there.

19             MR. LENDER:  Let's blow up the first

20 paragraph on 43.  It's actually 20 in the exhibit.

21 Okay.

22     Q.    (By Mr. Lender) Now, it's your claim that the

23 parties would have agreed to a running royalty even

24 though you know and have previously written that the

25 choice between a running royalty and a lump sum, quote,

1  usually depends on the situation, including practices in

2  the industry.

3                  MR. LENDER:  And, Chris, can you just

4  highlight that sentence, so we all have it?

5       Q.    (By Mr. Lender) Right?

6       A.    I've written that, and I agree with that

7  statement.

8       Q.    And in the actual world, you recognize and

9  understand that the industry practice for large software

10 companies like Microsoft is to enter into lump sum

11 licenses, right?

12      A.    It is.

13      Q.    Now, in other cases that you've worked on,

14 Mr. Wagner, you've in fact, given opinions that the

15 result of the hypothetical negotiation would be a lump

16 sum, right?

17      A.    Under certain fact situations, I have.

18      Q.    And it's your view that one of those fact

19 situations is when there's a design-around, correct?

20      A.    Yes.

21      Q.    Whenever there's a design around the patent,

22 it's your belief that the cost of the design-around is

23 the most amount of money that i4i -- that somebody could

24 ask for in a hypothetical negotiation, right?

25      A.    From an economic standpoint, that is my

1   opinion.

2       Q.    And that means that in this case, if there

3   is, in fact, a design-around, i4i can't get more money

4   from Microsoft than it would have cost to design around

5   that patent, right?

6       A.    If you properly calculate the cost, I agree

7   with that.

8       Q.    And a design-around is just a way to

9   restructure your product so that there can't be any

10  question whether it infringes or not, right?

11      A.    Right.   It doesn't practice the alleged

12  infringed claims.

13      Q.    So if it would have cost Microsoft, say, a

14  million dollars to design around this patent so there

15  would be no question on anyone's part that Microsoft

16  didn't infringe, your view would be the reasonable

17  royalty would be a million dollars?

18      A.    Yes.

19      Q.    Okay.   Let's now turn to the doctrine that

20  you referred to, which you called the 25-percent rule.

21            Now, it's your opinion that in the

22  hypothetical world, the parties, when they sat down to

23  negotiate, would have agreed to use the 25-percent rule?

24      A.    Yes.

25      Q.    Even though you know that in the actual real

1    world, you're not aware of any instance where Microsoft

2    went to the negotiating table with the 25-percent rule

3    in mind, right?

4         A.    They have not, based on their monopoly power.

5         Q.    Okay.  And you also -- you're not suggesting

6    monopoly power in a negative way; you're suggesting that

7    simply as the fact because of their large market share?

8         A.    Absolutely not.  Microsoft earned its

9    monopoly position by doing it the right way, by doing --

10   making good products and promoting them correctly and

11   dominating the marketplace the way you're supposed to.

12        Q.    Thank you.

13             And you know that in the real actual world,

14   i4i also has never gone to the negotiating table with

15   the 25-percent rule in mind, correct?

16        A.    I don't think they've ever gone to the

17   negotiating table, except when they did their split-up

18   between two related parties.

19        Q.    Right.  And in that instance, when i4i, Inc.,

20   sold the patent to i4i, LP, you're not suggesting that

21   they went to the market with the 25-percent rule in

22   mind, are you?

23        A.    I have no details, but I would be surprised

24   if they did.

25        Q.    Okay.  Now, you know that there are lots of

1  experts out there that actually think that there's no

2  basis for applying a 25-percent rule, right?

3       A.    Well, it depends on a lot.  There are a

4  number of people that do not believe that there's a

5  theoretical or empirical basis for the rule.

6       Q.    Including the coauthor of your book, right?

7       A.    That's right.  It made it very difficult to

8  write this chapter, but Dr. O'Brien, the coauthor of

9  this chapter, and I do not agree on this subject.

10       Q.    But you do agree that applying the 25-percent

11  rule can be a real problem when the accused product

12  incorporates lots of different technology that's

13  unrelated to the patent-in-suit, right?

14       A.    I agree with that.

15       Q.    And you also agree it's problematic to use

16  the 25-percent rule where the product has lots of

17  technologies, because the reason why is that it's

18  difficult to differentiate the contributions of the

19  asserted patent from the contributions of all the other

20  technologies and patents that are included within the

21  product, right?

22       A.    Yes.  You have an apportionment problem.

23       Q.    Now, in other cases you've worked on, there

24  are instances where you have not used your 25-percent

25  rule, right?

1    A.    Oh, yeah.  There's plenty of cases I did not

2 do that.

3    Q.    And a good example of where you might not use

4 the 25-percent rule is where you have a better

5 yardstick, like a comparable license, right?

6    A.    That's true.

7    Q.    Okay.  Let's -- let's -- I want to show you,

8 if I could, Plaintiffs' Exhibit 502.  And Plaintiffs'

9 Exhibit 502, which we'll put on the screen --

10         MR. LENDER:  Could we try to make that a

11 little bigger?

12    Q.    (By Mr. Lender) Plaintiffs' Exhibit 502 is an

13 exhibit that -- it was attached to your expert report,

14 correct?

15    A.    It's one of the schedules in my report.

16    Q.    And this is the schedule that you used to

17 analyze the 13 different licenses that Microsoft

18 produced to i4i in this case, right?

19    A.    Yes.

20    Q.    And you agree that the amount that Microsoft

21 has been willing to pay for licenses to patents in

22 actual negotiations in the real world provide some

23 indication of what Microsoft would have been willing to

24 pay i4i in a hypothetical negotiation, right?

25    A.    I do.

1       Q.    Now, the 13 licenses that you analyzed, I'm

2 correct that the range of those -- first of all, all 13

3 were lump sums, correct?

4       A.    They were.

5       Q.    Not a running royalty in any of them, right?

6       A.    No.

7       Q.    And the range of those 13 licenses entered

8 into by Microsoft were between $10,000 and $5 million,

9 correct?

10       A.    That is the range for the licenses they

11 produced in this case.

12       Q.    And the mean or average of those 13 licenses

13 was right around a million dollars, correct?

14       A.    That's correct.

15       Q.    Now, one of the licenses included within

16 those 13 was a license called the TecSec agreement.

17 That's T-E-C-S-E-C, right?

18       A.    It was.

19       Q.    And you knew that license was executed in

20 March of 2004, just about -- less than six months after

21 the hypothetical negotiation date, right?

22       A.    That's correct.

23       Q.    Can we all turn to DTX2246, which is a

24 copy of the TecSec license that you reviewed?

25               MR. LENDER:  Can you pull up the DRM,

1    right there, the 1213?

2                    Thank you.

3        Q.    (By Mr. Lender) Now, you understand that the

4    TecSec relates to something called digital rights

5    management, right?

6        A.    I do.

7        Q.    And that's also sometimes referred to as

8    information rights management, right?

9        A.    It is.

10       Q.    And digital rights management was one of the

11   new features that was included in Word 2003, right?

12       A.    I think it was also one of the top five

13   features introduced.

14       Q.    So when Microsoft was touting new features

15   within Word 2003, you, obviously, showed us some

16   documents where they were touting XML, but it's fair to

17   say that they were also touting this digital rights

18   management functionality, correct?

19       A.    That is fair.

20       Q.    And digital rights management, that refers to

21   security, correct?

22       A.    It does.

23       Q.    And security is very important to many of

24   Microsoft's customers, right?

25       A.    I'd agree with that.

1        Q.     Now, let's turn to Section 2.1 in the

2   license.

3               And 2.1, that's the article that grants

4   Microsoft the license, under the TecSec patents covered

5   under the agreement, correct?

6        A.     It does.

7        Q.     And the license, what it does is it extends

8   Microsoft a license to use the TecSec patents to what's

9   called Microsoft technologies in existence, correct?

10       A.     Yes.

11       Q.     So that's what Microsoft got a license for

12   under this license.

13              In other words, what it covers under this

14   license is the technology and the products that are

15   listed in the Microsoft technologies in existence,

16   right?

17       A.     Yes.

18       Q.     Now, let's look at the definition of

19   Microsoft technologies in existence.

20              MR. LENDER:  It's going to be at the

21   beginning of the license.

22       A.     Page 2.

23              MR. LENDER:  Thank you.

24   Page 2.

25       Q.     (By Mr. Lender) And if you go down about

1  two-thirds of the way, you'll see that two of the

2  products that are actually covered under this license is

3  Office 2003, which, of course, includes Word 2003,

4  right?

5      A.    It does.

6      Q.    So there's no question that the TecSec

7  license actually covers one of the products that's

8  accused of infringement in this case, right?

9      A.    One of the two, that's correct.

10      Q.    And the TecSec license includes one of the

11  new -- brand new features included in Word 2003 that was

12  touted by Microsoft, right?

13      A.    It does.

14      Q.    And because this license specifically covers

15  the accused product in this case, you'd agree that a

16  damages expert should give this license more weight,

17  correct?

18      A.    I would give it more weight than another

19  license agreement, yes.

20      Q.    Now, Mr. Wagner, a license that relates to

21  one of the goals or purposes of the '449 patent, that

22  would also increase the relevance of the license.

23          Would you agree with that?

24      A.    Yes.

25              MR. LENDER:  Let's just pull up the

1  patent real quick, Plaintiffs' 1 or DTX2001.  We both

2  listed it as our first exhibit.

3      Q.    (By Mr. Lender) You recognize this as a copy

4  of the '449 patent that's at issue in this case?

5      A.    I do.

6            MR.  LENDER:  And if we could turn to

7  Column 7, Lines 14 to 16.

8      Q.    (By Mr. Lender) And you see that what the

9  patent talks about is document security, and what it

10  says is that document security can be significantly

11  enhanced since the metacodes and content of the document

12  are separately stored and protected, correct?

13      A.    Yes.  That's one of the benefits of the

14  invention.

15      Q.    So one of the benefits of the invention is

16  the same benefit of including digital rights management

17  in the product, correct?

18      A.    Well, in a totally different way.

19      Q.    Right.  But they both relate to security,

20  correct?

21      A.    Yes, they do.

22      Q.    Now, the TecSec license grants Microsoft a

23  license to 70 different patents and patent applications,

24  right?  They're all listed on Schedule A?

25      A.    You counted them for me in my deposition, and

1    I think that's the number you gave me.

2         Q.    And for all of those patents that Microsoft

3    got a license to, in the actual world in that

4    negotiation, Microsoft and TecSec agreed to a lump sum

5    payment of $3 million, correct?

6         A.    They did.

7         Q.    That's -- if I did my math correctly, it's

8    about $43,000 a patent, right?

9         A.    I'll accept your math.

10        Q.    And you have no reason to believe, sitting

11   here today, that that $3 million was an unreasonable

12   royalty, correct?

13        A.    No.   I have no information that tells me it

14   was not, except for this possibly was done in connection

15   with settlement of litigation.

16        Q.    Okay.  But you have no -- you have no

17   knowledge of that, correct?

18        A.    Only by reading Section 7.1 of the agreement.

19        Q.    Okay.  But you didn't see any testimony in

20   any of the testimony you reviewed or any documents --

21   any of the documents you reviewed, that anyone ever said

22   that the TecSec license was, in fact, the result of a

23   settlement of a lawsuit, correct?

24        A.    No.   I read the deposition of the Microsoft

25   spokesperson that discuss this, and that fact was not

1  discussed.

2      Q.    Okay.  Now, given that the TecSec license

3  covers the accused product in this case and also relates

4  to one of the goals of the '449 patent, would you agree

5  that the TecSec license is a comparable license?

6      A.    Well, it has some comparability, but there

7  are so many other issues with it that I discussed in my

8  report and my deposition that I did not think that gave

9  me good information.

10     Q.    Well, let's put up Page 18 of your report.

11  One of the reasons --

12          MR. LENDER:  Let's get it up there.

13  Sorry.  Page 18 of his expert report.

14     Q.    (By Mr. Lender) And do you need a copy of

15  your expert report?

16     A.    No.  But I -- hopefully, if he blows it up, I

17  can read it here.

18          MR. LENDER:  Okay.  Actually, if you can

19  go to the demo.  It's the next slide, just to make it

20  easier for everybody.

21          Next page.  Okay.

22     Q.    (By Mr. Lender) Now, is one of the reasons

23  why you used the 25-percent -- strike that.  Let me make

24  this simpler for you.

25          Mr. Wagner, in your report, what you said in

1  your report was that none of the licenses that you

2  reviewed had anything to do with the accused products in

3  this case, right?

4      A.    Yes.

5      Q.    And you know that's not correct any longer,

6  correct?

7      A.    I still didn't think the one line you read

8  out of the patent that deals with this has something to

9  do with security as to why we're here or why this patent

10 is important to Microsoft or i4i.  That's not why

11 they're doing it.  That's just a side benefit.

12         So I do not think that this makes these

13 patents comparable.

14     Q.    So, Mr. Wagner, what you actually wrote was

15 that, To my knowledge, none of the license agreements

16 relate to the licensing of technology for use in

17 Microsoft Word.

18     A.    That's true.

19     Q.    That's not correct, right?

20     A.    That is correct.  And we talked about it in

21 my deposition.  I agreed that was a mistake, that this

22 one patent, TecSec, did discuss and is used in Word.

23     Q.    Okay.  Now, let's talk a little bit about the

24 methodology that you used to come up with your damages

25 numbers.

1              MR. LENDER:  Can you put up the next

2   slide, please?

3        Q.    (By Mr. Lender) Over the course of the work

4   that you've done on this case, you've offered a number

5   of different damages calculations, correct?

6        A.    I did.  I think maybe there's 18.

7        Q.    Actually, if I -- my count is that -- that we

8   have on the slide here, there's actually 23 different

9   damages calculations.

10       A.    Okay.

11       Q.    And if I look at this right, your damages

12   calculations, your 23, they range from 22 million all

13   the way up to 207 million, right?

14       A.    That's correct.

15       Q.    And some of these calculations actually

16   corrected errors that you had made in your earlier

17   calculations -- calculations, which were pointed out by

18   our damages expert, Keith Ugone, right?

19       A.    Well, he corrected one error.  He did it

20   incorrectly.  I made the correct change, and that's

21   true; I made one change to the profitability of

22   Microsoft.

23       Q.    So one of the changes you made to your

24   damages calculations was, in fact, to address the issue

25   of double-counting; isn't that right?

1    A.    Well, possible double-counting.

2    Q.    And you knew about the issue of

3    double-counting before you issued your original report,

4    right?

5    A.    I did.

6    Q.    But it was only after you read our expert's

7    report where he pointed out the fact that you

8    double-counted that you changed the calculations, right?

9    A.    Yes.

10    Q.    Now, some of the damages calculations that we

11    see on the screen rely on Microsoft's CEIP data, and

12    then there are others that rely on the Wecker survey,

13    right?

14    A.    I think you did put them in different colors,

15    yes.

16    Q.    And if we just look at the Microsoft CEIP

17    data, your view, if I go to the bottom section, the

18    damages range is now between 22 million and 56 million.

19    A.    If you look at the very bottom quadrant, yes.

20    Q.    Okay.  But using the Wecker survey, your

21    damages number is between 199 -- I'm sorry -- between

22    200 -- 199 and 207 million, right?

23    A.    That is correct.

24    Q.    And that's the range we're talking about.

25    A.    Yes.  And you shouldn't really -- it's unfair

1   to characterize this as double-counting.  There's no

2   double-count in Dr. Wecker's.  That's not appropriate.

3       Q.   Okay.  Well, sitting here today, you can't

4   actually tell us which of these damages numbers is

5   actually the right one to use, based on your

6   methodology, right?

7       A.   Well, I think I told the jury I think both of

8   them understate, dramatically, use.  So if I had to

9   choose as a professional, I'd choose Dr. Wecker's

10   because of the many problems wrong with the CEIP data.

11       Q.   Okay.  But you have no opinion, sitting here

12   right now, as to whether the Wecker survey data or the

13   Microsoft CEIP data is more reliable, right?

14       A.   Well, I believe Dr. Wecker's is more

15   reliable.

16       Q.   Okay.

17           MR. LENDER:  Your Honor, may I approach,

18   please?

19           THE COURT:  Yes, you may.

20       Q.   (By Mr. Lender) Here's a copy of your

21   deposition, Mr. Wagner, that I took on January 27, 2009.

22   Mr. Wagner, if we turn to Page 79 of your deposition,

23   Line 8 to 14, I asked you these questions, and did you

24   give me these answers?

25           QUESTION:  What do you think is -- is

1  more reliable, the survey data or the CEIP data?

2            ANSWER:  I don't think I have an

3  independent opinion on the subject.

4            QUESTION:  In the hypothetical.

5            ANSWER:  I think -- personally, I think

6  they're both usable in my experience as a damages

7  expert.

8            That was your testimony, right?

9       A.    It was.

10      Q.    So since they're both usable and they're

11  equally reliable, it's your opinion that any number

12  between 22 million and 207 million could, in fact, be

13  the right damages number, right?

14      A.    Depending on what the jury finds as what is

15  infringing and what is not infringing.

16      Q.    And if the jury were to find, after hearing

17  from Dr. Wecker, that the Wecker survey is unreliable or

18  unbelievable, then you would say that the damages range,

19  the appropriate damages range, at least to start our

20  discussions, would be those numbers based on Microsoft's

21  CEIP data.

22            That would be the number between 22 million

23  and 56 million, right?

24      A.    That would be the only choice we would have

25  left.

1      Q.    Okay.  Let's talk a little bit about XMetaL,

2  your benchmark.

3            To come up with your damages calculation, you

4  relied on a third-party product called XMetaL, which you

5  told the jury had a list price of $499, right?

6      A.    It's XMetaL for Author, yes.

7      Q.    And Microsoft has never sold the XMetaL

8  product, correct?

9      A.    They only purchased it; they never sold it.

10     Q.    And i4i has never sold the XMetaL product,

11  correct?

12     A.    No.

13     Q.    And let me just talk for a moment about your

14  personal experiences with the XMetaL product.

15            You've never used the XMetaL product in your

16  entire life, correct?

17     A.    I personally have not.

18     Q.    You've never spoken to anyone in the whole

19  world who's ever used the XMetaL product, right?

20     A.    That is correct.

21     Q.    You've never studied or even seen the XMetaL

22  product, right?

23     A.    Well, I've studied information about it, but

24  I've never seen the product myself.

25     Q.    Okay.  And you don't personally know whether

1   XMetaL uses the accused functionality at issue in this

2   case, right?

3        A.    I did not.

4        Q.    You do understand, however, that XMetaL is

5   not strictly a custom XML application, right?

6        A.    That is true.

7        Q.    XMetaL contains, for example, many general

8   word processing functionalities, right?

9        A.    Which are totally and necessary if you use it

10  as an add-on to Word.

11       Q.    In fact, XMetaL includes lots of

12  functionalities that have nothing to do with opening

13  documents containing custom XML and Word; isn't that

14  right?

15       A.    I agree with that.

16       Q.    And you've made no attempt to allocate the

17  list price of XMetaL among all of these different

18  functionalities that are included within XMetaL, right?

19       A.    That's not true.  If you want to again turn

20  in my deposition to Page 173, I told you I didn't do it

21  quantitatively, but I did do it judgmentally in both

22  selecting my starting point and reaching my conclusions.

23       Q.    Well, let's be clear about a couple of

24  things, Mr. Wagner.

25             You have no idea what caused any customer

1  anywhere in the world to purchase the XMetaL product;

2  isn't that right?

3       A.    That's true.

4       Q.    And despite all of this, you used the '499

5  full list price of XMetaL, right?

6       A.    I did.

7       Q.    And sitting here today, you can't tell us how

8  often anyone has paid the list price for XMetaL, right?

9       A.    No.  I have no information from them as to

10 actual sales price.

11      Q.    In fact, you don't even know whether anyone

12 anywhere in the world has ever paid the list price for

13 XMetaL, right?

14      A.    I have no information on that subject.

15      Q.    And you don't know how many units of XMetaL

16 have ever been sold, correct?

17      A.    No.

18      Q.    Now, let me just make sure I've got the

19 methodology right.

20            Using XMetaL as the benchmark, your

21 methodology was to take the full list price of XMetaL,

22 the full $499, multiple that, not by the profitability

23 of XMetaL but the profitability of Microsoft, and then

24 you took 25 percent of that number to come up with $96?

25      A.    That's how I got my starting point.

1       Q.      And then you looked at the Georgia-Pacific

2  factors, which we'll talk about shortly, and you bumped

3  it up 2 more dollars to $98, right?

4       A.      That was my conclusion.

5       Q.      Let's talk about another potential benchmark.

6  You understand that when Microsoft was pricing its 2003

7  version of Office, it decided to price the Professional

8  version of Office at a price point $50 higher than the

9  small business version of Office, correct?

10       A.      That's accurate.

11       Q.      And it's your opinion that most of that

12  50-dollar difference between the small business and

13  Professional versions of Office is due to the custom XML

14  included in the Professional version of Office, right?

15       A.      I think that's one of the major reasons, yes.

16       Q.      And that's your opinion.

17              And in addition -- you know in addition to

18  the custom XML functionality, there are actually lots of

19  other differences in the two products, right?

20       A.      I do.

21       Q.      Just to give one example, the Professional

22  of Office contains an additional program called

23  Access, which is actually not included in the small

24  business version, right?

25       A.      I understand that.

1    Q.    Let's put those differences -- all those

2 other differences to the side.  Let's just focus on the

3 accused custom XML functionality, okay?

4         Let's assume for argument's sake that you're

5 actually right, that most of that 50-dollar differential

6 in the real world is due to the custom XML functionality

7 included within Word within the Professional version of

8 Office, okay?

9         Did you ever do a calculation -- you talked

10 about reasonable -- reasonableness checks.  Did you ever

11 do a calculation to see what your damages analysis would

12 have looked like had you used a 50-dollar price

13 differential as the benchmark rather than XMetaL?

14    A.    No, because I read the deposition of the

15 Microsoft's spokesman on this issue, and he testified

16 that Microsoft does not charge these differential prices

17 based on features.

18         So if I had done that, you would have

19 criticized me for doing it.  It's actually totally

20 irrelevant as a data point.

21    Q.    So your view is that we would have criticized

22 you for using the 50-dollar differential that you claim

23 was caused by accusing the accused custom XML

24 functionality rather than using a completely unrelated

25 product that costs ten times that?

1          That's your testimony?

2     A.     It's not an unrelated product.  It is

3 actually the closest yardstick in the market as of the

4 date of the hypothetical to show the type of

5 functionality that not only Microsoft internally was

6 using itself at the time because they didn't have that

7 functionality in Word, but like they would offer

8 themselves.

9          The internal statements that Microsoft say

10 they can't wait for Microsoft to have this functionality

11 inside their product so they don't have to use XML

12 anymore.

13     Q.     But, Mr. Wagner, you conceded; you said just

14 a moment ago that you have no idea whether XMetaL

15 actually includes the accused custom XML functionality.

16          Isn't that still your testimony?

17     A.     No.  My understanding is that custom

18 capabilities -- my client has a study to see if it

19 infringes.  I'm not going to claim it infringes, if I

20 don't know.

21     Q.     Okay.  Well, do you have any sense of what

22 the damages would look like, if we had used the

23 50-dollar differential rather than the price -- the full

24 list price of XMetaL?

25     A.     I know Dr. Ugone did that.  At one time, I

1  read it, but I didn't commit it to memory.

2      Q.    Well, I wasn't sure whether you would say

3  that or not, so I did.  So let's take a look.  Let's

4  first put up his calculation.

5              MR. LENDER:  Put up the products slide,

6  please.

7      Q.    (By Mr. Lender) This is the calculation that

8  you did we just walked through.  Start with the XMetaL

9  benchmark of 499, multiple that by Microsoft's

10 profitability.  That's for Office, right, for 76

11 percent.

12             Multiply by the 25-percent rule; get to $96;

13 add the 2-dollar for Georgia-Pacific; we get to 98.

14 And then in this example to get to your 207-million-

15 dollar number, I used the numbers that you provided

16 based on the Wecker survey updated through May 15th.

17             All right.  And that's how you came up with

18 $207 million, right?

19     A.    That is correct.

20     Q.    Now, if I actually replaced that 499 from

21 XMetaL and instead used a 50-dollar differential that

22 you said was because of the custom XML functionality,

23 that 207-million-dollar number drops all the way down to

24 24.4 million, right?

25     A.    It does, but this does not -- this is not

1  logical.

2      Q.    This is not logical; this is not what happens

3  if I take the 499 and replace it with 50?  Are you

4  saying this math is not correct?

5      A.    No.  The math is correct, but the logic

6  underlying it doesn't make sense.

7            And the reason for that is that this is --

8  this is the difference for all products sold by

9  Microsoft whether they infringe or not.  The 400 million

10 users of Office would pay this 50 million

11 differential -- or 50-dollar differential in order to

12 get this additional functionality.

13           My 499 only applies to people who really want

14 to use the infringing technology, not to everyone like

15 this calculation assumes.

16     Q.    Okay.  Well, let me ask you this.  Let's

17 say -- do you have any idea what would happen to this

18 same calculation if instead of using the 499 XMetaL list

19 price, I used a 50-dollar differential that you said was

20 the result of concluding the accused custom XML

21 functionality in Word, and instead of using the Wecker

22 survey numbers, I used the other data, the CEIP data

23 that you said was equally reliable?

24           Do you know what happens to these numbers?

25     A.    I am certain they're smaller.

 1      Q.    Okay.  Let's see what happens.  I'm going to

 2 take the Wecker survey now and take out the 2.1 million

 3 units.  And first, I'm going to show you, based on the

 4 lower counter, which actually, under your analysis using

 5 the lower counter, would be only 227,000 units accused

 6 of infringement.

 7           That gets me to a damages number of 2.6

 8 million, correct?

 9      A.    I assume that math is correct.

10      Q.    In fact, even if you use the higher number

11 that you talked about in your report --

12           MR. LENDER:  Next slide, please.

13      Q.    -- that would just get us to 6.8 million,

14 right?

15      A.    It would.

16      Q.    Let's talk about Factor 5 for a minute.

17           MR. LENDER:  Just leave that up for now.

18      Q.    (By Mr. Lender) Let's talk about Factor 5 for

19 a minute.

20           MR. LENDER:  Actually, you can take it

21 down.

22      Q.    (By Mr. Lender) Let's talk about Factor 5.

23 Factor 5 was the issue where you testified that i4i and

24 Microsoft are not competitors, right?

25           I'm sorry.  Are competitors.

1    A.    No, I said they are competitors.

2    Q.    Are competitors.  Thank you.

3          And you stated -- I think you said you put up

4  the obsolete e-mail, the one that we saw in opening, and

5  you said that Microsoft rendered i4i's product obsolete,

6  right?

7    A.    Yes, for 80 percent of the market.

8    Q.    Okay.  You were sitting here when Keith

9  Thomas testified, and I asked him the same question, and

10  Keith Thomas actually testified to the opposite.  He

11  said that we have not rendered their product obsolete,

12  correct?

13   A.    Yes, but I think he was talking about the

14  vertical market in pharmaceuticals where the Microsoft

15  Word product, even with this functionality, was not

16  powerful enough for some customers.  But that's a very

17  small subset of the potential customers that i4i could

18  sell to.

19   Q.    Well, I guess the record will just reflect

20  what it reflected.

21         Now, despite now stating in this trial that

22  Microsoft and i4i are competitors, it's fair to say that

23  you can't identify a single document where i4i stated

24  that it considered Microsoft to be a competitor, right?

25   A.    Except for what I said in my deposition,

1  that's true.

2      Q.    Okay.  And that's, in fact, what you did say

3  in your deposition, right?

4      A.    Well, what I said was I did see a document; I

5  read a deposition, which is a document where the

6  executives say they were -- they were competitors.

7      Q.    Okay.  But no documents in the millions of

8  documents that have been produced in this case, you

9  didn't see any contemporaneous documents where i4i said

10 that it considered Microsoft to be a competitor,

11 correct?

12     A.    That's true.

13     Q.    And, in fact, you were also here -- you were

14 here for the whole trial so far, right?

15     A.    I have.

16     Q.    So you were here when Mr. Powers was

17 cross-examining Mr. Cox where it came out that, in fact,

18 i4i's losses went down after Word 2003, right?

19     A.    I was here.

20     Q.    Now, you reviewed certain deposition

21 testimony in this case in connection with the opinions

22 you're giving today, right?

23     A.    I did.

24     Q.    And you determined which depositions you

25 should read based on requests by your staff to i4i's

1   lawyers, and i4i's lawyers saying to you and your staff,

2   you know, you should really read this particular

3   deposition, right?

4        A.    Both of those ways is how information comes

5   to me.

6        Q.    Okay.  And, of course, any testimony of an

7   i4i witness where they said they did not perceive

8   Microsoft to be a competitor, that's the kind of

9   testimony you would have liked to see, right?

10       A.    It is.

11       Q.    Now, let's talk a little bit about one of

12  i4i's witnesses in this case, Richard Owens.

13            You know that Richard Owens was a member of

14  the Board of Directors of i4i from the period of the

15  late 1990s through 2006 or 2007, correct?

16       A.    I don't recall exact dates, but I know he was

17  a member of the Board.

18       Q.    And was Richard Owens -- was that one of the

19  depositions that you reviewed in connection with the

20  opinions you're giving in this case?

21       A.    No.

22       Q.    Let me read for you, if I could, a section

23  from Richard Owens' deposition.  And what I'm going to

24  read is Page 193, Line 20 to 194, Line 24, okay?

25            QUESTION:  Do you know who i4i's competitors

1  were from the years 2002 to 2007?

2           ANSWER:  No.  I know it to the extent I was

3  told.  I don't remember.

4           QUESTION:  Do you have any recollection of

5  major competitors that i4i had in 2002 to 2007?

6           ANSWER:  There were two classes of

7  competitors.  Open Text, as a broad document management

8  solution, was one that occurs to me.

9           Okay.  But I remember in board meetings

10 others would be mentioned in competitions for large

11 contracts, but they were firms that I only heard of once

12 or twice in that context, and I do not recall their

13 names.

14          QUESTION:  So other than Open Text, you don't

15 remember any competitor from 2002 to 2007 that

16 significantly impacted i4i's ability to achieve success

17 in the marketplace?

18          ANSWER:  No, I do not.

19          QUESTION:  And as a member of the Board of

20 Directors, that's the kind of information you would have

21 been exposed to?

22          ANSWER:  Sure.

23          QUESTION:  You never heard of Microsoft

24 referred to as a competitor in the space for i4i's

25 product?

```
 1              ANSWER:  Not that I recall, no.

 2              Mr. Wagner, Richard Owens, that testimony,

 3   that would have been some of the types of testimony you

 4   would have liked to have known about before you gave

 5   your opinion that Microsoft and i4i were competitors,

 6   right?

 7        A.    It is, and I wished you would address that

 8   with him at trial so that we could find out what he

 9   meant by that.

10        Q.    And, Mr. Wagner, if the jury actually

11   concludes that Microsoft and i4i are not competitors,

12   under your analysis, it would cut your royalty rate in

13   half, right?

14        A.    Approximately, that would be true.

15              MR. LENDER:  Chris, can you put back up

16   our little slide for a minute.  Let's just see where we

17   are.

18        Q.    (By Mr. Lender) This is the slide that did

19   the damages calculation using the 50-dollar differential

20   that you testified was the result of the accused custom

21   XML functionality and the Microsoft CEIP data that you

22   testified was as reliable as the Wecker survey.

23        A.    No.  You're mischaracterizing my testimony.

24   I'm sorry.  I never said that was the cause.

25              We talked about that.  I did not use that.  I
```

1   understood from Microsoft's witnesses that that is not

2   an appropriate analysis, and I did not do it.  So that

3   is not properly representing my testimony.

4       Q.    Okay.  But if I take that -- if I assume for

5   argument's sake that we're not competitors and the jury

6   believes that Microsoft and i4i are not competitors, I

7   take that royalty rate and I cut it in half.

8           And you know what happens to damages if I cut

9   it in half?

10      A.    That 2.6 would be 1.3.  I can do that math.

11      Q.    Well, let's just put the slide up, 1.3.

12  And what happens with the larger CEIP data number that

13  you relied on?

14      A.    Again, it's going to be cut in half.

15          MR. LENDER:  Let's put that up, please.

16      A.    That's 1.7.

17      Q.    (By Mr. Lender)  Okay.

18          MR. LENDER:  3.4, right?

19          Now, can we put up -- if we could, can we

20  please put up --

21      A.    Oh, I'm sorry.  You already did the half.  I

22  took the half of a half.  You're right; it's 3.4.

23      Q.    (By Mr. Lender) Now, Mr. Wecker (sic), part

24  of your damages analysis was to include additional

25  damages for the period of time from November 2008, the

1  date of the Wecker survey, through the date of trial,

2  right?

3       A.    I did.

4       Q.    And it's your claim that every single day

5  there are new people that are out there that are using

6  the accused functionality for the very first time,

7  right?

8       A.    Yes -- no -- yes, that's correct.

9       Q.    But you don't actually know how many new

10 people, for example, today have actually used the

11 accused functionality for the very first time, right?

12      A.    I don't.

13      Q.    In fact, you can't name a single person

14 anywhere in the world who has actually used the accused

15 functionality for the very first time since the date of

16 the Wecker survey, right?

17      A.    I cannot.

18      Q.    Now, I think it was last week we got copies

19 of some new schedules that you provided, which updated

20 this additional damages through May 15th.  And I'm just

21 going to put up a demonstrative.  This comes from

22 Plaintiffs' Exhibit 631.

23           But you gave us actually two completely

24 different calculations.  What you said is that the

25 number of new people that have actually used the accused

1  functionality for the very first time, since November

2  2008, could be either 262,282 people or 50,788 people,

3  right?

4      A.    Those calculations are in my report, yes.

5      Q.    Now, let me ask you this:  The difference

6  between those two numbers, 262,282 or 50,788, that

7  results in a big addition; that differs to your damages

8  number, right?

9      A.    Well, it's the difference times $98.

10      Q.    Right.  And if I take that differential --

11           MR. LENDER:  Next slide, please.

12      Q.    (By Mr. Lender) -- and multiply that by $98,

13  using the bigger number actually increases the damages

14  by more than $20 million, right?

15      A.    According to your calculation, $25.7 million.

16      Q.    And if I use the lower number, it's actually

17  only 4.9 million, right?

18      A.    Correct.

19      Q.    And in your damages calculation, the one that

20  you said to the jury where you asked for 200 million,

21  you used the bigger number, right?

22      A.    I did.

23           MR. LENDER:  Okay.  You can put that

24  down.

25      Q.    (By Mr. Lender) Let's talk a little bit about

1  the Wecker survey.  I think I actually wrote this down

2  almost verbatim.

3          What you said to the jury was that this

4  survey -- that surveys are the kind of data that experts

5  in your field typically rely on.  Isn't that what you

6  said?

7      A.    Yes.

8      Q.    But the fact is that in your experience,

9  that's not true, right?

10      A.    Well, it's not common, because I have data

11  that I don't need it.  But anytime I need that type of

12  information, I rely on surveys.

13      Q.    Mr. Wagner, in your experience, it's fair to

14  say that surveys done by experts are rarely very useful

15  to you, right?

16      A.    That's often been my experience.

17      Q.    In fact, it's been your experience that when

18  you see surveys, even ones done by reputable survey

19  experts, that they often ask the wrong questions, right?

20      A.    That's true.

21      Q.    Now, you had no involvement in conducting the

22  Wecker survey that you rely upon, correct?

23      A.    That is correct.

24      Q.    You never spoke to Dr. Wecker about the

25  survey, right?

1      A.     No.

2      Q.     And you understand we talked about before

3  that Dr. Wecker only got 46 companies to respond to the

4  survey, right?

5      A.     That is correct.

6      Q.     And you don't know whether any of the 46

7  people who responded to the survey were capable of

8  answering the questions that were asked in the Wecker

9  survey, right?

10     A.     I have no knowledge on that subject.

11     Q.     Now, in relying on a survey that's supposed

12 to show the amount of alleged infringing use, you would

13 agree that it's important to make sure that the people

14 who are responding understood the questions that were

15 being asked, right?

16     A.     Yes.

17     Q.     And if the survey questions resulted in

18 including uses that did not infringe i4i's patent, under

19 their theory of the case, that would raise questions in

20 your mind about the reliability of the survey, right?

21     A.     That is correct.

22     Q.     But if you're talking for purposes of the

23 survey, you just took those numbers and used it for your

24 base, correct?

25     A.     I did.

1      Q.     Now, one of the factors in the

2 Georgia-Pacific analysis that you talked about was

3 Factor 6, right?

4      A.     I did.

5      Q.     And Factor 6, that's the fact that -- what

6 you're saying is that somehow a sale -- that by

7 encouraging sales of custom XML in Microsoft Word, that

8 it promoted sales of other products?

9      A.     Possibly Microsoft Office, yes.

10     Q.     But you can't point to a single transaction

11 where that actually happened, right?

12     A.     I think you've already asked me that.  I have

13 no information on the motivation of actual purchasers.

14     Q.     Okay.  Now, you also spent some time talking

15 about Georgia-Pacific Factor No. 11.

16            Do you remember that?

17     A.     I do.

18     Q.     And Georgia-Pacific Factor 11, that talks

19 about the extent to which Microsoft has used the

20 invention as specifically claimed in the patent, right?

21     A.     It does.

22     Q.     In none of the documents you talked about in

23 connection with this factor specifically discussed

24 opening certain types of documents containing custom XML

25 in Word, right?

1    A.    No.   They only talk about the importance of

2  custom XML.

3    Q.    None of the documents mentioned Mr. Vulpe or

4  Mr. Owens?

5    A.    No.

6    Q.    None of the documents discussed i4i's '449

7  patent?

8    A.    No.

9    Q.    None of the documents you reviewed actually

10  tied what Microsoft was doing with custom XML to i4i,

11  correct?

12    A.    They didn't tie what's alleged as the

13  infringing use in this case in any of the documents that

14  I saw.

15    Q.    None of the documents you reviewed tied

16  anything that Microsoft was doing with custom XML to

17  i4i, correct?

18    A.    Correct.

19    Q.    Now, there were three Factor 11 documents I

20  think you talked about, and I'd like to briefly just go

21  through each of them.

22         The first one you mentioned was Plaintiffs'

23  Exhibit 212.

24              MR. LENDER:  Can you blow that up?  And

25  if you can just blow up Paragraph No. 1.

1       Q.     (By Mr. Lender) And I believe the

2    demonstrative you showed actually highlighted only some

3    of this language.  You highlighted the part that said:

4    We love XML, especially arbitrary or customer-defined

5    XML.

6              You also highlighted:  We emphasize

7    custom-defined schemas, because we truly believe in all

8    our hearts that that is what the future is.

9              Do remember that seriously?

10      A.     I do.

11      Q.     I want to ask you about the paragraph that

12   you weren't asked to look at, which is on the second

13   page.

14                MR.  LENDER:  If you can just blow up

15   Paragraph 7.

16      Q.     (By Mr. Lender) I'm going to ask you -- I'm

17   going to read this.  Then I'm going to ask you a

18   question about it.

19              Here's what the document -- this author,

20   Chris Pratley, also wrote in Paragraph 7:  If we were

21   trying to impose a new file format on users, we would

22   default to a new format, and that would be that.

23              Instead, we default to dot doc, because that

24   is what 300 million people out there today use and can

25   read.

1        If we defaulted to some new XML format, they

2   would have a problem, and customers who got 2003 would

3   have a problem working with them.  Since Word ML is not

4   about, quote, new file format to us, we do not use it as

5   a default.

6        XML is quite weak as a file format compared

7   to binary in many ways, although we love its portability

8   and accessibility.

9        You have no reason to deny or disagree with

10  this statement, correct?

11       A.   Oh, no.  That's what I thought at the time,

12  but then Microsoft changed their opinion when 2007 came

13  out, and they did default to an XML format.

14       Q.   This is what they were -- but at the time of

15  the hypothetical negotiation in 2003, this is what

16  Microsoft was thinking, right?

17       A.   That's what they were thinking with that

18  document at that time.

19       Q.   And just so we're clear, you know --

20            MR. LENDER:  Your Honor, may I approach

21  the easel?

22            THE COURT:  Yes, you may.

23            MR. LENDER:  I just want to, again,

24  remind everybody, this is the easel -- oh, excuse me --

25  that Mr. Powers and Mr. Rhyne went through.

1    Q.    (By Mr. Lender) Looking at No. 1, you know

2  that the dot doc file that Mr. Pratley is talking about,

3  in that document with custom XML, that's not accused of

4  infringement in this case, right?

5    A.    I am aware of that fact.

6    Q.    Let's go to the next one, PX183, and if you

7  could turn to the second page of that document.  This is

8  another one from Chris Pratley.

9         I believe you read to the jury the part where

10  he talked about a cust -- customer-defined schemas is

11  more like 90 percent of the value.

12         Do you remember -- do you remember reading

13  that to the jury?

14    A.    I do.

15         MR. LENDER:  Would you pull that up,

16  Chris, so we can see it?

17              Top of the second page.

18    Q.    (By Mr. Lender) See it right there, the last

19  line, it is more than 90 percent of the value, that's

20  what you read to the jury, right?

21    A.    It is.

22    Q.    You know that when Chris Pratley wrote this,

23  he wasn't thinking about the accused functionality,

24  correct?

25    A.    No.  He's thinking more generally of just

1  offering custom XML.

2      Q.    And you know and you agree that if

3  Mr. Pratley was referring to functionality regarding

4  custom XML that was unrelated to the accused

5  functionality, that would change your 90-percent

6  opinion, right?

7      A.    It would.

8      Q.    Okay.  Last document you talked about was the

9  glue document.  This was Plaintiffs' Exhibit 215.

10  Remember, you mentioned the glue document when you were

11  talking to the jury?

12      A.    I do.

13      Q.    And you know that when this document is

14  talking about the glue -- the glue document, this,

15  again, is not talking about the accused custom XML

16  functionality, correct?

17      A.    It's a broader statement than that, yes.

18      Q.    It's talking about all of the functionality

19  that Microsoft is offering with XML and throughout the

20  entire product offer, right?

21      A.    That is correct.

22      Q.    And you knew that XML is used in all kinds of

23  programs that have nothing to do with Word, correct?

24      A.    I do.

25      Q.    Now, Mr. Wagner, you agree that the amount of

1  sales that i4i has made in selling its products provides

2  some indication as to the value of the accused

3  functionality, correct?

4      A.    It does.

5      Q.    You also agree that the amount of profits

6  that i4i has earned in selling its products provides

7  some indication as to the value of the accused

8  functionality, right?

9      A.    That is correct.

10     Q.    And in the real world, you know that in the

11  11-year period from its inception in 1993 to 2003 that

12  i4i lost in the neighborhood of $25 million, right?

13     A.    They did.

14     Q.    And, in fact, just in the three-year period

15  right up to the hypothetical negotiation, they lost more

16  than $9 million, right?

17     A.    I believe that's correct.

18     Q.    And we already talked about it a moment ago.

19  At the time of the hypothetical negotiation in October

20  of 2003, would you agree it's fair to say that i4i was

21  in financial crisis?

22     A.    I think they clearly were in financial

23  crisis.

24     Q.    For example --

25             MR. LENDER:   Just DTX 2235.   Just pop the

1   top part.

2       Q.    (By Mr. Lender) This is a memo that you

3   reviewed in connection with your opinions that you gave?

4       A.    Yes.

5       Q.    And this is a memo that was written by Stuart

6   Angus, the President; John Anhang, the CFO to the

7   Directors for i4i?

8       A.    Yes.

9       Q.    And given who wrote this document, you would

10  expect it to be pretty accurate, right?

11      A.    I would.

12      Q.    Now, you also were aware that i4i was

13  experiencing quality problems, right?

14      A.    Well, I heard the testimony on that, and I

15  have read some documents on that subject, yes.

16      Q.    And Microsoft and i4i would know all about

17  these quality problems and all these financial problems

18  when they sat down to negotiate the hypothetical

19  license, correct?

20      A.    All the information would be known by both

21  parties, yes.

22      Q.    In fact, you would expect that Microsoft

23  would try to use them to try to negotiate a lower rate,

24  right?

25      A.    I think clearly they would do that.

1    Q.    And you also understand that in a

2  hypothetical negotiation, Microsoft would be aware of

3  the valuation that i4i put on its company, right?

4    A.    They would.

5    Q.    And you're aware -- it's been talked about a

6  few times today that right around the time of the

7  hypothetical negotiation, McLean Watson thought the

8  value of the company was only $2 million, right?

9    A.    Well, I think it was unclear who thought

10 that, but that is an indication of value.

11                MR. LENDER:  Would you put up

12 Exhibit 2088?

13                Let's blow up the bottom part first.

14   Q.    (By Mr. Lender) Okay.  The bottom part is an

15 e-mail that is written by Michel Vulpe to Loudon Owen,

16 and he writes that the value of the company at the end

17 of the process appears to be $2 million?

18   A.    He does say that under Point 2.

19   Q.    Okay.  And this memo -- this e-mail was

20 written in December of 2003, right around the period of

21 the hypothetical negotiation, right?

22   A.    That's true.

23   Q.    And if we go to the top e-mail, this is the

24 response by Loudon Owen to -- from McLean Watson to

25 Michel Vulpe.

1           What he says is that the 2-million-dollar

2   valuation of the company is probably not that far off,

3   given the tax loss value, correct?

4       A.    That is correct.

5       Q.    Now, you also know that McLean Watson, in

6   fact, prior to the hypothetical negotiation, they wrote

7   down the amount of their investment, right?

8       A.    They did.

9       Q.    They had invested $10 million in the company,

10  and by the time of the hypothetical negotiation, they

11  wrote down that investment by 99 percent to just a

12  hundred thousand dollars, right?

13      A.    They did.

14      Q.    And one of the reasons why they did that was

15  because they were -- they had concerns about i4i's

16  ability to continue as a going concern, right?

17      A.    They did.

18      Q.    And the issue about whether a company can

19  continue as a going concern, that means that there's

20  questions about whether the company can continue in

21  business, right?

22      A.    Yes, over the next 12-month period.

23      Q.    Okay.  And that going concern, that was in

24  the period of around the time of the hypothetical

25  negotiation, right?

```
 1        A.    It was.

 2        Q.    Okay.  The last thing I want to talk to you

 3   about real quick --

 4              MR. LENDER:  Can we put up Exhibit 364,

 5   Plaintiffs' Exhibit 364?

 6              And go to the next page.  And can you

 7   first blow up that last column?  Is it possible?

 8              Could you do me a favor and just blow up

 9   the whole bottom?  That will be easier.

10        Q.    (By Mr. Lender) Now, what I'm putting up

11   here, Mr. Wagner, is this the results of the -- of

12   the -- of the Wecker survey that you relied upon,

13   correct?

14        A.    It is.

15              MR. LENDER:  And if we could highlight

16   the numbers of the last column.

17        Q.    (By Mr. Lender) Those top two numbers, the

18   148,000 number and the 1.6 million number, those are the

19   numbers that you relied upon, right?

20        A.    If you change the 148 to 248, I would agree.

21        Q.    I couldn't see the numbers from this far

22   away.  Maybe I should get my own copy so I don't make

23   that mistake again.

24        A.    Well, you said the second number correctly.

25        Q.    Okay.  So that last column, that's the column
```

1    for documents -- XML documents that have been opened

2    containing custom XML and saved in the dot XML, dot

3    docx, or dot docm file format, right?

4        A.    Yes.

5        Q.    Now, you were here when Dr. Rhyne testified

6    that people don't save in the dot doc or dot dot format

7    because it loses the advantages of custom XML.

8              Do you remember that?

9        A.    Well, he does say they don't, but he says if

10   they do, they will lose the advantages of the custom

11   XML.

12       Q.    In fact, he gave that testimony as the basis

13   for him saying that people wouldn't use this; it would

14   be insubstantial, right?

15       A.    I believe that's true.

16       Q.    Well, you know that's not true based on the

17   results of the Wecker survey, right?

18       A.    I don't know that's true.

19       Q.    Well, let's look at the other column right

20   next to it.  The other column right next to it reports

21   people that opened an XML document containing custom XML

22   but saved it in a dot doc or dot dot format, right?

23       A.    It does.

24       Q.    And if we look at that column, virtually

25   every one of those numbers is actually larger than the

1 numbers that are reported in the column for saving as a

2 dot XML or a dot docx or dot docm; is that correct?

3     A.    That's true.

4     Q.    Thank you.

5              MR. LENDER:  I have no further questions.

6              THE COURT:  All right.  Redirect?

7              MR. CAWLEY:  Only a few questions, Your

8 Honor.

9                REDIRECT EXAMINATION

10 BY MR. CAWLEY:

11     Q.    Just to start off very generally, Mr. Wagner,

12 have you been asked any questions or shown any

13 information in your cross-examination that's caused you

14 to reconsider or change your opinion about a reasonable

15 royalty in this case?

16     A.    No.  All of that information presented me,

17 why I was considering what my opinion would be, so I've

18 already considered all of that.

19     Q.    Okay.  Well, let's go over at least a few

20 points.

21              One of the first things you were shown was

22 the circle, and it was surrounded by a lot of features

23 of Microsoft Word.

24              Do you remember that?

25     A.    I certainly do.

1    Q.    You were asked some questions, and before it

2  was over, Microsoft's lawyer said there's thousands upon

3  thousands of features in Microsoft Word.

4          Do you remember that?

5    A.    I do.

6    Q.    But remind us of the importance to

7  Microsoft's business strategy, not of the features that

8  are already there, but of the new features for new

9  versions?

10    A.    You know, I went over that very quickly, but

11  I believe every single feature on that sheet was already

12  in Word XP, except for possibly digital rights

13  management.

14          So most of those thousands and thousands of

15  features are irrelevant.  Somebody already has that if

16  they have Word 2000 or Word XP.  So they're not going to

17  make a decision to upgrade just to have the chance to

18  see the file again or to print a file or to use a

19  particular type of font.  They already can do all of

20  those things.

21          So it's irrelevant to this calculation.

22    Q.    Do you remember reviewing some evidence about

23  Microsoft's own statements about the importance of the

24  new XML capability in Word 2003?

25    A.    In the launched document for Office 2003,

1  they stated the foremost improvement was custom XML

2  above anything else they were doing.

3      Q.    Next topic:  In your study of documents and

4  things in this case and hearing the testimony in this

5  case, have you heard a whole range of valuations of what

6  the value of the company, i4i, has been at various

7  times?

8      A.    Yes.

9      Q.    Why didn't you use those valuations as part

10  of your decision about what would be a reasonable

11  royalty?

12      A.    Because not a single one of those evaluations

13  considered -- part of the value of the '449 patent was

14  to license the largest software company in the world for

15  a very important use.

16          At that point, no one at i4i thought that

17  Microsoft was going to use their technology, so there's

18  no information in those valuations that would help me

19  value this patent for this case.

20      Q.    Okay.  And this may be something that I just

21  misheard.  I just want to make sure there's not any

22  confusion.

23          You're not saying, are you, that the

24  reasonable royalty that you determined and explained to

25  the jury would apply every time a Microsoft customer

1   used the XML functionality.

2       A.    Only if they used it in an infringing

3   fashion.

4       Q.    But if they use it on Monday and then use it

5   on Tuesday, is that two different royalties?

6       A.    Oh, I'm sorry.  No.

7             Once they've used it once, it triggers a

8   royalty.  But the chances are, once someone understands

9   and uses this functionality, they're going to use it a

10  lot.

11            As an example, on that chart that Mr. Wecker

12  shows, there's a fair number of people that save and

13  appear to save in dot doc or dot dot formats.  That

14  doesn't tell you how often they did it.  It could have

15  been the first time they used the product, or it could

16  have been default and saved because they didn't realize

17  it was going to default to that.

18            But then the other column, which has lower

19  numbers, they could do that a thousand times.

20      Q.    Okay.  Just so there's no confusion, are you

21  saying that when a business buys Word 2003 or 2007 and

22  puts it on a computer and uses it to infringe, that's

23  one royalty, right?

24      A.    Right.  It's one royalty whether they use it

25  once or 10,000 times.  It doesn't increase.

1      Q.     On that computer?

2      A.     That's correct.

3      Q.     And if they have a second computer and they

4   get a second license to Word and put it on that computer

5   and use it to infringe, is that a second royalty?

6      A.     Yes.

7      Q.     No matter how many times they do it on that

8   computer?

9      A.     Right.  The royalty will never change.

10     Q.     All right.  Now, you also heard or were asked

11  some questions about Microsoft's practices out in the

12  real world in their negotiation of what they're going to

13  pay and the terms that they're going to be willing to

14  pay for patent license agreements; is that right?

15     A.     That's correct.

16     Q.     And you were basically informed in the

17  questioning that Microsoft dictates that it just pays a

18  lump sum, right?

19     A.     That's true.

20     Q.     And Microsoft dictates that it won't listen

21  to the 25-percent rule, right?

22     A.     That's correct.

23     Q.     Well, does Microsoft get to dictate what

24  happens here in the courtroom in the jury's

25  consideration of the hypothetical negotiation?

1    A.    No.  Actually, in this situation, since they

2  have to, in this hypothetical, agree that it's a valid

3  patent, if my work is relevant and that they infringe.

4  In the patent, the monopolist here is i4i.  They have a

5  monopoly, according to the United States government, by

6  their patent.  They're the monopolist.

7    Q.    Well, let's make sure we understand that.

8  Out in the real world where Microsoft can dictate the

9  terms because of their power, when they're negotiating,

10  do they have to assume that they, in fact, are

11  infringing the patent?

12    A.    No, they don't do that.  In fact, they will

13  tell the person they license with, we don't practice

14  your invention.  We think it's an invalid patent.  We

15  will prove that if you want to fight about it.

16          So they get a discount, in effect, from the

17  licensor because of that fact.

18    Q.    And out in the real world, when Microsoft is

19  behaving the way that their lawyer just described, do

20  they have to assume that the patent is valid?

21    A.    No.

22    Q.    How is that different from what, in this

23  courtroom, the law tells us that you are to assume and

24  everyone is to assume about the hypothetical

25  negotiation?

1       A.     It gives the owner of the patent much more

2   negotiating power.

3       Q.     Okay.  Why don't you think a lump sum royalty

4   is appropriate here?

5       A.     Because my reading of the statute that gives

6   rise to this remedy, Title 35, Section 284 of the U.S.

7   Code, says that you are to award a reasonable royalty

8   for use of the invention.

9              The best measure of the use is actually how

10  much the alleged infringer used the product.  And a lump

11  sum in some situations may way overcompensate for use or

12  may way undercompensate.

13             The most accurate way to measure it is to

14  look at all of the infringing use, and I do that whether

15  I work for an infringer or I work for a patent owner

16  when I'm an expert.

17      Q.     Mr. Wagner, you were asked in your

18  cross-examination about some Microsoft license

19  agreements.

20             Do they affect your opinion here?

21      A.     No.  I considered them, and there is some

22  relevance to them, but they did not give me what I

23  thought was real important information to consider.

24      Q.     Why not?

25      A.     Again, a number of them were university

1  licenses; they're not competitors.  Universities license

2  at a lower rate.

3         Again, Microsoft is using its legally

4  entitled dominance in this industry to negotiate terms,

5  and I have no information that these patents were of the

6  same type of value as the patent in this lawsuit.

7     Q.    Okay.  You were shown a slide that I won't

8  take the time to try and retrieve, with a bunch of

9  colors on it.  And it said that at least according to

10  Microsoft's lawyers, you did 23 different calculations

11  of the royalty.

12         Do you remember that?

13     A.    I do.

14     Q.    Now, did you have 23 different opinions?

15     A.    No.  They were all different calculations

16  given certain assumptions.

17     Q.    What's the -- regardless of how many

18  different ways you showed that it could be sliced up, in

19  fact, you testified to the jury earlier today what you

20  think the right answer is.

21     A.    Right.  I gave the jury what I thought is the

22  right answer, based on the work that I've done.

23     Q.    Okay.  And another point:  You were asked

24  about this product called XMetaL, the one that you used

25  sort of as your starting point in determining a

1    reasonable royalty.

2           Do you remember that?

3       A.    I do.

4       Q.    Have you read anything that Microsoft has

5    said supposedly about all these supposed valuable

6    features in XMetaL besides XML?

7       A.    No.   When Microsoft themselves bought the

8    product, they didn't use the word processing capability

9    of XMetaL; they don't need it.

10          They needed the custom XML feature to help

11   them have that in their work internally at Microsoft.

12   Once Microsoft got their own functionality, they didn't

13   need XMetaL anymore or any of its other features, and

14   they had what they wanted.

15      Q.    All right.   And when you needed to know the

16   price of XMetaL for purposes of making your

17   calculations, how did you arrive at that?

18      A.    I had to go to public information.   I used

19   their website to find the price.

20      Q.    Okay.   And near the end of your

21   cross-examination, you were asked some questions yet

22   again about the fact that i4i is a struggling company

23   and has had some financial difficulties.

24          Why have you expressed the opinion that $207

25   million is a reasonable royalty for Microsoft's use of

1  this patent, taking into account i4i's sales and

2  profits?

3      A.    Well, there is another remedy that i4i could

4  have sought here, and they could have said we have lost

5  sales because of Microsoft; we want our lost profits.

6  If I did that type of damage calculation, what they have

7  earned on the product isn't important.  What's important

8  here is what Microsoft is able to earn from the

9  invention.

10          To give you an example, Mike Wagner is i4i

11  and you give me a great golf club, I guarantee it's not

12  going to be of much use in my hands.  But that same

13  great golf club could be put in Microsoft's hands, and

14  they're Tiger Woods, and they're going to get a lot more

15  money with that golf club.

16          And that's what we're trying to value here,

17  not i4i's use of the invention.

18      Q.    Okay.  And one last topic:  You remember that

19  you were reminded by Microsoft's lawyer that in some

20  products, the difference between a product that has XML

21  capability and another product that doesn't is $50.

22  Do you remember that?

23      A.    Well, and other things as well.

24      Q.    Okay.  Other things as well.  But the

25  difference was $50.

1          Do you remember?

2     A.    I do.

3     Q.    And then you were shown some calculations

4 using $50 instead of your $499.

5          Is that a legitimate comparison?

6     A.    No.  I tried to explain by saying it's not

7 logical.

8     Q.    Let me give you a chance now to actually

9 explain yourself fully.

10    A.    Microsoft earns $50 from every customer who

11 buys the more expensive version and less expensive

12 version.  And, of course, they want their customers to

13 do that.

14          Anyone who buys that is going to pay that

15 price.  That's not the construct I'm using for this

16 reasonable royalty.  I'm not looking at all the

17 customers that have the capability of infringing.  If I

18 did that, the royalty rate would be $2.

19          I'm only looking at that very narrow slice

20 that actually use it.  So trying to make that 50-dollar

21 comparison is just not correct.

22    Q.    Let's accept their invitation.  Tell us the

23 calculation.  If we follow Microsoft's lawyer's

24 suggestion and say that the value of the difference for

25 XML is $50 for every copy that they sell to anybody,

1   you're the CPA; do the math.

2      A.    That's right.  I wouldn't, then, limit it to

3   the 2.1.  I would look at all units sold, and the number

4   would be significantly higher.

5           I can't calculate it for you.  It would be 98

6   times higher -- no, pardon me -- 50 times higher.

7      Q.    Fifty times higher than the amount you've

8   asked for?

9      A.    Well, the 24 million that was calculated

10  using that approach.

11     Q.    Okay.

12           MR. CAWLEY:  Pass the witness, Your

13  Honor.

14           THE COURT:  All right.  Any brief

15  redirect?

16           MR. LENDER:  Very, very short.  Very

17  short.

18           THE COURT:  All right.

19           MR. LENDER:  Chris, can you put up the

20  wheel again, the last thing?

21               REDIRECT EXAMINATION

22  BY MR. LENDER:

23     Q.    This is the first slide I showed for Word

24  2003 features.  And you remember we talked about this.

25  This is all the features that are included in Word 2003

1  that are not accused of infringement in this case,

2  right?

3       A.    I'm sure there's many more than this, but

4  this is all you could fit on this wheel.

5       Q.    Right.  And I think what you said was that

6  actually all these features, other than perhaps digital

7  rights management, were included in the earlier versions

8  of Word.

9            That's what you said, right?

10      A.    Well, I said that it's possible.  I just read

11  this very quickly.  You didn't give me a lot of time to

12  look at it.

13      Q.    Okay.  Well, research and reference, see that

14  one on the left there on the top?

15            That's a brand new feature included in Word

16  2003, right?

17      A.    If you represent that it is, then I would

18  agree with you.

19      Q.    Clear type, that's another one that's brand

20  new included in Word 2003, right?

21      A.    I don't know that.  You'd have to tell me

22  that.

23      Q.    Reader view, another brand new one included

24  in Word 2003, right?

25      A.    Again, we can do this all the way around the

1  circle.  My answer is the same.

2      Q.    So it's fair to say that you don't know how

3  many of the features that I included on this wheel were

4  included in Word 2003 for the very first time, right?

5      A.    Only you would know that, but I can tell you,

6  saving, printing, strike through table contents, all

7  that stuff I do know, because I can do that in my

8  version of XP.

9      Q.    Thank you very much.

10             THE COURT:  All right.  Very well.

11  May this witness step down?  Are we through with this

12  witness?

13             MR. CAWLEY:  Yes, Your Honor.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  All right.  Ladies and

16  Gentlemen of the Jury, it's 5:00 o'clock.  I believe we

17  still have a couple of witnesses for i4i to go, so we

18  should finish by 8:00 o'clock tonight, if that's all

19  right with you.

20             [Laughter.]

21             THE COURT:  No.  We're going to recess

22  for the evening.  We'll come back on Friday morning.  If

23  you come back tomorrow, you're welcome to come; I've got

24  another hearing in a completely different case, and you

25  can sit there and listen to it.

But if you don't want to do that, I would request that you plan to be back here at 9:00 o'clock on Friday morning, and we'll start back and finish up the Plaintiffs' case and begin the Defendant's case. Then we'll come back on Monday and proceed on in that manner. Remember my instructions. You're going to be off tomorrow. Enjoy your day off and don't think or worry about this. Definitely don't talk about it with anybody. Don't do any independent investigation. And we'll see you back here on Friday morning at 9:00 o'clock.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Please be seated.

All right. For the parties' information, the Plaintiffs have used 8 hours and 49 minutes, and the Defendant has used 5 hours and 10 minutes.

On Friday morning, please try to get your exhibits all in shape. Let's get those offered. Y'all meet and confer, as you need to, and, hopefully, there won't be many objections. If there are, I'll rule on them at the time they're offered.

Anything else I can help you with this afternoon?

MR. CAWLEY: I don't think so, Judge.

1    Thank you.

2                    MR. POWERS:  Nothing for Microsoft.

3                    Thank you, Your Honor.

4                    THE COURT:  Oh, one other thing.  I do

5    have a Markman hearing in here tomorrow, and I

6    understand the attorneys are coming early in the morning

7    to try to set up.  So if y'all could sort of clean up

8    your playground here, I would appreciate it.

9                    We'll be in recess.

10                   COURT SECURITY OFFICER:  All rise.

11                   (Court adjourned.)

12                   *      *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          <u>CERTIFICATION</u>

5

6              I HEREBY CERTIFY that the foregoing is a

7   true and correct transcript from the stenographic notes

8   of the proceedings in the above-entitled matter to the

9   best of my ability.

10

11

12

13  /s/_____        _____
    SUSAN SIMMONS, CSR                      Date
14  Official Court Reporter
    State of Texas No.:  267
15  Expiration Date:  12/31/10

16

17

18  /s/_____        _____
    JUDITH WERLINGER, CSR                Date
19  Deputy Official Court Reporter
    State of Texas No.:   731
20  Expiration Date  12/31/10

21

22

23

24

25