**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **i4i LIMITED PARTNERSHIP and** | § | |
| **INFRASTRUCTURES FOR** | § | |
| **INFORMATION, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. 6:07-CV-113 LED** |
| **v.** | § | |
| | § | |
| **MICROSOFT CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MICROSOFT'S MOTION FOR NEW TRIAL,**
**AND ALTERNATIVE MOTION FOR REMITTITUR,**
**ON PLAINTIFFS' CLAIM FOR DAMAGES**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.  BACKGROUND ........................................................................................................ 2

    A.  The Wecker Survey Estimates ....................................................................... 3

    B.  Mr. Wagner's Royalty Calculations Based on the Wecker Survey
        Estimates ......................................................................................................... 5

    C.  Mr. Wagner's Royalty "Rate" Derived from the XMetaL "Benchmark" ............... 6

III.  STATEMENT OF ISSUES PRESENTED .................................................................. 10

IV.  LEGAL STANDARDS ................................................................................................ 10

    A.  Standards for New Trial Under FED. R. CIV. P. 59 ....................................... 10

    B.  Standards for Remittitur ................................................................................. 11

V.  ARGUMENT .............................................................................................................. 11

    A.  The Wecker Survey Estimates Were Inherently Unreliable and Should
        Have Been Excluded ....................................................................................... 11

        1.  The Wecker Survey Should Have Been Excluded as Inadmissible
            Hearsay ............................................................................................... 12

        2.  The Wecker Survey Asked the Wrong Questions and Thus
            Provided Irrelevant and Misleading Information ............................... 13

        3.  The Wecker Survey Estimates Were Error-Laden and Tainted ......... 15

    B.  Mr. Wagner's Benchmark Was Erroneous and Cannot Support a Royalty
        "Rate" of $98 for Each Allegedly Infringing "Installation" ......................... 16

    C.  In the Alternative, Remittitur Should Be Ordered ........................................ 18

VI.  CONCLUSION:   RELIEF REQUESTED .................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) ........................................................................ 2

*Bank of Tex. v. Commerce Southwest, Inc.*,
  741 F.2d 785 (5th Cir. 1984) ........................................................................ 12

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004) ........................................................................ 2

*Immunocept, LLC v. Fulbright & Jaworski, LLP*,
  504 F.3d 1281 (Fed. Cir. 2007) ...................................................................... 10

*Jackson v. Nat'l Action Fin. Svcs.*,
  441 F. Supp. 2d 877 (N.D. Ill. 2006),
  *aff'd*, 505 F.3d 769 (7th Cir. 2007) ............................................................ 14, 15

*Jinro America Inc. v. Secure Investments, Inc.*,
  266 F.3d 993 (9th Cir. 2001) ........................................................................ 16

*Laxton v. Gap, Inc.*,
  333 F.3d 572 (5th Cir. 2003) ........................................................................ 11

*Montgomery Ward & Co. v. Duncan*,
  311 U.S. 243 (1940).................................................................................... 10

*Pittsburgh Press Club v. United States*,
  579 F.2d 751 (3d Cir. 1978) ........................................................................ 12

*Rite-Hite Corp. v. Kelly Co.*,
  56 F.3d 1538 (Fed. Cir. 1995) (*en banc*) ........................................................ 17

*Rousseau v. Teledyne Movible Offshore, Inc.*,
  812 F.2d 971 (5th Cir. 1987) ........................................................................ 10

*Schering Corp. v. Pfizer, Inc.*,
  189 F.3d 218 (2d Cir. 1999) ........................................................................ 13

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
  381 F.3d 477 (5th Cir. 2004) ........................................................................ 12

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) ........................................................................ 10

*Spreadsheet Automation Corp. v. Microsoft Corp.*,
  2007 U.S. Dist. LEXIS 94828 (E.D. Tex. Feb. 23, 2007) ...................................... 12

*Unisplay S.A. v. American Electronic Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995) ............................................................................... 11

*Univ. of W. Va. v. VanVoorhies*,
   342 F.3d 1290 (Fed. Cir. 2003) ............................................................................ 10

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
   746 F.2d 112 (2d Cir. 1984) ................................................................................. 12

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
   350 F.3d 1376 (Fed. Cir. 2003) ............................................................................ 12

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
   216 F. Supp. 670 (S.D.N.Y. 1963) ....................................................................... 12

## Other Authorities

Mark Berkman, "Valuing Intellectual Property Assets for Licensing Transactions," *The Licensing Journal*, (April 2002) ................................................................................. 17

Paul E. Schaafsma, "An Economic Overview of Patents," *Journal of the Patent and Trademark Office Society* (April 1997) ................................................................................. 17

## Rules

FED. R. CIV. P. 50(a) ......................................................................................................... 1

FED. R. CIV. P. 59 ...................................................................................................... 10, 11

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Pursuant to FED. R. CIV. P. 59, Microsoft Corporation respectfully moves for a new trial on the claims by plaintiffs i4i LP and Infrastructures for Information, Inc. ("i4i") for damages for alleged infringement of the patent-in-suit (U.S. Patent No. 5,787,449).   Microsoft alternatively seeks a remittitur to the maximum amount of damages supported by the relevant evidentiary record—$5 million.

Microsoft has, in co-pending motions, raised a panoply of fundamental errors regarding issues of infringement and invalidity that justify setting aside the jury's obviously emotion-laden verdict.   But nothing more clearly illustrates i4i's gross overreaching than i4i's inflated claim for damages.   Even though i4i's own product was plagued by quality issues,[1] i4i was generally unprofitable,[2] and i4i's entire value (including its patent) had been calculated in the relevant timeframe at under $2 million,[3] i4i saw an opportunity to exploit popular animus against large corporations by manufacturing a damages claim against Microsoft of $200+ million.   i4i tried to soft-pedal that demand to the jury by insisting that it sought damages based only on "businesses" that actually used the accused "custom XML functionality" in Word 2003 and Word 2007.[4]   But i4i went too far in trying to make its excessive royalty look "reasonable" when it compared that figure to the entire "operating profits" from all sales of Microsoft's Office suite of products— which included software and functionalities not even accused of infringing, amounting to over $14 billion.[5]   This backdoor reliance on an "entire market value rule" analysis was manifestly improper, and had no purpose other than to distract the jury from the merits.

---

[1]  Trial Tr. (5/15/09 p.m.) at 55 (Vulpe).

[2]  Trial Tr. (5/12/09 a.m.) at 44 (Cox).

[3]  Trial Tr. (5/19/09 a.m.) at 78-80 (Ugone); DTX-2088; DTX-2237.

[4]  Trial Tr. (5/13/09 p.m.) at 51 (Wagner).

[5]  Trial Tr. (5/13/09 p.m.) at 88-89 (Wagner) (discussing pie chart).

i4i's tactic clearly worked, because only a jury distracted from the merits could possibly have overlooked the fatal flaws in i4i's purported damages calculation.   i4i's damages claim was based on an alleged "reasonable royalty," which i4i's designated damages expert, Michael Wagner, purportedly calculated by multiplying an estimated royalty "base" by an imagined royalty "rate."   [Trial Tr. (5/13/09 p.m.) at 50, 76-77]   Both prongs of Mr. Wagner's "calculation" were based on distortions:   (1) Mr. Wagner's royalty base was derived from the survey sponsored by Dr. William Wecker ("the Wecker Survey"), which provided inherently unreliable "estimates" of certain uses of the accused functionality and further failed to differentiate between actual infringing uses versus admitted noninfringing uses; and (2) Mr. Wagner's royalty rate of $98 per "installation" was based on application of the "25% rule" to Microsoft's profit margin applied to a "benchmark" product that was neither sold by Microsoft nor even alleged to incorporate the allegedly infringing functionality.   Indeed, each prong of Mr. Wagner's analysis was so error-laden as to render the resulting conclusions a product of speculative imagination that bordered on the purely fictional.   The errors in either prong, independently, render the jury's verdict hopelessly tainted, and a new trial is required.

## II.    BACKGROUND

Because the only claims of the '449 patent remaining in this case are method claims,[6] any possible recovery of damages in this case is limited to proof of actual use of the claimed method—as Mr. Wagner admitted.[7]   *See, e.g.*, *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007); *Dynacore Holdings Corp.*, 363 F.3d at 1274.   [Trial Tr. (5/13/09 p.m.) at 51, 96 (Wagner)]   Although Microsoft tracks usage of certain functionalities

---

[6] This Court has previously granted summary judgment invalidating the apparatus claims of the patent-in-suit as being indefinite.   [Dkt. No. 111, April 10, 2008]

[7] Any recovery of damages further assumes that the jury's verdict of infringement survives post-verdict review.   Microsoft has also challenged issues of infringement, validity and unenforceability in co-pending briefing.

2

contained in Word, including those encompassing the accused functionality, by accumulating data from customers who opt into a user experience program, i4i eschewed such data at trial. This was unsurprising because, as conceded by Mr. Wagner, this data showed very limited use (<1%) of the accused functionality.   [Trial Tr. (5/13/09 p.m.) at 106-107 (Wagner)]   Apparently hoping to increase its potential damages claim, i4i commissioned a survey from Dr. Wecker, and presented those survey results at trial as i4i's only evidence of alleged third-party "infringing use" of the accused functionality in Word 2003 and Word 2007.[8]   As demonstrated herein, the Wecker Survey results were so grossly distorted—both in terms of survey methodology as well as post-survey manipulation—that any reliance on such results was manifest error.   Indeed, as Microsoft argued in a pre-trial *Daubert* motion, the Wecker Survey results should never have been admitted into evidence.[9]

### A.      The Wecker Survey Estimates

Dr. Wecker's survey purported to "estimate" the number of computers that were used between 2003-2008 to perform three specific actions using accused versions of Word 2003 or Word 2007:   (1) "open an XML document containing custom XML"; (2) "open an XML document containing custom XML and then save that opened document in .DOC or .DOT format"; and (3) "open an XML document containing custom XML and then save that opened document in .XML, .DOCX, .DOCM, 'Single File Web Page,' or 'Web Page' format, not

---

[8] The accused versions of Word are stand-alone editions of Word 2003; editions of Word 2003 sold as part of the Office 2003 Professional or Office 2003 Professional Enterprise suite; and all editions of Word 2007.   [Trial Tr. (5/12/09 p.m.) at 55-56 (Rhyne)]   The accused functionality includes some, but not all, ways of opening Word files of certain formats (.XML, .DOCX or .DOCM) containing custom XML. Opening other files containing custom XML, such as a .txt file or a .DOC file, is not accused of infringement.   [Trial Tr. (5/13/09 a.m.) at 28-29, 117-123 (Rhyne)]   i4i also insisted that it did not seek damages for any uses by individuals as opposed to "businesses."   [Trial Tr. (5/13/09 p.m.) at 52 (Wagner)]   This argument appears to have been solely for emotional appeal to the jury, as i4i presented no technical basis for this distinction.   Nevertheless, i4i is now estopped from seeking damages based on use by non-business users.

[9] *See* Dkt. No. 194.

3

including 'Web Page, Filtered' format."   [PX-364]   Based on his consultation with i4i's litigation counsel, Dr. Wecker purportedly designed the survey questions to elicit responses regarding these specific uses.   [Trial Tr. (5/15/09 a.m.) at 64 (Wecker)]   Dr. Wecker did not consult with any of i4i's other designated experts, including Mr. Wagner, and did not know how his estimates would be used.   [*Id*. at 56-59 (Wecker)]

The respondent pool of 988 potential respondents was selected by Dr. Wecker, purportedly drawn at random from the Dun & Bradstreet database of approximately 13 million U.S. businesses.   [Trial Tr. (5/15/09 a.m.) at 30-32 (Wecker)]   Dr. Wecker retained Opinion Research Corporation ("ORC") to conduct the survey, using a script that Dr. Wecker developed with i4i's counsel.   [*Id*. at 34-35]   Out of the potential 988 respondent companies, ORC obtained survey responses from only 46 companies, reflecting a response rate of less than 5%. [*Id*. at 39]

The sole effort to qualify the individuals interviewed comprised a short series of "screener" questions, which included asking the respondent to self-assess whether he/she was "the right person to speak to" about the number of computers using Word in that company and whether the respondent was "aware" of XML.   [PX-365 (script) at 365.002; Trial Tr. (5/15/09 a.m.) at 36-37]   After the "screener" questions, according to the script, the ORC interviewers read definitions of "XML" and "custom XML," but were not directed to confirm an understanding of those terms by the respondents.   [PX-365 at 365.004]   The interviewers did not ask the respondents directly about their own use of Word, but were directed by the script to ask only about estimated usage in the respondents' companies of Word 2003 and Word 2007, as a whole and also to perform specific functions with "custom XML," broken down by year dating back to 2003.   [*Id*. at 365.004-015]   No verification was made of the respondents' qualification to respond regarding others' alleged use of custom XML.   [Trial Tr. (5/15/09 a.m.) at 68-69

(Wecker)]   In fact, the respondents' inability to answer accurately was anticipated—for each question asking to quantify such usage, the ORC interviewers were directed "if necessary" to advise the respondents that their "best estimate is fine."   [*Id*. at 74; PX-365]

That the "estimates" amounted to virtually random guesses is clear from the internally inconsistent responses by nearly every respondent that reported use of custom XML.   Among the numerous inconsistencies, some respondents reported use of Word 2007 on more computers for a "typical day" in November 2008 than for "any time" in 2008.   [Trial Tr. (5/15/09 a.m.) at 90-92 (Wecker) (respondent #262:   75 vs. 0)]   And several respondents' answers were internally inconsistent as to whether Word 2003 and/or 2007 was even installed.   [Trial Tr. (5/18/09 a.m.) at 49-51 (Simonson)]

These inconsistencies and "anomalies" were immediately apparent to Dr. Wecker upon his review of the database from ORC.   [Trial Tr. (5/15/09 a.m.) at 88 (Wecker)]   Dr. Wecker agreed at trial that these inconsistencies were likely the result of the respondents not listening carefully.   [*Id*. at 99 (Wecker)]   Despite the obvious confusion and communication failures, Dr. Wecker did not call any of the respondents back, but instead made a judgment call to <u>change</u> the "internally inconsistent" data—and, in so doing, violated one of the most basic principles of surveys.   [*Id*. at 87-89 (Wecker); Trial Tr. (5/18/09 a.m.) at 48 (Simonson)]   Not only did he change the responses where he saw ambiguities, but Dr. Wecker "always went with the bigger number," insisting that was the "right way to do it."   [Trial Tr. (5/15/09 a.m.) at 95:24-25 (Wecker)]   Given the small response rate, Dr. Wecker's reported results were highly sensitive to this decision to "fix" the raw data.   [Trial Tr. (5/19/09 a.m.) at 97 (Ugone) (difference of "40 percent")]

## B.   Mr. Wagner's Royalty Calculations Based on the Wecker Survey Estimates

Although Dr. Wecker and Mr. Wagner never spoke about the survey results or Dr.

Wecker's estimates of allegedly infringing use, Mr. Wagner relied upon the Wecker Survey as a fundamental component of i4i's exorbitant damages demand.[10]   [Trial Tr. (5/13/09 p.m.) at 107-108, 151-152 (Wagner)]   In particular, Mr. Wagner selected as his primary royalty base the cumulative estimates for the third category of uses purportedly surveyed by Dr. Wecker—namely, use of Word 2003/2007 to "open an XML document containing custom XML and then save that opened document in .XML, .DOCX, .DOCM, 'Single File Web Page,' or 'Web Page' format, not including 'Web Page, Filtered' format."   [*Id.* at 78-79; Trial Tr. (5/15/09 a.m.) at 20 (Wecker)]   Mr. Wagner then revised Dr. Wecker's estimates <u>upward</u> to expand them from the survey termination date through the date of trial.   [Trial Tr. (5/13/09 p.m.) at 79-80 (Wagner)][11]

Based on the combined (albeit independent) efforts of Dr. Wecker and Mr. Wagner, i4i asked the jury to award a "reasonable royalty" of between $200-207 million, which reflected an estimated royalty base of approximately 2.1 million allegedly infringing "installations"[12] multiplied by a "royalty" of $98 per unit.   [Trial Tr. (5/13/09 p.m.) at 79-80 (Wagner)]

### C.   Mr. Wagner's Royalty "Rate" Derived from the XMetaL "Benchmark"

Not only was the first prong of Mr. Wagner's damages analysis fatally flawed, but the second prong—Mr. Wagner's derivation of the $98 royalty "rate"—was equally untenable, and

---

[10] No other i4i expert purports to rely on the Wecker Survey, nor has i4i attempted to tie the Wecker Survey estimates to any alleged acts of inducement.   Nor could i4i do so, as Dr. Wecker has confirmed that the survey did not inquire into whether any alleged direct infringement was the result of encouragement, assistance or instruction by Microsoft.   [Trial Tr. (5/15/09 a.m.) at 82-83 (Wecker)]

[11] Mr. Wagner's extrapolation was based on the unwarranted assumption that the number of new business users would simply grow on a steady daily basis.   [Trial Tr. (5/13/09 p.m.) at 149-150 (Wagner); PX-631.006]   But even Mr. Wagner hedged his bets by presenting two very different numbers of "estimated" new users between the survey and the date of trial—262,282 vs. only 50,788, a difference in claimed damages of over $20 million.   [Trial Tr. (5/13/09 p.m.) at 150 (Wagner)]   Mr. Wagner chose the "bigger number" for his $200 million damages figure.   [*Id.*]   Dr. Wecker, on the other hand, testified that, at the time he provided his survey estimates to i4i, he <u>did not</u> "know how to" project his estimates through the time of trial.   [Trial Tr. (5/15/09 a.m.) at 102-103]

[12] As used herein, an allegedly infringing "installation" reflects what Mr. Wagner characterized as an "infringing unit actually used in an infringing manner."   [Trial Tr. (5/13/09 p.m.) at 51 (Wagner)]

6

independently justifies a new trial.  This alleged "rate" was derived by Mr. Wagner principally through application of the so-called "25% rule" to a third-party "benchmark" product.  Mr. Wagner's application of "the 25% rule" was not merely inconsistent with accepted principles and methods for calculating patent damages, but was in fact at odds with the very principle that Mr. Wagner himself purportedly applied.   According to Mr. Wagner, "the 25% rule" provides for a royalty rate that would enable an inventor to take one quarter of an infringer's profits from the sale of "infringing" products.   [Trial Tr. (5/13/09 p.m.) at 54 (Wagner)]   Mr. Wagner did not apply "the 25% rule" to any "infringing" products, however, but rather applied it to the price of an expensive, high-end, <u>third-party</u> product, known as XMetaL 4 Author ("XMetaL"), which <u>Microsoft never sold</u>, which <u>i4i never contended embodied its patent</u>, and which none of i4i's experts analyzed on even a basic level.

Perhaps the simplest and most compelling basis for rejecting Mr. Wagner's reliance on the irrelevant XMetaL data is that it was totally unnecessary.  This is not a case where information concerning products alleged to be used to perform the method of the patent-in-suit was unavailable.   Mr. Wagner had plenty of data for the products that i4i actually alleged to be capable of performing the method claimed in the '449 patent—Microsoft Word 2003 and 2007 and the i4i S4/Text product—and did not need to rely on pricing from irrelevant, nonaccused products sold by neither party to this litigation.

Nevertheless, disregarding these facts, Mr. Wagner took the $499 list price of XMetaL[13] and multiplied it by an alleged Microsoft profitability rate of 76.6% to arrive at hypothetical "profits" of $382 per unit of XMetaL.   [Trial Tr. (5/13/09 p.m.) at 58-59 (Wagner)]   This "profit" was derived from XMetaL's price—not Word's price, and not even the much lower

---

[13]  The unreasonableness of Mr. Wagner's use of the full list price for XMetaL was further exposed at trial by the fact that the company that originally sold XMetaL was ultimately bought out for a mere $18 million.   [Trial Tr. (5/19/09 a.m.) at 86 (Ugone)]

price of i4i's alleged commercial embodiment, S4/Text.   [Trial Tr. (5/13/09 p.m.) at 56 (Wagner); Trial Tr. (5/19/09 a.m.) at 87 (Ugone) (list price for S4/Text was $275)]   Mr. Wagner admitted that he had never seen the XMetaL product nor talked to anyone who has used it. [Trial Tr. (5/13/09 p.m.) at 134-135 (Wagner)]   Mr. Wagner also admitted that he had no information regarding XMetaL's actual selling price, the number of units sold, or its profitability. [*Id*. at 135-136 (Wagner)]   Mr. Wagner further admitted that XMetaL included many functionalities that have nothing to do with the accused functionality in this case and that he made no effort to allocate the list price among any of the specific functions contained within XMetaL.   [*Id*.]   The only discernable reason why Mr. Wagner chose this XMetaL price as the surrogate for the value of the accused functionality, rather than prices connected with Word or i4i's own S4/Text product alleged to embody the patent, is that XMetaL had a $499 list price. That much higher price, although totally irrelevant, superficially enabled Mr. Wagner to postulate a much higher royalty.

To make matters worse, Mr. Wagner applied <u>Microsoft's</u> high profitability numbers (alleged to be 76.6%) to the $499 <u>XMetaL</u> list price.   [Trial Tr. (5/13/09 p.m.) at 58-59 (Wagner)]   The amalgam of these two unrelated numbers was meaningless, and again, appeared to have been made for the sole reason that XMetaL, a niche product with a much more limited distribution than Word, likely had much lower profit margins.   The result was an inflated "expected profitability" number of $382 per unit—which, applying the "25% rule" led to an inflated baseline per-unit royalty "rate" of $96.   [*Id*.]   The remainder of Mr. Wagner's analysis was devoted entirely to an analysis of selected *Georgia-Pacific* factors that had essentially no effect on Mr. Wagner's conclusions beyond raising his "rate" from $96 to $98.   [*Id*. at 75 (Wagner)]   Finally, as noted, Mr. Wagner applied the $98 "rate" to his approximately 2.1 million estimated accused "installations" (based solely on the Wecker Survey and Mr. Wagner's

extrapolation through the trial date) to arrive at a damages number of between $200-207 million.[14]   But, due to Mr. Wagner's substitution of the XMetaL sales price, this figure did not represent 25% of Microsoft's profits from the allegedly infringing installations—rather, based on Mr. Wagner's calculations, it actually represented nearly 70% of those profits.[15]

Worse still, Mr. Wagner provided a self-styled "reasonableness check" on his damages figure that attempted—probably successfully, in the eyes of the jury—to make i4i's exorbitant damages demand seem comparatively small.   This "check" came at the end of Mr. Wagner's direct examination, when Mr. Wagner displayed a "pie chart" purportedly depicting the entire "operating profits"—over $14 billion—that Microsoft earned from all sales of its Office suite of software.   [Trial Tr. (5/13/09 p.m.) at 88-89 (Wagner)]   Mr. Wagner acknowledged that these were not profits from actual infringing uses, but he strained to make them seem relevant by insisting that they were from software that "could <u>potentially</u> practice this invention."   [*Id.* at 88:13-14 (emph. added)]   This so-called "reasonableness check" was anything but reasonable— instead (as discussed *infra*), it invited the jury to award damages based on the entire value of the Microsoft software, without any regard for whether the accused functionality was the basis for consumer demand, thus running far afoul of the "entire market value" rule.

Ultimately, Mr. Wagner's damages analysis invited the jury to award an exorbitant damages figure based on nothing more than speculation fueled by emotion.   Because Mr. Wagner's damages analysis was unreliable and unsupported by legitimate, admissible evidence, the jury's verdict cannot stand.   The Court should grant Microsoft's motion for a new trial.

---

[14] According to Mr. Wagner, the difference in the range of alleged damages was due to inclusion or exclusion of customers who used custom transforms to strip out the custom tags from XML.   [Trial Tr. (5/13/09 p.m.) at 81-85 (Wagner)]

[15] Per Mr. Wagner testimony at trial, the total profits from sales of versions allegedly "capable" of infringing was $14 billion.   If the percentage of infringing uses is taken from the Wecker Survey (2.1%-- PX-631), the profits from allegedly infringing installations would be approximately $294 million.   Mr. Wagner's damages demand—adopted by the jury—of $200 million reflects 68% of those alleged profits.

## III.   STATEMENT OF ISSUES PRESENTED

1.      Whether a new trial is warranted in view of substantial errors in the admission of evidence pertaining to damages and in view of the jury's verdict on damages being against the great weight of the evidence?

2.      Whether, as an alternative to a new trial, the damages should be remitted to no more than $5 million?

## IV.   LEGAL STANDARDS

### A.      Standards for New Trial Under FED. R. CIV. P. 59

Pursuant to FED. R. CIV. P. 59, a court may grant a new trial "on all or some of the issues" where the moving party establishes that "the verdict is against the weight of the evidence," or there were "substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 612-13 (5th Cir. 1985).[16]   In deciding a motion for a new trial, in contrast to one for judgment as a matter of law, the district court need not conclude that the jury's verdict is not supported by substantial evidence.   Rather, the law in the Fifth Circuit is clear that the district court has broad discretion to weigh the evidence, and "a verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial evidence to support it."   *Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987).

---

[16] Determination of a Rule 59 motion for a new trial is a procedural question not unique to patent law and, as such, is governed by the law of the Fifth Circuit.  *Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1289 (Fed. Cir. 2007) (noting that the Federal Circuit uses the law of the regional circuit to review denial of a Rule 59 motion); *Univ. of W. Va. v. VanVoorhies*, 342 F.3d 1290, 1294 (Fed. Cir. 2003) (holding that denial of a Rule 59 motion "is a purely procedural question not unique to patent law").

### B.   Standards for Remittitur

As an alternative to granting a new trial, the Court may offer i4i the election of a reduced sum of damages.   Remittitur is appropriate when the damages award is "excessive or so large as to appear contrary to right reason."   *Laxton v. Gap, Inc.*, 333 F.3d 572, 586 (5th Cir. 2003). The use of remittitur enables parties to avoid the delay and expense of a new trial when a jury's verdict is excessive in relation to the evidence of record.   *Unisplay S.A. v. American Electronic Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995).   The Federal Circuit follows the "maximum recovery rule," which requires that the determination of remittitur "be based on the highest amount of damages that the jury could properly have awarded based on the relevant evidence." *Id*.

## V.   ARGUMENT

The fatal flaws underlying Mr. Wagner's damages methodology—both in terms of the royalty "base" and the royalty" rate"—render it utterly lacking in legitimate evidentiary support. A finding of error underlying Mr. Wagner's opinions on either the "base" or the "rate" independently justifies setting aside the jury's verdict ordering a new trial ordered on damages pursuant to FED. R. CIV. P. 59(a).   In the alternative, the Court should order remittitur to no more than $5 million.

### A.   The Wecker Survey Estimates Were Inherently Unreliable and Should Have Been Excluded

First, and perhaps most fundamentally, the Wecker Survey should never have been admitted, and Mr. Wagner's exclusive reliance on that survey as "evidence" of the number of allegedly infringing third-party uses of the accused functionality rendered his damages calculation insupportable.   As Microsoft noted in its pre-trial *Daubert* motion,[17]   "serious flaws

---

[17] [Dkt. No. 194]   Microsoft re-urged its *Daubert* motions on the Wecker Survey and the XMetaL benchmark by moving at trial to strike Mr. Wagner's testimony.   [Trial Tr. (5/15/09 a.m.) at 105-106]

in a survey will make any reliance on that survey unreasonable." *See, e.g.*, *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) (quoting *Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 789 (5th Cir. 1984)). Thus, "although minor methodological flaws will affect weight rather than admissibility, a survey can be 'so badly flawed that it cannot be used to demonstrate the existence of a question of fact.'" *Id.* (*quoting Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984)). The flaws in the survey cannot be overcome merely by cloaking them in the mantle of Mr. Wagner's expert analysis; as the Federal Circuit has admonished, a patent damages analysis grounded on unreliable data is just as unreliable and should be excluded. *See, e.g.*, *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385-86 (Fed. Cir. 2003) (affirming exclusion of expert's reasonable-royalty analysis based on unreliable information that would mislead and confuse the jury); *see also Spreadsheet Automation Corp. v. Microsoft Corp.*, 2007 U.S. Dist. LEXIS 94828 at *15-16 (E.D. Tex. Feb. 23, 2007) (excluding testimony from plaintiff's damages expert).

### 1. The Wecker Survey Should Have Been Excluded as Inadmissible Hearsay

Surveys offered for the truth of the assertions therein are inadmissible unless they fall within a recognized class exception to the hearsay rule—for example, a present sense impression, as may be the case in on-the-spot opinion surveys often used in trademark cases.[18] But if a survey does not fit into a class exception to the hearsay rule, it is <u>inadmissible</u> unless it can meet the requirements of the residual exception of Rule 807—which are <u>stringent</u> to ensure that the rule is used "very rarely." *See, e.g.*, *Pittsburgh Press Club v. United States*, 579 F.2d 751, 757-58 (3d Cir. 1978) (reversing admission of survey evidence that failed to qualify for

---

[18] *E.g.*, *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 680-86 (S.D.N.Y. 1963).

residual hearsay exception); *see also Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 240 (2d Cir. 1999) (remanding for determination of whether surveys met residual hearsay exception).

To satisfy the residual hearsay exception of Rule 807, the proponent of evidence must establish that the evidence has "equivalent circumstantial guarantees of trustworthiness"—specifically, that (1) the evidence is offered as "evidence of a material fact"; (2) it is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"; and (3) the "general purposes of [the rules of evidence] and the interests of justice will best be served by admission" of the evidence.  FED. R. EVID. 807; *Schering*, 189 F.3d at 231.

i4i cannot satisfy the residual hearsay exception for the Wecker Survey.  The Wecker Survey not only presented all four of the classic hearsay dangers but also posed the additional risk arising from the fact that i4i offered the survey to support statistical inferences to a large population group extrapolated from a small sample.  *See Schering*, 189 F.3d at 233.  The danger of such inferences is that they are subject to methodological error and can "sometimes be manipulated through artful data collection or presentation."  *Id*.  Such is the case here.  As explained by Dr. Simonson, a survey expert with experience in over 1000 surveys, the Wecker Survey boiled down to inherently unreliable estimates upon estimates.  [Trial Tr. (5/18/09 a.m.) at 52 (Simonson)]

### 2. The Wecker Survey Asked the Wrong Questions and Thus Provided Irrelevant and Misleading Information

A basic measure of the trustworthiness of a survey is whether it collects relevant information.  As noted *supra*, Dr. Wecker purportedly attempted to quantify Word installations that were accused of infringement.  But the Wecker Survey did not ask the respondents directly about their own use of Word but, instead, asked generally about use within the respondents' work units (which could encompass company-wide usage).  [PX-365 at 365.004-015]  Thus,

13

respondents were asked to recall and interpret actions by <u>others</u>, which may have been difficult to perceive.   Nothing in the survey verified that the respondents understood the questions asked, reliably knew the answers, or were qualified to respond about others' usage.   [Trial Tr. (5/18/09 a.m.) at 39 (Simonson)]   The Wecker Survey also did not confine the questions to recent events, but asked respondents to recall and quantify events taking place as far back as 2003.   [PX-365] Respondents' probable difficulty recalling specific but rare uses of Word over a period of several years—including acts by third parties—was anticipated in the survey design by allowing respondents to offer their "best estimate."   [Trial Tr. (5/15/09 a.m.) at 74 (Wecker); PX-365; Trial Tr. (5/18/09 a.m.) at 42-43 (Simonson)]

Perhaps the most fundamental and glaring error was the fact that the survey simply asked the wrong questions.   Although Dr. Wecker insisted that his questions were carefully worded, in fact the survey commingled acts accused of infringement with acts that are undeniably not infringing.   In particular, the survey asked respondents to state whether they "opened an XML document containing 'custom XML,'" but did not in any way distinguish the ways of doing so that are accused in this case from those that undisputedly are not.[19]   [Trial Tr. (5/18/09 a.m.) at 44-45 (Simonson); (5/15/09 a.m.) at 80-82 (Wecker)]   The survey estimates consequently provided no basis for the jury to assess the extent of actual direct infringement, even according to i4i's own theory, and should have been excluded.   [*Id.*]   *See, e.g.*, *Jackson v. Nat'l Action Fin. Svcs.*, 441 F. Supp. 2d 877, 882 (N.D. Ill. 2006) (excluding opinion on survey evidence, noting that "the key question was drafted in such a way as to render it irrelevant to the issue in this case"), *aff'd*, 505 F.3d 769 (7th Cir. 2007).

---

[19] Dr. Rhyne agreed that, *inter alia*, the following are ways of opening an "XML document with Custom XML" that <u>do not infringe</u>: (1) opening a .DOC document with custom XML; (2) opening a .XML document with custom XML as plain text; and (3) opening a .XML document with a custom XSL transform that strips out Custom XML tags.   [Trial Tr. (5/13/09 a.m.) at 29, 117-123 (Rhyne)]   The Wecker Survey did not make any attempt to differentiate these clearly non-accused, noninfringing ways of opening an "XML document" with custom XML from those that were accused.

### 3.      The Wecker Survey Estimates Were Error-Laden and Tainted

i4i touted heavily at trial Dr. Wecker's skills in statistics.   [Trial Tr. (5/15/09 a.m.) at 23-24 (Wecker)]   Although statistical tools can be used to analyze data produced by surveys, a flawed survey necessarily produces unreliable results.   A survey is necessarily flawed where it violates the basic principle that survey respondents are asked questions only for which they are likely to have the knowledge/information necessary to provide meaningful, relevant answers. [Trial Tr. (5/18/09 a.m.) at 37, 39 (Simonson)]   The Wecker Survey defied this principle by failing to ask respondents directly about their own uses, and instead asking about a rare behavior of <u>others</u> in their organization (instances of opening and saving files in particular formats over a six-year period) without first establishing reliable indicators that the respondents even understood the questions or knew the answers.   *See Jackson*, 505 F.3d at 778 (noting inherent flaw in asking respondents about third parties).   The Wecker Survey further violated standard survey procedures by allowing the respondents to guess.   [Trial Tr. (5/18/09 a.m.) at 41-44 (Simonson)]   These errors were further compounded by the low response rate[20] and the lack of adequate controls and validation for the survey results.   [*Id*. at 45-47 (Simonson)]

An especially serious error, introduced by Dr. Wecker himself, was the distortion resulting from the numerous changes that Dr. Wecker made to the data upon discovering many inconsistencies and so-called "anomalies" in the responses.   [*Id*. at 47-52 (Simonson)]   Dr. Wecker's changes dramatically impacted the royalty base.   As explained by Microsoft's damages expert, Keith Ugone, Dr. Wecker's changes to even a few of the responses inflated the claimed damages by <u>over 40%</u>.   [Trial Tr. (5/19/09 a.m.) at 97 (Ugone)]

---

[20] Out of the 988 companies selected to represent a population of 13 million businesses, only 46 provided any responses, reflecting a response rate of <u>less than 5%</u>.    [Trial Tr. (5/15/09 a.m.) at 39 (Wecker)]

In short, where, as here, a survey's design is flawed because the questions are not meaningful and/or the respondents lack the qualifications to answer the questions, the sample is too small, and so on, there are no statistical manipulations that can convert unreliable data into reliable, useful information.   The Wecker Survey asked a very small number of likely irrelevant respondents confusing questions that most of them could not answer meaningfully.   Not surprisingly, many of the respondents provided inconsistent, contradictory and/or seemingly nonsensical answers.   The false sense of accuracy provided by Dr. Wecker's tabulated "estimates" was misleading and inherently unreliable, and invited pure speculation by the jury. Admission of this evidence necessitates a new trial.

**B.**     **Mr. Wagner's Benchmark Was Erroneous and Cannot Support a Royalty "Rate" of $98 for Each Allegedly Infringing "Installation"**

The second half of Mr. Wagner's damages "equation" was also insupportable as a matter of law.   Mr. Wagner's implausible and inflated royalty rate derived from a nonsensical combination of Microsoft's profitability and the irrelevant XMetaL list price constituted unfair prejudice that could not be cured by simply forcing Microsoft to address the issue at trial.   Mr. Wagner presented the jury with a speculative and absurdly inflated valuation of the accused functionality based on the irrelevant XMetaL pricing benchmark.   Repackaging implausible and incoherent damages estimates derived from irrelevant facts as "expert testimony" is fundamentally unfair and improper.   *See, e.g., Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) (finding it inappropriate to allow a witness to come "before the jury cloaked with the mantle of an expert" unless the witness qualifies as an expert and the proffered testimony is both relevant and reliable).   A damages expert should not be permitted to offer speculative and uninformed testimony based on third-party products not at issue in the case as a vehicle for presenting unreasonably inflated royalty rate estimates.   Admission of Mr. Wagner's opinions based on the XMetaL benchmark was error, and requires a new trial.

16

Additional flaws in Mr. Wagner's damages analysis further warrant a new trial.   Mr. Wagner's application of the "25% rule" was manifestly inappropriate, especially given that Mr. Wagner did not even attempt to justify how a 25% allocation can be reasonable when the accused custom XML functionality is one narrow functionality within Word products containing thousands of features not accused of infringement.   In fact, Mr. Wagner agreed at trial that it is "problematic to use the 25-percent rule where the product has lots of technologies because … it's difficult to differentiate the contribution of the asserted patent from the contributions of all the other technologies" included in the product.   [Trial Tr. (5/13/09 p.m.) at 120:15-22 (Wagner)] Even Mr. Wagner's co-author does not agree that the 25% rule is an appropriate measure of a royalty rate, and Mr. Wagner himself rarely uses it.   [*Id*. at 120-21 (Wagner)][21]

Mr. Wagner's "reasonableness check"—which was nothing other than a vehicle for presenting evidence of overall "operating profits" from Office 2003 and 2007—flew in the face of the "entire market value rule."   The "entire market value rule" permits inclusion within the royalty base of noninfringing elements along with infringing elements <u>only</u> under certain circumstances—namely, where the infringing elements are the <u>basis for the customer demand</u> for the entire product including the portions beyond the claimed invention.   *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995) (*en banc*).   Microsoft Word 2003 and Word 2007 are very richly featured software applications that support a very wide range of word-processing capabilities, and contain thousands of features and are subject to thousands of uses that are not at

---

[21]   Other commentators have also noted the problematic nature of the "25% rule." *See e.g.*, Mark Berkman, "Valuing Intellectual Property Assets for Licensing Transactions," *The Licensing Journal*, April 2002, p. 16 (commenting that the 25% rule does "not take into account specific circumstances that will determine the actual value of the patent at issue. No consideration is given to the number or value of economic alternatives or the incremental value of using the patented technology over other viable alternatives"); Paul E. Schaafsma, "An Economic Overview of Patents," *Journal of the Patent and Trademark Office Society*, 79 April 1997, pp. 251-52 (explaining that the 25% rule uses "an arbitrary fraction" that when multiplied by a profitability number results "in an exercise in arbitrary business analysis").

issue in this case and are not related to the '449 patent.   Indeed, the parties stipulated to the fact that "there are many uses of Word 2003 and Word 2007 that are not accused of infringement and that are not at issue in this case."   [Trial Tr. (5/13/09 p.m.) at 14:6-8 (stipulation)]   i4i alleged at trial that only use of a very specific feature of this software—termed by i4i "custom XML support."—in a very specific manner, infringed the asserted claims.   [*E.g.*, Trial Tr. (5/13/09 a.m.) at 11 (defining act of alleged direct infringement), 117-123 (discussing noninfringing acts) (Rhyne)]   And i4i's own damages expert, Mr. Wagner, had to concede that "[m]ost of the products that are capable of infringing were not used in an infringing manner."   [Trial Tr. (5/13/09 p.m.) at 51:9-13 (Wagner)]    Because i4i presented no evidence that the "custom XML support" was the basis for consumer demand for Word 2003 or Word 2007—especially given i4i's own tiny "estimates" of allegedly infringing uses of Word 2003 and Word 2007—i4i should not have been allowed to make an end-run around the "entire market value rule" by presenting evidence of the large revenues generated from Word 2003 or 2007 in an attempt to make i4i's exorbitant damages demand of nearly $200 million seem "reasonable."

### C.    In the Alternative, Remittitur Should Be Ordered

Once Mr. Wagner's improper opinions are excluded, as they should have been all along, the highest amount of damages supported by the remaining evidence would be a lump-sum royalty of $5 million.   [Trial Tr. (5/19/09 a.m.) at 112 (Ugone)]   This would be the maximum amount of remittitur.   But if this Court were to grant Microsoft's co-pending motion regarding indirect infringement,[22] then only liability for direct infringement could remain.   In that event (and only for purposes of that calculation), Microsoft stipulates to a remittitur amount of $127,988, which would reflect i4i's royalty "rate" of $98 multiplied by 1306 alleged acts of

---

[22] This hypothetical assumes that the Court were to deny Microsoft's other requested relief pertaining to noninfringement, invalidity and unenforceability, which—if granted—could render moot Microsoft's motion on damages.

direct infringement by Microsoft employees.   [*See* Trial Tr. (5/13/09 p.m.) at 102-103 (Wagner)]

## VI.    CONCLUSION:   RELIEF REQUESTED

The infirmities in Mr. Wagner's royalty analysis are not merely issues of weight. Rather, being premised on a royalty "base" derived from the unreliable and inadmissible Wecker Survey estimates, and on a royalty "rate" premised on an irrelevant and unreasonable "benchmark," Mr. Wagner's analysis exemplifies the "garbage in, garbage out" principle.   The jury's verdict, which simply adopted i4i's requested damages figure of $200 million, is fatally tainted by Mr. Wagner's erroneous analysis.   A new trial should be granted.   In the alternative, the Court should order a remittitur.

DATED:   June 4, 2009

*/s/   Kevin Kudlac*

Matthew D. Powers (Lead Attorney)
  CA State Bar No. 104795
  matthew.powers@weil.com
**WEIL GOTSHAL & MANGES LLP**
201 Redwood Shores Parkway
Redwood Shores, CA   94065
Phone: 602-802-3000
Fax: 602-802-3100

Kevin Kudlac
  State Bar No. 00790089
  kevin.kudlac@weil.com
**WEIL, GOTSHAL & MANGES LLP**
8911 Capital of Texas Highway, Suite 1350
Austin, TX   78759
Telephone: 512-349-1930
Fax:   512-527-0798

David Lender
*admitted pro hac vice*
  david.lender@weil.com
Paul Torchia
*admitted pro hac vice*
  paul.torchia@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 5th Avenue
New York, NY   10153
Telephone:   212-310-8000
Fax:   212-310-8007

Eric Findlay
  State Bar No. 00789886
  efindlay@findlaycraft.com
**FINDLAY CRAFT**
6760 Old Jacksonville Hwy Suite 101
Tyler, TX 75703
Telephone: 903-534-1100
Fax: 903-534-1137

**ATTORNEYS FOR DEFENDANT
MICROSOFT CORPORATION**

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).   As such, the foregoing document was served on all counsel who are deemed to have consented to electronic service.   Local Rule CV-5(a)(3)(A). Pursuant to FED. R. CIV. P. 5(d) and Local Rule 5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copies of the foregoing by certified mail, return receipt requested, on this the 4th day of June, 2009.

         /s/   *Margaret M. Masters*
         Margaret M. Masters